UNITED STATES BANKRUPTCY COURT
FOR THE EASTERN DISTRICT OF TEXAS
PLANO DIVISION

| | | |
|---|---|---|
| In re: | § § | |
| | § | Case No. 22-40276 btr |
| **BSPV-PLANO, LLC.,**[1] | § § | |
| | § | Chapter 11 |
| Debtor. | § § § | |

**BOND TRUSTEE'S PRECAUTIONARY OBJECTION TO DEBTOR'S ATTEMPT TO MOVE RESIDENTS TO CONSTRUCTION SITE AND REQUEST FOR STATUS CONFERENCE**

The Huntington National Bank, not individually but as trustee for the bonds described more fully below (the "Bond Trustee"), files this precautionary objection to any attempt by the above-captioned debtor to move residents to the debtor's project site, which is a partially constructed senior living housing rental community located on Park Vista Road in Plano, Texas (the "Project"). Additionally, the Bond Trustee requests that the Court schedule a status conference as soon as practical so that the parties and the Court can better understand the Debtor's goals in moving seniors to the Project at this early stage of this bankruptcy case. In support of this objection, the Bond Trustee states as follows:

**Introduction**

1. On March 1, 2022 (the "Filing Date"), BPSV-Plano, LLC (the "Debtor") filed its voluntary petition for relief with this Court under Chapter 11 of Title 11 of the United States Code (the "Bankruptcy Code").

2. The Debtor is obligated to the Bond Trustee for the benefit of the beneficial holders (the "Bondholders") of the Bonds (as defined below) authorized and issued by the New Hope Cultural Education Facility Finance Corporation (the "Issuer") for the benefit of the Debtor.

---

[1] The last four digits of the Debtor's federal tax identification number are 3228.

ACTIVE 63337406v3

3. Pursuant to that certain Trust Indenture dated as of December 1, 2018 between the Issuer and Bond Trustee (the "Indenture"), the Issuer issued its $66,795,000 aggregate principal amount of Revenue Bonds comprised of:

   a. $50,530,000 Senior Living Revenue Bonds (Bridgemoor Plano Project), Senior Series 2018A;
   b. $6,765,000 Senior Living Revenue Bonds (Bridgemoor Plano Project), Taxable Senior Series 2018B;
   c. $5,000,000 Senior Living Revenue Bonds (Bridgemoor Plano Project), Subordinate Series 2018C; and
   d. $4,500,000 Senior Living Revenue Bonds (Bridgemoor Plano Project), Junior Subordinate Series 2018D

(collectively, the "Bonds").

4. The Issuer loaned the proceeds of the Bonds to the Debtor pursuant to that certain Loan Agreement dated December 1, 2018 (the "Loan Agreement") between the Issuer and the Debtor. The Debtor used the proceeds of the Bonds to: (i) finance the acquisition of the site on which the Project would be built, (ii) finance a portion of the cost of constructing, developing, furnishing and equipping the Project, (iii) fund interest on the Bonds, during the construction phase and for the anticipated lease-up of the Project, (iv) fund separate debt service reserve accounts for the Bonds, and (v) pay the costs of issuance of the Bonds.

5. The rights of the Issuer under the Loan Agreement and the other documents evidencing and/or securing the Bonds (collectively, the "Bond Documents") were assigned to the Bond Trustee under the terms of the Indenture and/or that certain Assignment of Notes, Liens, Security Interests and Other Documents, dated January 8, 2019.

6. The obligations of the Debtor to the Bond Trustee under the Bond Documents are secured by a first priority, validly and properly perfected lien on substantially all of Debtor's real and personal assets.

