**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE EASTERN DISTRICT OF TEXAS**
**SHERMAN DIVISION**

| | | |
|---|---|---|
| In re: | § § § | Chapter 11 |
| BSPV-PLANO, LLC,[1] | § § | Case No. 22-40276 (BTR) |
| Debtor. | § § § § | |

**DEBTOR'S EMERGENCY MOTION FOR**
**INTERIM AND FINAL AUTHORITY TO USE CASH COLLATERAL**

TO THE HONORABLE BRENDA T. RHOADES, U.S. BANKRUPTCY JUDGE:

COMES NOW BSVP-Plano, LLC (the "Debtor"), the debtor-in-possession in the above styled and numbered bankruptcy case (the "Bankruptcy Case"), and file this *Emergency Motion for Interim and Final Authority to Use Cash Collateral* (the "Motion"), respectfully stating as follows:

**I.      PROCEDURAL BACKGROUND**

1.      On March 1, 2022 (the "Petition Date"), the Debtor filed its voluntary petition for relief under Chapter 11 of the United States Bankruptcy Code (the "Bankruptcy Code"), thereby initiating its Bankruptcy Case and creating its bankruptcy estate (the "Estate").

2.      The Debtor continues to operate its business and to manage the Estate as a debtor-in-possession.  No committee, trustee, or examiner has been appointed.

3.      The Court has jurisdiction over the Bankruptcy Case and this Motion under 28 U.S.C. § 1334.  Such jurisdiction is core under 28 U.S.C. 157(b)(2).  Venue of the Bankruptcy Cases before this Court is appropriate under 28 U.S.C. §§ 1408 and 1409.

---

[1]      The last four (4) digits of the Debtor's federal tax identification number is (3228).  The Debtor's address for notices is: 4851 Keller Springs Road 209, Addison, Texas 75001.

## II.      FACTUAL BACKGROUND

### A.      THE PROJECT

4.      The Debtor was formed in May 2018 to acquire, own, develop, and operate a 31.5 acre, "55+" Independent Senior Luxury Apartment Community with 318 units of apartment inventory, that is known and branded as "The Bridgemoor at Plano," and located at 1109 Park Vista Road in Plano, Texas (the "Project").[2]   The Bridgemoor development is adjacent to the Pecan Hollow Golf Course, as well as a private 13-acre park along Rowlett Creek with a pond, dog park, gazebo, and creek-side fishing, and boasts close proximity to restaurants, shopping, a DART line, and lively entertainment venues.   This community is marketed to independent seniors[3] and offers a variety of one and two bedroom floor plans comprised of 156 cottage style units in 22 stand-alone buildings, as well as 162 units contained in a single, elevator serviced, 3-story apartment building with a subterranean garage with 194 leased parking spaces, and a 10,000 sq. ft. clubhouse, with a requirement that a certain percentage of units must be leased at a discounted rate to meet affordability criteria.   The Project is a premiere property in Plano and is expected to be a generator of significant additional business.   Indeed, the Project is financed in part with tax exempt bonds, due to the importance of the Project to the city and the county.

5.      The Debtor's equity sponsors have substantial experience in real estate development and management.   Over more than eighty (80) years, those sponsors have supervised the development, construction and management of more than 50 commercial apartment developments including over 35,000 units, primarily in the State of Texas but also in multiple other states in the southern United States.   These sponsors are committed to the

---

[2]      *See* https://www.bridgemoorplano.com/

[3]      Although the community includes a clubhouse room for outsourced, home healthcare services, as a community intended for independent seniors it is not an assisted living facility. The Debtor is not a healthcare provider nor healthcare business.

Project—as discussed below, after the Issuer (defined below) froze most of the Debtor's development funds, they invested an additional $6.9 million to continue the development of the Project and are prepared to loan at least an additional $1 million DIP Loan (defined below).

B.      THE LENDER AND CASH COLLATERAL

6.      The Debtor financed the acquisition and development of the Project, in part, through a transaction with New Hope Cultural Education Facilities Finance Corporation, a nonprofit cultural education facilities finance corporation organized under the laws of the State of Texas (the "Issuer").  Under this transaction, the Issuer, as authorized by the provisions of Chapter 337 of the Texas Local Government Code (the "Act"), entered into that certain Trust Indenture, dated as of December 1, 2018 (the "Indenture") with The Huntington National Bank, a national banking association, as trustee (the "Trustee"), pursuant to which the Issuer issued four series of revenue bonds.

