IN THE UNITED STATES BANKRUPTCY COURT
FOR THE EASTERN DISTRICT OF TEXAS
SHERMAN DIVISION

| | | |
|---|---|---|
| In re: | § | Chapter 11 |
| | § | |
| BSPV-PLANO, LLC,[1] | § | Case No. 22-40276 (BTR) |
| | § | |
| Debtor. | § | |

## DEBTOR'S EMERGENCY MOTION FOR
## INTERIM AND FINAL APPROVAL OF POSTPETITION FINANCING

TO THE HONORABLE BRENDA T. RHOADES, U.S. BANKRUPTCY JUDGE:

COMES NOW BSVP-Plano, LLC (the "Debtor"), the debtor-in-possession in the above styled and numbered bankruptcy case (the "Bankruptcy Case"), and file this *Emergency Motion for Interim and Final Approval of Postpetition Financing* (the "Motion"), respectfully stating as follows:

### I.  PROCEDURAL BACKGROUND

1. On March 1, 2022 (the "Petition Date"), the Debtor filed its voluntary petition for relief under Chapter 11 of the United States Bankruptcy Code (the "Bankruptcy Code"), thereby initiating its Bankruptcy Case and creating its bankruptcy estate (the "Estate").

2. The Debtor continues to operate its business and to manage the Estate as a debtor-in-possession.  No committee, trustee, or examiner has been appointed.

3. The Court has jurisdiction over the Bankruptcy Case and this Motion under 28 U.S.C. § 1334.  Such jurisdiction is core under 28 U.S.C. 157(b)(2).  Venue of the Bankruptcy Cases before this Court is appropriate under 28 U.S.C. §§ 1408 and 1409.

---

[1]  The last four (4) digits of the Debtor's federal tax identification number is (3228).  The Debtor's address for notices is: 4851 Keller Springs Road 209, Addison, Texas 75001.

DEBTOR'S EMERGENCY MOTION FOR INTERIM AND FINAL APPROVAL OF POSTPETITION FINANCING – Page 1

## II.   FACTUAL BACKGROUND

### A.   THE PROJECT

4. The Debtor was formed in May 2018 to acquire, own, develop, and operate a 31.5 acre, "55+" Independent Senior Luxury Apartment Community with 318 units of apartment inventory, that is known and branded as "The Bridgemoor at Plano," and located at 1109 Park Vista Road in Plano, Texas (the "Project").[2] The Bridgemoor development is adjacent to the Pecan Hollow Golf Course, as well as a private 13-acre park along Rowlett Creek with a pond, dog park, gazebo, and creek-side fishing, and boasts close proximity to restaurants, shopping, a DART line, and lively entertainment venues. This community is marketed to independent seniors[3] and offers a variety of one and two bedroom floor plans comprised of 156 cottage style units in 22 stand-alone buildings, as well as 162 units contained in a single, elevator serviced, 3-story apartment building with a subterranean garage with 194 leased parking spaces, and a 10,000 sq. ft. clubhouse, with a requirement that a certain percentage of units must be leased at a discounted rate to meet affordability criteria. The Project is a premiere property in Plano and is expected to be a generator of significant additional business. Indeed, the Project is financed in part with tax exempt bonds, due to the importance of the Project to the city and the county.

5. The Debtor's equity sponsors have substantial experience in real estate development and management. Over more than eighty (80) years, those sponsors have supervised the development, construction and management of more than 50 commercial apartment developments including over 35,000 units, primarily in the State of Texas but also in multiple other states in the southern United States. These sponsors are committed to the

---

[2]  *See* https://www.bridgemoorplano.com/

[3]  Although the community includes a clubhouse room for outsourced, home healthcare services, as a community intended for independent seniors it is not an assisted living facility. The Debtor is not a healthcare provider nor healthcare business.

DEBTORS' EMERGENCY MOTION FOR INTERIM AND FINAL AUTHORITY TO USE CASH COLLATERAL – Page 2

Project—as discussed below, after the Issuer (defined below) froze most of the Debtor's development funds, they invested an additional $6.9 million to continue the development of the Project and are prepared to loan at least an additional $1 million DIP Loan (defined below).

**B.     THE LENDER AND CASH COLLATERAL**

6. The Debtor financed the acquisition and development of the Project, in part, through a transaction with New Hope Cultural Education Facilities Finance Corporation, a nonprofit cultural education facilities finance corporation organized under the laws of the State of Texas (the "Issuer"). Under this transaction, the Issuer, as authorized by the provisions of Chapter 337 of the Texas Local Government Code (the "Act"), entered into that certain Trust Indenture, dated as of December 1, 2018 (the "Indenture") with The Huntington National Bank, a national banking association, as trustee (the "Trustee"), pursuant to which the Issuer issued four series of revenue bonds.

