**UNITED STATES BANKRUPTCY COURT**
**FOR THE EASTERN DISTRICT OF TEXAS**
**PLANO DIVISION**

| | | |
|---|---|---|
| In re: | § | |
| | § | **Case No. 22-40276 btr** |
| **BSPV-PLANO, LLC.,**[1] | § | |
| | § | **Chapter 11** |
| **Debtor.** | § | |
| | § | |

**OBJECTION OF THE HUNTINGTON NATIONAL BANK, AS BOND TRUSTEE, TO DEBTOR'S FIRST DAY MOTIONS, INCLUDING USE OF CASH COLLATERAL AND APPROVAL OF DEBTOR IN POSSESSION FINANCING**

The Huntington National Bank, not individually but as trustee for the bonds described more fully below (the "Bond Trustee"), objects (the "Objection") and otherwise responds to certain relief requested by BSPV-Plano, LLC (the "Debtor")[2] in its first day motions (as defined below, the "First Day Motions"), including, without limitation, *Debtor's Emergency Motion for Interim and Final Authority to Use Cash Collateral* (the "Cash Collateral Motion") [Docket No. 9] that seeks to wrest $6.2 million of cash collateral away from the Bond Trustee to support the Debtor's misguided efforts to pour more funds into the bottomless money pit that is the Debtor's partially constructed senior living housing rental community located on Park Vista Road in Plano, Texas (the "Project"). In support of this Objection, the Bond Trustee states as follows:

**Preliminary Statement**

As an initial matter, there is no emergency here. The *Debtor's Emergency Motion for Interim and Final Approval of Postpetition Financing* (the "DIP Financing Motion") [Docket No. 10] alleges that (i) the putative lender (current equity or affiliates) has $1 million available to invest

---

[1] The last four digits of the Debtor's federal tax identification number are 3228.

[2] Capitalized terms not otherwise defined in this Objection have the meanings given to them in the Cash Collateral Motion.

in the Project, and (ii) the Project is worth "upwards of $80 million" in its current state. DIP

Financing Motion at ¶¶ 14, 15. According to the Debtor's budget, the Debtor needs $452,000 to

fund its operating and bankruptcy expenses through March 25th. If the Debtor's principals believe

their own motions, they should have no problem contributing that amount to avert any emergency

caused by the filing of this case while the parties have an opportunity to fully litigate the issues

surrounding the First Day Motions.

Stepping back from the exigency of the Debtor's current request, the problems the Debtor

now face are of its own making. The Project has been in trouble for more than a year and a half.

In November 2020, the Debtor stopped making the payments required under the governing loan

documents, thereby putting the Debtor in default under its bond financing. And even prior to that

date, as early as August 2020, the Borrower began repeatedly requesting that the Bond Trustee

agree to restructure the bond debt because the Debtor's projections showed that it would be unable,

even after Project completion, to pay the required debt service on the bonds. Because of the

defaults, the loan documents prohibited the Bond Trustee from advancing the funds the Debtor

now seeks to forcibly remove from the Bond Trustee.

But the solution was always within the Debtor's control. One of the Debtor's principals,

Mr. Richard Shaw, had agreed at the time that the bond debt was issued to guaranty completion of

the Project. As discussed below, Mr. Shaw never executed and delivered the promised completion

guaranty, which, had he done so, would have obviated the Debtor's need to file this bankruptcy

case.

More troubling than Mr. Shaw's failure to live up to his promised guaranty, however, is

the incompetence Mr. Shaw has repeatedly demonstrated over the years as the general contractor

of the Project. The Project is now more than 600 days late and at least $8 million over budget. The

examples of incompetence are manifold, but the most recent ones include that (i) just within the last few weeks, the Debtor disclosed to the Bond Trustee that the construction budget was short up to an additional $2 million as a result of failures by Mr. Shaw's construction company to adequately supervise its subcontractors, requiring the Debtor to replace two subcontractors at an increased cost of over $900,000, and (ii) the failure to accurately count the number of doors required at the Project. Mr. Shaw undercounted the number of doors by 1,300, adding a cost of $300,000 to the Project budget, because Mr. Shaw "forgot" that some of the buildings had second and third floors. In addition, Mr. Shaw has let the value of the Project deteriorate over time by permitting approximately $3 million of mechanic's liens to encumber the Project.

Contrary to the Debtor's assertions in the Cash Collateral Motion, much of the blame for the failings of the Project falls squarely on the shoulders of the Debtor's principals, Mr. Shaw and his partner, Mr. Steffen Waltz. Now that they have failed by every conceivable measure to do what they promised to do when they borrowed almost $67 million to construct the Project, they ask this Court to allow them to access almost $6.2 million of the Bond Trustee's Cash Collateral without the Bond Trustee's consent. They ask this without providing one shred of evidence that using the Bond Trustee's Cash Collateral will enhance the Bond Trustee's collateral position. They ask this without providing one shred of evidence that the monies will be sufficient to complete the Project. And they ask this without providing one shred of evidence that they have the ability (heretofore undemonstrated) to actually complete the Project. They ask too much.

As discussed below, there is a solution here, but not the one suggested by the Debtor. To be clear, the Bond Trustee is not, *per se*, opposed to completing the Project. But, before additional funds that belong to the Bond Trustee are invested in the Project, the Bond Trustee must fully vet the alternatives of completing the Project or selling it as it currently exists as an unfinished senior

housing project, to ensure that the path taken is the one that will produce the greatest return for the holders of the Debtor's bonds and other creditors. At this point – because the Debtor has offered no evidence whatsoever – it is impossible to know whether investing additional amounts in the Project will increase the value of the Project. The Bond Trustee is in the process of hiring an expert to advise it on whether the Project should be completed and respectfully suggests that, until the Bond Trustee and the Court have the opinion of that expert, it is premature to force the Bond Trustee to use its Cash Collateral to complete the Project. The Bond Trustee also reserves the right to call the question of whether Messrs. Waltz and Shaw are the appropriate parties to complete the Project if that path forward is the most sensible.

The unsupported statements with respect to the value of the Project, that is the accretive value of each additional dollar put into the Project at this time, and the existence of a substantial equity cushion, combined with the incompetence with which the Debtor has led the Project over the past few years leads to this inescapable conclusion: the Debtor cannot adequately protect the interests of the Bond Trustee in the $6.2 million Cash Collateral the Debtor seeks to use over the objection of the Bond Trustee.