**Objection**

7. The Debtor has been attempting to construct the Project since 2018. The Project was scheduled to be substantially completed in June 2020, but for a variety of reasons, some outside the Debtor's control such as COVID and weather, but many as a direct result of the Debtor's mismanagement, the Project is now more than 600 days behind schedule. With the construction delays, inevitably, have come large cost overruns which the Debtor has refused to meet even though it is obligated to do so under the Bond Documents.[2] The Debtor has apparently filed this bankruptcy case in an attempt to access funds held by the Bond Trustee as collateral for the Bonds despite the fact that the Debtor has failed to make required payments on the Bonds since November 2020.

8. Since that time, the Bond Trustee has attempted to work with the Debtor to complete the Project. Among other things, the Bond Trustee has not exercised remedies to give the Debtor breathing room to complete the Project and has installed its own project monitor (the "Project Monitor") to monitor the construction.

9. On February 17, 2022, the Debtor informed the Bond Trustee that the construction completion budget that the Debtor and the Project Monitor had agreed upon likely would be $2 million short of funds necessary to complete construction, because, among other reasons, one of the Debtor's principals and one of the contractors "forgot" that some of the buildings had more than one level, thus leading to an undercount of 1,300 doors, which the Debtor estimates will add another $300,000 cost to the Project.

---

[2] As will be more fully described in the coming days, one of the Debtor's principals, Richard Shaw, failed to execute a construction completion guaranty even though the Debtor represented in the offering statement for the Bonds that such a guaranty would be in place. As a result of this failure, the Debtor's assurances that the Project would be completed have turned out to be meaningless.

3

10. The Debtor previously has demanded that the Bond Trustee allow it to access funds on hand that constitute collateral for the Bonds to pay construction costs even though the Bond Documents do not permit the Bond Trustee under the circumstances to use those funds to pay construction costs, and despite the fact that one of the Debtor's principals, Steffen Waltz, had repeatedly and publicly assured the Bond Trustee and Bondholders that he would personally pay cost overruns of the Project.

11. The Borrower now apparently intends to attempt to access funds held by the Bond Trustee as collateral for the Bonds to complete the Project. It is unclear at this time to the Bond Trustee that completing the Project will benefit the Bondholders. It is even less clear to the Bond Trustee that the Debtor has the expertise necessary to complete the Project. The Bond Trustee is in the process of hiring an expert to assist it with evaluating the Project and determining whether Bondholders will benefit from completion of the Project or whether a sale of the Project in its current state would yield the highest recovery for the Bondholders and other creditors.

12. Given all of this, and the fact that this bankruptcy case is in its very early stages, the Bond Trustee was concerned to learn this week that the Debtor intends to move tenants into the Project as soon as this week.

13. As an initial matter, the Bond Trustee does not believe, given that the Debtor had not moved any tenants into the Project prepetition, that moving tenants in now would be within the Debtor's ordinary course of business. Accordingly, the Bond Trustee believes that the Debtor is required to file a motion with this Court requesting authority to move in tenants.

14. Regardless of whether moving in tenants is in the ordinary course of business for the Debtor, the Bond Trustee does not believe that it is appropriate to move tenants into the Project at this time.

4

15. As discussed above, it is unclear if the Project will ever be complete. The Bond Trustee is concerned that the Debtor, as it attempts to move tenants into the Project, may not be disclosing this fact to them. If the Project is not completed, then having tenants may very well complicate attempts to sell the Project in its current state and could actually reduce the value of the Project from its current value.

16. Moreover, moving senior citizens into a construction site, even if some of the buildings are cordoned off from the buildings under active construction, seems to be a precipitous move. Seniors living at or near an active construction site would face a heightened risk of injury which could create substantial administrative claims for the Debtor's estate. Additionally, given that there would be so few seniors living at the construction site, the lack of a community presence could put those few seniors at additional risk including possibly by intruders who would seek to do harm to the Project.