7.      In turn, and in accordance with the Act and the Indenture, the Issuer entered into the Loan Agreement, dated as of December 1, 2018 (the "Loan Agreement") with the Debtor, as borrower, under which the Issuer used the proceeds of the foregoing bonds to advance certain loans to the Debtor, as evidenced by the following promissory notes issued thereunder (collectively, the "Notes"): (i) the Senior Living Promissory Note Senior Series 2018A dated January 8, 2019 in an original principal amount of $50,530,000; (ii) the Senior Living Promissory Note Taxable Senior Series 2018B dated January 8, 2019 in an original principal amount of $6,765,000; (iii) the Senior Living Promissory Note Subordinate Series 2018C dated January 8, 2019 in an original principal amount of $5,000,000; and (iv) the Senior Living Promissory Note Junior Subordinate Series 2018D dated January 8, 2019 in an original principal amount of $4,500,000.  The Loan Agreement and the Notes are generally secured by, among

other things, all real property and improvements of the Debtor and the Project, and all income and rents from the Project. However, the differing Notes have different interests and priorities with respect to collateral.[4]

8.      For purposes of this Motion, the Trustee, for the benefit of the various holders of the Notes, holds a first-priority lien against certain funds of the Debtor. These funds include various amounts funded under the Loan Agreement and allocated for certain expenses, including the "Project Fund."[5] The purpose of the Project Fund is to pay for the development and buildout of the Project. The Project Fund is in the possession of the Issuer and under the control of the Issuer, and represents funds in which the Issuer asserts first-priority liens, but otherwise belongs to the Debtor.

## C.   THE NEED FOR CASH COLLATERAL

9.      Construction of the Project began in January 2019 and was originally scheduled to complete in June 2020. However, poor and inclement weather experienced in the area during construction, including the 2021 freeze, resulted in construction delays. These delays were greatly exacerbated by the onset of the global pandemic in early 2020. These consequences included extraordinary supply chain issues and shortages in construction materials and supplies, as well as available labor, and by way of further example, caused the City of Plano and other regulatory agencies to temporarily close its offices which resulted in significant delays in procuring requisite inspections and permits.

---

[4]      The foregoing is intended to be a general discussion of the Loan Agreement and related liens and is not intended to be exhaustive or definitive with respect to varying and various rights. The Debtor reserves all rights to contest the validity of any Note, Loan Agreement, or lien, and nothing in this Motion prejudices the same. The Trustee has an "interest" in cash collateral, whether perfected, valid, avoidable, or not, and that is why the Debtor files this Motion.

[5]      The Issuer is holding other additional funds belonging to the Debtor. This Motion is without prejudice to all issues related to the same.

10.    In turn, these delays and overruns caused the Issues to declare various alleged

defaults under the Loan Agreement and the Indenture.  Among other things, the Issuer froze the

Project Fund in January 2021.  Since that time, the Debtor has financed the completion of the

Project from additional funds invested by the Debtor's indirect equity interest holders,

amounting to approximately $6.9 million

11.    Notwithstanding the foregoing unpredictable circumstances and the freezing of

the Debtor's funds, as of the Petition Date construction of the Project is over 85% complete with

completion currently projected in June, 2022 – assuming that construction is prosecuted without

unnecessary delay and further unforeseen delays do not manifest.  Due to staging, forty (40)

units are currently available for immediate occupancy.  Indeed, the Debtor has already procured

three temporary certificates of occupancy for different Project buildings, temporarily certifying

these buildings as suitable for occupancy.  The Debtor anticipates procuring a temporary

certificate of occupancy for the clubhouse and leasing office in the next ten days.  The Debtor

has already commenced leasing at the Project and has leased over twenty (20) units as of the

Petition Date.  The Debtor expects leasing to be robust and has been able to increase its leasing

rates, due to significant improvements in the market over what was projected.

12.    At greater than 85% percent complete, therefore, the Debtor has very little to go

to finish the Project.  Presently in the Project Fund is approximately $6,191,031.27.  The Debtor

needs to be able to use this Cash Collateral to finish the Project and to expend necessary funds to

market the Project.  Among other things, the Debtor needs to use the Cash Collateral to:

- Pay the prepetition claims of various critical vendors, primarily contractors, if the
  Court otherwise so authorizes.  If the Debtor is unable to pay past, present, and
  future construction costs, then contractors will leave for other projects, and the
  Debtor will face massive additional costs and delays in locating replacement
  contractors, especially in the present market.

- Complete heating and air condition at the Project, without which the remainder of the construction on the 3-story apartment building cannot proceed, which includes, among others, setting drywall, installing flooring, installing appliances, installing countertops, and finishouts.

- Complete plumbing requirements at the Project, without which the remainder of the construction on the 3-story apartment building cannot proceed, causing the same disruptions as above.

- Pay the general contractor to continue to move the construction forward.

- Finish out the work on the cottage style buildings, as these are the first buildings that can be leased, and thus provide operating cash flows to help ease the burden of the Cash Collateral and accelerate payment of all classes of creditors.

13.     As of the Petition Date, approximately $66.8 million was owing under the Loan Agreement and related Notes (not all of which is secured by the Cash Collateral).