7. In turn, and in accordance with the Act and the Indenture, the Issuer entered into the Loan Agreement, dated as of December 1, 2018 (the "Loan Agreement") with the Debtor, as borrower, under which the Issuer used the proceeds of the foregoing bonds to advance certain loans to the Debtor, as evidenced by the following promissory notes issued thereunder (collectively, the "Notes"): (i) the Senior Living Promissory Note Senior Series 2018A dated January 8, 2019 in an original principal amount of $50,530,000; (ii) the Senior Living Promissory Note Taxable Senior Series 2018B dated January 8, 2019 in an original principal amount of $6,765,000; (iii) the Senior Living Promissory Note Subordinate Series 2018C dated January 8, 2019 in an original principal amount of $5,000,000; and (iv) the Senior Living Promissory Note Junior Subordinate Series 2018D dated January 8, 2019 in an original principal amount of $4,500,000. The Loan Agreement and the Notes are generally secured by, among

other things, all real property and improvements of the Debtor and the Project, and all income and rents from the Project. However, the differing Notes have different interests and priorities with respect to collateral.[4]

8. For purposes of this Motion, the Trustee, for the benefit of the various holders of the Notes, holds a first-priority lien against certain funds of the Debtor. These funds include various amounts funded under the Loan Agreement and allocated for certain expenses, including the "Project Fund." The purpose of the Project Fund is to pay for the development and buildout of the Project. The Project Fund is in the possession of the Issuer and under the control of the Issuer, and represents funds in which the Issuer asserts first-priority liens, but otherwise belongs to the Debtor.

9. Construction of the Project began in January 2019 and was originally scheduled to complete in June 2020. However, poor and inclement weather experienced in the area during construction, including the 2021 freeze, resulted in construction delays. These delays were greatly exacerbated by the onset of the global pandemic in early 2020. These consequences included extraordinary supply chain issues and shortages in construction materials and supplies, as well as available labor, and by way of further example, caused the City of Plano and other regulatory agencies to temporarily close its offices which resulted in significant delays in procuring requisite inspections and permits.

10. In turn, these delays and overruns caused the Issues to declare various alleged defaults under the Loan Agreement and the Indenture. Among other things, the Issuer froze the Project Fund in January 2021. Since that time, the Debtor has financed the completion of the

---

[4] The foregoing is intended to be a general discussion of the Loan Agreement and related liens and is not intended to be exhaustive or definitive with respect to varying and various rights. The Debtor reserves all rights to contest the validity of any Note, Loan Agreement, or lien, and nothing in this Motion prejudices the same. The Trustee has an "interest" in cash collateral, whether perfected, valid, avoidable, or not, and that is why the Debtor files this Motion.

Project from additional funds invested by the Debtor's indirect equity interest holders, amounting to approximately $6.9 million.

11. Notwithstanding the foregoing unpredictable circumstances and the freezing of the Debtor's funds, as of the Petition Date construction of the Project is over 85% complete with completion currently projected in June, 2022 – assuming that construction is prosecuted without unnecessary delay and further unforeseen delays do not manifest. Due to staging, forty (40) units are currently available for immediate occupancy. Indeed, the Debtor has already procured three temporary certificates of occupancy for different Project buildings, temporarily certifying these buildings as suitable for occupancy. The Debtor anticipates procuring a temporary certificate of occupancy for the clubhouse and leasing office in the next ten days. The Debtor has already commenced leasing at the Project and has leased over twenty (20) units as of the Petition Date. The Debtor expects leasing to be robust and has been able to increase its leasing rates, due to significant improvements in the market over what was projected.

12. At greater than 85% percent complete, therefore, the Debtor has very little to go to finish the Project. Presently in the Project Fund is approximately $6,191,031.27. The Debtor needs to be able to use this cash to finish the Project and to expend necessary funds to market the Project. Among other things, the Debtor needs to use cash to:

- Pay the prepetition claims of various critical vendors, primarily contractors, if the Court otherwise so authorizes. If the Debtor is unable to pay past, present, and future construction costs, then contractors will leave for other projects, and the Debtor will face massive additional costs and delays in locating replacement contractors, especially in the present market.

- Complete heating and air condition at the Project, without which the remainder of the construction on the 3-story apartment building cannot proceed, which includes, among others, setting drywall, installing flooring, installing appliances, installing countertops, and finishouts.