Accordingly, the Bond Trustee objects and otherwise responds to:[3]

➢ Use by the Debtor of the more than $6.2 million of Cash Collateral as requested by the Cash Collateral Motion;

➢ The DIP Financing Motion;

➢ The *Debtor's Emergency Motion for Entry of Interim and Final Orders (I) Authorizing the Payment of Claims of Critical Vendors and (II) Granting Related Relief* (the "Critical Vendor Motion") [Docket No. 11];

➢ The *Debtor's Emergency Motion for Entry of an Order (I) Approving the Debtor's Proposed Adequate Assurance of Payment for Future Utility Services, II)*

---

[3] Capitalized terms not otherwise defined in this Objection have the meanings given to them in the Cash Collateral Motion.

*Prohibiting Utility Companies from Altering, Refusing, or Discontinuing Services, (III) Approving the Debtor's Proposed Procedures for Resolving Additional Assurance Requests, and (IV) Granting Related Relief* (the "Utilities Motion") [Docket No. 12]; and

➢ The *Debtor's Emergency Motion for Entry of an Order (I) Authorizing the Debtor to (A) Pay Prepetition Wages, Salaries, Other Compensation, and Reimbursable Expenses and (B) Continue Employee Benefits Programs and (II) Granting Related Relief* (the "Employee Motion" and with the Cash Collateral Motion, the DIP Financing Motion, the Critical Vendor Motion and the Utilities Motion, the "First Day Motions") [Docket No. 14].[4]

## **Background**

1.      On March 1, 2022, the Debtor filed its voluntary petition for relief with this Court under Chapter 11 of Title 11 of the United States Code (the "Bankruptcy Code").

2.      The Debtor is obligated to the Bond Trustee for the benefit of the beneficial holders (the "Bondholders") of the Bonds (as defined below) authorized and issued by the New Hope Cultural Education Facility Finance Corporation (the "Issuer") for the benefit of the Debtor.

3.      Pursuant to that certain Trust Indenture dated as of December 1, 2018 between the Issuer and the Bond Trustee (the "Indenture"), the Issuer issued its $66,795,000 aggregate principal amount of Revenue Bonds comprised of:

   a.   $50,530,000 Senior Living Revenue Bonds (Bridgemoor Plano Project), Senior Series 2018A;

   b.   $6,765,000 Senior Living Revenue Bonds (Bridgemoor Plano Project), Taxable Senior Series 2018B;

   c.   $5,000,000 Senior Living Revenue Bonds (Bridgemoor Plano Project), Subordinate Series 2018C; and

   d.   $4,500,000 Senior Living Revenue Bonds (Bridgemoor Plano Project), Junior Subordinate Series 2018D

---

[4] In addition, the Bond Trustee incorporates by reference its Precautionary Objection to Debtor's Attempt to Move Residents to Construction Site and Request for Status Conference (the "Bond Trustee's Preliminary Objection") [Docket No. 8] and requests that the Court require the Debtor to address the questions raised therein as part of its first day presentation.

(collectively, the "Bonds").

4.      The Issuer loaned the proceeds of the Bonds to the Debtor pursuant to that certain Loan Agreement dated December 1, 2018 (the "Loan Agreement") between the Issuer and the Debtor. The Debtor used the proceeds of the Bonds to: (i) finance the acquisition of the site on which the Project would be built, (ii) finance a portion of the cost of constructing, developing, furnishing and equipping the Project, (iii) fund interest on the Bonds, during the construction phase and for the anticipated lease-up of the Project, (iv) fund separate debt service reserve accounts for the Bonds, and (v) pay the costs of issuance of the Bonds.

5.      The rights of the Issuer under the Loan Agreement and the other documents evidencing and/or securing the Bonds (collectively, the "Bond Documents") were assigned to the Bond Trustee under the terms of the Indenture and/or that certain Assignment of Notes, Liens, Security Interests and Other Documents, dated January 8, 2019.[5]

6.      As of February 28, 2022, the amount owing on the Bonds, including outstanding principal and non-default interest, but excluding outstanding professional fees and expenses, was $68,962,414.50. Because the Bonds have been in default since at least October 2020, additional default interest at 2% over the interest rates on the Bonds from at least that time is also due and owing. If, as the Debtor suggests, the Bond Trustee is oversecured, interest will continue to accrue on the Bonds and the Debtor will be responsible for the professional fees and expenses of the Bond Trustee pursuant to the terms of the Bond Documents. In addition, default interest continues to accrue on the Bonds at $14,859.70 per day, or almost $450,000 per month.

---

[5] Throughout the Cash Collateral Motion, the Debtor erroneously refers to the Issuer of the Bonds as the party that holds the Cash Collateral. The Bond Trustee holds the Cash Collateral as security for the amounts owing on the Bonds, for the benefit of the Bondholders.

7.     The obligations of the Debtor to the Bond Trustee under the Bond Documents are secured by a first-priority, validly and properly perfected lien on substantially all of the Debtor's real and personal assets.

## Objections

### I.     The Debtor's request to use the Cash Collateral should be denied because the Debtor cannot adequately protect the Bond Trustee for the use of such funds.