17. There also does not seem to be any economic justification for the Debtor to take this risk now. Any rents realized from seniors living in a construction site cannot possibly justify the downside monetary risk. Although the Debtor is required to provide the Bond Trustee with proof of insurance, the Debtor has not provided the Bond Trustee with proof that it has liability insurance on the site. Even if the Debtor has liability insurance in place, there is no assurance that insurance would cover theft and physical harm caused to seniors by intruders to the construction site. A lack of insurance exacerbates the concern that moving seniors onto the site now could result in administrative claims. And as mentioned above, moving a few tenants on the Project at this time may adversely impact the market value of the Project if it is determined that a sale of the Project in its current state is the best course of action.

18.    Third, the Debtor has provided no justification for wanting to complicate this bankruptcy case in its very early stages by introducing seniors to the Project. Currently, any dispute between the Debtor and the Bond Trustee will be limited to the bricks and mortar of the Project and the funds currently held by the Bond Trustee. If the Debtor brings in a few seniors to live at the construction site, the health, safety and well-being of those seniors becomes a concern.

19.    Given all of this, and as mentioned above, the Debtor's proposed actions are not ordinary course and require this Court's authority to start bringing in seniors to live at the construction site. Section 363(b) of the Bankruptcy Code requires the Debtor to seek court approval before it engages in any activity that is not in its ordinary course of business. At this stage of the Debtor's business lifecycle – mired in delayed construction – it is not in the Debtor's ordinary course of business to rent units to seniors who will have to live at a construction site.

20.    No prudent debtor would move seniors into an active construction site that it does not know it will ever be able to complete. This Court should not permit this Debtor to do so without a proper showing that the Debtor is ready for the responsibility of transitioning from a construction manager to a senior living rental manager and without resolution of the issue of whether the Project will ever be completed.

## Conclusion

21.    The Debtor filed a voluntary petition for bankruptcy relief. As such, the Debtor must operate within the purview of the Bankruptcy Code and be mindful of how its actions might adversely affect the bankruptcy estate. Yet in the nascent days of this bankruptcy case, even before the Debtor has filed any typical first day motions, the Debtor intends to take a reckless action that (i) arguably is not in the ordinary course of its business, (ii) could reduce the value of the Project, (iii) would unduly complicate the case without providing any real benefit to the Debtor or its estate,

6

ACTIVE 63337406v3

and which could create administrative claims beyond the Debtor's ability to pay, and perhaps most importantly, (iv) could lead to physical harm to the seniors who will be moving to the Project. Accordingly, the Bond Trustee objects to the efforts of the Debtor to move seniors to the Project at this time.

**WHEREFORE**, the Bond Trustee requests that the Court issue an appropriate order requiring the Debtor to seek court approval before moving seniors to the Project at this time; schedule a status conference as soon as practical so that the parties and the Court can better understand that Debtor's alleged need to move seniors to the Project at this time; and grant such further and proper relief that is just under the circumstances.

Dated:  March 3, 2022.

**GREENBERG TRAURIG, LLP**

By: */s/ Karl D. Burrer*
Karl D. Burrer
Texas Bar Number 24043584
*BurrerK@gtlaw.com*
1000 Louisiana, Suite 1700
Houston, Texas 77002
Telephone: (713) 374-3500
Facsimile: (713) 374-3505

-and-

Kevin J. Walsh
*Pro Hac Vice* Application forthcoming
WalshKe@gtlaw.com
Charles W. Azano
*Pro Hac Vice* Application forthcoming
AzanoCh@gtlaw.com
One International Place, Suite 200
Boston, Massachusetts 02110
Telephone: (617) 310-6000
Facsimile: (617) 310-6001

***Counsel for The Huntington National Bank solely in its Capacity as Indenture Trustee on behalf of Holders of Certain Bonds***

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that a true and correct copy of the foregoing *Precautionary Objection to Debtor's Attempts to Move Residents to Construction Site and Request for Status Conference* was served on March 3, 2022, by electronic mail at the time of filing via the CM/ECF system which sends notification of such filings to those parties receiving electronic notification.

*/s/ Karl D. Burrer*
Karl D. Burrer