14.     The Debtor estimates that, at present, the Project is worth upwards of $80 million.  Once completed and stabilized, the Debtor estimates that the Project will rapidly have a value in excess of $120 million.

15.     By separate motion, the Debtor is seeking interim and final approval to obtain postpetition financing in the amount of $1 million from an entity affiliated with the Debtor's equity sponsors (the "DIP Loan").  The DIP Loan would be used for administrative costs, other expenses, and as a standby in the event that more funds are needed than projected in the Interim Budget and Final Budget (defined below), and logistically as a bridge while the Debtor obtains the Project Funds (assuming this Motion is granted) and opens DIP accounts.  However, the Cash Collateral would be used first (prior to the DIP Loan) to complete the development of the Project.

## III.     RELIEF REQUESTED

16.     By this Motion, the Debtor requests: (i) first, authority to use the Cash Collateral (defined below) on an emergency, interim basis, for the period from the Petition Date to

approximately March 31, or such other date that the Court holds the Final Hearing (defined

below) (the "Interim Period"), in the amounts listed, and for the purposes disclosed, on the

"Interim Budget" attached hereto as Exhibit "A" and incorporated herein; and (ii) second,

authority to use Cash Collateral for an additional three (3) month period (the "Final Period"), in

the amounts listed, and for the purposes disclosed, on the Final Budget attached hereto as Exhibit

"B" and incorporated herein, subject to any further extension thereof by agreement or by future

order of the Court, and subject to a maximum 10% variance for any given category and a 5%

variance overall.

## IV.    DISCUSSION

### A.    USE OF CASH COLLATERAL

17.    As noted above, the Debtor holds approximately $6.2 million in the Project Fund,

in which the Issuer claims perfected and valid first-priority liens, and the Debtor will be

receiving rents from the Project, on which the Issuer also claims such liens (the Project Fund and

such rents, the "Cash Collateral").  The Issuer therefore claims an interest in "cash collateral" as

defined by section 363(a) of the Bankruptcy Code. While the Debtor reserves all of their rights to

contest the validity, extent, priority, or avoidance of Issuer's interest in the Cash Collateral, at

least pending their final review of all such documents and applicable law, the Debtor believes

that the Issuer has a colorable claim to rights in the Cash Collateral.

18.    Pursuant to the Bankruptcy Code, the Debtors may not use Cash Collateral unless

"each entity that has an interest in such cash collateral consents," or unless "the court, after

notice and a hearing, authorizes such use, sale, or lease in accordance with the provisions of this

section."  11 U.S.C. § 363(c)(2)(A)-(B) (2009).

19.     It goes without saying that the Debtors has an immediate, urgent, and ongoing

need for the use of its present and future cash.  Among other things, the Debtor needs to: (i) pay

its contractors, who, without payment, would walk off the job leading to massive increased costs

and delays as replacement contractors are located; (ii) finish heating, air conditioning, and

interior finishout at the three story building, without which the Debtor cannot lease the

apartments and realize income; (iii) finish plumbing at the three story building; and (iv) finish

the work on the cottage style buildings, which are the first to be leased and can therefore start

bringing in revenue and income very soon.  Without paying for the same, the Debtor will not be

able to complete the Project, will not be able to fully lease the Project, will not realize market

leasing rates, and may not be able to obtain the necessary permitting and certificates of

occupancy.  The Project will be seen as a failure and a blight to the community and will not be

able to attract tenants.  All creditors and parties-in-interest, and primarily the Issuer, would be

prejudiced.  Even a short period of delay, including if the Issuer forecloses on the collateral, will

lead to contractors walking off the job, will lead to massive costs and delays to locate cover, and

will inevitably lead to a market perception of the Project that will, for a long time, seriously

affect its prospects and its rental rates.

20.     The Debtor will have other expenses, such as US Trustee fees and professional

fees.  The Debtor is not, at present, seeking to use the Cash Collateral to make these payments,

without prejudice to its ability to seek such relief in the future.  Rather, the Debtor intends to pay

for these other expenses from the DIP Loan.  Thus, the Debtor is not proposing to use the Cash

Collateral for any purpose other than it was always intended for—to complete the Project.

Indeed, for more than one year, as the Issuer froze the Project Fund, the Debtor has been paying

interest on millions of dollars in funded loans without being able to use the funds for their intended purpose. All that the Debtor seeks is to now use those funds as intended.

## B.   INTERIM, EMERGENCY RELIEF

21.     The Debtor recognizes that, for the first fifteen (15) days after the Petition Date, the Court may authorize the use of Cash Collateral only on an interim basis, and only to "avoid immediate and irreparable harm to the estate." FED. R. BANKR. P. 4001(b)(2). For the reasons stated above, and as will be demonstrated by the evidence, a refusal to permit the Debtor to use Cash Collateral for said fifteen (15) days will lead to immediate and irreparable injury, since the Debtor cannot go fifteen days without paying its vendors and contractors, who will otherwise walk off the Project to go to other developments and it will be prohibitively expensive and time consuming to get them back or to find replacement contractors and vendors. Therefore, the Court may and should authorize the Debtors to use Cash Collateral immediately, on an interim basis in accordance with the Interim Budget, pending a final hearing.