- Complete plumbing requirements at the Project, without which the remainder of the construction on the 3-story apartment building cannot proceed, causing the same disruptions as above.

- Pay the general contractor to continue to move the construction forward.

- Finish out the work on the cottage style buildings, as these are the first buildings that can be leased, and thus provide operating cash flows to help ease the burden of the Cash Collateral and accelerate payment of all classes of creditors.

13. As of the Petition Date, approximately $66.8 million was owing under the Loan Agreement and related Notes (not all of which is secured by the Cash Collateral).

14. The Debtor estimates that, at present, the Project is worth upwards of $80 million. Once completed and stabilized, the Debtor estimates that the Project will rapidly have a value in excess of $120 million.

15. By separate motion, the Debtor is requesting interim and final authority to use the Project Fund and lease income from the Project (the "Cash Collateral") for the principal purpose of completing the Project. Nevertheless, as discussed below, the Debtor has a need for additional cash and funding to fund both this Bankruptcy Case and the Project. In other words, the Cash Collateral itself will not be enough to fund all costs of the Bankruptcy Case and the Project and there is likely to be a timing issue with respect to being able to use the Cash Collateral to pay immediate and ongoing Project costs.

### III.   RELIEF REQUESTED

16. By this Motion, the Debtor requests authority to approve postpetition financing on an interim and final basis (the "DIP Loan"): $500,000 on an interim, immediate basis, and the balance of $500,000 on a final basis after a final hearing on this Motion. The DIP Loan will be evidenced by a new promissory note and junior deed of trust to be recorded against the Project,

both of which will be filed as supplements to this Motion once they are prepared. The terms of the DIP Loan will be as follows:

- Lender: DCJ Capital, LLC (the "DIP Lender"), an entity affiliated with the Debtor's equity sponsors and potentially an insider.

- Principal: $1 million in two tranches; $500,000 upon interim approval and $500,000 upon final approval.

- Interest: simple interest of 4.5% paid monthly.

- Monthly payments: interest only pending maturity.

- Term: All principal and unpaid interest due December 31, 2022, unless there is an uncured default, in which case all principal and interest may be accelerated immediately (but automatic stay will prevent foreclosure, unless the Issuer also obtains relief from the automatic stay). Option to extend for additional year under negotiation.

- Collateral: first priority lien on any unencumbered assets of the Debtor and the Estate (including any cash and proceeds funded by the Issuer), junior lien on any assets of the Debtor and the Estate that the Issuer otherwise has a valid and perfected lien against.

- Events of default: conversion or dismissal of Bankruptcy Case, appointment of Chapter 11 trustee, failure to pay interest, relief from the automatic stay to the Issuer.

- Origination fee: $2,500.

- Administrative and legal fee: $500.00. Debtor to also pay recording fees.

- Carveout for professional fees and UST fees: under negotiation.

## IV.   DISCUSSION

17.   The Debtor has a need for funding in the form of the DIP Loan. First, while the Debtor has requested the use of Cash Collateral, it is anticipated that, even if the Court grants the Debtor the use of Cash Collateral, it will take time to transfer those funds to new DIP accounts. In the meantime, the Debtor will have an urgent need for funds to pay contractors to continue the Project and to avoid irreparable injury. Second, the Debtor will have expenses, including US

Trustee fees, professional fees and expenses, and other opening, marketing, and leasing expenses, that may not be paid or payable from the Cash Collateral, although the Debtor reserves all rights and arguments with respect to the same.

18. The Bankruptcy Code provides that:

(c) If the trustee is unable to obtain unsecured credit allowable under section 503(b)(1) of this title as an administrative expense, the court, after notice and a hearing, may authorize the obtaining of credit or the incurring of debt—

(1) with priority over any or all administrative expenses of the kind specified in section 503(b) or 507(b) of this title;

(2) secured by a lien on property of the estate that is not otherwise subject to a lien; or

(3) secured by a junior lien on property of the estate that is subject to a lien.

11 U.S.C. § 364(c).

19. Here, the Debtor is not able to obtain postpetition credit on an unsecured basis as an administrative claim. Among other things, the Debtor is not presently generating sufficient income to pay unsecured debt and, with the Issuer having an asserted lien on all cash collateral, no lender will take the risk that the Debtor will not have any unencumbered funds to repay postpetition unsecured debt.