8.     At the heart of the Debtor's First Day Motions is a request by the Debtor to access almost $6.2 million[6] in cash held by the Bond Trustee as collateral for the payment of the Bonds. The Bond Trustee does not consent to the use by the Debtor of Cash Collateral, but rather vehemently opposes such use. The Debtor is incapable of demonstrating adequate protection for the proposed use of the Bond Trustee's Cash Collateral. The Debtor offers absolutely no evidence in support of its proffered reasons for why it can adequately protect the Bond Trustee: (i) the existence of a substantial equity cushion, and (ii) the increase in value of the Project by more than one dollar for every dollar of Cash Collateral sunk into the Project. To the contrary, the Debtor's assertions that the Project has a substantial equity cushion directly contradict public statements that the Debtor has made that the Project would not, when completed, support the Bond debt. As a result, the Debtor, on multiple occasions, beginning in August 2020 and continuing through just

---

[6] Although the Cash Collateral Motion seeks authority only to use amounts in the Project Fund and some yet-to-be-generated rents from the Project, in an attempt to demonstrate that, after raiding the Bond Trustee's collateral, the Debtor would potentially have enough funds to complete the Project, the Debtor includes, as a source of funds in its proposed budget, the approximately $2,270,000 held by the Bond Trustee as collateral for the benefit of the Bondholders in the Operating and Maintenance Reserve Fund (the "O&M Fund") (which, pursuant to the terms of the Trust Indenture, are earmarked for specific uses other than construction of the Project), funds it has not even asked the Court for in the Cash Collateral Motion. It is not surprising that the Debtor did not come out and ask the Court to allow it to access the funds in the O&M Fund to complete construction because, pursuant to the terms of the Indenture, those funds are not available for that purpose. **Exhibit A**, Trust Indenture, at § 5.09(b). In addition, as with the Project Fund, funds in the O&M Fund are not to be requisitioned by the Debtor when there is an Event of Default. But none of this stopped the Debtor from counting those funds as funds available to complete the Project and including them in its proposed budget.

before the bankruptcy filing, has requested that the Trustee and the Bondholders agree to restructure the Bond debt. *See, e.g.,* **Exhibit B**, Notice of Meeting To Discuss Proposed Restructuring of Bonds September 3rd, 2020.[7] Therefore, as a matter of law, the Debtor has failed to carry its burden of demonstrating adequate protection. *In re Windsor Hotel, L.L.C.*, 295 B.R. 307, 314 (Bankr. C.D. Ill. 2003) ("A finding of adequate protection should be premised on facts, or on projections grounded on a firm evidentiary basis.")

9.      More troubling to the Bond Trustee, however, is the rank incompetence, at best, and potential outright fraud, demonstrated by the Debtor's principals throughout the troubled history of the Project. This incompetence informs whether the Debtor can actually complete the Project within the budget and time parameters the Debtor now claims it can in the First Day Motions. As discussed below, the Debtor has been telling the Bond Trustee a much different story in terms of what it would cost to complete the Project (much more that the claimed $6.2 million) and by when the Project could be completed (long after the claimed June 30th completion date). In this particular case, therefore, the Bond Trustee asserts that in assessing whether the Debtor is capable of adequately protecting the Bond Trustee's interest in the Cash Collateral, a major component of any adequate protection is whether the Debtor is even capable of living within its self-determined budget and timeline for the Project.

A. **The Debtor cannot satisfy the adequate protection standard in Sections 363(c)(2) and 363(e) of the Bankruptcy Code.**

10.      Section 363(c)(2) of the Bankruptcy Code prohibits the Debtor from using cash collateral "unless – (A) each entity that has an interest in such cash collateral consents; or (B) the

---

[7] The Debtor caused this document to be posted to the Municipal Securities Rulemaking Board's Electronic Municipal Market Access website (the "EMMA System"), a website that has been designated by the Securities Exchange Commission as the official repository for municipal securities disclosures.

court, after notice and a hearing, authorizes such use in accordance with the provisions of this section." 11 U.S.C. § 363(c)(2); *see also In re Cafeteria Operators, L.P.*, 299 B.R. 400, 403 (Bankr. N.D. Tex. 2003). Section 363(e), in turn, requires "adequate protection" of the secured creditor's interest in the cash collateral to the extent that the Debtor is permitted to use cash collateral without consent. 11 U.S.C. § 363(e) (requiring a bankruptcy court to "prohibit or condition such use . . . as is necessary to provide adequate protection of such interest"); *see also Marathon Petroleum Co, LLC v. Cohen (In re Delco Oil, Inc.)*, 599 F.3d 1255, 1258 (11th Cir. 2010) (noting that, in the absence of adequate protection, the "unhindered use of cash collateral, i.e., 'secured property' may result in the dissipation of the estate"). The terms of 11 U.S.C. §363(e) are mandatory. 3 COLLIER ON BANKRUPTCY ¶ 363.05[2], 363-39 (16th ed. 2021); *see also, In re Chateaguay Corp.*, 94 F.3d 772, 775 (2nd Cir. 1996). As such, the Debtor cannot use the Bond Trustee's Cash Collateral over the Bond Trustee's objection unless it can adequately protect the Bond Trustee.

11.     When considering the non-consensual use of cash collateral, the "guiding inquiry is whether [the creditor's] security interests are 'adequately protected' absent the additional protection the cash collateral would provide. . . . In determining whether a creditor's secured interests are so protected, there must be an individual determination of the value of that interest and whether a proposed use of cash collateral threatens that value." *In re Martin*, 761 F.2d 472, 476-77 (8th Cir. 1985) (observing that "[i]n any given case, the bankruptcy court must necessarily (1) establish the value of the secured creditor's interest, (2) identify the risks to secured creditor's value resulting from the debtor's request of the use of cash collateral, (3) determine whether the debtor's adequate protection proposal protects value as nearly as possible against risk to value consistent with the concept of indubitable equivalence."). "Although the concept of adequate

protection is a flexible one, it encompasses the basic constitutional requirement that a creditor's interest in property cannot be in any respect impaired or subjected to increased risk without assurance that the creditor will realize the benefit of its bargain." *In re Magnus*, 50 B.R. 241, 243 (Bankr. D.N.D. 1985). The Debtor can only meet its adequate protection burden by showing on a "firm evidentiary basis" that the Bond Trustee's liens will be adequately protected from the decrease in value that will be caused if the Debtor is allowed to use the Cash Collateral as requested in the DIP Motion and the Cash Collateral Motion. *See In re Windsor Hotel, L.L.C.*, 295 B.R. at 314.

12.     The Debtor bears the burden of proof on the issue of whether the Bond Trustee's interest in the Cash Collateral is adequately protected. 11 U.S.C. § 363(p)(1) ("the [debtor in possession] has the burden of proof on the issue of adequate protection"). *see also In re Cafeteria Operators, L.P.*, 299 B.R. at 405. Here, the Debtor has not carried its burden.