## C.   ADEQUATE PROTECTION OF ISSUER'S INTERESTS

22.     The Debtor acknowledges that, in order to use Cash Collateral, it must provide adequate protection to the Issuer. *See* 11 U.S.C. § 363(e). Whatever the forms of adequate protection may be under section 361 of the Bankruptcy Code, one conclusion is clear: if a lender does not suffer a diminution in the value of its cash collateral as a result of the Debtor's usage thereof, then the lender is adequately protected. This is especially the case here where, for every dollar of Cash Collateral that the Debtor uses, the Project will increase in value by well more than one dollar. There can be no question that the completion of the Project, the Issuer's collateral, is in the best interests of the Issuer first and foremost and will greatly increase the value of its collateral.

23.     Here, the Issuer will be amply protected against a diminution in the value of its

collateral through the Debtor's use of the Cash Collateral:

- The Project Funds were always expressly intended to be used to complete the Project, which is the purpose for which the Debtor intends to use them.[6]

- The Issuer is already protected by a large equity cushion in the value of all of its collateral.

- The Cash Collateral will be used to complete the development and the leasing of the Project, which will only increase the value of the Issuer's collateral by at least $1 for each dollar used.

- The DIP Loan will, if approved, provide the Debtor with additional funds to address administrative expenses and other expenses, and will therefore serve to help preserve the value of all collateral.

- The Debtor proposes to grant the Issuer replacement liens on all postpetition assets, except the proceeds of the proposed DIP Loan, with the same validity and priority as currently exists.

- The Debtor proposes to grant the Issuer a superpriority administrative expense claim to the extent of any diminution in the value of its collateral as a result of the Debtor's use of the Cash Collateral.

24.     In short, the Debtor's use of the Cash Collateral will preserve, enhance, and

increase the value of all of the Issuer's collateral—an obvious proposition when a project is this

close to completion and the alternative is an almost-finished luxury development. Conversely, if

the Debtor is unable to use the Cash Collateral to complete the Project, then one of three things

will happen.  First, the Debtor will be forced to seek funding from other sources to complete the

development and leasing of the Project.  This will likely have to be on an equal or priming basis

with the Issuer.  Second, the Debtor will be forced to not complete the Project, which would have

a substantially negative effect on cash flow and rental rates, which would negatively impact the

value of all of the Issuer's collateral for amounts in excess of the value of the Cash Collateral.

---

[6]     This does not mean that other funds also frozen by the Issuer cannot be used to complete the Project or for any other purpose.

Third, the Issuer may be permitted to foreclose on the Project, in which case the Issuer will have to expend the Project Funds and certainly additional funds out-of-pocket to complete and to lease-out the Project.

25.    For these reasons and protections, *i.e.* enhancing the value of Cash Collateral, preserving all collateral, detailed budgeting, replacement liens, and a superpriority administrative claim as described above, the Debtor submits that the Issuer is more than adequately protected for the Debtor's requested usage of Cash Collateral.

## V.    PRAYER

WHEREFORE, PREMISES CONSIDERED, the Debtor respectfully requests that the Court enter an order: (i) authorizing the Debtor to use Cash Collateral during the Interim Period as discussed above; (ii) scheduling a final hearing on the Motion; (iii) authorizing the Debtor to use Cash Collateral during the Final Period as discussed above, subject to potential future additional requests and extensions; (iv) finding any creditor with an interest in Cash Collateral to be adequately protected under the protections discussed above; and (v) granting the Debtor such other and further relief to which they may show themselves to be justly entitled.

RESPECTFULLY SUBMITTED this 3d day of March, 2022.

**MUNSCH HARDT KOPF & HARR, P.C.**


By:  /s/ Davor Rukavina
     Jay H. Ong, Esq.
     Texas Bar No. 24028756
     Davor Rukavina, Esq.
     Texas Bar No. 24030781
     Thomas D. Berghman, Esq.
     Texas Bar No. 24082683
     3800 Lincoln Plaza
     500 N. Akard Street
     Dallas, Texas  75201-6659
     Telephone: (214) 855-7500
     Facsimile: (214) 855-7584

**PROPOSED ATTORNEYS FOR
THE DEBTOR-IN-POSSESSION**


**CERTIFICATE OF SERVICE**

An omnibus Certificate of Service concerning all "first day" motions shall be separately filed by the Debtor, which shall reflect service of this Motion.

By:  /s/ Davor Rukavina
     Davor Rukavina