20. Therefore, pursuant to section 364(c)(2) and (3) of the Bankruptcy Code, the Debtor seeks the approval of the DIP Loan as a secured loan. Where the Issuer has a valid and perfected lien, the DIP Lender's liens would be junior in priority to the Issuer. Where the Issuer does not have a valid and perfected lien, such as to the new funds advanced by the DIP Lender, the DIP Lender would have a first priority lien. In no event would the DIP Lender have a lien on any so-called avoidance actions.

21. Whether to approve non-priming postpetition financing is generally subject to the following factors: first, that the proposed financing is an exercise of sound and reasonable business judgment; second, that no alternative financing is available on any other basis; third, that the financing is in the best interests of the estate and its creditors; and, as a corollary to the first three points, that no better offers, bids, or timely proposals are before the Court." *In re Phase-I Molecular Toxicology*, 285 B.R. 494, 495 (Bankr. D.N.M. 2002). *Accord In re Mid-State Raceway Inc.*, 323 B.R. 40, 59-60 (Bankr. N.D.N.Y. 2005). That the funding source is an insider is not a disqualifier, but the insider nature of the transaction does subject the transaction to greater scrutiny. *See In re C.E.N. Inc.*, 86 B.R. 303, 306 (Bankr. D. Me. 1988). The Debtor does not have to prove that it is impossible for it to find financing otherwise, but the Court must be cautious that the financing does not elevate the rights of one creditor unnecessarily or unfairly over others, or that the financing is a *sub rosa* plan. *See, e.g., In re Mid-State Raceway Inc.*, 323 B.R. at 59.

22. Here, the proposed financing, together with the proposed protections to the DIP Lender, represent a sound exercise of business judgment, is fair and reasonable, and is in the best interests of the Estate, for at least the following reasons:

- The Debtor has an immediate need for cash to pay contractors, including for prepetition critical vendor claims (if the Court otherwise permits such payments), without which the contactors will walk and the Estate will face massive costs and delays.

- The Debtor has an immediate and future need for funds to pay administrative claims and expenses, including US Trustee fees and professional fees to the extent allowed.

- The Debtor will have a need for expenses related to marketing and advertising the Project to secure leases and revenue, which the Debtor may or may not have sufficient Cash Collateral alone to do after the construction of the Project is complete.

- The Debtor is not seeking to prime or prejudice the Issuer and its collateral. Rather, obtaining additional funding will only serve to protect and enhance the rights of the Issuer and the value of its collateral.

23. The Debtor recognizes that, for the first fifteen (15) days after the Petition Date, the Court may approve postpetition financing that is necessary to "avoid immediate and irreparable harm to the estate." FED. R. BANKR. P. 4001(c)(2). Here, without immediate cash to pay contractors and vendors, contractors will walk off the Project to go to other developments and it will be prohibitively expensive and time consuming to get them back or to find replacement contractors and vendors. While the Debtor has sought the use of Cash Collateral to pay construction costs, it is anticipated that it will take some time for the Debtor to obtain the Project Fund and deposit the same into a DIP account, during which time construction may cease. Therefore, the Court may and should authorize the Debtor to obtain the DIP Loan immediately, on an interim basis pending a final hearing, and on a final basis at the final hearing.

## V.    PRAYER

WHEREFORE, PREMISES CONSIDERED, the Debtor respectfully requests that the Court enter an order: (i) authorizing the Debtor to obtain the DIP Loan on an interim basis, up to the amount of $500,000; (ii) authorizing, after a final hearing, the Debtor to obtain the full amount of the DIP Loan on a final basis; (iii) providing the DIP Lender with the protections and liens described above; and (iv) granting the Debtor such other and further relief to which they may show themselves to be justly entitled.

RESPECTFULLY SUBMITTED this 3d day of March, 2022.

**MUNSCH HARDT KOPF & HARR, P.C.**

By: /s/ Davor Rukavina
    Jay H. Ong, Esq.
    Texas Bar No. 24028756
    Davor Rukavina, Esq.
    Texas Bar No. 24030781
    Thomas D. Berghman, Esq.
    Texas Bar No. 24082683
    3800 Lincoln Plaza
    500 N. Akard Street
    Dallas, Texas 75201-6659
    Telephone: (214) 855-7500
    Facsimile: (214) 855-7584

**PROPOSED ATTORNEYS FOR THE DEBTOR-IN-POSSESSION**

## CERTIFICATE OF SERVICE

    An omnibus Certificate of Service concerning all "first day" motions shall be separately filed by the Debtors, which shall reflect service of this Motion.

By: /s/ Davor Rukavina
    Davor Rukavina