**B. The Debtor has offered no evidence of adequate protection.**

13.     The Debtor argues that the Bond Trustee will be adequately protected if the Debtor uses the Cash Collateral because (i) the Project, in its current state, is worth "upwards of $80 million" and therefore the Bond Trustee is protected by a substantial equity cushion, and (ii) every dollar of the Bond Trustee's Cash Collateral that the Debtor spends will increase the value of the Project by more than one dollar. Cash Collateral Motion, at ¶ 14.

14.     In support of its request to use the Bond Trustee's Cash Collateral, the Debtor offers the following unsupported statements:[8]

---

[8] If all of these statements were true, we would not be here today: the Debtor's principals would have put in additional equity or easily found partners to put in additional equity, they would have been able to refinance the Project and offer to take-out the Bonds at the amount owed, or the Bond Trustee and the Bondholders would have agreed to let them use amounts in the Project Fund. The case is not as easy as the Debtor makes it out to be because if it were, the parties would have found that easy solution outside of bankruptcy. The fact that the Debtor elected to file for bankruptcy shows that most (if not all) of these statements are untrue. The Debtor's principals chose not to put any more of their

➢ The Project is over 85% complete and close to finished (Cash Collateral Motion at ¶ 12);

➢ The Project can be completed by using only the $6.2 million in the Project Fund, the $1 million from the DIP loan, and the initial rents generated from opening the Project (Cash Collateral Motion at ¶ 22 (based on Debtor's assertion that the Bond Trustee is adequately protected by completion of the Project));

➢ Messrs. Waltz and Shaw are "committed to the Project" (Cash Collateral Motion at ¶ 5);

➢ The completion delays and cost overruns are merely the result of bad luck in the form of weather issues and COVID and not mismanagement by the Debtor's principals (Cash Collateral Motion at ¶ 9); and

➢ That the Project will be completed by June 2022 (Cash Collateral Motion at ¶ 12).

15.     Not only has the Debtor failed to offer a "firm evidentiary basis" that the Bond Trustee will be adequately protected if the Debtor uses its Cash Collateral, the Debtor has failed to offer any evidence whatsoever. *See In re Windsor Hotel, L.L.C.*, 295 B.R. at 314. Other than bald assertions that the Project is worth "upwards of $80 million" and that the Project's value will be enhanced beyond the amount of Cash Collateral the Debtor seeks to put into the Project, the Debtor has provided no indication of the value of the Project. The Debtor has not provided an appraisal of the Project in its current state or even a broker's opinion of value. The Debtor has offered up no expert that the Bond Trustee could cross-examine on these matters. As such, the Debtor has not met its burden of proving that the Bond Trustee's interest in the Cash Collateral will not be "impaired or subjected to increased risk." *See In re Magnus*, 50 B.R. 241, 243 (Bankr. D.N.D. 1985).

16.     The lack of any evidentiary record and the very filing of this bankruptcy case belie the Debtor's position. If the Debtor's principals truly believed what they now are telling the Court,

---

own money at risk and decided instead to file this bankruptcy proceeding in the misguided hope that the Court would allow them to gamble with money that is collateral for the Bond debt.

most importantly that the Project is worth $80 million in its current state, surely they would have been willing to put in the additional $2 million necessary to complete the Project by June 30, 2022. The fact that they were not willing to put more money in before the bankruptcy – and now in fact seek to contribute $1 million only as <u>secured</u> <u>debt</u> – demonstrates that even the Debtor's principals don't buy what they are selling.

17.    The Debtor has failed to prove that it can adequately protect the Bond Trustee and the Court should therefore deny the Cash Collateral Motion.

**C. The Debtor's incompetence is a further indication that it cannot adequately protect the Bond Trustee for the use of its Cash Collateral.**

18.    Supposedly, the Debtor learned less than two weeks prior to filing this bankruptcy case that, due to serious errors by Mr. Shaw and his company, North South Building, Inc. which is the Project's general contractor (the "<u>General Contractor</u>"), the Project would cost up to an additional $2 million over the current budget.

19.    On February 17, 2022, Mr. Waltz convened a call with his counsel and the Bond Trustee and its counsel to discuss the "newly discovered" budget shortfall. On that call, Mr. Waltz and his counsel informed the Bond Trustee and its counsel that, among other things: (i) Mr. Waltz was concerned that the City of Plano was not treating the Debtor fairly as a result of ongoing issues with Mr. Shaw and the General Contractor, (ii) there had been a setback on finding a solution to certain construction issues involving an operating rail line that runs across part of the Project, (iii) there were "multiple indications that the prior leadership of the Development" (i.e., Richard Shaw) had "created reputational issue with vendors" which might be impacting the Project's relationship with the City of Plano and the rail issue, and (iv) Richard Shaw "had created a stigma" with contractors.

20.     In total, Mr. Waltz opined that, including contingency, the completion of the Project would require an additional $2,000,000 beyond the current budgeted amount. Mr. Waltz expressed frustration with the Project and likened it to a "bad apple" that was negatively impacting his other business concerns and suggested that he would walk away from the Project. Mr. Waltz's counsel suggested that Mr. Waltz would be willing to turn the Project over to the Bond Trustee and give the Bond Trustee a deed in lieu or cooperate in a receivership proceeding. Mr. Waltz also suggested that there was a real possibility that the Project would be vandalized or looted and suggested that the Bond Trustee should immediately secure the facility, which the Bond Trustee did.[9] The call ended with Mr. Waltz demanding that the Bond Trustee contribute the additional $2 million needed from funds in the O&M Fund, even though Mr. Waltz is well aware that those funds cannot be used for construction pursuant to the terms of the Trust Indenture. *See also* **Exhibit C,** Updated Proposal to Bridgemoor Bondholders – 2/28/22 (identifying $8,000,000 as cost to complete construction).

21.     Mr. Waltz's abrupt change of attitude – from threatening to abandon the Project because he was tired of throwing good money after bad to claiming that the Project is now worth "upwards of $80 million" – is startling, to say the least. And now, the Debtor seeks to use bankruptcy to force what it could not achieve consensually outside of bankruptcy. But filing bankruptcy has not solved the problems that have plagued the Project; if anything it has exacerbated them. The Debtors still do not have adequate funds in the Project Fund to complete the Project. And the administrative costs that will be layered on to the Project as a result of this bankruptcy will only put the Project further in the red.

---

[9] Mr. Waltz has since ordered the security detail off of the property.

22.     The problems with the Debtor are not recent but began at the inception of the Bond financing. The Bonds were offered for sale pursuant to an Official Statement dated December 21, 2018 (the "Official Statement") upon which Bondholders relied in making their decision to purchase the Bonds. In the Official Statement, the Debtor represented that Mr. Shaw, who signed the Debtor's bankruptcy petition, would "enter into a Guaranty Agreement dated December 1, 2018, in favor of the [Bond] Trustee" that would "guarantee completion of construction of the Community . . . at a cost not exceeding the amount allocated therefor under the final written budget for such construction." **Exhibit D**, Official Statement at p. (iii), (9). That approved budget was $40,014,900. *Id.* In other words, in the Official Statement, the Debtor assured Bondholders that, if there were insufficient funds to complete the Project, Mr. Shaw, the Debtor's principal and owner of the General Contractor, would personally pay the shortfall. Unfortunately, the statements to that effect in the Official Statement were false and materially misleading – Richard Shaw never executed the promised construction completion guaranty in connection with the issuance of the Bonds.

23.     As noted, the Project has been in trouble since the time the Debtor stopped making payments on the Bonds in November 2020, which resulted in Events of Defaults under the Bond Documents. Given the existence of the Events of Defaults, the terms of the Bond Documents prohibited the Debtor from accessing funds in the Project Fund. Notwithstanding the clear terms of the Bond Documents, the Debtor has repeatedly threatened the Bond Trustee and the Bondholders with dire consequences if the Bond Trustee did not voluntarily hand over funds to pay Project shortfalls from both the Project Fund (which was unavailable to the Debtor because of the Events of Default), and funds held by the Bond Trustee as collateral for the Bonds in the O&M

Fund (which, pursuant to the terms of the Trust Indenture, are earmarked for specific uses other than construction of the Project).

24.     The Bond Trustee, as required under the Bond Documents, has steadfastly refused to hand over such funds, and instead has repeatedly insisted that Mr. Waltz and Mr. Shaw first pay the shortfalls because: (i) Mr. Shaw was supposed to have executed a completion guaranty but did not, and (ii) the Loan Agreement requires that the Debtor use its own funds to complete the Project if there are insufficient monies in the Project Fund to do so. **Exhibit E**, Loan Agreement § 3.6,

25.     Despite the troubled relationship, the Bond Trustee and the Debtor agreed that once the Debtor funded projected budget shortfalls such that the projected amount to complete the Project was no more than the balance in the Project Fund, the Bond Trustee would allow the Debtor to access the Project Fund to complete the Project, despite the ongoing Events of Default. Prior to the bankruptcy filing, the Bond Trustee and the Debtor were very close to documenting that agreement through a forbearance agreement.[10] And, for a period of time, the Debtor, albeit grudgingly, was performing under that agreement by funding projected shortfalls in the budget. Indeed, Mr. Waltz repeatedly and publicly assured the Bond Trustee and the Bondholders that he and Mr. Shaw were committed to paying the shortfalls. *See, e.g.,* **Exhibit F**, Call with the Bridgemoor at Plano Bondholders November 19, 2021 Agenda (stating that Mr. Waltz and Mr. Shaw "are committed to funding the remaining amount necessary to make the remaining 'cash to complete' match the remaining funds of $6.2 million" in the Project Fund).[11]

---

[10] The forbearance agreement required the consent of the holders of a majority in aggregate principal amount of the Series 2018A and Series 2018B Bonds.

[11] The Debtor caused this document to be posted to the EMMA System.

26.    With all the water that has gone under the bridge, it is difficult to conceive of how the Debtor believes that filing for bankruptcy will be helpful to it. In addition to the added layer of administrative costs attendant to any bankruptcy case, bankruptcy in and of itself cannot solve the myriad issues surrounding the Debtor's mismanagement of the Project. In Mr. Waltz's own words, Mr. Shaw, whose construction company made millions of dollars off of the Project, is "incompetent." So much so that Mr. Waltz was forced to bring in another construction company to complete the Project. On more than one occasion Mr. Waltz has remarked that he is embarrassed to be associated with Mr. Shaw. Mr. Shaw's "incompetence" has resulted in significant delays to the Project, and added significant additional expense to the Project including, but not limited to, the additional costs incurred to replace Mr. Shaw's company.

27.    Likewise, the bankruptcy cannot solve the problem that Mr. Waltz has been an absentee manager who has been living out of the country for many months, and, who, on information and belief, has no present intention of returning to the country.

28.    Finally, the bankruptcy cannot correct for the fact that the Debtor has been consistently and inexplicably unable to produce anything close to an accurate budget. In fact, the Bond Trustee was forced to hire an accountant at its own expense to assist the Debtor with preparing a construction completion budget, a task that so completely flummoxed the Debtor that it was unable to produce even a draft budget on its own for many months. Examples of the Debtor's inability to accurately budget abound in the Cash Collateral Motion and the attached budgets, including the following:

> ➢ The Debtor has Misrepresented the Amount Required to Complete the Project. The Debtor requests authority to use the Cash Collateral and implies the Project can be completed by the end of June[12] by using the funds it references in the Cash

---

[12] Although the Debtor does not mention an actual completion date in the Cash Collateral Motion, in its DIP Financing Motion, the Debtor claims that completion is "currently projected in June, 2022." DIP Financing Motion at ¶ 11. In

**OBJECTION OF THE HUNTINGTON NATIONAL BANK, AS BOND TRUSTEE, TO
DEBTOR'S FIRST DAY MOTIONS, INCLUDING USE OF CASH COLLATERAL
AND APPROVAL OF DEBTOR IN POSSESSION FINANCING                    Page 16**

Collateral Motion (i.e., the $6.2 million in the Project Fund and the $1 million from the proposed DIP loan). This is not the case. According to the last pre-petition calculation by the Debtor, it will cost at least $8 million to complete the Project. **Exhibit C** Updated Proposal to Bridgemoor Bondholders – 2-28-2022. Notwithstanding this $8 million estimate, the Debtor's budget only includes construction expenditures of approximately $5.15 million through its end date of June 24. Because of this, the $3.1 million in cash that remains at the end of June is illusory as nearly all of it will be needed to complete construction after the period in which the current budget ends. Moreover, the fact that the budget leaves $3 million in construction expenditures unaccounted-for likely means that the completion schedule is closer to the end-of-August completion date that the Debtor had previously told the Bond Trustee, and not the end-of-June timeline that it now tells the Court. The Debtor's budget shortfalls are further exacerbated by the facts that, as noted below, the Debtor has added $2.27 million from the O&M fund that it has not even requested to use and that the Debtor has left numerous expenses out of its budget, including nearly all bankruptcy expenses including professional fees and payments to the United States Trustee.

➤ The Debtor Includes Amounts in its Budget which it Has Not Requested Authority to Use. As mentioned above, in footnote 6, the Debtor includes in the budget the $2,270,000 held by the Bond Trustee in the O&M Fund even though it has not asked the Court to allow it to access those funds and those funds are not permitted, by the express terms of the Indenture, to be used for construction costs.

➤ The Debtor has Failed to Disclose the Over $3 Million of Mechanics' Liens on the Project. Nowhere in the Cash Collateral Motion (or in any of the other First Day Motions) does the Debtor reference the over $3 million of mechanics' liens that the Debtor has saddled the Project with, nor does the Debtor provide any explanation as to how it intends to deal with those liens. The Debtor has also failed to include any amounts whatsoever in its budget to pay or defend against those liens.

29.    While the Debtor claims that it can complete the Project in June 2022 by using only the $6.2 million in the Project Fund, the $1 million from the DIP loan, and the initial rents generated from opening the Project, the Bond Trustee's experience over the last few years is that the Debtor cannot be taken at its word when it comes to budgets or timing issues. Throughout the

---

fact, as recently as February 1st, in connection with the negotiation of the forbearance agreement, the Debtor's counsel emailed counsel to the Trustee a revised draft of the forbearance agreement that pushed out the completion milestone date by which the Debtor would be required to receive all of its temporary certificates of occupancy from July 31, 2022 to August 31, 2022 and receipt of final certificates of occupancy to the later of (i) ninety days after the issuance of the applicable temporary certificate of occupancy, or (ii) within forty-five (45) days after approval of any flood plain issues and/or rail approvals (for units impacted by such flood plain issues or rail approvals). See **Exhibit G**, Forbearance Agreement, at §II(k) (with accompanying email).

**OBJECTION OF THE HUNTINGTON NATIONAL BANK, AS BOND TRUSTEE, TO DEBTOR'S FIRST DAY MOTIONS, INCLUDING USE OF CASH COLLATERAL AND APPROVAL OF DEBTOR IN POSSESSION FINANCING                                    Page 17**

prior 18-month period, the Debtor has continuously failed to meet any budget or timing milestone

that it has set for itself. There is no indication that the Debtor can do so now that it is in bankruptcy.

30.    The Debtor's proposed use of Cash Collateral risks leaving the Bond Trustee in the

worst possible position – with a still incomplete Project but with no funds on hand. The Debtor

has failed to prove that it can adequately protect the Bond Trustee. Accordingly, in order to avoid

this tremendous harm to the Bond Trustee and its collateral position, the Court should deny the

Debtor's request to use Cash Collateral.

## II.    Limited Objection to DIP Financing Motion

31.    Pursuant to the DIP Financing Motion, the Debtor seeks authorization for a $1

million loan from DCJ Capital, LLC (the "Affiliate Lender"), $500,000 of which would be

advanced on an interim basis and $500,000 of which would be advanced on final approval. The

loan from the Affiliate Lender would be subordinate to the liens in favor of the Bond Trustee.

32.    Subject to the few issues raised below, the Bond Trustee supports the Debtor's

proposal to fund necessary expenses with a cash infusion from current equity or affiliates of current

equity. If approved, the $500,000 proposed by the Debtor on an interim basis will avert the cash

emergency claimed by the Debtor for a few weeks and give the Bond Trustee and the Debtor time

to discuss a consensual use of Cash Collateral or to litigate the issues raised in connection

therewith. The initial $500,000 cash infusion from the Affiliate Lender will be sufficient to cover

the Debtor's requests in the Employee Motion and the Utilities Motion, will likely be sufficient to

pay some critical vendors (if the Court determines such expenditures appropriate), and can be used

to continue to purchase goods and continue construction if the Debtor believes that is in its best

interest.

33.     Further, as stated above, funding of the Project by current equity is consistent with the Debtor's statements in the Official Statement that Richard Shaw would personally fund construction shortfalls, with the provision in the Loan Agreement that requires the Debtor to pay amounts required to complete the Project in excess of amounts in the Project Fund and with the Debtor's repeated public assurances to the Bond Trustee and the Bondholders that the Debtor's principals would fund shortfalls. Payment of cost over-runs by current equity or affiliates of current equity is therefore entirely appropriate.

34.     So long as the order approving the proposed $1 million loan with the Affiliate Lender is clear that the loan is junior to the obligations owed to the Bond Trustee in terms of payment, remedies and lien-priority, the Bond Trustee does not object to the loan (although the Bond Trustee notes that a committee of unsecured creditors, if appointed, might have an issue with the fact that the funds are being advanced as a loan rather than as equity at this early stage of the case, and will seemingly be senior to unsecured creditors).[13] The Bond Trustee also notes that the DIP Financing Motion does not address the relative priority of the DIP Loan vis-à-vis the over $3 million in mechanic's liens. There are, however, several proposed provisions that are objectionable.

35.     First, the Debtor should not pay monthly interest payments to an insider when it is not making similar interest payments to the Bond Trustee, especially since the Debtor takes the position that the Bond Trustee is over-secured. There is no source from which to make these insider

---

[13] The Bond Trustee also questions the veracity of the Debtor's statement at paragraph 19 of the DIP Financing Motion that the Debtor was not able to obtain post-petition credit on an unsecured basis. Although this statement is likely true to the extent that the Debtor sought financing from a third-party lender, the proposed DIP loan is being funded by current equity (or an affiliate of current equity), and is already subordinated to almost $69 million in Bond debt (exclusive of default interest and professional fees and other expenses). Since the DIP loan is likely being advanced to protect current equity's position in the Project or for other strategic reasons in the bankruptcy case, it is likely that the Debtor could have procured the same funds from its principals on an unsecured basis or even more appropriately as an equity contribution.

**OBJECTION OF THE HUNTINGTON NATIONAL BANK, AS BOND TRUSTEE, TO DEBTOR'S FIRST DAY MOTIONS, INCLUDING USE OF CASH COLLATERAL AND APPROVAL OF DEBTOR IN POSSESSION FINANCING**                    **Page 19**

interest payments other than the funds being borrowed from the Affiliate Lender or the cash held by the Bond Trustee that serves as the Bond Trustee's collateral. To the extent that the Debtor seeks to use the Bond Trustee's Cash Collateral to make these interest payments, it would be impossible for the Debtor to provide the Bond Trustee with adequate protection for such use, especially given the other terms of the proposed DIP Loan including that it matures at the end of the year.

36.     Second, as noted above, any order approving the DIP Loan should provide that it is junior to the obligations owed to the Bond Trustee in terms of payment, remedies and lien-priority. The Debtor claims that this is the case, but also states that the Affiliate Lender will have a first priority lien on any unencumbered assets of the Debtor, "including any cash and proceeds funded by the Issuer." *See* DIP Financing Motion, at ¶ 16. The Debtor's plan appears to be to move the $6.2 million held by the Bond Trustee into its own account and then grant the Affiliate Lender a first priority lien on those amounts.[14] Since the Debtor cannot provide the Bond Trustee adequate protection to use the $6.2 million in the first instance for the reasons stated in Part I above, the Debtor's proposal is flawed. If, however, the Bond Trustee ultimately consents to the Debtor using some portion of the funds held by the Bond Trustee for construction purposes, or in the unlikely event the Court finds that the Bond Trustee is adequately protected, under no circumstance should the Affiliate Lender be able to prime the security interest of the Bond Trustee in those funds. Appropriate protections would need to be put in place to prevent any such priming.

---

[14] The Trustee has no objection to the Affiliate Lender having a first-priority lien on the funds advanced by the Affiliate Lender.

### III.    Limited Objection to Critical Vendor Motion

37.    The Bond Trustee does not object to the Debtor paying so-called critical vendors to the extent this Court makes the required findings that such payments are appropriate. The Bond Trustee does, however, object to any such amounts being funded from the Bond Trustee's Cash Collateral as the Debtor cannot provide the Bond Trustee adequate protection for use of such amounts for the reasons set forth in Part I hereof. Instead, the Debtor should only be permitted to pay such amounts from further contributions from current equity or the amounts advanced by the Affiliate Lender.

38.    The Debtor's current request, however, is flawed in that it contains none of the information that a Court would generally require in a critical vendor motion such as the identity of the vendor the Debtor seeks to pay, the amount to be paid to each vendor, and the specific reasons why that vendor is essential to the Debtor's reorganization efforts. Instead, the Critical Vendor Motion contains a blanket request for the immediate payment of $517,936.97 for "supplies of equipment, goods, and services essential to the Debtor's business." *See* Critical Vendor Motion, at ¶9. Phrasing its request in this manner is entirely unhelpful as it is just the Debtor stating that it wants to pay critical vendors because they are critical vendors.

39.    The Bond Trustee further notes that the amount requested by the Debtor likely demonstrates that the Debtor has not made proper inquiry into whether payment of certain vendors is essential to the Debtor's reorganization efforts. The Debtor seeks to pay approximately 2/3rd of the amounts owed to its top 20 creditors, leading to the logical question: who isn't a critical vendor? *See* List of 20 Largest Unsecured Creditors Filed by BSPV-Plano, LLC [Docket No. 3]. Without

proper explanation as to who is receiving the funds and why such vendors are critical, the Debtor's request should be denied.

## IV.    Limited Objection to Employee Motion

40.    The Bond Trustee does not object to the Debtor making the payments requested in the Employee Motion. The Bond Trustee does, however, object to any such amounts being funded from the Bond Trustee's Cash Collateral as the Debtor cannot provide the Bond Trustee adequate protection for use of such amounts for the reasons set forth in Part I hereof. Instead, the Debtor should only be permitted to pay such amounts from further contributions from current equity or the amounts advanced by the Affiliate Lender.

41.    The Bond Trustee further notes that the Debtor has not included any amounts for payroll in the first four weeks of its proposed budget. See Cash Collateral Motion, Ex. A. The Debtor should explain this omission as part of its first-day presentation as it affects its overall budget and anticipated cash needs. In addition, the Debtor should clarify that no insiders are to receive payments as part of the relief requested.

## V.    Limited Objection to Utilities Motion

42.    The Bond Trustee does not object to the relief requested in the Debtor's Utilities Motion, including the proposed adequate assurance payments, especially given that the Debtor only seeks to put $6,280 in a segregated bank account. The Bond Trustee does, however, object to any such amounts being funded from the Bond Trustee's Cash Collateral as the Debtor cannot provide the Bond Trustee adequate protection for use of such amounts for the reasons set forth in Part I hereof. Instead, the Debtor should only be permitted to pay such amounts from further contributions from current equity or the amounts advanced by the Affiliate Lender.

43.     Notwithstanding the foregoing, the Bond Trustee notes that, under the Debtor's budget, utility usage appears to increase significantly as the case progresses and so basing adequate assurance payments at 50% of past payments will not result in 50% reserves for future use. The Bond Trustee raises this at this time to avoid a request to use the Bond Trustee's Cash Collateral on an emergency basis at some point in the future.

## VI.   Request that the Debtor Address the Issues Raised in the Bond Trustee's Preliminary Objection as Part of its First-Day Presentation

44.     Finally, the Bond Trustee incorporates by reference the Bond Trustee's Preliminary Objection, filed on March 4, 2022, and requests that the Court require the Debtor to address the issues raised in that objection as part of its first day presentation. The Debtor's budget attached to the Cash Collateral Motion indicates that the Debtor intends to move residents into the Project in mid-March. *See* Cash Collateral Motion, Ex. B, at fn. 2. Allowing residents to move into the Project will fundamentally change the nature of this case from being a construction case to one that has an operating business with residents living on the Project. Further, it would be reckless for the Debtor to move residents into the Project without knowing whether the Debtor can finish the Project, the cost of doing so, and how long doing so will take. Given these factors, and the other factors raised in the Bond Trustee's Preliminary Objection, the Bond Trustee believes that moving residents into the Project is not within the Debtor's ordinary course of business and therefore requires Court approval.

## Conclusion

45.     For the foregoing reasons, the Bond Trustee requests that the Court deny the relief requested in the Cash Collateral Motion, and condition the relief requested in the DIP Financing Motion, the Employee Motion, the Utilities Motion and the Critical Vendor Motion as set forth herein, and grant such other relief as may be just and proper.

Dated: March 7, 2022.

By: */s/ Eric Soderlund*

Judith W. Ross
State Bar No. 21010670
Frances A. Smith
State Bar No. 24033084
Eric Soderlund
State Bar No. 24037525
Jessica Lewis
State Bar No. 24060956
**ROSS & SMITH, PC**
700 N. Pearl Street, Suite 1610
Dallas, Texas 75201
Telephone: 214-377-7879
Facsimile: 214-377-9409
Email: Judith.riss@judithwross.com
frances.smith@judithwross.com
eric.soderlund@judithwross.com
jessica.lewis@judithwross.com

-and-

**GREENBERG TRAURIG, LLP**

Kevin J. Walsh
(*Pro Hac Vice* Application pending)
WalshKe@gtlaw.com
Charles W. Azano
(*Pro Hac Vice* Application pending)
AzanoCh@gtlaw.com
Colleen A. Murphy
(*Pro Hac Vice* Application forthcoming)
MurphyC@gtlaw.com
One International Place, Suite 200
Boston, Massachusetts 02110
Telephone: (617) 310-6000
Facsimile: (617) 310-6001

*Counsel for The Huntington National Bank solely in its Capacity as Bond Trustee on behalf of Holders of Certain Bonds*

## <u>CERTIFICATE OF SERVICE</u>

The undersigned hereby certifies that on this 7th day of March 2022, I caused to be served a true and correct copy of the above and foregoing document via the Court's ECF filing system (with exhibits) and/or U.S. mail (without exhibits)[15] as indicated in the attached Master Service List.

*/s/ Frances A. Smith*
Frances A. Smith

---

[15] Anyone wishing to receive copies of the exhibits may contact Michael Coulombe by email at michael.coulombe@judithwross.com.

**OBJECTION OF THE HUNTINGTON NATIONAL BANK, AS BOND TRUSTEE, TO DEBTOR'S FIRST DAY MOTIONS, INCLUDING USE OF CASH COLLATERAL AND APPROVAL OF DEBTOR IN POSSESSION FINANCING**                    **Page 25**

**Master Service List**
**BSPV-Plano, LLC**
**Case No. 22-40276**

*__Debtor:__*
BSPV-Plano, LLC
4851 Keller Springs Rd., #209
Addison, TX 75001
**Served via U.S. mail**

*__Debtor's Counsel:__*
Munsch Hardt Kopf & Harr
Attn:  Thomas Daniel Bergham
  Davor Rukavina
500 N. Akard, Ste. 3800
Dallas, TX 75201-6659
Phone: 214-855-7554
Fax: 214-978-4346
Email: tberghman@munsch.com
  drukavina@munsch.com
**Served via ECF**

Munsch Hardt Kopf and Harr PC
Attn:  Thanhan Nguyen
  Jay H. Ong
1717 West 6th Street, Suite 250
Austin, TX 78703
Phone: 512-391-6100
Fax: 512-391-6149
Email: anguyen@munsch.com
  jong@munsch.com
**Served via ECF**

*__U.S. Trustee:__*
Office of the U.S. Trustee
110 N. College Ave., Suite 300
Tyler, TX 75702
Phone: 903-590-1450
Email: ustpregion06.ty.ecf@usdoj.gov
**Served via ECF**

*__20 Largest Creditors:__*
AGES Service Company, Inc.
1080 S. Kimball Ave., Ste. 150
Southlake, TX 76092
**Served via U.S. mail**

American Arbitration Association
120 Broadway, 21st Fl.
New York, NY 10271
**Served via U.S. mail**

Centex Skilled Trades, LLC
1813 Ann and Dossy Ct.
Crowley, TX 76036
**Served via U.S. mail**

Civil Point Engineers
9101 LBJ Frwy., Ste. 300
Dallas, TX 75243
**Served via U.S. mail**

Dalworth Framing Corp.
4817 Worth St.
Dallas, TX 75246
**Served via U.S. mail**

JM Lawncare & Sprinkler, LLC
806 Jennifer Ct.
Highland Village, TX 75077
**Served via U.S. mail**

Landstar Excavation Inc.
P. O. Box 293838
Lewisville, TX 76247
**Served via U.S. mail**

Miguel Hernandez
1508 Indiana Ct.
Irving, TX 75060
**Served via U.S. mail**

Oldham Lumber Company
8738 Forney Rd.
Dallas, TX 75227
**Served via U.S. mail**

Paradis Brothers Construction Inc.
450 Cherry Ln.
Southlake, TX 75092
**Served via U.S. mail**

Ranger Fire, Inc.
1000 S. Main St., Ste. 150
Grapevine, TX 76051
**Served via U.S. mail**

Regent Construction
1107 E 1st St.
Fort Worth, TX 76102
**Served via U.S. mail**

Republic Services #615
551 Huffines Blvd.
Lewisville, TX 75056
**Served via U.S. mail**

Slates Harwell LLP
1700 Pacific Ave., Ste. 3800
Dallas, TX 75201
**Served via U.S. mail**

Southwest Enclosure Systems, Inc.
1438 Crescent Dr., #104
Carrollton, TX 75006
**Served via U.S. mail**

Terry's Portable Welding
106 E. Pioneer
Irving, TX 75061
**Served via U.S. mail**

Trinia Zais
P. O. Box 1403
Decatur, TX 76234
**Served via U.S. mail**

Trusted Mechanical Services
7665 Dick Price Rd.
Mansfield, TX 76063
**Served via U.S. mail**

TXU Energy
P. O. Box 650638
Dallas, TX 75265-0638
**Served via U.S. mail**

Zais Companies
P. O. Box 1403
Decatur, TX 76234
**Served via U.S. mail**