TRUST INDENTURE

Dated as of December 1, 2018

by and between

NEW HOPE CULTURAL EDUCATION FACILITIES FINANCE CORPORATION
as Issuer

and

THE HUNTINGTON NATIONAL BANK
as Trustee

Relating to

$66,795,000
New Hope Cultural Education Facilities Finance Corporation
Senior Living Revenue Bonds
(Bridgemoor Plano Project)

Consisting of:

$50,530,000 Senior Series 2018A
$6,765,000 Taxable Senior Series 2018B
$5,000,000 Subordinate Series 2018C
$4,500,000 Junior Subordinate Series 2018D

EXHIBIT A

## TABLE OF CONTENTS

Page

### ARTICLE I
### DEFINITIONS AND INTERPRETATION

| | | |
|---|---|---|
| Section 1.01 | Definitions | 4 |
| Section 1.02 | Rules of Construction | 28 |
| Section 1.03 | Content of Certificates and Opinions | 28 |

### ARTICLE II
### THE SERIES 2018 BONDS

| | | |
|---|---|---|
| Section 2.01 | Authority for and Issuance of Series 2018 Bonds; Interest on the Series 2018 Bonds | 29 |
| Section 2.02 | Interest on Bonds | 31 |
| Section 2.03 | Execution | 31 |
| Section 2.04 | Limited Obligations | 31 |
| Section 2.05 | Authentication | 33 |
| Section 2.06 | Form of Bonds | 33 |
| Section 2.07 | Delivery of Series 2018 Bonds | 33 |
| Section 2.08 | Mutilated, Lost, Stolen or Destroyed Bonds | 34 |
| Section 2.09 | Registration and Transfer of Bonds; Persons Treated as Holders | 34 |
| Section 2.10 | Cancellation and Disposition of Bonds | 35 |
| Section 2.11 | Temporary Bonds | 35 |
| Section 2.12 | Book-Entry Form | 36 |
| Section 2.13 | Additional Bonds | 37 |
| Section 2.14 | Delivery of Additional Bonds | 37 |
| Section 2.15 | CUSIP Numbers | 39 |

### ARTICLE III
### REDEMPTION OR PURCHASE OF SERIES 2018 BONDS

| | | |
|---|---|---|
| Section 3.01 | Mandatory Redemption of Series 2018 Bonds | 39 |
| Section 3.02 | Optional Redemption of Series 2018 Bonds | 40 |
| Section 3.03 | Mandatory Sinking Fund Redemption | 41 |
| Section 3.04 | Purchase in Lieu of Redemption | 42 |
| Section 3.05 | Selection of Bonds to Be Redeemed | 43 |
| Section 3.06 | Notice of Redemption | 43 |

Section 3.07    Payment of Redemption Price ........................................................ 44

Section 3.08    No Partial Redemption After Default ........................................... 44

Section 3.09    Effect of Notice of Redemption .................................................... 44

Section 3.10    Redemption Payments ................................................................... 45

Section 3.11    Optional Tender ............................................................................ 45

Section 3.12    Redemption of Additional Bonds ................................................. 46

Section 3.13    Optional Tender of Bonds in Connection With a Change of Control ........... 46

### ARTICLE IV
### GENERAL COVENANTS

Section 4.01    Payment of Bonds; Limited Obligations ....................................... 47

Section 4.02    Performance of Covenants; Authority: Due Execution ................. 48

Section 4.03    Instruments of Further Assurance .................................................. 48

Section 4.04    Recording and Filing; Further Instruments ................................... 48

Section 4.05    [Reserved] ..................................................................................... 48

Section 4.06    No Disposition of Trust Estate, Project or Project Revenues ........ 48

Section 4.07    Access to Books ............................................................................ 49

Section 4.08    Trustee to Retain Information ....................................................... 49

Section 4.09    Tax Covenants Relating to the Tax-Exempt Bonds ...................... 49

### ARTICLE V
### DEPOSIT OF BOND PROCEEDS; FUNDS AND ACCOUNTS; REVENUES

Section 5.01    Creation of Funds and Accounts ................................................... 50

Section 5.02    Deposit of Funds ........................................................................... 51

Section 5.03    Disbursements From the Project Fund .......................................... 51

Section 5.04    Revenue Fund ............................................................................... 52

Section 5.05    Bond Fund ..................................................................................... 54

Section 5.06    Debt Service Reserve Fund ........................................................... 56

Section 5.07    Rebate Fund .................................................................................. 57

Section 5.08    Operating Fund ............................................................................. 58

Section 5.09    Operations and Maintenance Reserve Fund .................................. 59

Section 5.10    Insurance and Tax Escrow Fund ................................................... 60

Section 5.11    Repair and Replacement Fund ...................................................... 61

Section 5.12    Administration Fund ..................................................................... 62

Section 5.13    Surplus Fund ................................................................................. 62

Section 5.14      Bonds Not Presented for Payment ............................................................. 63

Section 5.15      Money Held in Trust ................................................................................ 63

Section 5.16      Payment to the Borrower ......................................................................... 64

Section 5.17      Deposit of Extraordinary Revenues ......................................................... 64

ARTICLE VI
INVESTMENTS

Section 6.01      Investments ............................................................................................. 64

ARTICLE VII
DEFEASANCE

Section 7.01      Defeasance ............................................................................................. 66

ARTICLE VIII
DEFAULTS AND REMEDIES

Section 8.01      Events of Default .................................................................................... 67

Section 8.02      Acceleration; Other Remedies ................................................................ 68

Section 8.03      Restoration to Former Position ................................................................ 70

Section 8.04      Cure by Holders ...................................................................................... 70

Section 8.05      Controlling Holders' Right to Direct Proceedings .................................... 70

Section 8.06      Limitation on Holders' Right to Institute Proceedings ............................. 70

Section 8.07      No Impairment of Right to Enforce Payment ........................................... 71

Section 8.08      Proceedings by Trustee Without Possession of Bonds ............................ 71

Section 8.09      No Remedy Exclusive .............................................................................. 71

Section 8.10      No Waiver of Remedies ........................................................................... 71

Section 8.11      Application of Money ............................................................................... 71

Section 8.12      Severability of Remedies ........................................................................ 73

Section 8.13      Notice of Event of Default ....................................................................... 73

ARTICLE IX
TRUSTEE

Section 9.01      Acceptance of Trusts ............................................................................... 73

Section 9.02      No Responsibility for Recitals ................................................................. 76

Section 9.03      Limitations on Liability and Indemnity ................................................... 76

Section 9.04      Compensation, Expenses and Advances ................................................... 76

Section 9.05      Notice of Events of Default ..................................................................... 77

Section 9.06      Action by Trustee .................................................................................... 77

Section 9.07   Good Faith Reliance ................................................................... 77

Section 9.08   Dealings in Bonds or with the Issuer or the Borrower.................. 77

Section 9.09   Resignation of Trustee .............................................................. 77

Section 9.10   Removal of Trustee.................................................................... 78

Section 9.11   Appointment of Successor Trustee ............................................. 78

Section 9.12   Qualifications of Trustee............................................................ 78

Section 9.13   Judicial Appointment of Successor Trustee................................. 78

Section 9.14   Acceptance of Trusts by Successor Trustee................................. 79

Section 9.15   Successor by Merger or Consolidation ........................................ 79

Section 9.16   Intervention in Litigation of the Issuer ....................................... 79

Section 9.17   Paying Agent............................................................................. 79

Section 9.18   Qualifications of Paying Agent; Resignation; Removal................. 79

Section 9.19   Several Capacities; Duty to Cooperate ........................................ 80

Section 9.20   Additional Duties ...................................................................... 80

Section 9.21   Survival.................................................................................... 80

## ARTICLE X
### EXECUTION OF INSTRUMENTS BY HOLDERS AND PROOF OF OWNERSHIP OF BONDS

Section 10.01   Execution and Proof of Ownership.............................................. 80

## ARTICLE XI
### MODIFICATION OF BOND DOCUMENTS

Section 11.01   Limitations ............................................................................... 81

Section 11.02   Supplemental Indentures Without Holder Consent ....................... 81

Section 11.03   Supplemental Indentures Requiring Holders' Consent.................. 82

Section 11.04   Amendment of Borrower Documents Without Holder Consent.................... 83

Section 11.05   Amendment of Borrower Documents Requiring Holders' Consent.............. 83

Section 11.06   Procedures for Amendments....................................................... 84

Section 11.07   Opinions; Certificate ................................................................. 84

Section 11.08   Effect of Amendments; Other Consents ...................................... 84

## ARTICLE XII
### MISCELLANEOUS

Section 12.01   Successors of the Issuer ............................................................ 85

Section 12.02   Parties in Interest...................................................................... 85

Section 12.03     Severability ................................................................................................. 85

Section 12.04     No Personal Liability ................................................................................... 85

Section 12.05     Counterparts ................................................................................................. 85

Section 12.06     Governing Law ............................................................................................. 85

Section 12.07     Notices .......................................................................................................... 85

Section 12.08     Holidays ........................................................................................................ 87

Section 12.09     Force Majeure ............................................................................................... 87

Section 12.10     U.S.A. Patriot Act ........................................................................................ 87

Exhibit A          (FORM OF SERIES 2018A BOND) ........................................................... A-1

Exhibit B          (FORM OF SERIES 2018B BOND) ........................................................... B-1

Exhibit C          (FORM OF SERIES 2018C BOND) ........................................................... C-1

Exhibit D          (FORM OF SERIES 2018D BOND) ........................................................... D-1

Exhibit E          TENDER NOTICE ...................................................................................... E-1

Exhibit F          COSTS OF ISSUANCE ACCOUNT REQUISITION ............................... F-1

Exhibit G          INSURANCE AND TAX ESCROW FUND REQUISITION .................... G-1

Exhibit H          PROPERTY TAX ACCOUNT REQUISITION ......................................... H-1

Exhibit I          REPAIR AND REPLACEMENT FUND REQUISITION .......................... I-1

TRUST INDENTURE

THIS TRUST INDENTURE is made and entered into as of December 1, 2018, by and between the NEW HOPE CULTURAL EDUCATION FACILITIES FINANCE CORPORATION (the "Issuer"), a non-profit cultural education facilities finance corporation duly organized and validly existing under the laws of the State of Texas and THE HUNTINGTON NATIONAL BANK, a national banking association, as trustee (together with its successors and assigns in the trust created hereunder, the "Trustee") and being qualified to accept and administer the trusts hereby created, as Trustee. All capitalized terms used in this Indenture have the meanings ascribed to them in Section 1.01 of this Indenture.

RECITALS:

WHEREAS, the Issuer is a non-profit cultural education facilities finance corporation duly organized and validly existing under the laws of the State of Texas; and

WHEREAS, pursuant to Chapter 337, Texas Local Government Code, as amended, the Issuer is authorized and empowered to issue its revenue bonds and to lend the proceeds thereof for the purpose of financing "Cultural Facilities," within the meaning of the Act; and

WHEREAS, the Issuer hereby finds and determines that the Project hereinafter referenced is necessary and convenient to construct and furnish an independent senior living community and in so doing will provide a community benefit and will furnish shelter, food, medical services, social activities and other personal services or attention as described in Section 221.003(8)(D) of the Texas Health and Safety Code, as amended; and

WHEREAS, pursuant to the laws of the State, and particularly the Act, the Issuer has agreed to issue its revenue bonds and to lend the proceeds thereof to BSPV-Plano, LLC, a Texas limited liability company (the "Borrower"), for the purpose of financing the acquisition, construction and equipping of a senior living facility for rental housing, all to be owned by the Borrower and to be located in the City of Plano, Collin County, Texas (the "Project"), funding capitalized interest during construction and for a period of not more than 12 months thereafter, funding debt service reserve accounts, and paying a portion of the costs of issuing such revenue bonds; and

WHEREAS, pursuant to and in accordance with the Act, and this Indenture, the Issuer desires to provide funds to finance the acquisition, construction and equipping of the Project by issuing its Senior Living Revenue Bonds (Bridgemoor Plano Project) Senior Series 2018A (the "Series 2018A Bonds") its Senior Living Revenue Bonds (Bridgemoor Plano Project) Taxable Senior Series 2018B (the "Series 2018B Bonds") its Senior Living Revenue Bonds (Bridgemoor Plano Project) Subordinate Series 2018C (the "Series 2018C Bonds") and its Senior Living Revenue Bonds (Bridgemoor Plano Project) Junior Subordinate Series 2018D (the "Series 2018D Bonds") in the combined aggregate principal amount of $66,795,000 (collectively, the "Series 2018 Bonds" and, together with any Additional Bonds that may be issued hereunder, the "Bonds"); and

WHEREAS, the Series 2018C Bonds and the Series 2018D Bond are being issued on a subordinate basis to the Senior Bonds and the Series 2018D Bonds are being issued on a subordinate basis to the Series 2018C Bonds;

WHEREAS, the Issuer has determined that the purpose of the Act in providing for the acquisition, construction and equipping of the Project will be realized by the issuance of the Series 2018 Bonds, and the loan of the proceeds of such Series 2018 Bonds (the "Loan") pursuant to a Loan Agreement dated as of even date herewith (the "Loan Agreement") between the Issuer and the Borrower, and therefore the Issuer has agreed to issue the Series 2018 Bonds and lend the proceeds thereof to the Borrower and the Borrower has agreed to (i) apply the proceeds of the Loan to pay a portion of the costs of acquisition, construction and equipping of the Project, to fund capitalized interest during construction and for a period of up to 12 months thereafter, to fund debt service reserve accounts, and pay a portion of the costs of issuance of the Bonds, (ii) make payments sufficient to pay the principal of and interest on the Bonds when due (whether at maturity, by redemption, acceleration or otherwise), and (iii) observe the other covenants and agreements and make the other payments set forth therein; and

WHEREAS, the Borrower has delivered to the Issuer four promissory notes, each dated the date of issuance of the Series 2018 Bonds in an original principal amount equal to the original principal amount of each respective Series of the Series 2018 Bonds (as amended, modified, or supplemented from time to time, the "Series 2018 Notes") evidencing its obligation to repay the Loan, and the Issuer has made the Loan to the Borrower, subject to the terms and conditions of the Loan Agreement, this Indenture and the applicable Deeds of Trust, Assignment of Rents and Leases, and Security Agreement (collectively, the "Mortgage"), each dated as of December 1, 2018 by the Borrower to the trustee named therein, for the benefit of Issuer and as assigned to the Trustee, as from time to time supplemented and amended, except as otherwise herein provided; and

WHEREAS, the Series 2018 Bonds, the certificates of registration and authentication to be endorsed on the Series 2018 Bonds and the form of assignment to be endorsed on each respective Series of the Series 2018 Bonds are to be in substantially the forms, with appropriate variations, omissions and insertions as permitted or required by this Indenture described in Exhibit A, Exhibit B, Exhibit C and Exhibit D, respectively; and

WHEREAS, all acts and proceedings required by law necessary to make the Series 2018 Bonds, when registered by the Comptroller of Public Accounts of the State of Texas and authenticated by the Trustee and duly issued as provided in this Indenture, the valid, binding and legal limited obligations of the Issuer, and to constitute this Indenture a valid and binding agreement for the uses and purposes herein set forth, in accordance with its terms, have been done and taken; and the execution and delivery of this Indenture have been in all respects duly authorized.

GRANTING CLAUSES

NOW, THEREFORE, the Issuer, in consideration of the premises and the acceptance by the Trustee of the trusts hereby created and of the purchase and acceptance of the Bonds by the Holders thereof, and for other good and valuable consideration, the receipt and sufficiency of

which are hereby acknowledged, to secure the payment of the principal of, premium, if any, and interest on the Bonds according to their tenor and effect and to secure the performance and observance by the Issuer of all the covenants expressed or implied herein and in the Bonds, does hereby bargain, sell, convey, mortgage, assign, pledge and grant, a security interest to the Trustee, and its successors in trust and assigns forever, for the securing of the performance of the obligations of the Issuer hereinafter set forth, in all of the Issuer's right, title and interest in and to the following property (the "Trust Estate"):

### GRANTING CLAUSE FIRST

The Loan Agreement, the Series 2018 Notes, the Mortgage and the Regulatory Agreement, including all extensions and renewals of the terms thereof, if any (except for Reserved Rights of the Issuer), including, but not limited to, Loan Payments made by the Borrower pursuant to the Loan Agreement and the Mortgaged Property, and the present and continuing right to make claim for, collect, receive and receipt for any of the sums, amounts, income, revenues, issues and profits and any other sums of money payable or receivable under the Loan Agreement, the Series 2018 Notes, the Mortgage and the Regulatory Agreement, to bring actions and proceedings thereunder or for the enforcement thereof, and to do any and all things which the Issuer is or may become entitled to do under the Loan Agreement, the Series 2018 Notes, the Mortgage and the Regulatory Agreement;

### GRANTING CLAUSE SECOND

All Project Revenues (as defined herein) of the Borrower, whether received by the Borrower or the Manager;

### GRANTING CLAUSE THIRD

All money and securities and interest earnings from time to time held by the Trustee under the terms of this Indenture (except amounts on deposit in the Rebate Fund and except that money and securities on deposit in the Funds and Accounts established with respect to the Bonds shall be held solely for the Holders of the Bonds);

### GRANTING CLAUSE FOURTH

Any and all other property rights and interests of every kind and nature from time to time hereafter by delivery or by writing of any kind granted, bargained, sold, alienated, demised, released, conveyed, assigned, transferred, mortgaged, pledged, hypothecated or otherwise subjected hereto, as and for additional security for the payment of the Bonds, by the Issuer or any other person on its behalf or with its written consent, and the Trustee is hereby authorized to receive any and all such property at any and all times and to hold and apply the same subject to the terms hereof; and

### GRANTING CLAUSE FIFTH

All the right, title, and interest of the Issuer in and to all proceeds (cash and noncash) of any or all of the foregoing, including, without limiting the generality of the foregoing, all inventory, accounts, chattel paper, documents, equipment, instruments, farm products, consumer

goods, and general intangibles constituting proceeds acquired with cash proceeds of any or all of the foregoing.

TO HAVE AND TO HOLD all and singular the Trust Estate, whether now owned or hereafter acquired, to the Trustee and its respective successors in trust and assigns forever;

IN TRUST NEVERTHELESS, upon the terms and trusts herein set forth (except as otherwise specifically provided herein), for the equal and proportionate benefit, security and protection of all present and future Holders of the Bonds without privilege, priority or distinction as to the lien or otherwise with respect to any of the Bonds over any of the other Bonds;

PROVIDED, HOWEVER, that if the Issuer, its successors or assigns, shall well and truly pay, or cause to be paid, the principal of, premium, if any, and interest on the Bonds due or to become due thereon, at the times and in the manner mentioned in the Bonds and as provided in Article VII hereof according to the true intent and meaning thereof, and shall cause the payments to be made as required under Article IV hereof, or shall provide, as permitted hereby, for the payment thereof in accordance with Article VII hereof, and shall well and truly keep, perform and observe all the covenants and conditions pursuant to the terms of this Indenture to be kept, performed and observed by it, and shall disburse or cause to be disbursed to the Trustee all sums of money due or to become due in accordance with the terms and provisions hereof, then upon such final payments or deposits as provided in Article VII hereof, this Indenture and the rights hereby granted shall cease, terminate and be void.

THIS TRUST INDENTURE FURTHER WITNESSETH, and it is expressly declared, that all Bonds issued and secured hereunder are to be issued, authenticated and delivered and all of the Trust Estate is to be dealt with and disposed of, under, upon and subject to the terms, conditions, stipulations, covenants, agreements, trusts, uses and purposes hereinafter expressed, and the Issuer has agreed and covenanted, and does hereby agree and covenant, with the Trustee and with the respective Holders, from time to time, of the Bonds, or any part thereof, as follows:

## ARTICLE I

## DEFINITIONS AND INTERPRETATION

Section 1.01   Definitions.  Unless the context otherwise requires, the following words and phrases shall, for all purposes of this Indenture and of the Loan Agreement and of any supplement or amendment hereto or thereto, have the following meanings:

"Account" or "Accounts" means any one or more, as the case may be, of the named and unnamed accounts established within any Fund.

"Act" means Chapter 337, Texas Local Government Code, as amended, all as now in effect and as it may from time to time hereafter be amended or supplemented.

"Additional Bonds" means the additional bonds authorized to be issued by the Issuer pursuant to the terms and conditions of Section 2.13 of this Indenture.

"Additional Payments" means those payments described in Section 3.2(b)(ii) of the Loan Agreement.

"Administration Expenses" means (a) the Ordinary Trustee's Fees and Expenses, (b) the Dissemination Agent Fee, (c) the Rebate Analyst Fee, (d) the Issuer's Fees and Expenses, and (e) the fees and expenses of any Servicer.

"Administration Fund" means the trust fund by that name established pursuant to Section 5.01 hereof.

"Advanced Funds" has the meaning provided in Section 8.04 hereof.

"Affiliate" means any Person (a) directly or indirectly controlling, controlled by, or under common control with the Borrower; or (b) a majority of the members of the Directing Body of which are members of the Directing Body of the Borrower. For purposes of this definition, control means with respect to: (a) a corporation having stock, the ownership, directly or indirectly, of more than 50% of the securities (as defined in Section 2(1) of the Securities Act of 1933, as amended) of any class or classes, the holders of which are ordinarily, in the absence of contingencies, entitled to elect a majority of the directors of such corporation; (b) a not for profit corporation not having stock, having the power to elect or appoint, directly or indirectly, a majority of the members of the Directing Body of such corporation; or (c) any other entity, the power to direct the management of such entity through the ownership of at least a majority of its voting securities or the right to designate or elect at least a majority of the members of its Directing Body, by contract or otherwise. For the purposes of this definition, "Directing Body" means with respect to: (a) a corporation having stock, such corporation's board of directors and owners, directly or indirectly, of more than 50% of the securities (as defined in Section 2(1) of the Securities Act of 1933, as amended) of any class or classes, the holders of which are ordinarily, in the absence of contingencies, entitled to elect a majority of the directors of such corporation (both of which groups will be considered a Directing Body); (b) a not for profit corporation not having stock, such corporation's members if the members have complete discretion to elect the corporation's directors or trustees, or the corporation's directors or trustees if the corporation's members do not have such discretion; or (c) any other entity, its governing body or board. For the purposes of this definition, all references to directors, trustees and members will be deemed to include all entities performing the function of directors, trustees  or members however denominated.

"Amend" or "Amendment," as used in Article Xl hereof, refer to any amendment, modification, alteration or supplement to any Bond Document, or any waiver of any provision thereof.

"Annual Budget" means the annual budget of the Borrower required by Section 6.10 of the Loan Agreement.

"Annual Debt Service" means, for any period of twelve consecutive months, the amount of the scheduled principal and interest payment requirement with respect to all Outstanding Bonds, or all Outstanding Bonds of one or more Series, or Indebtedness, as applicable, for such period. For Bonds or Indebtedness that bears interest at a variable rate, such interest rate shall be assumed to be: (1) for the purpose of determining whether such Bonds or Indebtedness may be incurred,

the rate estimated by a Consultant to be in effect on debt of comparable terms and creditworthiness at the time of such incurrence; and (2) for future periods for Bonds or Indebtedness Outstanding, including any projected Debt Service Coverage Ratios, the higher of (a) the average interest rate on such Bonds or Indebtedness Outstanding for the preceding calendar year or (b) the rate then in effect on such Bonds or Indebtedness.

"Annual Evaluation Date" means each December 31, commencing December 31, 2019.

"Architect" means any architect, engineer or firm of architects or engineers that is Independent and that is appointed by the Borrower for the purpose of passing on questions relating to the design and construction of any particular facility, has all licenses and certifications necessary for the performance of such services, and has a favorable reputation for skill and experience in performing similar services in respect of a facility of a comparable size and nature of the Project.

"Audited Financial Statements" means the financial statements prepared for each Fiscal Year for the Borrower prepared in accordance with generally accepted accounting principles and examined by a Certified Public Accountant.

"Authorized Denominations" means $5,000 principal amount and any integral multiple thereof and, with respect to any Series of Additional Bonds, as provided in the Supplemental Indenture creating such Series of Additional Bonds.

"Beneficial Owner" means a Person owning a Beneficial Ownership Interest in the Bonds, as evidenced to the satisfaction of the Trustee.

"Beneficial Ownership Interest" means the right to receive payments and notices with respect to the Bonds held in a book-entry system.

"Bond Counsel" means (a) Norton Rose Fulbright US LLP or (b) any Independent Counsel of nationally recognized standing in matters pertaining to the validity of, and exclusion from gross income for federal income tax purposes of interest on, obligations issued by states and political subdivisions, familiar with the transactions contemplated under this Indenture appointed by the Borrower and reasonably acceptable to the Issuer.

"Bond Documents" means this Indenture and the Borrower Documents.

"Bond Fund" means each trust fund by that name created pursuant to Section 5.01 hereof.

"Bond Obligation" means the then outstanding principal amount of the Bonds.

"Bond Payment Date" means any Interest Payment Date, any Principal Payment Date and any other date on which the principal of, premium, if any, or interest on the Bonds is to be paid to the Holders thereof, whether upon redemption, at maturity or otherwise.

"Bonds" means, collectively, the Series 2018 Bonds and any Additional Bonds.

"Borrower" means BSPV-Plano, LLC, a limited liability company organized and existing under the laws of the State of Texas, and its authorized successors and assigns under Section 6.3 of the Loan Agreement.

"Borrower Documents" means the Loan Agreement, the Mortgage, the Notes, the Regulatory Agreement, the Continuing Disclosure Agreement, the Borrower's Tax Letter of Representation, the Issuer's Certificate as to Tax Exemption, the Management Agreement, the Collateral Assignment of Management Agreement, and together with all other documents or instruments executed by the Borrower evidencing or securing the Borrower's Indebtedness under the Loan Agreement, in each case as the same may be amended or supplemented from time to time.

"Borrower Representative" means each person at the time designated to act on behalf of the Borrower by written certificate furnished to the Issuer and the Trustee on behalf of the Borrower containing the specimen signature of such person and any designated alternates and signed on behalf of the Borrower by the President, any Vice President, the Secretary, or any Assistant Secretary of the Borrower.

"Borrower's Tax Letter of Representation" means the Borrower's Tax Letter of Representation executed by the Borrower as of the Closing Date.

"Budget" means the budget described in Section 6.10 of the Loan Agreement.

"Budgeted Operating Requirement" means all Operating Expenses, exclusive of amounts to be deposited to or payable from the Administration Fund, Insurance and Tax Escrow Fund, Operations and Maintenance Reserve Fund or Repair and Replacement Fund, projected to be payable in a particular month in accordance with the Budget.

"Business Day" means any day other than a (i) Saturday, (ii) Sunday, (iii) day on which banking institutions in (a) any city in which the designated corporate trust or principal operations offices of the Trustee (such city being initially Grand Rapids, Michigan) are located, (b) the State of Texas or (c) The City of New York, are authorized or obligated by law or executive order to be closed, or (iv) day on which the New York Stock Exchange is closed.

"Certified Public Accountant" means any Person who is Independent, appointed by the Borrower, actively engaged in the business of public accounting and duly licensed as a certified public accountant under the laws of the State.

"Clearing Agency" means any clearing agency under federal law operating and maintaining, with its participants or otherwise, a book-entry system to record Beneficial Ownership Interests in the Bonds, and to effect transfers of book-entry interests of the Bonds in book-entry form, which agency initially shall be The Depository Trust Company.

"Closing Date" means, with respect to the Series 2018 Bonds, the date of initial issuance and delivery of the Series 2018 Bonds and, with respect to any Series of Additional Bonds, the date of initial issuance and delivery thereof.

"Code" means the Internal Revenue Code of 1986, as amended and in force and effect on the date hereof.

"Collateral Assignment of Management Agreement" means the Collateral Assignment of Management Agreement, dated as of December 1, 2018, between the Borrower and the Trustee and consented to by the Manager, as in effect on the Closing Date and as it may thereafter to be amended or supplemented from time to time in accordance with its terms.

"Completion Date" means the date of completion of the acquisition, construction, and installation of the Project; provided, however, the Completion Date will be (a) the date which is three years from the Closing Date if the Completion Date is not otherwise determined before that time or (b) any date after three years from the Closing Date with respect to which there is delivered Favorable Opinion of Bond Counsel.

"Compliance Certificate" means a certificate of a Borrower Representative stating that, as of the date of such certificate, the Borrower is in compliance with all requirements of the Borrower Documents (with such exceptions as shall be acceptable to the Issuer).

"Computation Date" has the meaning set forth in Section 1.148-1(b) of the Regulations.

"Condemnation Award" means the total condemnation proceeds paid by the condemner as a result of condemnation or eminent domain proceedings with respect to all or any part of the Project or of any settlement or compromise of such proceedings.

"Construction Consultant" means AECC, Inc., in its capacity as the construction consultant for the Project pursuant to the Construction Disbursement and Monitoring Agreement, entered into as of December 1, 2018, by and among the Borrower, the Trustee and the Construction Consultant.

"Consultant" means a Person who is Independent, appointed by the Borrower, and is nationally recognized as being expert as to matters for which its certificate or advice is required or contemplated.

"Continuing Disclosure Agreement" means the Continuing Disclosure Agreement dated December 1, 2018 between the Borrower and the Dissemination Agent, as in effect on the Closing Date and as it may thereafter be amended or supplemented from time to time in accordance with its terms.

"Controlling Holders" means, as of any date, in the case of consent or direction to be given hereunder or under the Loan Agreement, the Holders of the majority in aggregate principal amount of the Senior Bonds then Outstanding; provided if no Senior Bonds are then Outstanding, then the Holders of the majority in aggregate principal amount of the Series 2018C Bonds then Outstanding; and provided if no Senior Bonds and no Series 2018C Bonds are then Outstanding, then the Holders of the majority in aggregate principal amount of the Series 2018D Bonds then Outstanding.  For so long as the Beneficial Owners of the Series 2018C Bonds are managed by Tortoise Credit Strategies, LLC as their investment manager, the Controlling Holders of the Series 2018C Bonds shall be Tortoise Credit Strategies, LLC, and it shall notify the Issuer and the Trustee in writing promptly after it no longer is such manager.

"Costs of Issuance Account" means the account by that name in the Project Fund created pursuant to Section 5.01 hereof.

"Costs of the Project" means those costs and expenses in connection with the acquisition, construction, refinancing, furnishing, and equipping of the Project permitted by the Act to be paid or reimbursed from Bond proceeds including, but not limited to, the following:

(a)    payment of (i) the cost of the preparation of plans and specifications (including any preliminary study or planning of the Project, the renovations to the Project or any aspect thereof), (ii) the cost of acquisition, construction and equipping of the Project and all acquisition, construction and installation expenses required to provide utility services or other facilities and all real or personal properties deemed necessary in connection with the Project (including development, architectural, engineering, and supervisory services with respect to any of the foregoing), and (iii) interest on the Bonds during the construction of the Project, and (iv) any other costs and expenses relating to the Project;

(b)    payment of the purchase price of the Project, improvements thereon, and the Equipment, and any fixtures to be incorporated into the Project, including all costs incident thereto, payment for labor, services, materials, and supplies used or furnished in site improvement and in the construction of the Project, including all costs incident thereto, payment for the cost of the construction, acquisition, and installation of utility services or other facilities, payment for all real and personal property deemed necessary in connection with the Project, payment of consulting and development fees payable to the Borrower or others, and payment for the miscellaneous expenses incidental to any of the foregoing items including the premium on any surety bond;

(c)    payment to the Trustee, as such payments become due, of the reasonable fees and expenses of the Trustee (including, without limitation, the reasonable fees and expenses of counsel) other than its initial fee (as Trustee, bond registrar and paying agent) and of any paying agent properly incurred under this Indenture that may become due during the construction of the Project;

(d)    to such extent as they are not paid by a contractor for construction or installation with respect to any part of the Project, payment of the premiums on all insurance required to be taken out and maintained during the period of construction of the Project;

(e)    payment of the taxes, assessments, and other charges, if any, that may become payable during the period of construction of the Project;

(f)    payment of expenses incurred in seeking to enforce any remedy against any contractor or subcontractor in respect of any default under a contract relating to the Project;

(g)    payment of out-of-pocket fees and expenses of the Borrower, if any, including, but not limited to, architectural, engineering, and supervisory services with respect to the Project;

(h)    payment of the fees or out-of-pocket expenses, if any, of those providing services with respect to the Project, including, but not limited to, architectural, engineering, and supervisory services;

(i)　　payment to the Borrower of such amounts, if any, as are necessary to reimburse the Borrower in full for all advances and payments made by it for any of the items set forth in (a) through (h) above; and

(j)　　payment of any other costs and expenses relating to the Project that would constitute a "cost" or "expense" permitted to be paid by the Issuer under the Act.

"Counsel" means an attorney or firm of attorneys duly admitted to practice law before the highest court of any state and not unsatisfactory to the Trustee or the Issuer.

"Coverage Test" means that the Debt Service Coverage Ratio for the relevant period was equal to or greater than 1.20 to 1.00 on all Outstanding Senior Bonds.

"Dated Date" means, with respect to the Series 2018 Bonds, December 1, 2018, and, with respect to any Series of Additional Bonds, the dated date thereof as provided in the Supplemental Indenture creating such Series of Additional Bonds.

"Days' Cash on Hand" means as of any date of calculation, an amount equal to:　(a) Unrestricted Cash and Investments; divided by (b) Day's Cash Operating Expenses.

"Days' Cash on Hand Requirement" means 100 Days' Cash on Hand beginning December 31, 2020 and on each Liquidity Testing Date thereafter.

"Days' Cash Operating Expenses" means, as of any calculation date, an amount equal to (a) Operating Expenses for the preceding twelve (12) month period (including interest expense but excluding depreciation, amortization and Other Non-Cash Expenses and crediting against such interest expense amount actual interest earnings available to pay Debt Service, all for the same twelve (12) month period), divided by (b) 365.

"Debt Service" means for any period of computation the principal and redemption price of and interest due on any Series of Bonds during such period.

"Debt Service Coverage Ratio" means, for any period, the ratio obtained by dividing Net Income Available for Debt Service on the Senior Bonds for such period by the Annual Debt Service on the Senior Bonds for such period, in each case, as calculated by the Borrower and certified to the Trustee in writing and supported by the Audited Financial Statements described in Section 6.9 of the Loan Agreement or, in the case of reports delivered pursuant to Section 6.9(a)(i)(B) of the Loan Agreement, the unaudited financial reports or statements for the applicable period in such report.

"Debt Service Requirements" means for a specified period: (a) amounts needed to pay scheduled payments of principal of the Bonds during such period, including payments for mandatory sinking fund redemption pursuant to Section 3.03 hereof; (b) amounts needed to pay interest on the Bonds payable during such period; and (c) to the extent not duplicative of (a) or (b) above, amounts paid during such period to restore the amounts on deposit in the Debt Service Reserve Fund to the Debt Service Reserve Requirement.

"Debt Service Reserve Account" means the trust account by that name within the Debt Service Reserve Fund created with respect to a Series of Senior Bonds and the Series 2018D Bonds pursuant to Section 5.01 hereof.

"Debt Service Reserve Fund" means the trust fund of that name created with respect to the Series 2018A Bonds, the Series 2018B Bonds and the Series 2018D Bonds pursuant to Section 5.01 hereof.

"Debt Service Reserve Requirement" means (a) with respect to the Series 2018A Bonds, the amount of $4,087,047.55, and with respect to the Series 2018B Bonds means $547,177.45; and with respect to the Series 2018D Bonds, the amount of $225,000.00 provided, however, that the foregoing amounts shall be reduced to the extent of any reduction in Maximum Annual Debt Service on the aggregate principal amount of the applicable Series of Series 2018 Bonds Outstanding, if any such Series 2018 Bonds are redeemed other than pursuant to mandatory sinking fund redemption, and provided further, with respect to the Series 2018D Bonds, the Debt Service Reserve Requirement shall be reduced to zero dollars ($-0-) on the date which is 26 months after the Closing Date, and (b) with respect to any Series of Additional Bonds issued on a parity with the Senior Bonds, the amount provided in the Supplemental Indenture creating such Series of Additional Bonds.

"Default" under the Loan Agreement means any of the events described in Section 7.1 of the Loan Agreement.

"Default Rate" means (a) with respect to a Loan, the lesser of (i) the highest interest rate borne by any Bond related to such Loan, plus 2% per annum, or (ii) the maximum interest rate permitted under Chapter 1204, Texas Government Code, as amended, (b) with respect to any Bond, the lesser of (i) the interest rate borne by such Bond, plus 2% per annum, or (ii) the maximum interest rate permitted under Chapter 1204, Texas Government Code, as amended, and (c) with respect to any other amounts due, the lesser of (i) 10% per annum, or (ii) the maximum interest rate permitted under Chapter 1204, Texas Government Code, as amended.

"Deferred Management Fee" means the amount of the Management Fee that is otherwise due on and after (i) the date a report is delivered pursuant to Section 6.9(a)(i)(B) of the Loan Agreement showing that the Coverage Test has not been met, until the date a report is delivered pursuant to Section 6.9(a)(i)(B) of the Loan Agreement showing that the Coverage Test has been met, or (ii) the date an Event of Default hereunder or an event of default, as defined therein, under a Borrower Document has occurred and is continuing until such Event of Default or Default has been cured.

"Designated Office" means, when referring to the Trustee or any Paying Agent, the office where the Trustee or Paying Agent, as applicable, maintains its designated corporate trust department, which as of the date of this Indenture, shall be the address provided in Section 12.07.

"Determination of Taxability" means a determination that the interest accrued or paid on any of the Tax-Exempt Bonds is included in gross income of the Holders or former Holders for federal income tax purposes, which determination shall be deemed to have been made upon the occurrence of the first to occur of the following:

(i)      the day on which the Borrower, the Issuer, the Trustee or any Holder is advised in writing by the Commissioner or any District Director of the Internal Revenue Service that the interest on the Tax-Exempt Bonds is included in the gross income of any Holder or former Holder thereof for federal income tax purposes;

(ii)      the day on which the Borrower receives from the Trustee (1) a notice in writing by any Holder or former Holder that the Internal Revenue Service has issued a statutory notice of deficiency or other notice to such Holder or former Holder to the effect that the interest on the Tax-Exempt Bonds received by such Holder or former Holder is included in the gross income of such Holder or former Holder for federal income tax purposes, or (2) an Opinion of Bond Counsel that concludes that the interest on the Tax-Exempt Bonds is included in the gross income of any Holder or former Holder thereof for federal income tax purposes (after receiving a notice described in (1) or an opinion of Bond Counsel described in (2), the Trustee shall promptly forward such notice or opinion to the Borrower);

(iii)      the day on which the Borrower, the Issuer, the Trustee or any Holder is advised in writing by the Commissioner or any District Director of the Internal Revenue Service that there has been issued a public or private ruling of the Internal Revenue Service or a technical advice memorandum issued by the national office of the Internal Revenue Service that the interest on the Tax-Exempt Bonds is included in the gross income of any Holder or former Holder thereof for federal income tax purposes; or

(iv)      the day on which the Borrower, the Issuer, the Trustee or any Holder is advised in writing by Counsel that a final determination, from which no further right of appeal exists, has been made by a court of competent jurisdiction in the United States of America in a proceeding with respect to which the Borrower has been given written notice and an opportunity to participate and defend that the interest on the Tax-Exempt Bonds is included in the gross income of any Holder or former Holder thereof for federal income tax purposes;

provided, however, no Determination of Taxability shall occur if the interest on any of the Tax-Exempt Bonds is included in the gross income of any Holder or former Holder for federal income tax purposes solely because such Tax-Exempt Bond was held by a Person who is a substantial user or a related person as described in the Code.

"Dissemination Agent" means the Trustee, or any successor thereto, acting as Dissemination Agent under the Continuing Disclosure Agreement.

"Dissemination Agent Fee" means an annual fee payable to the Dissemination Agent in an amount not to exceed $1,000, as per agreement, commencing at the Closing Date and payable on December 1 of each year so long as the Bonds remain Outstanding as compensation for its services and expenses in performing its obligations under the Continuing Disclosure Agreement.

"EMMA" means the Electronic Municipal Market Access System maintained by the Municipal Securities Rulemaking Board.

"Environmental Laws" means the Comprehensive Environmental Response, Compensation and Liability Act of 1980, as amended ("CERCLA") (42 U.S.C. § 9601 et seq.), the Resource Conservation and Recovery Act, as amended ("RCRA") (42 U.S.C. § 6901 et seq.), the National Environmental Policy Act of 1969, as amended (42 U.S.C. § 4321 et seq.), the Solid Waste Disposal Act, as amended (42 U.S.C. § 6901 et seq.), the Hazardous Material Transportation Act, as amended (49 U.S.C. § 1801 et seq.), the Federal Insecticide, Fungicide, and Rodenticide Act, as amended (7 U.S.C. § 136 et seq.), the Toxic Substance Control Act, as amended (15 U.S.C. § 2601 et seq.), the Clean Water Act, as amended (33 U.S.C. § 1251 et seq.), the Clean Air Act, as amended (42 U.S.C. § 7401 et seq.), the Federal Water Pollution Control Act, as amended (33 U.S.C. § 1251 et seq.), the Federal Coastal Zone Management Act, as amended (16 U.S.C. § 1451 et seq.), the Occupational Safety and Health Act, as amended (29 U.S.C. § 651 et seq.), the Safe Drinking Water Act, as amended (42 U.S.C. § 300(f) et seq.), and any other federal, state, or local law, statute, ordinance, and regulation, now or hereafter in effect, and in each case as amended or supplemented from time to time, and any applicable judicial or administrative interpretation thereof, including, without limitation, any applicable judicial or administrative order, consent decree, or judgment applicable to the Project relating to the regulation and protection of human health and safety and/or the environment and natural resources (including, without limitation, ambient air, surface water, groundwater, wetlands, land surface or subsurface strata, wildlife, aquatic species, and/or vegetation), including all amendments to such acts, and any and all regulations promulgated thereunder, and all analogous local or state counterparts or equivalents, and any transfer of ownership notification or approval statutes, and any federal, state or local statute, law, ordinance, code, rule, regulation, order or decree, regulating, relating to or imposing liability or standards of conduct concerning any petroleum, petroleum byproduct (including but not limited to, crude oil, diesel oil, fuel oil, gasoline, lubrication oil, oil refuse, oil mixed with other waste, oil sludge, and all other liquid hydrocarbons, regardless of specific gravity), natural or synthetic gas, products and/or hazardous substance or material, toxic or dangerous waste, substance or material, pollutant or contaminant, as may now or at any time hereafter be in effect.

"Equipment" means the equipment, machinery, furnishings and other personal property located on the Mortgaged Property and all replacements, substitutions, and additions thereto.

"Event of Default" means any occurrence or event specified in Section 8.01 hereof.

"Extraordinary Expenses" means all reasonable expenses properly incurred by the Trustee under this Indenture, other than Ordinary Expenses.

"Extraordinary Services" means all services rendered by the Trustee under this Indenture, other than Ordinary Services.

"Extraordinary Trustee's Fees and Expenses" means the fees, expenses and disbursements payable to the Trustee and Paying Agent pursuant to Section 9.04 hereof during any Fiscal Year in excess of Ordinary Trustee's Fees and Expenses, including but not limited to, reasonable counsel fees and expenses, reasonable fees and expenses of other third party professionals, and any costs of sending notices pursuant to the terms and conditions of the Bond Documents, including but not limited to, Section 3.06 hereof.

"Favorable Opinion of Bond Counsel" means, with respect to any action the taking of which requires such an opinion, an opinion of Bond Counsel addressed to the Issuer and the Trustee to the effect that such action, or omission of an action, will not, in and of itself, cause interest on the Tax-Exempt Bonds to be includible in gross income for federal income tax purposes (subject to the inclusion of any exceptions contained in the opinion delivered upon the original issuance of the Tax-Exempt Bonds or as agreed by the Issuer and the Trustee).

"Federal Securities" means any bonds, notes, certificates of indebtedness, treasury bills or other securities now or hereafter issued, which are guaranteed by the full faith and credit of the United States of America as to principal and interest.

"Financial Consultant" means a firm of Accountants or consultants, knowledgeable in the operation and financial affairs of senior living facilities, which is to be employed by the Borrower pursuant to Section 4.4 of the Loan Agreement hereof to make reports with respect to rates, fees, charges, services, and operations and to provide other functions and duties provided for in the Loan Agreement.

"Fiscal Year" means a period of 12 consecutive months ending on each December 31, except that the first Fiscal Year shall begin on the Closing Date and end on December 31, 2019.

"Fitch" means Fitch Ratings, Inc., a corporation organized and existing under the laws of the State of New York, its successors and assigns, and, if such corporation shall be dissolved or liquidated or shall no longer perform the functions of a securities rating agency, "Fitch" shall be deemed to refer to any other nationally recognized securities rating agency designated by the Borrower by notice to the Trustee and the Issuer.

"Force Majeure" means (a) the following: acts of nature; strikes or other industrial disturbances; acts of public enemies; orders or restraints of any kind of the government of the United States of America or of the State or of any of their subdivisions, departments, agencies or officials, or of any civil or military authority; insurrections; riots; landslides; earthquakes; fires; floods; explosions, but only to the extent that any such cause or event is not within the control of the Borrower; and (b) any other cause or event not reasonably within the control of the Borrower.

"Fund" or "Funds" means any one or more, as the case may be, of the separate trust funds created and established in Article V of this Indenture.

"Governing Body" means (a) with respect to the Issuer, the Board of Directors of the Issuer, or any governing body that succeeds to the functions of the Board of Directors of the Issuer, and (b) with respect to the Borrower, the Board of Directors of the Borrower.

"Government Obligations" means direct obligations of, and obligations the principal of and interest on which are unconditionally guaranteed as to timely payment by, the United States of America.

"Gross Proceeds" means any proceeds, as defined in Section 1.148-1(b) of the Regulations, and any replacement proceeds, as defined in Section 1.148-1(c) of the Regulations, of the Tax-Exempt Bonds.

"Hazardous Substances" means any petroleum or petroleum products and their by-products, flammable explosives, radioactive materials, toxic chemicals and substances, radon, asbestos in any form that is or could become friable, urea formaldehyde foam insulation and polychlorinated biphenyls (PCBs), asbestos-containing materials (ACMs), lead-containing or lead-based paint (LBP), radon, medical waste and other bio-hazardous materials and any chemicals, pollutants, materials or substances defined as or included in the definition of "hazardous substances" as defined pursuant to the federal Comprehensive Environmental Response, Compensation and Liability Act, "regulated substances" within the meaning of subtitle I of the federal Resource Conservation and Recovery Act, and words of similar import under applicable Environmental Laws.

"Holder" or "Bondholder" means the Person or Persons in whose name any Bond is registered on the registration records for the Bonds maintained by the Trustee as registrar.

"Impositions" has the meaning given such term in Section 4.9 of the Loan Agreement.

"Indebtedness" means (a) all indebtedness, whether or not represented by bonds, debentures, notes or other securities, for the repayment of money borrowed, (b) all deferred indebtedness for the payment of the purchase price of properties or assets purchased, (c) all guaranties, endorsements (other than endorsements in the ordinary course of business), assumptions, and other contingent obligations in respect of, or to purchase or to otherwise acquire, indebtedness of others, (d) all indebtedness secured by a mortgage, or secured by a pledge, security interest, or lien existing on property owned which is subject to a mortgage, pledge, security interest, or lien, whether or not the indebtedness secured thereby has been assumed, (e) all capitalized lease obligations, (f) all unfunded amounts under a loan agreement, letter of credit, or other credit facility for which such Person would be liable, if such amounts were advanced under such instrument, (g) all amounts required to be paid by the Borrower as a guaranteed payment to partners or members or a preferred or special dividend, including any mandatory redemption of shares or interests, (h) all unfunded pension funds, or welfare or pension benefit plans or liabilities, and (i) all obligations (calculated on a net basis) of the Borrower under derivatives in the form of interest rate swaps, credit default swaps, total rate of return swaps, caps, floors, collars and other interest hedge agreements, in each case whether the Borrower is liable contingently or otherwise, as obligor, guarantor or otherwise, or in respect of which obligations the Borrower otherwise assures a creditor against loss; provided, however, that for the purpose of the foregoing any particular Indebtedness will be excluded if, upon or prior to the maturity thereof, there has been deposited with the proper depository in trust the necessary funds (or Government Obligations not callable or pre-payable by the issuer thereof) for the payment, redemption, or satisfaction of such Indebtedness, and thereafter such funds and such Government Obligations so deposited will not be included in any computation of the assets of the Borrower and the income derived from such funds and such Obligations so deposited will not be included in any computation of the income of the Borrower.

"Indenture" means this Trust Indenture, as in effect on the Closing Date and as it may thereafter be as amended or supplemented from time to time in accordance with Article XI hereof.

"Independent" means, with respect to any Counsel, Consultant or other person, a person who is not a member of the Governing Body of the Issuer or the Borrower and is not an officer or

employee of the Issuer or the Borrower and that is not a partnership, corporation or association having a partner, director, officer, member or substantial stockholder who is a member of the Governing Body of the Issuer or the Borrower or who is an officer or employee of the Issuer or the Borrower; provided, however, that the fact that such person is retained regularly by or transacts business with the Issuer or the Borrower shall not make such person an employee within the meaning of this definition.

"Initial Bond" or "Initial Bonds" means the initial Series 2018 Bonds registered by the Comptroller of Public Accounts of the State of Texas.

"Insurance and Tax Escrow Fund" means the trust fund by that name established pursuant to Section 5.01 hereof.

"Insurance Consultant" means a Consultant having the skill and expertise necessary to evaluate the insurance needs of multifamily rental housing and which may be a broker or agent with which the Borrower or the Issuer transacts business.

"Insurance Proceeds" means the total proceeds of insurance paid by an insurance company under the policies of property or title insurance required to be procured by the Borrower pursuant to the Loan Agreement.

"Interest Account" means each trust account by that name in the Bond Fund created with respect to a Series of Bonds pursuant to Section 5.01 hereof.

"Interest Payment Date" means, with respect to the Series 2018 Bonds, each June 1 and December 1, commencing June 1, 2019, and with respect to any Series of Additional Bonds, the dates specified in the Supplemental Indenture creating such Series of Additional Bonds, until the final Principal Payment Date of the applicable Bonds.

"Interest Period" for any Bonds means initially the period from the Closing Date to but not including the first Interest Payment Date and thereafter the period from and including each Interest Payment Date to but not including the next Interest Payment Date or other date on which interest is required to be paid on such Bonds.

"Interest Requirement" for any Bonds means an amount equal to the interest that would be due and payable on such Bonds on the Interest Payment Date next succeeding the date of determination (assuming that no principal of such Bonds is paid or redeemed between such date and the next succeeding Interest Payment Date) multiplied by a fraction the numerator of which is one and the denominator of which is the number of whole calendar months in the Interest Period in which such date occurs.  For purposes of determining the Interest Requirement for any Bonds during a period where the interest rate borne by such Bonds has not yet been determined, an interest rate equal to the maximum rate allowable on such Bonds shall be assumed for such period.

"Investment Securities" means any of the following which at the time of investment are legal investments under the Act and the laws of the State for the money proposed to be invested therein: (i) Federal Securities; (ii) certificates of deposit or time deposits of any bank, as defined by the Texas Banking Act (Chapter 31 of the Texas Finance Code, as amended), including without limitation the Trustee or any of its affiliates, except that investments may be made only in

certificates of deposit or time deposits which are insured by the Bank Insurance Fund or the Savings Association Insurance Fund as administered by the Federal Deposit Insurance Corporation, if then in existence; continuously and fully secured by securities described above, which have a value, exclusive of accrued interest, at all times at least equal to the principal amount of such certificates of deposit or time deposits; or issued by a bank whose outstanding unsecured long-term debt is rated at the time of issuance in any of the three (3) highest rating categories by two (2) nationally recognized rating agencies; (iii) short-term obligations of corporations organized in the United States of America with assets exceeding $500,000,000, if such obligations are rated on the date of purchase and at any time held by the Trustee within one of the three (3) highest rating classifications established by at least two (2) nationally recognized rating services (without regard to any rating refinement or gradation by numerical or other modifier), and which mature not later than 24 months from the date of purchase, such purchases do not exceed ten percent (10%) of such corporations' outstanding obligations, and no more than one-third of the money relating to the Bonds is so invested; (iv) interests in money market mutual funds registered under the Investment Company Act of 1940 (15 U.S.C. §§ 80a-1 – 80a-64), as from time to time amended; provided, that the governing instrument or order directs, requires, authorizes or permits investment in Federal Securities; provided further, that the portfolio of any such money market fund is limited to Federal Securities or to repurchase agreements fully collateralized by such Federal Securities; (v) short-term discount obligations of the Federal National Mortgage Association; (vi) bonds, notes or other obligations issued by any state, unit of local government or school district, which obligations are rated on the date of purchase and at any time held by the Trustee within one of the two (2) highest rating classifications (without regard to rating refinement or gradation by numerical or other modifier) by a nationally recognized rating service; (vii) investment agreements constituting an obligation of a bank, as defined by the Texas Banking Act (including the Trustee or any of its affiliates), or an obligation of an insurance company authorized to do business in the State of Texas, whose outstanding unsecured long-term debt is rated at the time of such agreement in any of the three (3) highest rating categories by two (2) nationally recognized rating agencies; and (viii) any other investments permitted by law if such investments are rated on the date of purchase and at any time held by the Trustee within one of the two (2) highest classifications (without regard to rating refinement or graduation by numerical or other modifier) established by a nationally recognized rating service.

"Issuance Costs" means costs to the extent incurred in connection with, and allocable to, the issuance of the Bonds within the meaning of Section 147(g) of the Code.  For example, Issuance Costs include the following costs, but only to the extent incurred in connection with, and allocable to, the borrowing: underwriters' spread; counsel fees; financial advisory fees; fees paid to an organization to evaluate the credit quality of an issue; trustee fees; paying agent fees; bond registrar, certification and authentication fees; accounting fees; printing costs for bonds and offering documents; public approval process costs; engineering and feasibility study costs; guarantee fees, other than qualified guarantees; and similar costs.

"Issuer" means the New Hope Cultural Education Facilities Finance Corporation, a non-profit cultural education facilities finance corporation duly organized and validly existing under the laws of the State, and any successor body to the duties or functions of the Issuer.

"Issuer Representative" shall mean the President or any Vice President of the Issuer, or such other person at the time designated to act on behalf of the Issuer as evidenced by a written

certificate furnished to the Trustee and the Borrower containing the specimen signature of such person and signed on behalf of the Issuer by an Issuer Representative.  Such certificate may designate an alternate or alternates, each of whom shall be entitled to perform all duties of the Authorized Issuer Representative.

"Issuer's Certificate as to Tax Exemption" means the Certificate as to Tax Exemption executed by the Issuer and delivered on the Closing Date.

"Issuer's Fees and Expenses" means those reasonable fees and expenses, if any, payable to or incurred by the Issuer in connection with its administration and enforcement of or compliance with the Indenture or any of the Borrower Documents, or otherwise in connection with the Project and the Bonds, including without limitation fees and expenses of such agents, attorneys and independent accountants as are employed by the Issuer.

"Liquidity Covenant" means the covenant set forth in the first paragraph of Section 6.19 of the Loan Agreement.

"Liquidity Testing Date" means each June 30 and December 31 commencing December 31, 2020.

"Loan" means the loan evidenced by the Series 2018 Notes from the Borrower to the Issuer in the aggregate principal amount of $66,795,000, and each additional loan financed by the Issuer and evidenced by additional Notes from the Borrower to the Issuer in respect of Additional Bonds.

"Loan Agreement" means the Loan Agreement of even date herewith between the Issuer and the Borrower, as in effect on the Closing Date and as it may thereafter be amended and supplemented from time to time in accordance with its terms.

"Loan Payments" means those payments described in Section 3.2(b)(i) of the Loan Agreement.

"Long-Term Indebtedness" means any Indebtedness other than Short-Term Indebtedness.

"Low Income Tenants" shall have the meaning ascribed to such term in the Regulatory Agreement.

"Mail" means either (a) first class mail by the United States Postal Service, postage prepaid, to the Holders at their respective addresses which appear on the registration books of the Paying Agent on the date of mailing, or (b) actual delivery to the Holders or their representatives evidenced by a receipt signed by such Holders or their representatives.

"Management Agreement" means the Management Agreement dated as of December 1, 2018, between the Manager and the Borrower, or any substitute agreement providing for the management, maintenance and operation of the Project, in each case as it may be amended and supplemented from time to time.

"Management Consultant" means a Consultant possessing significant management consulting experience in matters pertaining to owning and operating multifamily residential rental housing facilities similar to the Project.

"Management Fee" means the fee paid to the Manager pursuant to the Management Agreement.

"Manager" means, Lifestyle Property Management, Inc., or any subsequent third-party management company with experience in managing similar properties and their successors and assigns meeting the requirements of Section 4.7 of the Loan Agreement and any subcontractor as manager of the Project.

"Maximum Annual Debt Service" means as of any date of calculation the highest Annual Debt Service with respect to all Outstanding Bonds of the applicable Series for any succeeding Fiscal Year, but excluding the period ending on the final Principal Payment Date of the Bonds.

"Modifications" means modifications, repairs, renewals, improvements, replacements, alterations, additions, enlargements, or expansions in, on, or to the Project (other than routine repair or maintenance), but excluding any Equipment therefor.

"Moody's" means Moody's Investors Service, a corporation organized and existing under the laws of the State of Delaware, its successors and their assigns, and, if such corporation shall be dissolved or liquidated or shall no longer perform the functions of a securities rating agency, "Moody's" shall be deemed to refer to any other nationally recognized securities rating agency designated by the Borrower by notice to the Trustee and the Issuer.

"Mortgage" means the applicable Deed of Trust, Assignment of Rents and Leases, and Security Agreement dated as of even date herewith, by the Borrower to the trustee named therein, for the benefit of Issuer and assigned to the Trustee, securing the repayment of the portion of the Loan associated with the Series 2018A Note, the Series 2018B Note, the Series 2018C Note and the Series 2018D Note and certain additional amounts due and owing under the Loan Agreement, as in effect on the Closing Date and as it may thereafter be amended and supplemented from time to time in accordance with its terms and the terms of this Indenture.

"Mortgaged Property" means the real property on which the Project is located and all improvements thereon that is subject to the lien of the Mortgage and this Indenture, as more specifically described in Exhibit A to the Mortgage.

"Needs Assessment Analysis" means the analysis and report required as set forth in Section 4.12 of the Loan Agreement.

"Net Income Available for Debt Service" means, for any period of determination thereof, Project Revenues for such period, plus all interest earnings on money held in Funds and Accounts which are transferred to the Revenue Fund pursuant to Article VI hereof, minus (a) total Operating Expenses incurred by the Borrower for such period on a basis consistent with generally accepted accounting principles, (b) any profits or losses that would be regarded as extraordinary items under generally accepted accounting principles, (c) gain or loss on the extinguishment of Indebtedness, (d) contributions, (e) proceeds of Additional Bonds and any other Permitted Indebtedness, (f) Net

Proceeds of any Insurance Proceeds or Condemnation Awards, and (g) the proceeds of any sale, transfer or other disposition of all or any portion of the Project by the Borrower.

"Net Proceeds," when used with respect to (a) any Insurance Proceeds or Condemnation Award, means the gross proceeds from such Insurance Proceeds or Condemnation Award, less all expenses (including reasonable attorneys' fees of the Borrower or the Trustee and any Extraordinary Trustee's Fees and Expenses) incurred in the realization thereof; and (b) the Bonds, has the same meaning as "net sale proceeds" under Treasury Regulation 1.148-(1)(b).

"Nonpurpose Investment" shall mean any investment property (as defined in Section 148(b) of the Code) that is acquired with the Gross Proceeds of the Bonds and which is not acquired to carry out the governmental purpose of the Bonds.

"Notes" means the Series 2018 Notes and any promissory note issued in connection with Additional Bonds.

"Occupancy Covenant" means the covenant contained in Section 6.20 of the Loan Agreement.

"Operating Account" means, the demand deposit bank account maintained by the Borrower pursuant to Section 4.3 of the Loan Agreement against which the Borrower or its authorized agent writes checks to pay Operating Expenses.

"Operating Expenses" means, for any period, expenses paid or accrued in connection with the operation, maintenance and current repair of the Project (determined on a cash basis) during such period including, without limitation, the costs of any utilities necessary to operate the Project, advertising and promotion costs, payroll expenses, insurance premiums, administrative and legal expenses of the Borrower relating to the Project, labor, executive compensation, the cost of materials and supplies used for current operations of the Project, taxes and charges for accumulation of appropriate reserves for current expenses not annually recurrent but which are such as may reasonably be expected to be incurred in connection with the Project and in accordance with sound accounting practice. "Operating Expenses" does not include (a) Debt Service Requirements, (b) any loss or expense resulting from or related to any extraordinary and nonrecurring items, (c) any losses or expenses related to the sale of assets, the proceeds of which sale are not included in Project Revenues pursuant to clause (b) of the definition thereof, (d) expenses paid from operational reserves, including the Operations and Maintenance Reserve Fund, (e) expenses paid from the Repair and Replacement Fund, (f) any Rebate Amount to the extent that it is paid from the Rebate Fund, (g) deposits in the Repair and Replacement Fund in excess of the Repair and Replacement Reserve Requirement, (h) any allowance for depreciation or replacements of capital assets of the Project or amortization of financing costs or (i) disbursements from the Surplus Fund. In addition, for purposes of calculating Net Income Available for Debt Service, "Operating Expenses" does not include deposits to the Insurance and Tax Escrow Fund from the Revenue Fund or payments from the Insurance and Tax Escrow Fund, deposits to the Repair and Replacement Fund from the Revenue Fund in the amount of the Repair and Replacement Reserve Requirement, deposits to the Rebate Fund from the Revenue Fund, any Rebate Amount to the extent that it is not paid from the Rebate Fund, deposits to the Administration Fund from the Revenue Fund, the Administration Expenses, the actual Management Fee (and any

Deferred Management Fee paid from the Surplus Fund), and expenses funded with proceeds of the Bonds.

"Operating Fund" means the trust fund by that name created pursuant to Section 5.01 hereof.

"Operations and Maintenance Reserve Fund" means the trust fund by that name created pursuant to Section 5.01 hereof.

"Operations and Maintenance Reserve Requirement" means an amount equal to the Day's Cash on Hand Requirement for the Project for the applicable Fiscal Year.

"Ordinary Expenses" means those reasonable expenses incurred in the ordinary course of business, by a trustee, a registrar, an authenticating agent and a paying agent under instruments similar to this Indenture, but excluding Extraordinary Expenses.

"Ordinary Services" means those services normally rendered by a trustee, a registrar, an authenticating agent and a paying agent under instruments similar to this Indenture, excluding Extraordinary Services.

"Ordinary Trustee's Fees and Expenses" means those annual fees, expenses and disbursements for the Ordinary Services and the Ordinary Expenses of the Trustee and Paying Agent incurred in connection with their duties under this Indenture payable in advance on the Closing Date and as agreed pursuant to the Trustee's fee schedule.

"Organizational Documents" means the documents under which the Borrower is organized and governed as such documents are in effect on the Closing Date and as they may be thereafter amended or supplemented from time to time in accordance with their terms.

"Other Non-Cash Expenses" means, other than depreciation and amortization expense, provisions for bad debt expense and any other expense not requiring the payment of cash.

"Outstanding" or "outstanding" with respect to Bonds means, as of any given date, all Bonds which have been authenticated and delivered by the Trustee under this Indenture, except: (a) Bonds cancelled at or prior to such date or delivered to or acquired by the Trustee or Paying Agent on or prior to such date for cancellation; (b) Bonds deemed to be paid in accordance with Article VII of this Indenture; and (c) Bonds in lieu of which other Bonds have been authenticated under Section 2.08 or 2.09 hereof and Bonds paid pursuant to Section 2.08 hereof.

"Paying Agent" means the Trustee or any successor or additional Paying Agent appointed hereunder that satisfies the requirements of Section 9.18 hereof.

"Permitted Encumbrances" means, with respect to the Project, the Mortgage and (a) the lien of current real property taxes (if any), ground rents, water charges, sewer rents and assessments not yet due and payable, (b) covenants, conditions and restrictions, rights of way, easements and other matters of public record, none of which, individually or in the aggregate, materially interferes with the current use of the Project or the security intended to be provided by the Mortgage or with the Borrower's ability to pay its obligations when they become due or materially and adversely

affects the value of the Project, (c) the Regulatory Agreement, (d) the exceptions (general and specific) set forth in the Title Policy or appearing of record, none of which, individually or in the aggregate, materially interferes with the intended use of the Project or the security intended to be provided by the Mortgage or with the Borrower's ability to pay its obligations when they become due or materially and adversely affects the value of the Project, (e) any lien of any contractor, subcontractor, supplier of goods, materials, equipment or services, or laborer or any other similar lien arising in the ordinary course of business, in respect of any claim that is being contested by the Borrower in good faith by appropriate proceedings conducted with due diligence with the execution thereon stayed, (f) any liens or encumbrances expressly permitted by the Loan Agreement or the Mortgage, (g) any lien placed upon any furniture, equipment, vehicle or other tangible personal property or any fixture being acquired by the Borrower, to secure all or a portion of the purchase price thereof or any rent payable with respect thereto, (h) any attachment or judgment lien being contested by the Borrower in good faith by appropriate proceedings diligently pursued, if such lien shall have been duly stayed, and (i) statutory liens and rights of setoff granted to banks or other financial institutions with respect to funds on deposit in the ordinary course of business.

"Permitted Indebtedness" means (a) the Borrower's payment obligations under the Loan Agreement or the Notes, (b) liabilities of the Borrower under the Mortgage, and (c) Indebtedness of the Borrower allowed pursuant to Section 6.13 of the Loan Agreement.

"Person" or "person" means an individual, a corporation, a limited liability company, a partnership, an association, a joint stock company, a trust, any unincorporated organization, a governmental body, any other political subdivision, municipality or authority or any other group or entity.

"Potential Default" means any event which with the passage of time or the giving of notice, or both, would constitute an Event of Default under this Indenture, a Default under the Loan Agreement or a default under any other Borrower Document.

"Principal Account" means the trust account by that name within the Bond Fund created with respect to a Series of Bonds pursuant to Section 5.01 hereof.

"Principal Payment Date" means the maturity date of the Bonds and any date for mandatory sinking fund redemption of the Bonds pursuant to Section 3.03 hereof.

"Principal Requirement" for any Bonds means an amount equal to the regularly scheduled principal that is due and payable on such Bonds on the Bond Payment Date next succeeding the date of determination, whether by maturity or by mandatory sinking fund redemption pursuant to Section 3.03 hereof, multiplied by a fraction the numerator of which is one and the denominator of which is the number of whole calendar months in the period commencing on the last date of payment of regularly scheduled principal (or the date of issuance of such Bonds, if no principal has been paid) and ending on the next Bond Payment Date for payment of regularly scheduled principal.

"Project" means the Mortgaged Property, together with the improvements constructed thereon, consisting of a 318-unit senior living facility and related support facilities, including all

buildings, structures and improvements now or hereafter constructed thereon, and all fixtures, machinery, equipment, furniture, furnishings and other personal property hereafter attached to, located in, or used in connection with any such structures, buildings or improvements, and all additions, substitutions and replacements thereto, whether now owned or hereafter acquired. The term "Project" does not include property owned by Persons other than the Borrower, including the Manager or residents of the Project.

"Project Fund" means the trust fund by that name created pursuant to Section 5.01 hereof.

"Project Revenues" means for any period, all cash operating and non-operating revenues of the Project, including Unrestricted Contributions, less (a) any extraordinary and nonrecurring items (including any real property tax refunds), (b) income derived from the sale of assets not in the ordinary course of business which is permitted under the Bond Documents, (c) security, cleaning or similar deposits of tenants until applied or forfeited, (d) Net Proceeds of Insurance Proceeds or Condemnation Awards and (e) any amount disbursed to the Borrower from the Surplus Fund, but including as Project Revenues (i) any such Net Proceeds resulting from business interruption insurance or other insurance or condemnation proceeds retained by the Borrower and (ii) amounts received by the Borrower or the Trustee pursuant to any payment guaranty, operating guaranty or similar agreement with respect to the Project.

"Property Tax Account" means the trust account by that name within the Insurance and Tax Escrow Fund created pursuant to Section 5.01 hereof.

"Purchase Notice Date" means, with respect to any purchase of Bonds pursuant to Section 3.04, (a) if the Bonds are not in book-entry form with a Clearing Agency, the fifth (5th) Business Day prior to the applicable scheduled redemption date for the Bonds, and (b) if the Bonds are in book-entry form with a Clearing Agency, the earlier of (i) that number of Business Days prior to the applicable scheduled redemption date for the Bonds which is required by the Clearing Agency to comply with the rules and regulations of the Clearing Agency, and (ii) the fifth (5th) Business Day prior to the applicable scheduled redemption date for the Bonds.

"Qualified Insurer" has the meaning provided in Section 5.2 of the Loan Agreement.

"Qualified Project Period" shall have the meaning ascribed to such term in the Regulatory Agreement.

"Rate Covenant" means the Debt Service Coverage Ratio covenants contained in Section 4.4 of the Loan Agreement.

"Rating Agency" means S&P, Moody's or Fitch, or any other nationally recognized rating agency.

"Rebate Amount" has the meaning set forth in Section 1.148-1(b) of the Regulations.

"Rebate Analyst" means a Certified Public Accountant, financial analyst or Bond Counsel, or any firm of the foregoing, or a financial institution (which may include the Trustee) experienced in making the arbitrage and rebate calculations required pursuant to Section 148 of the Code and

retained by the Borrower to make the computations and give the directions required pursuant to this Indenture and the Loan Agreement.

"Rebate Analyst Fee" means a fee paid for each rebate calculation (which are to be made every fifth year, if required).

"Rebate Fund" means the trust fund by that name created pursuant to Section 5.01 hereof.

"Record Date" means, with respect to the Series 2018 Bonds, the fifteenth day (whether or not a Business Day) of the calendar month immediately preceding any applicable Interest Payment Date, and with respect to any Series of Additional Bonds, the date specified in the Supplemental Indenture creating such Series of Additional Bonds.

"Regulations" means any proposed, temporary, or final Income Tax Regulations issued pursuant to sections 103 and 141 through 150 of the Code. Any reference to any specific Regulation shall also mean, as appropriate, any proposed, temporary or final Income Tax Regulation designed to supplement, amend or replace the specific Regulation referenced.

"Regulatory Agreement" means the Regulatory Agreement and Declaration of Restrictive Covenants, dated as of the date hereof among the Issuer, the Trustee, and the Borrower relating to the use of the Project.

"Repair and Replacement Fund" means the trust fund by that name established pursuant to Section 5.01 hereof.

"Replacement Reserve Requirement" means an amount equal to $150 per unit per year, as increased pursuant to any Needs Assessment Analysis required by Section 4.12 of the Loan Agreement.

"Reserved Rights" shall mean (a) all of the Issuer's right, title and interest in its reimbursement and indemnification pursuant to the Bond Documents and all enforcement remedies with respect to the foregoing, all of which shall survive any transfer or payment of the Bonds in full or in part and which shall also survive the termination of the Loan Agreement and this Indenture, (b) all the rights to receive the Issuer's Fees and Expenses, (c) the right to receive notices and to make any determination and to grant any approval or consent to anything in this Indenture, the Loan Agreement, the Regulatory Agreement, the Notes and the Bonds requiring the determination, consent or approval of the Issuer, (d) all rights of the Issuer to enforce the representations, warranties, covenants and agreements of the Borrower set forth in the Borrower's Tax Letter of Representation and in the Regulatory Agreement, (e) any and all limitations of liability of the Issuer set forth in the Bond Documents and related rights and remedies regarding (i.) the negotiability, registration and transfer of the Bonds, (ii.) the loss or destruction of the Bonds, (iii.) the limited liability of the Issuer as provided in the Act and in this Indenture and the Bond Documents, (iv.) the maintenance of insurance by the Borrower, (v.) no liability of the Issuer to third parties, and (vi.) no warranties of suitability or merchantability by the Issuer, and (f) all rights of the Issuer in connection with any amendment to or modification of this Indenture, the Loan Agreement, the Regulatory Agreement, the Notes and the Bonds.

"Responsible Officer," when used with respect to the Trustee, means any corporate trust officer or assistant corporate trust officer or any other officer of the Trustee within its corporate trust department customarily performing functions similar to those performed by any of the above designated officers, and also means, with respect to a particular corporate trust matter, any other officer to whom such matter is referred because of such person's knowledge of and familiarity with the particular subject.

"Restoration" means the restoration, replacement, repair or rebuilding of the Project as a result of an event for which Condemnation Awards or Insurance Proceeds are received with respect to the Project, as provided in Section 5.3 of the Loan Agreement.

"Restoration Plans" has the meaning provided in Section 5.3 of the Loan Agreement.

"Revenue Available for Debt Service" means, for any period, the excess of Revenues over Operating Expenses of the Borrower for such period, plus amounts deducted in arriving at such excess of Revenues over Operating Expenses for (a) interest on Indebtedness other than Short-Term Indebtedness, (b) depreciation, (c) amortization, and (d) Other Non-Cash Expenses.

"Revenue Fund" means the trust fund by that name created pursuant to Section 5.01 hereof.

"Revenues" means, for any period, the sum of (a) the gross rents and service revenues less contractual allowances and provisions for uncollectible accounts, free care, and discounted care, plus (b) other operating revenues, plus (c) non-operating revenues (other than income derived from the sale of assets not in the ordinary course of business or any gain from the extinguishment of debt, termination of pension plans, or other extraordinary items or earnings which are not recurring), but excluding in any event (i) any gains on the sale of or other disposition of investments or fixed or capital assets not in the ordinary course of business and (ii) earnings resulting from any reappraisal, revaluation, or write-up of assets.

"S&P" means S&P Global Ratings, a division of S&P Global Inc., a corporation organized and existing under the laws of the State of New York, its successors and their assigns, and, if such organization shall be dissolved or liquidated or shall no longer perform the functions of a securities rating agency, "S&P" shall be deemed to refer to any other nationally recognized securities rating agency designated by the Borrower by notice to the Trustee and the Issuer.

"Senior Bonds" means the Series 2018A Bonds and the Series 2018B Bonds.

"Series" means any series of Bonds issued pursuant to this Indenture.

"Series 2018 Bonds" means the Series 2018A Bonds, the Series 2018B Bonds, the Series 2018C Bonds and the Series 2018D Bonds.

"Series 2018 Notes" means the four notes executed by the Borrower in favor of the Issuer on behalf of the Holders evidencing the Loan of the proceeds related to each Series of the Series 2018 Bonds.

"Series 2018A Bonds" means $50,530,000 aggregate principal amount of the Issuer's Senior Living Revenue Bonds (Bridgemoor Plano Project) Senior Series 2018A.

"Series 2018B Bonds" means $6,765,000 aggregate principal amount of the Issuer's Senior Living Revenue Bonds (Bridgemoor Plano Project) Taxable Senior Series 2018B.

"Series 2018C Bonds" means $5,000,000 aggregate principal amount of the Issuer's Senior Living Revenue Bonds (Bridgemoor Plano Project) Subordinate Series 2018C.

"Series 2018D Bonds" means $4,500,000 aggregate principal amount of the Issuer's Senior Living Revenue Bonds (Bridgemoor Plano Project) Junior Subordinate Series 2018D.

"Series 2018A Note" means the Note in the original principal amount of $50,530,000 related to the Series 2018A Bonds.

"Series 2018B Note" means the Note in the original principal amount of $6,765,000 related to the Series 2018B Bonds.

"Series 2018C Note" means the Note in the original principal amount of $5,000,000 related to the Series 2018C Bonds.

"Series 2018D Note" means the Note in the original principal amount of $4,500,000 related to the Series 2018D Bonds.

"Series 2018B Optional Tender Date" means December 1, 2025.

"Series 2018C Optional Tender Date" means December 1, 2025 and each June 1 and December 1 thereafter until the maturity or prior redemption of the Series 2018C Bonds.

"Servicer" means any mortgage banking company or financial institution engaged pursuant to Section 6.2 of the Loan Agreement to service the Loan.

"Short-Term Indebtedness" means any Indebtedness maturing not more than 365 days after it is incurred or which is payable on demand, except for any such Indebtedness which is renewable or extendable at the sole option of the debtor to a date more than 365 days after it is incurred, or any such Indebtedness which, although payable within 365 days, constitutes payments required to be made on account of Indebtedness expressed to mature more than 365 days after it was incurred.

"Special Redemption Account" means each trust account by that name within the Bond Fund created with respect to a Series of Bonds pursuant to Section 5.01 hereof.

"Stable Occupancy" means the average occupancy of the units in the Project for three consecutive months is equal to or greater than eighty-five percent (85%), as evidenced by a certificate executed by the Borrower Representative and delivered to the Trustee.

"State" means the State of Texas.

"Supplemental Indenture" means any Amendment to this Indenture entered into in accordance with Article XI hereof.

"Surplus Cash" means the amount on deposit in the Surplus Fund that may be distributed to the Borrower pursuant to Section 5.13(b) hereof.

"Surplus Fund" means the trust fund by that name created pursuant to Section 5.01 hereof.

"Tax-Exempt Bonds" means the Series 2018A Bonds, the Series 2018C Bonds and the Series 2018D Bonds and any Additional Bonds that, as originally issued, were the subject of an opinion of Bond Counsel to the effect that the interest thereon is excluded from gross income for federal income tax purposes.

"Tender Notice" means the tender notice in the form set forth in Exhibit E to this Indenture giving notice of the exercise of the right to have the Series 2018C Bonds purchased and the Optional Tender Date.

"Title Policy" means title insurance in the form of a TLTA loan title policy issued by a title insurance company acceptable to the Underwriter and Trustee in the face amount of at least the principal amount of Series 2018A Bonds, the Series 2018B Bonds and the Series 2018C Bonds insuring that the Trustee has a first priority (in the case of the Series 2018A Bonds and the Series 2018B Bonds) or second priority (in the case of the 2018C Bonds) valid lien in the Mortgaged Property subject only to Permitted Encumbrances.

"Town" means the Town of New Hope, Texas.

"Trust Estate" means the property conveyed to the Trustee hereunder, including all of the Issuer's right, title and interest in and to the property described in the Granting Clauses hereof.

"Trustee" means The Huntington National Bank, Grand Rapids, Michigan, or any successors or assigns hereunder.

"Underwriter" means BB&T Capital Markets, a division of BB&T Securities, LLC.

"Unrestricted Cash and Investments" means, as of the date of determination, any cash, cash equivalents, marketable investments, and board designated or trustee held funds (including the Operating Fund, the Operations and Maintenance Reserve Fund, the Repair and Replacement Fund, and the Surplus Fund, but specifically excluding Short Term Indebtedness and amounts in any other fund or account held by the Trustee pursuant to the Indenture), all to the extent available for the payment of Operating Expenses and Debt Service and as evidenced by the most recent financial statements of the Borrower.

"Unrestricted Contributions" means contributions that are not restricted in any way that would prevent their application to the payment of Operating Expenses and Debt Service.

"Yield" of (1) any Investment Security has the meaning set forth in Section 1.148-5 of the Regulations, and (2) the Tax-Exempt Bonds has the meaning set forth in Section 1.148-4 of the Regulations.

Section 1.02   <u>Rules of Construction</u>.   In this Indenture, unless the context otherwise requires:

(a)   The singular form of any word used herein, including the terms defined in Section 1.01, shall include the plural, and vice versa, unless the context otherwise requires.  The use herein of a pronoun of any gender shall include correlative words of the other genders.

(b)   All references herein to "Articles," "Sections" and other subdivisions hereof are to the corresponding Articles, Sections or subdivisions of this Indenture as originally executed; and the words "herein," "hereof," "hereunder" and other words of similar import refer to this Indenture as a whole and not to any particular Article, Section or subdivision hereof.

(c)   The table of contents and the headings or titles of the several Articles and Sections hereof, and any table of contents appended to copies hereof, shall be solely for convenience of reference and shall not affect the meaning, construction or effect, of this Indenture.

(d)   The parties acknowledge that the Issuer, the Trustee, the Borrower, and their respective counsel have participated in the drafting of this Indenture and the other Bond Documents.  Accordingly, the parties agree that any rule of construction to the effect that ambiguities are to be resolved against the drafting party shall not apply in the interpretation of this Indenture or any of the other Bond Documents or any amendment or supplement or exhibit hereto or thereto.

(e)   References to the Tax-Exempt Bonds as "tax-exempt" or to the "tax-exempt status" of the Tax-Exempt Bonds, refer to the exclusion of interest on the Tax-Exempt Bonds from gross income for federal income tax purposes pursuant to Section 103(a) of the Code, irrespective of such forms of taxation as alternative minimum tax, environmental tax, or branch profits tax on foreign corporations, as is consistent with the approach taken in Section 59(i) of the Code.

Section 1.03   <u>Content of Certificates and Opinions</u>.   Every certificate or opinion with respect to compliance with a condition or covenant provided for in this Indenture or the Loan Agreement shall include (a) a statement that the person or persons making or giving such certificate or opinion have read such covenant or condition and the definitions herein relating thereto; (b) a brief statement as to the nature and scope of the examination or investigation upon which the statements or opinions contained in such certificate or opinion are based; (c) a statement that, in the opinion of the signers, they have made or caused to be made such examination or investigation as is necessary to enable them to express an informed opinion as to whether or not such covenant or condition has been complied with; and (d) a statement as to whether, in the opinion of the signers, such condition or covenant has been complied with.

Any such certificate or opinion made or given by an officer of the Issuer may be based, insofar as it relates to legal matters, upon a certificate or opinion of or representations by counsel, unless such officer knows that the certificate or opinion or representations with respect to the matters upon which his or her certificate or opinion may be based as aforesaid are erroneous, or in the exercise of reasonable care should have known that the same were erroneous.  Any such certificate or opinion made or given by counsel may be based, insofar as it relates to factual matters (with respect to which information is in the possession of the Issuer), upon the certificate or opinion

of or representations by an officer of the Issuer, unless such counsel knows that the certificate or opinion or representations with respect to the matters upon which his or her opinion may be based as aforesaid are erroneous, or in the exercise of reasonable care should have known that the same were erroneous.

## ARTICLE II

## THE SERIES 2018 BONDS

Section 2.01    Authority for and Issuance of Series 2018 Bonds; Interest on the Series 2018 Bonds.  Pursuant to the authority of the Act, including Section 337.012 of the Act, there is hereby authorized under this Indenture four Series of Series 2018 Bonds which shall mature (such maturity not to exceed forty years from the Closing Date) in the respective principal amounts and bear interest from the Closing Date, payable on each Interest Payment Date, at the respective rates per annum as set forth in the following tables:

### Series 2018A Bonds

| Maturity Date | Amount ($) | Interest Rate (%) |
|---|---|---|
| December 1, 2053 | 50,530,000 | 7.250 |

### Series 2018B Bonds

| Maturity Date | Amount ($) | Interest Rate (%) |
|---|---|---|
| December 1, 2031 | 6,765,000 | 8.00 |

### Series 2018C Bonds

| Maturity Date | Amount ($) | Interest Rate (%) |
|---|---|---|
| December 1, 2053 | 5,000,000 | 10.00 |

### Series 2018D Bonds

| Maturity Date | Amount ($) | Interest Rate (%) |
|---|---|---|
| December 1, 2053 | 4,500,000 | 12.00 |

The total combined aggregate principal amount of Series 2018 Bonds that may be issued and Outstanding hereunder is expressly limited to $66,795,000, except as provided in Section 2.08 and Section 2.13 hereof. The Series 2018 Bonds are designated "New Hope Cultural Education Facilities Finance Corporation Senior Living Revenue Bonds (Bridgemoor Plano Project) Senior Series 2018A," "New Hope Cultural Education Facilities Finance Corporation Senior Living Revenue Bonds (Bridgemoor Plano Project) Taxable Senior Series 2018B," "New Hope Cultural Education Facilities Finance Corporation Senior Living Revenue Bonds (Bridgemoor Plano Project) Subordinate Series 2018C" and "New Hope Cultural Education Facilities Finance Corporation Senior Living Revenue Bonds (Bridgemoor Plano Project) Junior Subordinate Series 2018D. No Bonds may be issued under the provisions of this Indenture except in accordance with this Article.

All of the Trust Estate (except as provided herein with respect to the separate Accounts related to a specific Series of Bonds in the Bond Fund and Debt Service Reserve Fund) pledged to secure the Bonds issued hereunder shall be applied, as among the Holders, to pay the principal of, premium, if any, and interest due on the Bonds on any particular date in the following order of priority:

FIRST:    To the payment to Persons entitled to all installments of principal and interest due on the Senior Bonds;

SECOND:    To the payment to Persons entitled to all installments of principal and interest due on the Series C Bonds;

THIRD:    To the payment to Persons entitled to all installments of principal and interest due on the Series D Bonds.

The Bonds shall be issuable only as fully registered Bonds without coupons, in Authorized Denominations. Each Series of the Series 2018 Bonds shall be lettered "A," "B," "C" or "D," as appropriate, shall be registered by the Comptroller of Public Accounts of the State of Texas, and shall be numbered separately from R-l consecutively upwards, except for the Initial Bonds, which shall be numbered T-l within each Series of Bonds, bearing numbers not then contemporaneously outstanding (in order of issuance) according to the bond register.

The Series 2018 Bonds shall be dated the Dated Date. The Bonds shall bear interest from the Interest Payment Date preceding the date of authentication thereof, unless the date of such authentication shall be after a Record Date, in which case they shall bear interest from the Interest Payment Date succeeding the Record Date; provided that if, as shown by the records of the Paying Agent, interest on the Bonds shall be in default, Bonds shall bear interest from the date to which interest has been paid in full on the Bonds, or if no interest has been paid on the Bonds, from the date of their initial delivery. Bonds authenticated on or before the first Record Date following the Closing Date shall bear interest from the date of their initial delivery.

The principal of and premium, if any, on the Bonds shall be payable, when due, in lawful money of the United States of America at the Designated Office of the Trustee upon presentation and surrender of the Bonds. Payment of interest on the Bonds shall be made in like coin or currency on each Interest Payment Date to the Holder thereof as of the Record Date, by check

mailed by the Trustee on such Interest Payment Date to the Holder at its address as it appears on the registration books maintained by or on behalf of the Trustee or at such other address as is furnished to the Trustee in writing by such Holder prior to such Record Date. Payment of interest on any Bonds may, upon written request to the Trustee of any Holder of Bonds in an aggregate principal amount of at least $100,000, be transmitted by wire transfer of immediately available funds on the Interest Payment Date to such Holder to the bank account number at a bank located within the continental United States on file with the Trustee as of the Record Date. Any such wire transfer request shall continue in force until revoked in writing by such Holder to the Trustee, and to be effective as to any interest payment such revocation must be received by the Trustee at least ten (10) Business Days prior to the applicable Record Date.

Section 2.02    Interest on Bonds. Interest accrued on the Bonds during each Interest Period shall be paid on the following Interest Payment Date. Interest on the Bonds shall be computed on the basis of a 360-day year comprised of twelve 30-day months, or as otherwise provided in a Supplemental Indenture authorizing a Series of Additional Bonds.

Section 2.03    Execution. The Bonds shall be executed on behalf of the Issuer with the manual or facsimile signature of the President or any Vice President of the Issuer, shall be attested by the manual or facsimile signature of the Secretary or an Assistant Secretary of the Issuer, and shall have impressed or imprinted thereon the official seal of the Issuer or a facsimile of such seal, if applicable.

In case any officer of the Issuer whose signature or whose facsimile signature shall appear on the Bonds shall cease to be such officer before the authentication of such Bonds, such signature or the facsimile signature thereof shall nevertheless be valid and sufficient for all purposes the same as if he or she had remained in office until authentication; and any Bond may be signed on behalf of the Issuer by such persons as are at the time of execution of such Bond proper officers of the Issuer, even if, at the date of this Indenture, any such person was not such officer.

Section 2.04    Limited Obligations.

(a)    Not a Debt of the State or Political Subdivision. THE BONDS AND THE INTEREST THEREON ARE LIMITED OBLIGATIONS OF THE ISSUER, PAYABLE SOLELY FROM THE TRUST ESTATE AND GIVE RISE TO NO PECUNIARY LIABILITY OF THE ISSUER. THE BONDS ARE SPECIAL, LIMITED OBLIGATIONS OF THE ISSUER. THE BONDS AND THE INTEREST THEREON DO NOT CONSTITUTE OR GIVE RISE TO A PECUNIARY LIABILITY, GENERAL OR MORAL OBLIGATION OR A PLEDGE OF THE FULL FAITH AND CREDIT OR TAXING POWER OF THE ISSUER, THE TOWN, THE STATE, OR ANY POLITICAL SUBDIVISION OF THE STATE WITHIN THE MEANING OF ANY CONSTITUTIONAL OR STATUTORY LIMITATIONS. NEITHER THE STATE NOR ANY POLITICAL SUBDIVISION OF THE STATE NOR THE ISSUER NOR THE TOWN SHALL BE OBLIGATED TO PAY THE PRINCIPAL OF THE BONDS, THE INTEREST THEREON OR OTHER COSTS INCIDENT THERETO EXCEPT FROM REVENUES PLEDGED THEREFOR UNDER THIS INDENTURE, ALL AS MORE FULLY SET FORTH IN THIS INDENTURE. NEITHER THE FULL FAITH AND CREDIT NOR THE TAXING POWER, IF ANY, OF THE ISSUER, THE TOWN, THE STATE, OR ANY POLITICAL

SUBDIVISION THEREOF, IS PLEDGED TO THE PAYMENT OF THE PRINCIPAL OF THE BONDS OR THE INTEREST THEREON OR OTHER COSTS INCIDENT THERETO.

(b)    <u>No Recourse to Issuer</u>.  No recourse under or upon any obligation, covenant or agreement contained in this Indenture or in any Bond, or under any judgment obtained against the Issuer, or the enforcement of any assessment, or any legal or equitable proceedings by virtue of any constitution or statute or otherwise, or under any circumstances under or independent, or any claim based thereon or otherwise in respect thereof shall be had against the Town or the Issuer or any incorporator, member, director, officer, employee, agent or counsel as such, past, present or future of the Issuer or the Town, either directly or through the Issuer, the Trustee or otherwise, for the payment for or to the Issuer or any receiver thereof, or for or to the Owner of any Bond issued hereunder, or otherwise, of any sum that may be due and unpaid by the Issuer upon any such Bond. Any and all personal liability of every nature whether at common law or in equity or by statute or by constitution or otherwise of any such incorporator, member, director, officer, employee, agent or counsel, as such, to respond by reason of any act or omission on his part or otherwise, for the payment for or to the Owner of any Bond issued hereunder or otherwise of any sum that may remain due and unpaid upon the Bond hereby secured or any of them is, by the acceptance hereof, expressly waived and released as a condition of and in consideration for the execution and the issuance of the Bonds.

(c)    <u>Role of Issuer</u>.  The Issuer shall not be required to take any action hereunder not expressly provided for herein.  In addition, the Issuer shall have no obligation to review, control or oversee the activities of the Trustee in (a) collecting any amounts payable pursuant to the Loan Agreement, or (b) making any payments on the Bonds.  Furthermore, the Issuer shall not be obligated to take any action or execute any document that might, in its reasonable judgment, involve it in any expense or liability unless it shall have been furnished with assurance of payment or reimbursement for any expense and with reasonable indemnity for liability of the Issuer and its officers, directors, employees, agents and counsel.

(c)    <u>No Liability</u>.  No agreements or provisions contained in this Indenture nor any agreement, covenant or undertaking by the Issuer contained in any document executed by the Issuer in connection with the Project or the issuance, sale and delivery of the Bonds shall give rise to any pecuniary liability of the Issuer or any of its officers or directors or a charge against its general credit, or shall obligate the Issuer or any of its officers or directors financially in any way except with respect to the Issuer under the Loan Agreement and the application of revenues therefrom that have been pledged to the payment of the Bonds and the proceeds of the Bonds. No failure of the Issuer to comply with any term, condition, covenant or agreement herein shall subject the Issuer, its incorporators, officers, employees, agents and counsel to liability for any claim for damages, costs or other financial or pecuniary charge except to the extent that the same can be paid or recovered from the Loan Agreement or revenues therefrom that have been pledged to payment of the Bonds or proceeds of the Bonds.  Nothing herein shall preclude a proper party in interest from seeking and obtaining, to the extent permitted by law, specific performance against the Issuer for any failure to comply with any term, condition, covenant or agreement herein; provided, that no costs, expenses or other monetary relief shall be recoverable from the Issuer or its incorporators, officers, directors, employees, agents and counsel except as may be payable from the Loan Agreement or revenues therefrom that have been pledged to payment of the Bonds or the proceeds of the Bonds.

Section 2.05    <u>Authentication</u>.    Only such Bonds as shall have endorsed thereon a certificate of authentication manually executed by the Trustee or a certificate of registration executed by the Comptroller of Public Accounts of the State of Texas substantially in the form set forth in Exhibits A, B, C and D or a Supplemental Indenture authorizing a Series of Additional Bonds, respectively, shall be entitled to any security or benefit hereunder.    Other than the Initial Bonds, which shall be registered by the Comptroller of Public Accounts of the State of Texas, no Bond shall be valid or become obligatory for any purpose or entitled to any security or benefit under this Indenture unless and until such certificate of authentication shall have been manually executed by the Trustee, and such executed certificate of authentication of the Trustee upon any such Bond shall be conclusive evidence that such Bond has been authenticated and delivered hereunder.    Said certificate of authentication on any Bond shall be deemed to have been executed by the Trustee if signed by an authorized officer of the Trustee, but it shall not be necessary that the same officer sign the certificate of authentication on all of the Bonds issued hereunder.

Section 2.06    <u>Form of Bonds</u>.    The Series 2018A Bonds, the Series 2018B Bonds, the Series 2018C Bonds and the Series 2018D Bonds shall be substantially in the forms set forth in Exhibit A, Exhibit B, Exhibit C and Exhibit D, respectively, hereto with such variations, omissions and insertions as are permitted or required by this Indenture.    Each Series of Additional Bonds shall be substantially in the form set forth in the Supplemental Indenture authorizing such Series of Additional Bonds.

Section 2.07    <u>Delivery of Series 2018 Bonds</u>.    Upon the execution and delivery of this Indenture, the Issuer shall execute and deliver the Series 2018 Bonds to the Trustee, and the Trustee shall authenticate the Series 2018 Bonds and shall deliver them to the original purchasers thereof as directed by the Issuer in the request described in (c) below.

Prior to the delivery of any of the Series 2018 Bonds against payment therefor, the Trustee shall have received the following:

(a)    A copy, duly certified by the Secretary of the Issuer, of the resolution of the members of the Governing Body of the Issuer, authorizing the execution and delivery of the Loan Agreement, the Mortgage, and this Indenture and the issuance of the Series 2018 Bonds;

(b)    Original executed counterparts of this Indenture, the Loan Agreement, the Mortgage, the Series 2018 Notes, the Assignment of Notes, Liens, Security Interests and Other Documents, the Regulatory Agreement, the Issuer's Certificate as to Tax Exemption, the Borrower's Tax Letter of Representation, the Management Agreement, the Collateral Assignment of Management Agreement and the Continuing Disclosure Agreement;

(c)    A request and authorization to the Trustee on behalf of the Issuer and signed by an Issuer Representative to authenticate and deliver the Series 2018 Bonds as set forth therein;

(d)    Receipt of the Title Policy or a commitment to issue the Title Policy, in form and substance acceptable to the Underwriter;

(e)    Evidence of insurance coverage required by Section 5.1 of the Loan Agreement;

(f)    [RESERVED];

(g)      [RESERVED];

(h)      Opinions of Counsel to the Issuer and the Borrower in forms and substance satisfactory to the Underwriter and Bond Counsel;

(i)      An approving opinion of Bond Counsel;

(j)      An opinion of the Attorney General of the State of Texas approving the Series 2018 Bonds;

(k)      The certificate of registration of the Series 2018 Bonds from the Comptroller; and

(l)      Such other documents as may reasonably be requested by the Trustee.

Section 2.08   Mutilated, Lost, Stolen or Destroyed Bonds.   In the event any Bond is mutilated, lost, stolen or destroyed, the Issuer may execute and the Trustee may authenticate and deliver a new Bond of the same Series and of like date, interest rate, principal amount, maturity and denomination as the Bond mutilated, lost, stolen or destroyed; provided that, in the case of any mutilated Bond, such mutilated Bond shall first be surrendered to the Trustee, and, in the case of any lost, stolen or destroyed Bond, there shall be first furnished to the Trustee evidence of such loss, theft or destruction satisfactory to the Trustee, together with indemnity for the Issuer satisfactory to the Issuer and the Trustee satisfactory to the Trustee, in its sole and absolute discretion. In the event any such Bond shall be about to mature or has matured or been called for redemption, instead of issuing a duplicate Bond, the Issuer may pay the same without surrender thereof.  The Issuer and the Trustee may charge the Holder of such Bond their reasonable fees and expenses incurred pursuant to this Section.

All duplicate Bonds issued and authenticated pursuant to this Section 2.08 shall constitute original, contractual obligations of the Issuer to the extent provided in this Indenture (whether or not lost, stolen or destroyed Bonds be at any time found by anyone) and shall be entitled to equal and proportionate rights and benefits hereunder as all other Outstanding Bonds issued hereunder.

Section 2.09   Registration and Transfer of Bonds; Persons Treated as Holders.   The Trustee shall keep books for the registration and for the registration of transfer of the Bonds as provided in this Indenture.  So long as the Bonds are held in physical form and not book-entry form, at reasonable times and under reasonable regulations established by the Trustee and subject to applicable law providing to the contrary, such list may be inspected and copied by the Issuer, the Borrower or the Holders of $1,000,000 or more in aggregate Bond Obligation, or a designated representative of such Holders.

Promptly following surrender for registration of transfer of any Bond at its Designated Office, the Trustee shall enter the name and address of the transferee upon the registration books of the Issuer and shall deliver to the transferee a new fully authenticated and registered Bond or Bonds in the name of the transferee, such new Bond or Bonds to be of the same Series, of Authorized Denominations and of the same maturity, interest rate and for the aggregate principal amount which the new Holder is entitled to receive. In addition, promptly following surrender of any Bond at the Designated Office of the Trustee, duly endorsed in blank, such Bond may at the option of the Holder thereof, be exchanged for a Bond or Bonds of the same Series in an equal

aggregate principal amount of the applicable Series of Authorized Denominations and of the same form, interest rate, maturity and tenor of the Bond being exchanged.

All Bonds presented for registration of transfer, exchange, redemption or payment shall (if so required by the Issuer or the Trustee) be accompanied by a written instrument or instruments of transfer, in form and with guaranty of signature as set forth in the form of Bond of the applicable Series or as may be satisfactory to the Trustee, duly executed by the Holder.

The Trustee also may require payment from the Holder of a sum sufficient to cover any tax or other governmental fee or charge that may be imposed in relation thereto. Such taxes, fees and charges shall be paid before any such new Bond shall be delivered. The cost of printing Bonds and any services rendered or expenses incurred by the Trustee in connection with any transfer shall be paid by the Borrower.

The Issuer and the Trustee shall not be required (a) to issue or register the transfer of any Bonds during any period beginning on a Record Date with respect thereto and ending at the close of business on the Business Day preceding the next Interest Payment Date or (b) to transfer any Bonds selected, called or being called for redemption in whole or in part.

Bonds delivered upon any registration of transfer as provided herein, or as provided in Section 2.08 hereof, shall be valid limited obligations of the Issuer, evidencing the same debt as the Bonds surrendered, shall be secured by this Indenture and shall be entitled to all of the security and benefits hereof to the same extent as the Bonds surrendered.

The Issuer, the Borrower and the Trustee shall treat the person in whose name a Bond is registered on the registration books maintained by the Trustee as the absolute owner thereof for all purposes, whether or not such Bond shall be overdue, and shall not be bound by any notice to the contrary.

Section 2.10   Cancellation and Disposition of Bonds. Whenever any Outstanding Bond shall be delivered to the Trustee for cancellation pursuant to this Indenture, upon payment of the principal amount thereof and interest thereon, for replacement pursuant to Section 2.08 hereof, for registration of transfer or exchange pursuant to Section 2.09 hereof or otherwise, such Bond shall be cancelled and disposed of by the Trustee in accordance with its retention policies then in effect and, upon written request of the Issuer, evidence of such disposition shall be furnished by the Trustee to the Issuer.

Section 2.11   Temporary Bonds. Pending preparation of definitive Bonds, there may be executed, and upon the written request of the Issuer, the Trustee shall authenticate and deliver, in lieu of definitive Bonds and subject to the same limitations and conditions, temporary typewritten, printed, engraved or lithographed bonds, in the form of registered Bonds without coupons in Authorized Denominations, substantially in the respective forms of Exhibits A, B, C and D hereto, as applicable, or as set forth in a Supplemental Indenture for Additional Bonds.

If temporary Bonds shall be issued, the Issuer shall cause the definitive Bonds to be prepared and to be executed, authenticated and delivered to the Trustee not later than 14 days following the delivery or reissuance of such temporary Bonds, and the Trustee, upon presentation to it at its Designated Office of any temporary Bond, shall cancel the same and deliver in exchange

therefor at the place designated by the Holder, without charge to the Holder, a definitive Bond or Bonds of the same Series in an equal aggregate principal amount, of the same maturity and bearing interest at the same rate as the temporary Bond surrendered. Until so exchanged, the temporary Bonds shall in all respects be entitled to the same benefit and security of this Indenture as the definitive Bonds of such Series to be issued and authenticated hereunder.

Section 2.12    Book-Entry Form.    Notwithstanding anything herein to the contrary, the Series 2018 Bonds shall initially be issued as typewritten bonds and held in book-entry form on the books of the Clearing Agency. The Issuer, Trustee and Paying Agent may, in connection herewith, do or perform or cause to be done or performed any acts or things not adverse to the rights of the holders of the Bonds, as are necessary or appropriate to accomplish or recognize such book-entry form Bonds.

(a)    So long as the Bonds remain and are held in book-entry form on the books of a Clearing Agency, then (1) any such Bond may be registered upon the books kept by the Trustee in the name of such Clearing Agency, or any nominee thereof, including Cede & Co., as nominee of The Depository Trust Company; (2) the Clearing Agency in whose name such Bonds are so registered shall be, and the Issuer, the Trustee and Paying Agent may deem and treat such Clearing Agency as, the absolute owner and holder of such Bond for all purposes of this Indenture, including, without limitation, the receiving of payment of the principal of, premium, if any, and interest on such Bond and the receiving of notice and giving of consent; (3) neither the Issuer nor Trustee and Paying Agent shall have any responsibility or obligation hereunder to any direct or indirect participant, within the meaning of Section 17A of the Securities Exchange Act of 1934, as amended, of such Clearing Agency, or any person on behalf of which, or otherwise in respect of which, any such participant holds any interest in any Bond, including, without limitation, any responsibility or obligation hereunder to maintain accurate records of any interest in any Bond or any responsibility or obligation hereunder with respect to the receiving of payment of principal, premium, if any, or interest on any Bond, the receiving of notice or the giving of consent; and (4) the Clearing Agency is not required to present any Bond called for partial redemption prior to receiving payment so long as the Trustee and the Clearing Agency have agreed to the method for noting such partial redemption.

(b)    If either (i) the Issuer receives notice from the Clearing Agency which is currently the registered owner of the Bonds to the effect that such Clearing Agency is unable or unwilling to discharge its responsibility as a Clearing Agency for the Bonds or, (ii) the Issuer elects with the prior written consent of the Borrower to discontinue its use of such Clearing Agency as a Clearing Agency and the Issuer fails to establish a securities depository/book-entry system relationship with another Clearing Agency, then the Issuer and, at the written instruction of the Issuer, Trustee and Paying Agent each shall do or perform or cause to be done or performed all acts or things, not adverse to the rights of the holders of the Bonds, as are necessary or appropriate to discontinue use of such Clearing Agency as a Clearing Agency for the Bonds and to transfer the ownership of each of the Bonds to such person or persons, including any other Clearing Agency, as the holder of the Bonds may direct in accordance with this Indenture. Any expenses of such discontinuance and transfer, including expenses of printing new certificates to evidence the Bonds, shall be paid by the Borrower.

(c)    So long as the Bonds remain and are held in book-entry form on the books of a Clearing Agency, the Trustee shall be entitled to request and rely upon a certificate or other written representation from the Clearing Agency or any participant or indirect participant with respect to the identity of any Holders as of a record date selected by the Trustee.  For purposes of determining whether the consent, advice, direction or demand of an owner of a Bond has been obtained, the Trustee shall be entitled to treat the Holders as the owner or Beneficial Owner of such Bonds and any consent, request, direction, approval, objection or other instrument of such Holder may be obtained in the same fashion described in Article X hereof.

The book-entry system may also be discontinued with respect to the Bonds, at the direction of the Issuer or the Borrower, and at the Borrower's expense, and the Issuer and the Trustee will cause the delivery of Bond certificates to such Beneficial Owners of the Bonds, registered in the names of such Beneficial Owners as are specified to the Trustee by the Clearing Agency in writing.

When the book-entry system is not in effect, all references herein to the Clearing Agency will be of no further force or effect.

Section 2.13    Additional Bonds.  So long as no Event of Default has then occurred and is continuing, and upon the receipt of written consent of the Controlling Holders of the Senior Bonds, the Issuer at the request of a Borrower Representative may issue Additional Bonds for the purpose of (i) financing the costs of making such Modifications as the Borrower may deem necessary or desirable, (ii) financing the cost of completing any Modifications, (iii) refunding any Bonds, and (iv) in each such case, paying the costs of the issuance and sale of the Additional Bonds, capitalized or funded interest, and such other costs reasonably related to the financing as shall be agreed upon by the Borrower and the Issuer. The terms of such Additional Bonds, the purchase price to be paid therefor, and manner in which the proceeds therefrom are to be disbursed shall be determined by the Borrower and the sale of any Additional Bonds shall be the sole responsibility of the Borrower. The Borrower and the Issuer shall enter into an amendment to the Loan Agreement to provide for additional Loan Payments in an amount at least sufficient to pay principal of, premium, if any, and interest on the Additional Bonds when due and to provide for any additional terms or changes to the Loan Agreement required because of such Additional Bonds.  The Issuer and the Trustee shall enter into such amendments or supplements to this Indenture as are required to effect the issuance of the Additional Bonds.  An amount equal to any increase in the Debt Service Reserve Requirement attributable to issuance of the Additional Bonds shall be deposited in the applicable Debt Service Reserve Account of the Debt Service Reserve Fund at the time of delivery of the Additional Bonds.

Section 2.14    Delivery of Additional Bonds.  Upon the execution and delivery in each instance of an appropriate indenture supplemental hereto, the Issuer shall execute and deliver to the Trustee and the Trustee shall register and authenticate Additional Bonds and deliver them to the purchaser or purchasers as may be directed by the Issuer, as hereinafter in this Section 2.14 provided.  Prior to the delivery by the Trustee of any such Additional Bonds, there shall be filed with the Trustee:

(a)    a valid and effective amendment to the Loan Agreement, pursuant to Section 11.04 hereof, providing for the inclusion within the Project of any real estate and interests therein and any buildings, structures, facilities, machinery, equipment, and related property to be acquired by

purchase or construction from the proceeds of the Additional Bonds and providing for an adjustment to the Loan Payment obligations of the Borrower to cover the Debt Service Requirements of all the Bonds that will be Outstanding after the issuance of the Additional Bonds, which shall be evidenced by a Note of the Borrower, and providing any other changes in connection with the issuance of Additional Bonds;

(b)     a valid and effective Supplemental Indenture providing for the issuance of such new Series of Additional Bonds, and securing such Additional Bonds by the lien and security interest of the Trust Estate;

(c)     a valid and effective amendment to the Mortgage subjecting to the lien of the Mortgage any and all real estate and interests therein and any buildings, structures, facilities, and related property acquired by purchase or construction from proceeds of such Additional Bonds and assigning and pledging to the Issuer and the Trustee the Borrower's interest in the leases, rents, issues, profits, revenues, income, receipts, money, royalties, rights and benefits thereof and therefrom and granting a security interest to the Issuer in the Borrower's interest in the machinery, equipment, and related property acquired by purchase or construction from the proceeds of the Additional Bonds, in any inventory then or thereafter located at the real estate or interests therein and any buildings, structures, facilities, and related property to be acquired by purchase or construction from the proceeds of the Additional Bonds, and in the accounts, documents, chattel paper, instruments, and general intangibles arising in any manner from the Borrower's operation of any real estate or interests therein and any buildings, structures, facilities, machinery, equipment, and related property to be acquired by purchase or construction from the proceeds of the Additional Bonds;

(d)     a copy, duly certified by the Secretary of the Issuer, of the resolution of the members of the Governing Body of the Issuer, authorizing the execution and delivery of the Supplemental Indenture, amendment to the Loan Agreement, Note, amendment to the Mortgage and issuance of the Additional Bonds;

(e)     a request and authorization to the Trustee on behalf of the Issuer, signed by an Issuer Representative, to authenticate and deliver the Additional Bonds to the purchaser or purchasers therein identified upon payment to the Trustee, for the account of the Issuer, of a specified sum plus any accrued interest; the proceeds of the Additional Bonds shall be paid over to the Trustee and deposited to the credit of such other funds as are provided in such request and authority or as are created by the Supplemental Indenture;

(f)     a certificate signed by the Borrower Representative to the effect that no Event of Default under this Indenture or any Borrower Document has then occurred and is continuing;

(g)     a certification from the Borrower and calculations demonstrating that the requirements of Section 6.13 of the Loan Agreement will be satisfied in respect of the issuance of the Additional Bonds;

(h)     a Favorable Opinion of Bond Counsel with respect to the Outstanding Tax-Exempt Bonds and an approving opinion of Bond Counsel with respect to the Additional Bonds;

(i)       an opinion of the Attorney General of the State of Texas approving the Additional Bonds;

(j)       a certificate of registration of the Additional Bonds from the Comptroller;

(k)       the items required by Section 2.13 of this Indenture;

(l)       an endorsement of the Title Policy which endorsement includes any additional real property made subject to the Mortgage and increases the face amount of the policy to an amount equal to the principal amount of the Outstanding Bonds and the Additional Bonds; and

(m)      such other documents as the Trustee may require to evidence compliance with any of the Bond Documents.

Section 2.15    <u>CUSIP Numbers</u>.  The Issuer in issuing the Bonds may use "CUSIP" numbers (if then generally in use), and, if so, the Trustee shall use "CUSIP" numbers in notices of redemption as a convenience to Registered Owners; provided that the Trustee shall have no liability for any defect in the "CUSIP" numbers as they appear on the any Bond, notice or elsewhere, and, provided further that any such notice may state that no representation is made as to the correctness of such numbers either as printed on the Bonds or as contained in any notice of a redemption and that reliance may be placed only on the other identification numbers printed on the Bonds, and any such redemption shall not be affected by any defect in or omission of such numbers.  The Issuer will promptly notify the Trustee in writing of any change in the "CUSIP" numbers.

<div align="center">

ARTICLE III

REDEMPTION OR PURCHASE OF SERIES 2018 BONDS

</div>

Section 3.01    <u>Mandatory Redemption of Series 2018 Bonds</u>.  Series 2018 Bonds shall be called for redemption (a) in whole or in part in the event the Project or any portion thereof is damaged or destroyed or taken in a condemnation proceeding and Net Proceeds resulting therefrom are to be applied to the payment of the Series 2018 Notes as provided in Section 5.3 of the Loan Agreement, which Net Proceeds are to be used to redeem Series 2018 Bonds at the election of the Borrower made pursuant to Section 5.3 of the Loan Agreement, (b) in whole in the event the Borrower exercises its option to terminate the Loan Agreement pursuant to Article VIII thereof (and cause all of the Series 2018 Bonds to be redeemed as provided in Article III hereof), (c) in whole or in part from proceeds of the Title Policy pursuant to Section 3.9 of the Loan Agreement, or (d) in whole in the event the Borrower is required to prepay the Loan following a "Default" under the Loan Agreement.

If called for redemption at any time pursuant to clauses (a) through (d) above, the Series 2018 Bonds shall be redeemed by the Issuer prior to maturity, in whole at any time or (in the case of redemption pursuant to clause (a) or (c) above) in part at any time (less than all of such Series 2018 Bonds to be selected in accordance with the provisions of Section 3.05 hereof) at a redemption price equal to 100% of the principal amount thereof plus accrued interest to the redemption date; such redemption date to be a date determined by the Borrower, or in the case of redemption pursuant to (d) above, to be the earliest practicable date following acceleration of amounts due under the Loan.

The Series 2018 Bonds are also subject to mandatory redemption in whole at a redemption price equal to 108% of the principal amount of the Series 2018 Bonds to be redeemed plus interest accrued thereon to, but not including, the redemption date, for which notice of redemption can be given in accordance with this Indenture within forty-five (45) days after the occurrence of a Determination of Taxability; provided, however, if mandatory redemption on account of a Determination of Taxability of less than all the Tax-Exempt Bonds would result, in the opinion of Bond Counsel, in the interest on the Tax-Exempt Bonds Outstanding following such mandatory redemption being excludable from the gross income of the Holders of such Tax-Exempt Bonds Outstanding, then the Tax-Exempt Bonds are subject to mandatory redemption upon the occurrence of a Determination of Taxability in the amount specified in such opinion.

Section 3.02   Optional Redemption of Series 2018 Bonds. The Series 2018A Bonds and the Series 2018B Bonds are subject to optional redemption by the Issuer, at the written direction of the Borrower, in whole or in part from any moneys that may be available for such purpose, upon payment of the following redemption prices (expressed as a percentage of principal amount of the respective Series 2018A Bonds or Series 2018B Bonds to be redeemed) plus interest accrued to the date of redemption:

| Redemption Period | Redemption Price |
|---|---|
| December 1, 2025 through November 30, 2026 | 103% |
| December 1, 2026 through November 30, 2027 | 102% |
| December 1, 2027 through November 30, 2028 | 101% |
| December 1, 2028 and thereafter | 100% |

The Series 2018C Bonds are subject to optional redemption by the Issuer, at the written direction of the Borrower, on and after December 1, 2025, in whole or in part at any time, at a redemption price equal to 100% of the principal amount of the Series 2018C Bonds being redeemed, plus accrued interest to the date of redemption.  The Borrower may condition any election to redeem Bonds upon any condition.  To the extent that any condition specified in the notice of redemption does not occur, the Borrower may, by written direction, direct the Trustee to rescind the notice.  Upon receipt of such written direction by the Borrower, the Trustee shall notify the Holders of the Bonds that such redemption notice has been rescinded and that such Bonds remain outstanding.

The Series 2018D Bonds are subject to optional redemption by the Issuer, at the written direction of the Borrower, in whole or in part from any moneys that may be available for such purpose, upon payment of the following redemption prices (expressed as a percentage of principal amount of the respective Series 2018D Bonds to be redeemed) plus interest accrued to the date of redemption:

| Redemption Period | Redemption Price |
|---|---|
| December 1, 2025 through November 30, 2026 | 119% |
| December 1, 2026 through November 30, 2027 | 118% |
| December 1, 2027 through November 30, 2028 | 117% |
| December 1, 2028 through November 30, 2029 | 116% |

| December 1, 2029 through November 30, 2030 | 115% |
|---|---|
| December 1, 2030 through November 30, 2031 | 114% |
| December 1, 2031 and thereafter | 100% |

Section 3.03   Mandatory Sinking Fund Redemption.

(a)   The Series 2018A Bonds are subject to mandatory sinking fund redemption at a redemption price equal to 100% of the principal amount thereof plus accrued interest on December 1 of each year and in the principal amounts shown below:

| Date December 1 | Principal Amount ($) | Date December 1 | Principal Amount ($) |
|---|---|---|---|
| 2031 | 345,000 | 2043 | 2,145,000 |
| 2032 | 995,000 | 2044 | 2,300,000 |
| 2033 | 1,065,000 | 2045 | 2,465,000 |
| 2034 | 1,140,000 | 2046 | 2,645,000 |
| 2035 | 1,225,000 | 2047 | 2,835,000 |
| 2036 | 1,315,000 | 2048 | 3,045,000 |
| 2037 | 1,410,000 | 2049 | 3,265,000 |
| 2038 | 1,510,000 | 2050 | 3,500,000 |
| 2039 | 1,620,000 | 2051 | 3,755,000 |
| 2040 | 1,740,000 | 2052 | 4,025,000 |
| 2041 | 1,865,000 | 2053* | 4,320,000 |
| 2042 | 2,000,000 | | |

*Stated maturity

(b)   The Series 2018B Bonds are subject to mandatory sinking fund redemption at a redemption price equal to 100% of the principal amount thereof plus accrued interest on December 1 of each year and in the principal amounts shown below:

| Date December 1 | Principal Amount ($) | Date December 1 | Principal Amount ($) |
|---|---|---|---|
| 2021 | 425,000 | 2027 | 680,000 |
| 2022 | 460,000 | 2028 | 730,000 |
| 2023 | 500,000 | 2029 | 790,000 |
| 2024 | 540,000 | 2030 | 855,000 |
| 2025 | 580,000 | 2031* | 575,000 |
| 2026 | 630,000 | | |

*Stated maturity

The principal amount of the Series 2018 Bonds of any stated maturity bearing interest at the same interest rate required to be redeemed on each date set forth above shall be reduced by the

principal amount of the Series 2018 Bonds of such stated maturity bearing such rate of interest specified by Borrower request at least 45 days prior to the redemption date that have been either (i) purchased by or on behalf of the Borrower and delivered to the Trustee for cancellation, or (ii) redeemed other than through the operation of the provisions of this Section, and that have not been previously made the basis for a reduction of the principal amount of the Series 2018 Bonds of such stated maturity and interest rate to be redeemed on a sinking fund redemption date.

Section 3.04    Purchase in Lieu of Redemption.  Notwithstanding anything to the contrary in this Indenture, if any Bond is called for optional redemption or mandatory redemption, in whole or in part, the Borrower may, upon the receipt of a Favorable Opinion of Bond Counsel addressed to the Borrower, the Trustee and the Issuer, elect to have such Bond purchased and transferred in lieu of redemption and cancellation in accordance with this Section.

(a)    Direction to Purchase.  Unless otherwise provided in a Supplemental Indenture, purchase in lieu of redemption shall be available to all Bonds called for optional redemption or mandatory redemption, or for such lesser portion of such Bonds in any Authorized Denomination. The Borrower may direct the Trustee to purchase all or such lesser portion of the Bonds so called for redemption.  Any such direction to the Trustee must:

(i)    be in writing;

(ii)    state either that all the Bonds called for redemption are to be purchased or, if less than all of the Bonds called for redemption are to be purchased, identify those Bonds to be purchased by stated maturity and interest rate, and outstanding principal amount in Authorized Denominations; and

(iii)    be received by the Trustee no later than the Purchase Notice Date.

If so directed, the Trustee shall purchase such Bonds on the date which otherwise would be the redemption date of such Bonds.  Any of the Bonds called for redemption that are not purchased in lieu of redemption shall be redeemed and cancelled as otherwise required by this Indenture on such redemption date.

(b)    Withdrawal of Direction to Purchase.  Not later than the Purchase Notice Date, any direction given to the Trustee pursuant to this Section may be withdrawn by the Borrower by written notice to the Trustee.  Subject generally to this Indenture, should a direction to purchase be withdrawn, the Bonds for which such notice was given shall be subject to redemption on the redemption date.

(c)    Purchaser.  The purchase shall be made for the account of the Borrower or its designee.

(d)    Purchase Price.  The purchase price of the Bonds shall be equal to the outstanding principal of, accrued and unpaid interest on and the redemption premium, if any, that would have been payable on such Bonds on the scheduled redemption date.  To pay the purchase price of such Bonds, the Trustee shall use (A) such monies deposited by the Borrower with the Trustee for such purpose and (B) monies, if any, in Funds held under this Indenture, that the Trustee would have used to pay the outstanding principal of, accrued and unpaid interest on and the redemption

premium, if any, that would have been payable on the redemption of such Bonds on the scheduled redemption date.

Any Bonds purchased pursuant to this Section may be remarketed by any applicable remarketing agent and shall not be deemed cancelled or retired for any purpose unless otherwise directed by the Borrower. In the event that all Outstanding Bonds are purchased pursuant to this Section, such Bonds shall be deemed to be Outstanding for purposes of Article XI hereof.

(e)    No Notice to Holders. No notice of purchase in lieu of redemption shall be required to be given to the Holders (other than the notice of redemption otherwise required under this Indenture).

Section 3.05    Selection of Bonds to Be Redeemed. Bonds may be redeemed only in Authorized Denominations. If less than all of the Bonds of any maturity are being redeemed or purchased, the particular Bonds to be redeemed or purchased shall be selected by the Trustee by lot, in any case in accordance with the then applicable rules of DTC (a) in the case of mandatory sinking fund redemptions pursuant to Section 3.03 hereof, from the Outstanding Bonds of the applicable maturity to be redeemed in accordance with Section 3.03, and (b) otherwise in the principal amount and from the maturities and Series of the Bonds designated by the Authorized Borrower Representative in writing to the Trustee. Subject to the requirements of any Clearing Agency, if it is determined that less than all of the principal amount represented by any Bond is to be called for redemption, then, following notice of intention to redeem such principal amount, the Holder thereof shall surrender such Bond to the Trustee on or before the applicable redemption date for (i) payment on the redemption date to such Holder of the redemption price of the amount called for redemption and (ii) delivery to such Holder of a new Bond or Bonds of such Series in Authorized Denominations in the aggregate principal amount of the unredeemed balance of the principal amount of such surrendered Bond. If the Holder of any Bond or integral multiple of the Authorized Denomination selected for redemption shall fail to present such Bond to the Trustee for payment of the applicable redemption price and exchange as aforesaid, such Bond shall, nevertheless, become due and payable on the date fixed for redemption to the extent of the amount called for redemption (and to that extent only), and if sufficient moneys shall on the applicable redemption date be held in trust for the payment of such redemption price by the Trustee, interest shall cease to accrue from the date fixed for redemption.

Section 3.06    Notice of Redemption.

(a)    In the event any of the Bonds are called for redemption, the Trustee shall give notice, in the name of the Issuer, of the redemption of such Bonds, which notice shall be prepared by the Issuer and shall (i) specify the Bonds to be redeemed, the redemption date, the redemption price and the place or places where amounts due upon such redemption will be payable (which shall be the Designated Office of the Trustee), any conditions required to be satisfied prior to the redemption date and, if less than all of the Bonds are to be redeemed, the numbers of the Bonds, and the portions of the Bonds, to be so redeemed, and (ii) state that on the redemption date the Bonds to be redeemed shall cease to bear interest. Such notice may set forth any additional information relating to such redemption. Such notice shall be given by Mail (or secure email in the case of DTC) to the Holders of the Bonds to be redeemed, at least twenty (20) days but no more than sixty (60) days prior to the date fixed for redemption. Upon presentation and surrender

of the Bonds so called for redemption at the place or places of payment, such Bonds shall be redeemed.

(b)      [Reserved]

(c)      Failure of the Trustee to give notice to a Holder or any defect in such notice shall not affect the validity of the proceedings for redemption of the Bonds of any Holder to whom notice shall have been properly given.  Any notice mailed as provided in this Section shall be conclusively presumed to have been duly given, whether or not the Holders receive the notice.

(d)      The Trustee may give any other or additional redemption notice as it deems necessary or desirable, but it is not obligated to give or provide any additional notice or information.

(e)      Any Bonds which have been duly selected for redemption and which are deemed to be paid in accordance with Article VII hereof shall cease to bear interest on the specified redemption date.

Section 3.07   Payment of Redemption Price.  For the redemption of any of the Bonds of a Series, the Trustee shall cause to be deposited in the applicable Special Redemption Account of the Bond Fund, whether out of Project Revenues or any other money constituting the Trust Estate, including Net Proceeds of any Insurance Proceeds or Condemnation Awards available for such purpose pursuant to Article VIII of the Loan Agreement, or otherwise, an amount sufficient to pay the principal of, premium, if any, and interest to become due on the date fixed for such redemption. The obligation of the Trustee to cause any such deposit to be made hereunder shall be reduced by the amount of money in such Special Redemption Account available for and used on such redemption date for payment of the principal of, premium, if any, and accrued interest on the Bonds to be redeemed.

Section 3.08   No Partial Redemption After Default.  Anything herein to the contrary notwithstanding, if there has occurred and is continuing an Event of Default described in Section 8.01(a) hereof, there shall be no redemption of less than all of the Bonds Outstanding.

Section 3.09   Effect of Notice of Redemption.  If notice of redemption has been given in the manner provided in this Article, and money for the redemption is held by the Trustee for that purpose, the Bonds so called for redemption shall become due and payable on the redemption date, and interest thereon shall cease to accrue on such date; and such Bonds shall thereafter no longer be entitled to any security or benefit under this Indenture except to receive payment of the redemption price thereof.

If any Bond called for redemption shall not be so paid on the redemption date upon proper surrender of the Bond for redemption, the redemption price and, to the extent lawful, interest thereon shall, until paid, bear interest from the redemption date at the rate borne by the Bond immediately before the redemption date.

Notwithstanding the foregoing, with respect to optional redemption only, if the Trustee does not have funds in its possession on the redemption date sufficient to pay the redemption price (including interest accruing to the redemption date) of all of the Bonds to be optionally redeemed

for any reason (including, but not limited to, failure to issue any refunding obligations intended for such purpose on or prior to the redemption date), then the purported optional redemption and such notice of redemption shall be void. Such event shall not constitute an Event of Default hereunder.

Section 3.10    Redemption Payments.    At the written request by any Holder upon the payment of the redemption price of Bonds being redeemed, each check or other transfer of funds issued for such purpose shall, to the extent possible, bear the CUSIP number identifying, by issue and maturity, the Bonds being redeemed with the proceeds of such check or other transfer.    In addition, if such check or other transfer of funds includes more than one Series of Bonds being redeemed, such check or other transfer must set forth the dollar amount of each such Series being redeemed.

Section 3.11    Optional Tender.

(a)    Optional Tender of Series 2018B Bonds.    The Holders of the Series 2018B Bonds shall have the right, exercisable by delivery to the Borrower, the Trustee and the Issuer, not less than 180 days before the Series 2018B Optional Tender Date, of a Tender Notice in the form set forth in Exhibit E hereto, to tender all or a portion of the Series 2018B Bonds in Authorized Denominations for purchase on the Series 2018B Optional Tender Date.    If the Borrower is unable to purchase or cause the purchase of the Series 2018B Bonds on the Series 2018B Optional Tender Date, such failure to purchase or cause to be purchased the Series 2018B Bonds so tendered for purchase shall be an Event of Default.    The Series 2018B Bonds that are not purchased on the Series 2018B Optional Tender Date shall be retained by the Holder or Holders and the interest rate on such Series 2018B Bonds shall increase to the Default Rate.    The purchase price of the Series 2018B Bonds tendered for purchase shall be equal to the outstanding principal of, accrued and unpaid interest on and the redemption premium, if any, that would have been payable on such Series 2018B Bonds on the Series 2018B Optional Tender Date had the Series 2018B Bonds instead been redeemed at the option of the Borrower on such date.    To pay the purchase price of such Bonds, the Trustee shall use such monies deposited by the Borrower or on behalf of the Borrower with the Trustee for such purpose.

(b)    Optional Tender of Series 2018C Bonds.    The Holders of the Series 2018C Bonds shall have the right, exercisable by delivery to the Borrower, the Trustee and the Issuer, not less than 180 days before the Series 2018C Optional Tender Date, of a Tender Notice in the form set forth in Exhibit E hereto, to tender all or a portion of the Series 2018C Bonds in Authorized Denominations for purchase on the Series 2018C Optional Tender Date.    If the Borrower is unable to purchase or cause the purchase of the Series 2018C Bonds on the Series 2018C Optional Tender Date, such failure to purchase or cause to be purchased the Series 2018C Bonds so tendered for purchase shall be an Event of Default.    The Series 2018C Bonds that are not purchased on the Series 2018C Optional Tender Date shall be retained by the Holder or Holders and the interest rate on such Series 2018C Bonds shall increase to the Default Rate.    The purchase price of the Series 2018C Bonds tendered for purchase shall be equal to the outstanding principal of, accrued and unpaid interest on and the redemption premium, if any, that would have been payable on such Series 2018C Bonds on the Series 2018C Optional Tender Date had the Series 2018C Bonds instead been redeemed at the option of the Borrower on such date.    To pay the purchase price of

such Bonds, the Trustee shall use such monies deposited by the Borrower or on behalf of the Borrower with the Trustee for such purpose.

Any Series 2018B Bonds or Series 2018C Bonds purchased pursuant to this Section may be remarketed by any applicable remarketing agent and shall not be deemed cancelled or retired for any purpose unless otherwise directed by the Borrower. In the event that all Outstanding Series 2018B Bonds or Outstanding Series 2018C Bonds are purchased pursuant to this Section and not cancelled, such Series 2018B Bonds or Series 2018C Bonds shall be deemed to be Outstanding for purposes of this Indenture.

Section 3.12    Redemption of Additional Bonds. Additional Bonds may be made subject to redemption according to the terms set forth in the Supplemental Indenture related thereto.

Section 3.13    Optional Tender of Bonds in Connection With a Change of Control. Following the issuance of the Series 2018 Bonds, upon the occurrence of a Change of Control, as defined below, unless the Borrower has exercised its optional right to redeem or purchase the Series 2018 Bonds in whole, each Holder of the Senior Bonds will have the right to require the Borrower to repurchase all or any part (in Authorized Denominations) of its Series 2018 Bonds as set forth in this Section (the "Put Option"). A Holder of the Senior Bonds may exercise its Put Option by delivering a written notice to the Trustee, specifying the principal amount of Senior Bonds to be purchased by the Borrower (a "Put Option Notice"). A Put Option Notice must be delivered to the Trustee within 60 days after receiving notice of any Change of Control from the Trustee, which notice shall be delivered to the Holders of the Senior Bonds by the Trustee within 15 Business Days after receiving a written notice of a Change of Control from the Borrower.

Upon the expiration of 60 days from the time the notice of Change of Control is delivered to the Holders of the Senior Bonds ("Put Option Expiration Date"), the Trustee shall, at the written direction of the Borrower, specify a date which will be no earlier than 10 days, and not later than 60 days after the Put Option Expiration Date, on which all Senior Bonds for which the Trustee has received a Put Option Notice (the "Put Bonds") shall be purchased by the Borrower (the "Put Option Purchase Date"). On the Put Option Purchase Date, the Borrower shall pay the Make-Whole Price (as defined below) for all of the Put Bonds to the Trustee in immediately available funds and the Trustee shall pay the same to the Holders of the Put Bonds against delivery thereof. The Trustee shall have no duty to calculate or to verify the Make-Whole Price, and may conclusively rely upon the determination of such amount by the Borrower. Following such purchase, the Trustee shall register such Senior Bonds in accordance with the written instructions of the Borrower.

The purchase price of any Put Bond shall be equal to the Make-Whole Price.

No Holder of a particular series of Senior Bonds shall have a Put Option with respect to a Change of Control that is consented to in advance by the Controlling Holders.

The Trustee shall pay the Make-Whole Price of the Senior Bonds tendered from moneys provided to it by the Borrower, and shall not be required to expend funds of the Trustee.

"Change of Control" means that (i) the Managing Member no longer has the power, directly or indirectly, to direct or cause the direction of the management, operation and policies of

the Borrower; or (ii) the Controlling Parties no longer have the power, directly or indirectly, to direct or cause the direction of the management, operation and policies of the Borrower, whether as an owner or a member of the board of directors or similar governing body.

"Controlling Parties" means Richard Shaw and Steffen Waltz or in the event of the death, incapacity, resignation or removal of any of the foregoing persons, such other persons as may be appointed by the then remaining Controlling Parties.

"Make-Whole Price" means the present value of the remaining scheduled payments of principal and interest to the maturity date of any applicable Senior Bond (or portion thereof), not including interest accrued and unpaid as of the Put Option Purchase Date, discounted to the Put Option Purchase Date at the Adjusted MMD Rate plus 50 basis points, such discounting to be on a semiannual basis assuming a 360-day year consisting of twelve 30-day months. The Borrower shall provide to the Trustee in writing the Make-Whole Price and the Trustee shall have no duty to calculate or to verify the Make-Whole Price and may conclusively rely on the determination of such Make-Whole Price by the Borrower.  Prior to providing the Make-Whole Price to the Trustee, the Borrower shall cause the Make-Whole Price to be verified in writing by the Underwriter or an independent certified public accountant or firm of independent certified public accountants.

"Adjusted MMD Rate" means the Municipal Market Data ("MMD") AAA rate with a constant maturity most nearly equal to the period from the Put Option Purchase Date to the maturity date of any applicable Senior Bond; provided, however, that if the period from the Put Option Purchase Date to such maturity date is less than one year, a constant maturity of one year will be used.  The MMD Rate shall be determined by reference to Thomson Reuters Municipal Market Data as published on the most recent date that is at least two Business Days prior to the redemption date or, if such rate is no longer published, by reference to such publicly available index as the Borrower, in its reasonable judgment, shall deem reasonably comparable.

ARTICLE IV

GENERAL COVENANTS

Section 4.01    Payment of Bonds; Limited Obligations.

(a)     The Issuer covenants that it will promptly pay the principal of, premium, if any, and interest on every Bond issued under this Indenture at the place, on the dates and in the manner provided herein and in the Bonds, provided that such principal, premium, if any, and interest are payable by the Issuer solely from the Trust Estate, and nothing in the Bonds or this Indenture shall be considered as assigning or pledging any other funds or assets of the Issuer other than the Trust Estate.

(b)     Each and every covenant made herein by the Issuer is predicated upon the condition that neither the Issuer, the State nor any political subdivision of the State shall in any event be liable for the payment of the principal of, premium, if any, or interest on any of the Bonds or for the performance of any pledge, obligation or agreement undertaken by the Issuer except to the extent that money pledged herein are sufficient therefor.

Section 4.02    Performance of Covenants; Authority: Due Execution.    The Issuer covenants that it will faithfully perform or cause to be performed at all times any and all covenants, undertakings, stipulations and provisions to be performed by the Issuer contained in this Indenture and the other Bond Documents, in any and every Bond executed, authenticated and delivered hereunder and in all of its proceedings pertaining hereto.  The Issuer covenants that it is duly authorized under the laws of the State, including particularly the Act, to issue the Bonds, to execute this Indenture and to pledge the amounts hereby pledged in the manner and to the extent herein set forth.  The Issuer further covenants that all action on its part for the issuance of the Bonds and the execution and delivery of the Bond Documents have been duly and effectively taken.

Section 4.03    Instruments of Further Assurance.    The Issuer covenants that it will do, execute, acknowledge and deliver, or cause to be done, executed, acknowledged and delivered, such indentures supplemental hereto and such further acts, instruments and transfers as the Trustee may (but shall not be obligated to) reasonably require for the better assuring, transferring, pledging, assigning and confirming to the Trustee all and singular the rights assigned hereby and the amounts pledged hereby to the payment of the principal of, premium, if any, and interest on the Bonds.

Section 4.04    Recording and Filing; Further Instruments.

(a)    The Borrower shall cause to be recorded or filed, at the Borrower's expense, all necessary financing statements, including continuation statements, related to this Indenture, the Regulatory Agreement, and the Mortgage and all supplements hereto and thereto, and such other documents as may be necessary to be kept and filed in such manner and in such places as may be required by law in order to perfect, preserve and protect fully the security of the Holders and the rights of the Trustee hereunder. At the written request of the Trustee, the Borrower shall provide evidence to the Trustee that all necessary filings required by this paragraph have been made.

(b)    The Issuer shall, at the expense of the Borrower, upon the reasonable request of the Trustee, from time to time execute and deliver such further instruments and take such further action as may be reasonable and as may be required to effectuate the purposes of this Indenture or any provision hereof; provided, however, that no such instruments or actions shall pledge the general credit, the full faith or the taxing power of the Issuer, the State or any political subdivision thereof; and provided that the Borrower may fulfill the Issuer's obligations under this Section 4.04 (other than any obligations, duties or undertakings of the Issuer that, by their nature, cannot be delegated or assigned).

Section 4.05    [Reserved]

Section 4.06    No Disposition of Trust Estate, Project or Project Revenues.    Except as permitted by this Indenture (including specifically in connection with the discharge of the lien of this Indenture in accordance with Article VII hereof or the Mortgage), the Issuer shall not sell, lease, pledge, assign or otherwise encumber or dispose of its interest in the Trust Estate.  Except as described in the Loan Agreement and the Mortgage, the Issuer will not, and will not permit the Borrower to, sell, lease, pledge, assign or otherwise encumber or dispose of the Project or Project Revenues.

Section 4.07   Access to Books.  All books and documents in the possession of the Issuer or the Trustee relating to the Project, the Project Revenues and the Trust Estate shall at all reasonable times be open to inspection by the Trustee, the Issuer, the Borrower and the Holders of at least $100,000 in principal amount of the Outstanding Bonds.

Section 4.08   Trustee to Retain Information.  So long as any of the Bonds shall be Outstanding, the Trustee shall retain all certificates, requisitions, financial statements and other written information furnished to it by or on behalf of the Borrower or any other person under the Loan Agreement and any other agreement or instrument pertaining to the Bonds and shall make such documentation available to the Issuer, the Borrower or any Holder for review after reasonable written notice during regular business hours at the Designated Office of the Trustee. The Trustee shall permit such reviewers to take copies of all or any part of such documentation, subject to their payment of such copying and handling charges as the Trustee may impose.

Section 4.09   Tax Covenants Relating to the Tax-Exempt Bonds.

(a)      The Issuer shall not use, permit the use of, or omit to use Gross Proceeds or any other amounts (or any property the acquisition, construction, or improvement of which is to be financed or refinanced directly or indirectly with Gross Proceeds) in a manner which, if made or omitted, respectively, would cause the interest on the Tax-Exempt Bonds to become includable in the gross income, as defined in section 61 of the Code, of the owners thereof for federal income tax purposes.  Without limiting the generality of the foregoing, unless and until the Issuer shall have received a written opinion of Bond Counsel to the effect that failure to comply with such covenant will not adversely affect the exemption from federal income tax of the interest on the Tax-Exempt Bonds, the Issuer shall comply with each of the specific covenants in this Section.

(b)      The Issuer shall not direct or make any investment of the proceeds of the Tax-Exempt Bonds or any other funds of the Issuer in a manner which would result in the Tax-Exempt Bonds becoming "arbitrage bonds" within the meaning of section 148 of the Code or "hedge bonds" within the meaning of section 149 of the Code.  In the event the Issuer or the Borrower is of the opinion that it is necessary to restrict or limit the Yield on the investment of any money paid to or held by the Trustee hereunder in order to avoid classification of the Tax-Exempt Bonds as "arbitrage bonds" or "hedge bonds," the Issuer or the Borrower may issue to the Trustee a written instrument to such effect (along with appropriate written instructions), in which event the Trustee will, upon being indemnified to its satisfaction, take such action as is necessary to effect such written instructions so to restrict or limit the Yield on such investment in accordance with such instrument and instructions, irrespective of whether the Trustee shares such opinion.  The Trustee may conclusively rely upon any such instructions and shall not be responsible for any loss resulting from investment of any money held hereunder in accordance with such instructions.

(c)      Except to the extent permitted by section 149(b) of the Code and Regulations and rulings thereunder, the Issuer shall not take or omit to take any action which would cause the Tax-Exempt Bonds to be federally guaranteed within the meaning of section 149(b) of the Code and the Regulations and rulings thereunder.

(d)     The Issuer shall timely file or cause to be timely filed the information required by section 149(e) of the Code with the Secretary of the Treasury on such form and in such place as such Secretary may prescribe.

(e)     Except to the extent permitted by section 148 of the Code and the Regulations and rulings thereunder, the Issuer shall not, at any time prior to the earlier of the stated maturity or final payment of the Tax-Exempt Bonds enter into any transaction that reduces the amount required to be paid to the United States pursuant to Section 5.07 hereof because such transaction results in a smaller profit or a larger loss than would have resulted if the transaction had been at arm's length and had the Yield of the Tax-Exempt Bonds not been relevant to either party.

(f)     The Issuer hereby directs the Borrower to make elections permitted or required pursuant to the provisions of the Code or the Regulations, as it deems necessary or appropriate in connection with the Tax-Exempt Bonds.

(g)     The weighted average maturity of the Tax-Exempt Bonds does not exceed 120% of the reasonably expected economic life, within the meaning of section 147(b) of the Code, of the Project.

ARTICLE V

DEPOSIT OF BOND PROCEEDS; FUNDS AND ACCOUNTS; REVENUES

Section 5.01   <u>Creation of Funds and Accounts</u>.  There are hereby created by the Issuer and ordered established the following Funds and Accounts to be held by the Trustee:

(a)     A Bond Fund with respect to each Series of Bonds (treating the Senior Bonds as one Series for such purpose), namely the Senior Bond Fund, the Subordinate Bond Fund and the Junior Subordinate Bond Fund, and within such Fund, a Series 2018A Principal Account, and a Series 2018B Principal Account in the Senior Bond Fund, a Series 2018C Principal Account in the Subordinate Bond Fund and a Series 2018D Principal Account in the Junior Subordinate Fund, a Series 2018A Interest Account, a Series 2018B Interest Account in the Senior Bond Fund, a Series 2018C Interest Account in the Subordinate Bond Fund and a Series 2018D Interest Account in the Junior Subordinate Bond Fund and a Series 2018A Special Redemption Account, a Series 2018B Special Redemption Account in the Senior Bond Fund, a Series 2018C Special Redemption Account in the Subordinate Bond Fund and a Series 2018D Special Redemption Account in the Junior Subordinate Bond Fund;

(b)     The Debt Service Reserve Fund and therein a Debt Service Reserve Account with respect to the Series 2018A Bonds, the Series 2018B Bonds and the Series 2018D Bonds;

(c)     A Project Fund and therein a Costs of Issuance Account;

(d)     A Revenue Fund;

(e)     A Rebate Fund;

(f)     An Operating Fund;

(g)     An Operations and Maintenance Reserve Fund;

(h)     An Insurance and Tax Escrow Fund and therein a Property Tax Account;

(i)     A Repair and Replacement Fund;

(j)     A Surplus Fund; and

(k)     An Administration Fund.

Section 5.02   <u>Deposit of Funds</u>.  The proceeds from the sale of the Series 2018 Bonds and the initial equity contribution of the Borrower shall be applied as follows:

(a)     (i) $48,068,754.16 representing proceeds of the Series 2018 Bonds, consisting of $40,267,998.03 from proceeds of the Series 2018A Bonds, $604,022.80 from the proceeds of the Series 2018B Bonds, $3,686,733.33 from the proceeds of the Series 2018C Bonds and $3,510,000 from proceeds of the Series 2018D Bonds, shall be deposited into the Project Fund;

(ii) $3,000,000 representing proceeds of the Series 2018 Bonds, consisting of $250,000 from the proceeds of the Series 2018A Bonds, $548,900 from the proceeds of the Series 2018B Bonds and $201,100 from the proceeds of the 2018C Bonds and $2,000,000 from a portion of the initial equity contribution of the Borrower shall be applied to the Operations and Maintenance Reserve Fund;

(iii) $2,243,125 representing proceeds of the Series 2018 Bonds, consisting of $410,000 from proceeds of the Series 2018A Bonds, and $1,833,125 from the proceeds of the Series 2018B Bonds, shall be deposited into the Costs of Issuance Account;

(iv) $8,158,866.67 representing proceeds of the Series 2018 Bonds, consisting of $5,260,000 from proceeds of the Series 2018A Bonds, $992,200 from the proceeds of the Series 2018B Bonds, $916,666.67 from the proceeds of the Series 2018C Bonds and $990,000 from proceeds of the Series 2018D Bonds, shall be deposited to the respective Interest Accounts for each of the Series of the 2018 Bonds;

(v) $1,456,279.17 representing proceeds of the Series 2018B Bonds shall be deposited to the Interest Account for the Series 2018A Bonds; and

(b)     $4,814,225.00 representing proceeds of the Series 2018 Bonds, consisting of $4,087,047.55 from proceeds of the Series 2018A Bonds, $547,177.45 from the proceeds of the Series 2018B Bonds and $180,000.00 from the initial equity contribution of the Borrower to fund the Debt Service Reserve Requirement of the Series 2018D Bonds, shall be deposited in the appropriate Debt Service Reserve Account with respect to the Series 2018A Bonds, the Series 2018B Bonds and the Series 2018D Bonds, respectively.

Section 5.03   <u>Disbursements From the Project Fund</u>.

(a)     The Trustee shall disburse money in the Costs of Issuance Account in the Project Fund to pay the Issuance Costs upon receipt of a written requisition of the Borrower in the form

of Exhibit F to the Trustee signed by a Borrower Representative which requisition states (i) that such amount is to be paid to persons identified therein, (ii) that such amount is properly payable as Issuance Costs hereunder.  On the date that is six months after the Closing Date, the Trustee shall transfer any remaining balance in the Costs of Issuance Account to the Project Fund, and the Cost of Issuance Account shall be closed.

(b)　On the Closing Date for the Series 2018 Bonds, amounts on deposit in the Project Fund shall be applied to payment of the costs of acquiring the Project by disbursement thereof in accordance with one or more requisitions of the Borrower to the Trustee signed by a Borrower Representative in the form set forth as Exhibit B to the Loan Agreement.  Thereafter, amounts on deposit in the Project Fund shall be applied to payment of the costs of constructing and equipping the Project or for Modifications thereto and working capital expenses of the Project in accordance with one or more requisitions of the Borrower to the Trustee signed by a Borrower Representative in the form set forth as Exhibit B to the Loan Agreement.

(c)　Net Proceeds of any Insurance Proceeds or Condemnation Awards deposited in the Project Fund pursuant to Section 5.4 of the Loan Agreement shall be applied as provided in Section 5.3 and 5.4 of the Loan Agreement.

(d)　Any amounts remaining in the Project Fund on the date that is three years after the Closing Date (in the case of original and investment proceeds of the Bonds, or the date of deposit of such amounts into the Project Fund, in the case of other amounts) shall be deposited in the applicable Interest Account of the Bond Fund unless the Issuer advises in writing that it is otherwise required by the Issuer's Certificate as to Tax Exemption, and the Project Fund shall be closed.

Section 5.04　Revenue Fund.

(a)　There shall be deposited in the Revenue Fund (i) all Loan Payments and other amounts paid to the Trustee under the Loan Agreement (other than prepayments required to redeem Bonds pursuant to Sections 3.01 or 3.02 hereof, which shall be deposited in the related Special Redemption Account); (ii) all other amounts required to be so deposited pursuant to the terms hereof or of the Issuer's Certificate as to Tax Exemption, including investment earnings to the extent provided in Article VI; (iii) any amounts derived from the Loan Agreement or the Mortgage to be applied to payment of amounts intended to be paid from the Revenue Fund; (iv) all Project Revenues; (v) any amounts transferred from the Property Tax Account of the Insurance and Tax Escrow Fund pursuant to Section 5.10(c) hereof; and (vi) such other moneys as are delivered to the Trustee by or on behalf of the Issuer or the Borrower with written directions for deposit of such moneys in the Revenue Fund.

(b)　Money on deposit in the Revenue Fund shall be disbursed on the 15th day of each month in the following order of priority:

(1)　Subject to Section 5.10 hereof, for transfer to the Insurance and Tax Escrow Fund, an amount equal to one-twelfth of the amount budgeted by the Borrower for the current year for annual premiums for insurance required to be maintained pursuant to the Loan Agreement and for annual real estate taxes, or

other Impositions or charges for governmental services for the current year, as provided in the Budget;

(2)     To the Rebate Fund, to the extent of any deposit required to be made thereto pursuant to the Loan Agreement;

(3)     To the Series 2018A Interest Account and the Series 2018B Interest Account the applicable pro rata Interest Requirement for the Senior Bonds for the previous calendar month, together with an amount equal to any unfunded Interest Requirement for any prior month;

(4)     To the Series 2018A Principal Account and the Series 2018B Principal Account an amount equal to the applicable pro rata Principal Requirement for the Senior Bonds, together with an amount equal to any unfunded Principal Requirement from any prior month;

(5)     To the Debt Service Reserve Fund, the amount, if any, required to be paid into the Debt Service Reserve Fund with respect to the Series 2018A Bonds and the Series 2018B Bonds to restore the amounts on deposit therein on a pro rata basis to the applicable Debt Service Reserve Requirement provided, however, when the Series 2018B Bonds are no longer outstanding, any funds remaining in the Debt Service Reserve Fund applicable to the Series 2018B Bonds shall be transferred to the portion of the Debt Service Reserve Fund applicable to the Series 2018A Bonds and applied to the Debt Service Reserve Requirement applicable to the Series 2018A Bonds;

(6)     Subject to the provisions of Section 5.11 hereof, for transfer to the Repair and Replacement Fund, commencing with the month of February, 2021, an amount equal to one-twelfth of the Replacement Reserve Requirement;

(7)     To the Operating Fund, an amount equal to the Budgeted Operating Requirement (less any amounts to be paid to the Manager for its Management Fee pursuant to (10) below), together with such additional Operating Expenses requested in writing by a Borrower Representative from the Operations and Maintenance Reserve Fund or the Surplus Fund pursuant to and after satisfaction of the conditions specified in Section 4.3 of the Loan Agreement;

(8)     Subject to the provisions of Section 5.12 hereof, for transfer to the Administration Fund, an amount equal to one-twelfth (1/12) of the Administration Expenses (other than the Rebate Analyst Fee) scheduled to be due and payable on or before the next succeeding Interest Payment Date on which principal of the Series 2018 Bonds is scheduled to be paid;

(9)     To the Administration Fund, the amount of any Administration Expenses then due;

(10)     To the Manager, the Management Fee other than any Deferred Management Fee and paid monthly in accordance with the Budget per the written direction of the Borrower;

(11)     To the Series 2018C Interest Account of the Subordinate Bond Fund, the applicable Interest Requirement for the Series 2018C Bonds for the previous calendar month, together with an amount equal to any unfunded Interest Requirement from any prior month;

(12)     To the Series 2018C Principal Account of the Subordinate Bond Fund, an amount equal to the applicable Principal Requirement for the Series 2018C Bonds, together with an amount equal to any unfunded Principal Requirement from any prior month;

(13)     To the Series 2018D Interest Account of the Junior Subordinate Bond Fund, the applicable Interest Requirement for the Series 2018D Bonds for the previous calendar month, together with an amount equal to any unfunded Interest Requirement from any prior month;

(14)     To the Series 2018D Principal Account of the Junior Subordinate Bond Fund, an amount equal to the applicable Principal Requirement for the Series 2018D Bonds, together with an amount equal to any unfunded Principal Requirement from any prior month;

(15)     To the Series 2018D Debt Service Reserve Account to restore the amount on deposit therein to the Debt Service Reserve Requirement related to the Series 2018D Bonds; and

(16)     To the Surplus Fund, all remaining amounts.

In the event that, for any month, there are insufficient funds in the Revenue Fund to fund any one or more of the uses set forth in clauses (1) through (15) above, the amount not funded in such month due to such insufficiency of revenues shall be added to the amount to be funded in subsequent months under the same clause until such amount has been in fact funded.  Failure to deposit sufficient Project Revenues to make the deposits described above shall not, in itself, constitute an Event of Default hereunder.

Section 5.05     Bond Fund.

(a)     There shall be deposited into the respective Principal Accounts of the Bond Fund (i) money transferred to such Principal Accounts from the Revenue Fund pursuant to Section 5.04 hereof; (ii) money transferred from the Surplus Fund, the Operations and Maintenance Reserve Fund, the Repair and Replacement Fund, the applicable Debt Service Reserve Fund Accounts and the Operating Fund pursuant to Section 5.05(f) hereof in respect of principal payable on the Bonds, and (iii) any other amounts deposited with the Trustee with written directions from the Borrower to deposit the same in the applicable Principal Account of the Bond Fund.

(b)     There shall be deposited into the respective Interest Accounts of the Bond Fund (i) all accrued interest, if any, on the sale and delivery of the applicable Series of Series 2018 Bonds; (ii) the capitalized interest amounts pursuant to Section 5.02(a)(iv) hereof; (iii) money transferred to such Interest Accounts from the Revenue Fund pursuant to Section 5.04 hereof; (iv) money transferred from the Surplus Fund, the Operations and Maintenance Reserve Fund, the Repair and Replacement Fund, the applicable Debt Service Reserve Fund Accounts and the Operating Fund pursuant to Section 5.05(f) hereof in respect of interest payable on the Bonds, and (v) any other amounts deposited with the Trustee with written directions from the Borrower to deposit the same in the applicable Interest Account of the Bond Fund.

(c)     There shall be deposited in the applicable Special Redemption Accounts of the Bond Fund (i) any Net Proceeds of Insurance Proceeds or Condemnation Awards to be transferred to a Special Redemption Account pursuant to Section 5.17 hereof, and (ii) all other payments made by or on behalf of the Issuer with respect to the redemption of Bonds pursuant to Section 3.01 or 3.02 hereof. Amounts on deposit in each Special Redemption Account shall be used to pay the redemption price of Bonds of the related Series being redeemed.

(d)     Except as otherwise provided herein, money in each Principal Account shall be used for the payment of principal of the Bonds of the applicable Series 2018 Bonds as the same shall become due and payable on any Principal Payment Date, including a Principal Payment Date resulting from the redemption of the Bonds pursuant to Section 3.03 hereof.

(e)     Except as otherwise provided herein, money in each Interest Account shall be used for the payment of interest on the Series 2018 Bonds as the same becomes due and payable on any Bond Payment Date.

(f)     If on any Bond Payment Date, the amount on deposit in the Interest Accounts for the Senior Bonds or the Principal Accounts for the Senior Bonds is insufficient to make the payments or deposits described in (a) or (b) above, the Trustee shall, to the extent available, make up any such shortfall by transferring amounts from the following Funds in the following order:

> (1)     the Surplus Fund;
>
> (2)     the Operations and Maintenance Reserve Fund;
>
> (3)     the Repair and Replacement Fund;
>
> (4)     the applicable Debt Service Reserve Account; and
>
> (5)     the Operating Fund.

(g)     Any balance in the Principal Accounts and the Interest Accounts of the Bond Fund on each Bond Payment Date after making the payments required pursuant to clauses (d) and (e), respectively, above in this Section 5.05 shall be transferred to the Revenue Fund.

Section 5.06    Debt Service Reserve Fund.

(a)    There shall be deposited in the applicable Accounts in the Debt Service Reserve Fund (i) all money transferred to such Debt Service Reserve Account pursuant to Section 5.02 hereof, (ii) money transferred from the Revenue Fund pursuant to Section 5.04 hereof, and (iii) any other money received by the Trustee with written directions from the Borrower to deposit the same in such Debt Service Reserve Account.

(b)    Amounts on deposit in the applicable Debt Service Reserve Account shall be used to make the payments required pursuant to Section 5.04(b)(3) or (4) or Section 5.04(b)(13) or (14) after the transfer of any amounts from the Surplus Fund, the Operations and Maintenance Reserve Fund and the Repair and Replacement Fund pursuant to Section 5.05(f) hereof, if the amounts on deposit in the Revenue Fund are insufficient therefor.  If moneys are withdrawn from the Debt Service Reserve Accounts associated with the Senior Bonds, the amount withdrawn shall be replenished in six (6) equal monthly installments with the first installment being due on the first day of the month following the date of such withdrawal.  A failure to fully replenish the applicable account of the Debt Service Reserve Fund within such six (6) month period is an Event of Default as provided in Section 8.01 hereof.  Notwithstanding the foregoing provisions, there will be no disbursement from the Debt Service Reserve Accounts applicable to the Senior Bonds if there is an ongoing Event of Default unless the disbursement is consented to in writing by the Controlling Holders of the Senior Bonds.

(c)    Amounts on deposit in a Debt Service Reserve Account shall be transferred to the related Principal Account of the Bond Fund at the direction of the Borrower Representative for the purpose of paying the last maturing principal of the Bonds on a Principal Payment Date or, if all the Bonds are being redeemed, to the applicable Special Redemption Account of the Bond Fund for redemption of Bonds.

(d)    If the Debt Service Reserve Requirement for one or more Series of Bonds is reduced or eliminated in accordance with the definition thereof, the amounts on deposit in the related Debt Service Reserve Account in excess of the applicable Debt Service Reserve Requirement shall, at the written direction of a Borrower Representative delivered to the Trustee, be either (i) transferred to the applicable Special Redemption Account to be used to redeem Bonds pursuant to Section 3.02 hereof, (ii) transferred to the related Principal or Interest Account to pay the principal of and/or interest on the Bonds as it becomes due, or (iii) if no Bonds remain Outstanding, either transferred to the Revenue Fund and applied as provided in Section 5.04 hereof, or used for any other purpose directed in writing by a Borrower Representative, which, as set forth in a Favorable Opinion of Bond Counsel delivered to the Issuer and the Trustee, complies with the Act and will not adversely affect the exclusion from gross income of the recipients thereof of the interest on the Tax-Exempt Bonds for federal income tax purposes.

(e)    All interest income derived from the investment of amounts on deposit in the Debt Service Reserve Fund shall be retained in the Debt Service Reserve Fund until the amount on deposit therein shall be equal to the corresponding Debt Service Reserve Fund Requirement, and thereafter shall be deposited into the Revenue Fund to the extent the amount on deposit exceeds the Debt Service Reserve Fund Requirement.  On the date which is 26 months after the Closing Date, any amounts held in the Debt Service Reserve Account related to the Series 2018D Bonds

shall, at the written direction of the Borrower Representative delivered to the Trustee, be paid by the Trustee to the Borrower.

Section 5.07    Rebate Fund.

(a)    The Trustee shall maintain the Rebate Fund, for the benefit of all persons who are or have at any time been Tax-Exempt Bondholders, at all times prior to the final payment to the United States of America of the amounts described in Subsection (c) of this Section which fund shall not be part of the Trust Estate established hereunder. The money deposited to the Rebate Fund, together with all investments thereof and investment income therefrom, shall be held in trust separately and apart from the other funds held under the Indenture and applied solely as provided in this Section, unless in the opinion of Bond Counsel failure to make such application will not adversely affect any exclusion from gross income of interest on the Tax-Exempt Bonds under the Code.

(b)    The Trustee shall deposit or transfer to the credit of the account of the Rebate Fund each amount delivered to the Trustee by the Borrower for deposit thereto and each amount directed in writing by the Borrower to be transferred thereto. The Trustee shall credit all earnings and debit all losses from the investment of money held for the account of the Rebate Fund to such fund.

(c)    (i) Upon receipt of the Rebate Analyst's report and Borrower's written instruction, and within 30 days after each Computation Date, the Trustee, on behalf of the Issuer, shall withdraw from the Rebate Fund and pay to the Treasury Department of the United States of America the portion of the Rebate Amount specified in such instruction as being determined by the Rebate Analyst on behalf of the Borrower in the installments, to the place and in the manner required by section 148(f) of the Code, the Regulations, and rulings thereunder as instructed in writing by the Borrower or its legal counsel and as provided in subsection (iii) below.

(ii)    Within five days after receipt from the Borrower or the Rebate Analyst of written notification of any amount due to the United States of America pursuant to Section 1.148-3(h) of the Regulations accompanied by relevant IRS forms including IRS Form 8038-T, the Trustee shall withdraw from the Rebate Fund an amount specified in writing by the Rebate Analyst which when added to all prior payments to the United States of America equals the correct appropriate portion of the Rebate Amount, plus any penalties and interest specified in writing by the Rebate Analyst and pay such correction amount to the Treasury Department of the United States of America.

(iii)    All payments to the Treasury Department of the United States of America pursuant to this Subsection shall be made by the Trustee for the account and in the name of the Issuer and shall be paid by check posted by certified United States Mail (return receipt requested), or overnight mail delivery service, addressed to the Treasury Department of the United States of America (and, if appropriate, accompanied by the relevant Internal Revenue Service Form, such as Form 8038-T or such other statements, explanations or forms required pursuant to the Regulations or other Internal Revenue Service promulgations.

(d)     The Trustee shall preserve all written statements, forms, and explanations received from the Borrower or the Issuer pursuant to this Section and all records of transactions in the Rebate Fund until six years after the discharge of the Tax-Exempt Bonds.

(e)     The Trustee may conclusively rely on the information provided, instructions of and forms prepared by the Borrower or the Rebate Analyst with regard to any actions to be taken by it, including payments to be made, pursuant to this Section and shall have no liability for any consequences of any failure of the Borrower to supply accurate or sufficient instructions or to compute correctly any payment due pursuant to this Section.  The Trustee shall have no responsibility or duty to perform any rebate calculation or to expend its own funds to make any rebate payments.

(f)     If at any time during the term of this Indenture the Borrower, the Issuer or the Trustee desires to take any action which would otherwise be prohibited by the terms of this Section, such Person shall be permitted to take such action if it shall first obtain and provide at the expense of the Borrower to the other Persons named herein an opinion of Bond Counsel to the effect that such action shall not adversely affect the exclusion of interest on the Tax-Exempt Bonds from gross income of the owners of any Tax-Exempt Bond for Federal income tax purposes and shall be in compliance with the laws of the State of Texas.

(g)     Notwithstanding any provision of the Bond Documents and unless otherwise specifically agreed to in a separate written agreement, the Trustee shall not be liable or responsible for any method of calculation, or any calculation or determination which may be required in connection with or for the purpose of complying with Section 148 of the Code or any successor statute or any regulation, ruling, or other judicial or administrative interpretation thereof, including, without limitation, the calculation of amounts required to be paid the United States of America or the determination of the maximum amount which may be invested in Nonpurpose Investments having a higher yield than the yield on the Tax-Exempt Bonds, in connection with any such investments.  The method of calculation, calculation and determination required by section 148 of the Code shall be accomplished by the Rebate Analyst.  The Trustee shall not be liable or responsible for the negligence or misconduct of the Rebate Analyst.  The Trustee shall not be liable or responsible for monitoring the compliance by the Borrower or the Issuer of any of the requirements of Section 148 of the Code or any applicable regulation, ruling, or other judicial or administrative interpretation thereof (except for the administrative functions described in this Section and in this Indenture), it being acknowledged and agreed that the sole obligation of the Trustee in this regard shall be (i) to invest the moneys received by the Trustee pursuant to the written instructions of the Borrower in the specific investments identified by the Borrower.  The Trustee shall not be liable for the Tax-Exempt Bonds becoming "arbitrage bonds" within the meaning of the Code, as a result of investments it makes in compliance with the instructions it receives or pursuant to or in compliance with the terms of this Indenture.

Section 5.08    Operating Fund.  The Trustee shall deposit in the Operating Fund (i) money transferred from the Revenue Fund in the amounts and on the dates described in Section 5.04 hereof, (ii) any transfers from the Operating Account received by the Trustee for deposit in the Operating Fund and (iii) any other amounts required to be deposited into the Operating Fund hereunder or under the Loan Agreement or the Mortgage and delivered to the Trustee with written instructions to deposit the same therein. Except when an Event of Default under Section 8.01(a)

of this Indenture or a Default under the Loan Agreement has occurred and is continuing, the Trustee shall transfer amounts deposited in the Operating Fund to the Operating Account promptly following such deposits. If an Event of Default under this Indenture or a Default under the Loan Agreement has occurred and is continuing, the Trustee may, in its sole discretion, and shall, if so directed in writing by the Controlling Holders in accordance with Section 8.05 hereof, not make such transfers to the Operating Account, in which case (i) the Borrower will not be entitled to request withdrawals from funds on deposit in the Operating Fund, and (ii) the Trustee may determine to pay Operating Expenses of the Project directly, without receipt of direction from a Borrower Representative and in such event is to rely on the annual Budget prepared by the Borrower in connection with the Project. In addition, amounts on deposit in the Operating Fund shall be used to pay shortfalls in the Interest Accounts and Principal Accounts of the Bond Fund in accordance with Section 5.05(f) hereof.

Section 5.09    Operations and Maintenance Reserve Fund.

(a)    The Trustee shall deposit in the Operations and Maintenance Reserve Fund (i) on the Closing Date an amount equal to $3,000,000, (ii) money transferred from the Surplus Fund in the amounts and on the dates described in Section 5.13 hereof, (iii) any other amounts required to be deposited into the Operations and Maintenance Reserve Fund hereunder or under the Loan Agreement and delivered to the Trustee with instructions written from the Borrower to deposit the same therein and (iv) on or before the earlier of 18 months after the Closing Date or the date of receipt of the final certificate of occupancy for the Project from the City of Plano, Texas, an amount equal to $2,000,000.

(b)    Amounts on deposit in the Operations and Maintenance Reserve Fund shall be used to pay (i) maintenance and repair costs to the Project that are not capital expenditures payable from the Repair and Replacement Fund, (ii) Operating Expenses in excess of Budgeted Operating Requirements, (iii) certain costs of repair and replacement in accordance with Section 5.11(b) hereof and (iv) shortfalls in the Interest Accounts and Principal Accounts of the Bond Fund in accordance with Section 5.05(f) hereof. Except when transfers from the Operating Fund to the Operating Account are not permitted pursuant to Section 5.08 hereof, the Trustee shall disburse money in the Operations and Maintenance Reserve Fund to the Operating Account to pay such maintenance and repair costs and Operating Expenses upon receipt of a written direction of a Borrower Representative that states the purpose for such disbursement and the persons to which such amounts are to be paid, and when transfers from the Operating Fund to the Operating Account are not permitted pursuant to Section 5.08 hereof the Trustee may disburse such money directly to pay such costs and expenses. All interest income derived from the investment of amounts on deposit in the Operations and Maintenance Reserve Fund shall be retained in the Operations and Maintenance Reserve Fund until the Project has reached Stable Occupancy, and thereafter such interest income shall be deposited into the Revenue Fund to the extent the amount on deposit in the Operations and Maintenance Reserve Fund exceeds the Operations and Maintenance Reserve Requirement.

Money on deposit in the Operations and Maintenance Reserve Fund over and above the Operations and Maintenance Reserve Requirement shall be released from the Operations and Maintenance Reserve Fund as follows:

(i)      the first $500,000 shall be released if the Project has achieved Stable Occupancy and the Borrower has certified that it has met and is in compliance with all the covenants specified in the Loan Agreement related to the operations of the Project (which compliance has been verified in writing by an independent auditor) before the release of any funds and provides a projection that the cash flow of the Project will be sufficient to operate the Project and pay the Debt Service Requirements as evidenced by a certified rent roll of the Project provided by the Borrower or a management company and such projection has been verified in writing by an independent auditor;

(ii)      one-third (1/3) of the balance in the Operations and Maintenance Reserve Fund in excess of 100 Days' Cash on Hand or $500,000, whichever amount is greater, if the Project has achieved an average occupancy of the units in the Project for three (3) consecutive months of at least 90% and the Borrower has certified in writing that it has met and is in compliance with all the covenants specified in the Loan Agreement related to the operations of the Project (which compliance has been verified in writing by an independent auditor) before the release of any funds and provides a projection that the cash flow of the Project will be sufficient to operate the Project and pay the Debt Service Requirements as evidenced by a certified rent roll of the Project provided by the Borrower or a management company and such projection has been verified in writing by an independent auditor; and

(iii)      beginning for the year ended December 31, 2021 or thereafter, as applicable, any remaining balance in the Operations and Maintenance Reserve Fund in excess of 100 Days' Cash on Hand or $1,000,000, whichever is greater, if the Project has achieved an average occupancy of the units in the Project for three (3) consecutive months of at least 95% and the Borrower has certified in writing that it has met and is in compliance with all the covenants specified in the Loan Agreement (which compliance has been verified in writing by an independent auditor) related to the operations of the Project before the release of any funds and provides a projection that the cash flow of the Project will be sufficient to operate the Project and pay the Debt Service Requirements as evidenced by a certified rent roll of the Project provided by the Borrower or a management company and such projection has been verified in writing by an independent auditor.

Section 5.10   Insurance and Tax Escrow Fund.

(a)      The Trustee shall deposit in the Insurance and Tax Escrow Fund (i) money transferred from the Revenue Fund in the amounts and on the dates described in Section 5.04 hereof, (ii) any other amounts required to be deposited into the Insurance and Tax Escrow Fund hereunder or under the Loan Agreement or the Mortgage and delivered to the Trustee with instructions to deposit the same therein, and (iii) from the proceeds of the Series 2018B Bonds for deposit to the Property Tax Account therein, an amount equal to $250,000. Money on deposit in the Insurance and Tax Escrow Fund shall be disbursed by the Trustee to the Borrower to pay, or as reimbursement for the payment of, Impositions and insurance premiums with respect to the Project, as hereinafter provided; provided that amounts on deposit in the Property Tax Account shall be used and transferred as set forth in subsection (c) of this Section.  On an annual basis, excess amounts in the Insurance and Tax Escrow Fund may be disbursed to the Revenue Fund if actual costs are below budgeted amounts upon the written direction of a Borrower Representative on behalf of the Borrower.

(b)     Upon presentation to the Trustee of a requisition signed by a Borrower Representative in the form of Exhibit G accompanied by copies of bills or statements for the payment of such Impositions and premiums, when due, the Trustee will, not more frequently than once a month, pay to the Borrower to provide for the payment of, or as reimbursement for the payment of, such Impositions and premiums, from money then on deposit in the Insurance and Tax Escrow Fund.  If the total amount on deposit in the Insurance and Tax Escrow Fund shall not be sufficient to pay directly or to pay or reimburse the Borrower in full for the payment of such premiums or Impositions, then the Borrower shall pay the excess amount of such Impositions and premiums from the Surplus Fund.

(c)     Upon presentation to the Trustee of a requisition signed by a Borrower Representative in the form of Exhibit H accompanied by copies of Imposition bills or statements for the payment of Impositions relating to the Project, the Trustee shall pay to the Borrower to provide for the payment of such Impositions from money then on deposit in the Property Tax Account.  If the total amount on deposit in the Property Tax Account is not sufficient to pay directly or to pay or reimburse the Borrower in full for the payment of such Impositions, then the Borrower shall pay the excess amount of such Impositions from the Surplus Fund.

Section 5.11   Repair and Replacement Fund.

(a)     The Trustee shall deposit into the Repair and Replacement Fund (i) money transferred from the Revenue Fund in the amounts and on the dates described in Section 5.04 hereof and (ii) any other amounts required to be deposited into the Repair and Replacement Fund hereunder or under the Loan Agreement or the Mortgage and delivered to the Trustee with instructions to deposit the same therein.  The Trustee shall apply money on deposit in the Repair and Replacement Fund upon the written request of a Borrower Representative, but no more frequently than once a month, to pay to or to reimburse the Borrower for paying the cost of replacements or items of extraordinary maintenance or repair which may be required to keep the Project in sound condition, including but not limited to, replacement of appliances, major floor covering replacement, replacement or repair of any roof or other structural component of the Project, maintenance (including painting) to exterior surfaces and major repairs to or replacements of heating, air conditioning, plumbing and electrical systems, landscaping, storm water drainage, repairs to common area amenities and any other extraordinary costs required for the repair or replacement of the Project not properly payable from the Revenue Fund or the Operations and Maintenance Reserve Fund but in any case only if there are no funds available in the Project Fund for such purpose.

(b)     Upon presentation to the Trustee of a requisition signed by a Borrower Representative in the form of Exhibit I accompanied by a summary of the amount for which payment or reimbursement is sought and, for requests for a particular line item of disbursement in excess of $25,000, copies of bills or statements for the payment of the costs of such repair and replacement (provided that the Trustee shall have no duty or obligation to review or approve such bills or statements), the Trustee will pay to the Borrower the amount of such repair and replacement costs from money then on deposit in the Repair and Replacement Fund, provided no Event of Default shall then exist hereunder. If the total amount on deposit in the Repair and Replacement Fund shall not be sufficient to pay all of such repair and replacement costs when they shall become due, then funds in the Operations and Maintenance Reserve Fund may be disbursed until

exhausted, and then the Borrower shall pay the excess amount of such costs directly (which Borrower monies may be reimbursed from monies available in the Repair and Replacement Fund at a later date when they become available).

(c)     The Repair and Replacement Fund will also be used to remedy any deficiency in the Bond Fund on any Bond Payment Date after exhaustion of the Surplus Fund and the Operations and Maintenance Reserve Fund, without any prior consents, as provided in Section 5.05(f).

Section 5.12    Administration Fund.  The Trustee shall deposit in the Administration Fund (i) money transferred from the Revenue Fund pursuant to Section 5.04 hereof, and (ii) any other amounts required to be deposited in the Administration Fund hereunder or under the Loan Agreement or the Mortgage with instructions from the Borrower to deposit the same therein.  The Trustee shall disburse amounts in the Administration Fund necessary for payment of Administration Expenses then due automatically to the parties due such payment upon presentation of an invoice for payment from such requesting party without any approval of the Borrower.

Section 5.13    Surplus Fund.

(a)     The Trustee shall deposit, into the Surplus Fund, amounts provided in Section 5.04(b)(16) hereof and any other amounts delivered to it with written instructions from the Borrower to deposit the same in the Surplus Fund.  Money in the Surplus Fund shall be applied each month, when needed, for the following purposes and in the following manner and priority:

(i)     transferred to an Interest Account for the Bonds to pay interest on a Series of Bonds to the extent amounts on deposit in such Interest Account are insufficient therefor;

(ii)    transferred to a Principal Account for the Bonds to pay principal on a Series of Bonds to the extent amounts on deposit in such Principal Account are insufficient therefor;

(iii)   [Reserved]

(iv)   [Reserved]

(v)    transferred to the Revenue Fund to the extent of any deficiency in the amounts needed to fully make all transfers from the Revenue Fund pursuant to Section 5.04 hereof (other than to the Surplus Fund);

(vi)   transferred to the Borrower upon the written direction of the Borrower Representative for deposit into the Operating Account for the payment of Operating Expenses when a Borrower Representative certifies in writing to the Trustee, on behalf of the Borrower, that there are not sufficient moneys in the Operating Fund or Operating Account to pay Operating Expenses;

(vii)  paid to the Trustee an amount equal to any unpaid Extraordinary Trustee's Fees and Expenses then due;

(viii)    transferred to the Borrower or upon the written direction of a Borrower Representative, on behalf of the Borrower, to pay taxes, assessments and premiums as set forth in Section 5.10(b) hereto;

(ix)    transferred to the Operations and Maintenance Reserve Fund an amount sufficient to establish in such Fund or restore such Fund to the Operations and Maintenance Reserve Requirement; and

(x)    paid to the Manager, any Deferred Management Fee then owing.

(b)    If on or after any Annual Evaluation Date, the Trustee receives a certificate signed by a Borrower Representative stating that (i) the Borrower has satisfied the Coverage Test (accompanied by the certificate of the Certified Public Accountant delivered by the Borrower to the Trustee pursuant to Section 6.9(d) of the Loan Agreement calculating the Debt Service Coverage Ratio) for the Fiscal Year ending on such December 31, upon which the Trustee may conclusively rely, (ii) no Event of Default, or event which with the passage of time or the giving of notice or both would constitute an Event of Default, has occurred and is continuing, (iii) the Debt Service Reserve Fund is fully funded and the required Repair and Replacement Fund, Insurance and Tax Escrow Fund, and Operations and Maintenance Reserve Fund deposits have been fully funded, and (iv) any Deferred Management Fees have been paid, then within two Business Days after written request by a Borrower Representative to the Trustee, the Trustee shall disburse from the Surplus Fund to the Borrower an amount equal to the lesser of (A) the Surplus Cash as of such Annual Evaluation Date or (B) the Surplus Cash available on the date of disbursement.

(c)    Notwithstanding anything to the contrary herein, the Trustee shall not make disbursements to the Borrower pursuant to Section 5.13(b) hereof unless the Trustee has received from the Borrower a written certificate that the financial reports and certificates then due as set forth in Section 6.9 of the Loan Agreement have been provided to the Trustee.

Section 5.14    Bonds Not Presented for Payment.  In the event any Bonds shall not be presented for payment when the principal thereof becomes due on any Bond Payment Date, if money sufficient to pay such Bonds are held by the Trustee, the Trustee shall segregate and hold such money in trust, without liability for interest thereon, for the benefit of Holders of such Bonds who shall, except as provided in the following paragraph, thereafter be restricted exclusively to such funds for the satisfaction of any claim of whatever nature on their part under this Indenture or relating to said Bonds.

All money deposited with the Trustee for the payment of principal of, premium, if any, or interest on the Bonds and not claimed for the earlier of (a) two years after they become payable or distributable or (b) one day less than the applicable escheat laws shall, at the written instruction of the Issuer, be paid by the Trustee to the Issuer. In such event, the Trustee and the Borrower shall be relieved of all liability with respect to such money and payment for such Bonds and the Holder of such Bonds shall look solely to the Issuer for such payment.

Section 5.15    Money Held in Trust.  All money required to be deposited with or paid to the Trustee for deposit into any Fund or Account (other than the Rebate Fund) and all money

withdrawn from a Bond Fund and held by the Trustee shall be held by the Trustee, in trust, and such money (other than money held pursuant to Section 5.07 hereof) shall, while so held, constitute part of the Trust Estate and be subject to the lien hereof. Money held in a Bond Fund shall constitute a separate trust fund for the Holders of the related Series and shall not constitute property of the Issuer or the Borrower.

Section 5.16    Payment to the Borrower. After the right, title and interest of the Trustee in and to the Trust Estate and all covenants, agreements and other obligations of the Issuer to the Holders shall have ceased, terminated and become void and shall have been satisfied and discharged in accordance with Article VII hereof, and all fees, expenses and other amounts payable to the Trustee pursuant to any provision hereof shall have been paid in full, any money remaining in the Funds and Accounts hereunder shall be paid or transferred to the Borrower upon the written request of a Borrower Representative; provided that amounts on deposit in the Rebate Fund shall be retained therein to the extent required by Section 5.07.

Section 5.17    Deposit of Extraordinary Revenues.

(a)    Subject to the exemption of Insurance Proceeds of $100,000 or less being paid to the Borrower pursuant to Section 5.3(a) of the Loan Agreement, any money representing Net Proceeds of Insurance Proceeds or Condemnation Awards upon damage to, destruction of or governmental taking of the Project and deposited with the Trustee pursuant to the Loan Agreement shall be deposited by the Trustee in the Project Fund.

(b)    At the written direction of the Borrower, the Trustee shall disburse such money in the Project Fund as provided in Section 5.3 and 5.4 of the Loan Agreement to enable the Borrower to undertake a restoration of the Project if such restoration is permitted by law; provided that, if the Borrower exercises or is deemed to exercise its option to apply such money to the payment of the Notes or the conditions of Sections 5.3 and 5.4 of the Loan Agreement are not satisfied, or an excess of such money exists after restoration of the Project, such money shall be transferred by the Trustee to the applicable Special Redemption Account of the related Bond Fund and applied to redeem or prepay the Bonds pursuant to Article III hereof, in a principal amount equal to the amount so transferred or the next lowest Authorized Denomination of the Bonds.

(c)    Title Policy insurance proceeds shall be used to remedy any title defect resulting in the payment thereof or deposited in the Bond Fund for use in redeeming Bonds pursuant to Article III hereof.

(d)    The proceeds of any rental loss, use and occupancy or business interruption insurance shall be deposited in the Revenue Fund.


ARTICLE VI

INVESTMENTS

Section 6.01    Investments. Money in all Funds and Accounts established hereunder shall, at the written direction of the Borrower Representative at least two Business Days before the

making of such investment, be invested and reinvested by the Trustee in Investment Securities. Subject to the further provisions of this Article, such investments shall be made by the Trustee as directed and designated by the Borrower Representative in a certificate of a Borrower Representative.  As long as no Event of Default shall have occurred and be continuing, the Borrower shall have the right to designate the investments to be sold and otherwise to direct the Trustee in the sale or conversion to cash of the investments made with the money in any Fund or Account.  The Borrower will not direct that any investment be made of any funds which would violate the covenants set forth in Section 2.8(b) of the Loan Agreement.  Unless otherwise confirmed in writing, an account statement delivered by the Trustee to the Borrower shall be deemed written confirmation by the Borrower that the investment transactions identified therein accurately reflect the investment directions given to the Trustee by the Borrower, unless the Borrower Representative notifies the Trustee in writing to the contrary within 30 days after the date of such statement.  Absent written investment instructions, the Trustee shall invest moneys in any Account for which investments are permitted in the Federated Government Obligations Fund (GOSXX) or a successor money market fund so long as The Huntington National Bank is the Trustee.

Money in any Fund or Account shall be invested in Investment Securities with respect to which payments of principal thereof and interest thereon are scheduled to be paid or are otherwise payable (including Investment Securities payable at the option of the holder) not later than the earlier of (a) the date on which it is estimated that such money will be required by the Trustee, or (b) six (6) months after the date of acquisition thereof by the Trustee.

The Trustee may make any and all such investments through its own banking department or the banking department of any affiliate.  All income attributable to money deposited in any Fund or Account created hereunder shall be credited to the respective Interest Accounts of the Bond Fund until the capitalized interest deposits made on the Closing Date are fully expended and thereafter the income attributed to money deposited in any Fund or Account shall be credited to the Revenue Fund, except that income on money (a) in the Rebate Fund shall be credited to the Rebate Fund, (b) in the Debt Service Reserve Fund shall be credited to the Debt Service Reserve Fund to the extent provided in Section 5.06(e) hereof and (c) in the Operations and Maintenance Reserve Fund shall be credited to the Operations and Maintenance Reserve Fund to the extent provided in Section 5.09 hereof. Any net loss realized and resulting from any such investment shall be charged to the particular fund or account for whose account such investment was made.  The Trustee is authorized and directed to sell and reduce to cash funds a sufficient amount of such investments whenever the cash balance in any Fund or Account is insufficient to make any withdrawal therefrom as required under this Indenture.  The Trustee shall not be liable for any depreciation of the value of any investment made pursuant to this Article VI or for any loss  fee, tax or other charge resulting from any such investment, including, without limitation, on the redemption, sale and maturity thereof.

Investment Securities held in the Debt Service Reserve Fund shall be valued at cost on each Interest Payment Date.

The Trustee shall at all times maintain accurate records of deposits into each Fund and Account and the sources of such deposits and such records shall be made available to the Borrower upon reasonable written request.

Notwithstanding anything in this Indenture or the Bond Documents, and subject in all events to the requirements of the Borrower's Tax Letter of Representation, the amount of Tax-Exempt Bond proceeds placed in the Operations and Maintenance Reserve Fund may only be invested as permitted by this Indenture at the written direction of the Borrower Representative to produce a yield which is not greater than the yield on the applicable issue of Tax-Exempt Bonds or such investments shall consist solely of tax-exempt bonds within the meaning of Section 148(b)(3) of the Code.

ARTICLE VII

DEFEASANCE

Section 7.01    Defeasance.  If the Issuer shall pay or cause to be paid to the Holder of any Bond the principal of, premium, if any, and interest due and payable thereon, and thereafter to become due and payable, upon such Bond, or any portion of such Bond in any Authorized Denomination thereof, such Bond or portion thereof shall cease to be entitled to any lien, benefit or security under this Indenture.  If the Issuer shall pay or cause to be paid the principal of, premium, if any, and interest due and payable on all Outstanding Bonds, and thereafter to become due and payable thereon, and shall pay or cause to be paid all other sums payable hereunder by the Issuer, including all fees, compensation and expenses of the Trustee and receipt by the Trustee of an opinion of Counsel that all conditions precedent have been complied with, then the right, title and interest of the Trustee in and to the Trust Estate shall thereupon cease, terminate and become void and the Trustee shall release or cause to be released the Trust Estate, the Mortgage and any other documents securing the Bonds or execute such documents so as to permit the Trust Estate, the Mortgage and such other documents to be released.

Any Bond shall be deemed to be paid within the meaning of this Article and for all purposes of this Indenture when (a) payment of the principal of and premium, if any, on such Bond, plus interest thereon to the due date thereof (whether such due date is by reason of maturity or upon redemption as provided herein) either (i) shall have been made or caused to be made in accordance with the terms thereof or (ii) shall have been provided for by any irrevocable deposit with the Trustee in trust and irrevocably set aside exclusively for such payment, (1) funds sufficient to make such payment and/or (2) Government Obligations maturing as to principal and interest in such amounts and at such times as will insure the availability of sufficient money to make such payment, and (b) all fees, compensation and expenses of the Trustee pertaining to the Bonds with respect to which such deposit is made accrued and to accrue until final payment of the Bonds, whether at maturity or upon redemption, shall have been paid or the payment thereof provided for to the satisfaction of the Trustee. At such times as a Bond shall be deemed to be paid hereunder, as aforesaid, such Bond shall no longer be secured by or entitled to the benefits of this Indenture, except for the purposes of any such payment from such funds and/or Government Obligations.

Notwithstanding the foregoing paragraph, no deposit under clause (a)(ii) of the immediately preceding paragraph shall be deemed a payment of such Bond as aforesaid until (A) the Issuer or the Borrower, on behalf of the Issuer, shall have given the Trustee, in form satisfactory to the Trustee, irrevocable written instructions to provide notice (which notice shall be prepared by or on behalf of the Issuer), as soon as practicable, to the Holders in accordance with Section 3.06 hereof, that the deposit required by (a)(ii) above has been made with the Trustee

and that said Bond is deemed to have been paid in accordance with this Article VII and stating the maturity or redemption date upon which money is to be available for the payment of the redemption price of said Bond, plus interest thereon to the due date thereof; or (B) the maturity of such Bond. In addition to the foregoing, no deposit described in clause (a)(ii) of the immediately preceding paragraph shall be deemed a payment of said Bond until the Borrower has delivered to the Trustee (i) a report of an Independent Certified Public Accountant verifying the sufficiency of the amounts, if any, described in (a)(ii) above to ensure payment of such Bond, and (ii) a Favorable Opinion of Bond Counsel addressed to the Issuer and the Trustee to the effect that such deposit will not adversely affect the exclusion of interest on the Tax-Exempt Bonds from the gross income of the recipients thereof for federal income tax purposes.

## ARTICLE VIII

## DEFAULTS AND REMEDIES

Section 8.01    <u>Events of Default</u>.    (a) Each of the following events shall constitute an "Event of Default" hereunder with respect to the Bonds:

(i)    a failure to pay the principal of or premium, if any, on any of the Bonds when the same shall become due and payable at maturity or upon redemption; or

(ii)    a failure to pay an installment of interest on any of the Bonds when the same shall become due and payable; or

(b)    [Reserved]

(c)    a failure by the Issuer to observe and perform any other covenant, condition, agreement or provision (other than as specified in subparagraph (a) of this Section) contained in the Bonds or in this Indenture on the part of the Issuer to be observed or performed with respect to the Bonds, which failure shall continue for a period of thirty (30) days after written notice is provided by the Trustee specifying such failure and requesting that it be remedied, shall have been given to the Issuer by the Trustee, which may give such notice in its discretion and shall give such notice to the Issuer at the written request of the Controlling Holders, unless the Trustee, or the Trustee and Controlling Holders which requested such notice, as the case may be, shall agree in writing to an extension of such period prior to its expiration; provided, however, that the Trustee, or the Trustee and the Controlling Holders of such Bonds, as the case may be, shall be deemed to have agreed to an extension of such period if corrective action is initiated by the Issuer within such period and is being diligently pursued; provided, further that in no event shall such period be extended for more than 180 days after the date of giving of notice of such failure without the consent of the Controlling Holders; or

(d)    the occurrence of a "Default" under the Loan Agreement or an "Event of Default" under the Mortgage; or

(e)    the failure by the Borrower to (1) purchase or cause to be purchased the Series 2018B Bonds or the Series 2018C Bonds tendered for purchase pursuant to Section 3.11 hereof, (2) fully replenish the applicable account of the Debt Service Reserve Fund pursuant to Section

5.06(b) hereof or (3) make timely payment of the Make-Whole Price due on the Put Option Purchase Date.

Notwithstanding any other provision, a failure to pay principal, interest or any other Event of Default on the Series 2018C Bonds or the Series 2018D Bonds will not constitute an Event of Default on the Senior Bonds, and no Event of Default on the Series 2018D Bonds will constitute an Event of Default on the Senior Bonds or the Series 2018C Bonds.

Section 8.02   Acceleration; Other Remedies.

(a)    Upon the occurrence and continuance of an Event of Default, the Trustee, subject to the provisions of Sections 3.01(d) and 8.04 hereof, may, and at the written request of the Controlling Holders shall, by written notice to the Issuer and the Borrower, declare the Bonds to be immediately due and payable, whereupon such Bonds shall, without further action, become and be immediately due and payable, anything in this Indenture or in the Bonds to the contrary notwithstanding, and the Trustee shall give notice thereof to the Issuer and shall give notice thereof by Mail to Holders of the Bonds.

Notwithstanding any other provision of this Indenture to the contrary, (i) if an Event of Default with respect to the payment of the principal of or interest on the Series C Bonds or the Series 2018D Bonds occurs (but an Event of Default does not exist with regard to the Senior Bonds) while any Senior Bonds remain Outstanding, then the Trustee shall not accelerate the Bonds without the written consent of the Owners of all of the Senior Bonds and (ii) if an Event of Default with respect to the payment of principal of or interest on the Series 2018D Bonds occurs (but an Event of Default does not exist with respect to the Series 2018C Bonds) while any Series 2018C Bonds remain Outstanding but no Senior Bonds are Outstanding, then the Trustee shall not accelerate the Bonds without the written consent of the Owners of the Series 2018C Bonds.

(b)    The provisions of the preceding paragraph are subject to the condition that if, after the principal of the Bonds shall have been so declared to be due and payable, and before any judgment or decree for the payment of the money due shall have been obtained or entered as hereinafter provided, (i) the Issuer shall, from any payment received from the Borrower for such purpose, deposit or cause to be deposited with the Trustee a sum sufficient to pay all matured installments of interest on all Bonds and the principal of any and all Bonds which shall have become due otherwise than by reason of such declaration (with interest on such principal and, to the extent permissible by law, on overdue installments of interest, at the Default Rate) and such amount as shall be sufficient to pay Extraordinary Trustee's Fees and Expenses, and (ii) all Events of Default hereunder with respect to the Bonds other than nonpayment of the principal of and interest on such Bonds which shall have become due by said declaration shall have been remedied, then, in every such case, upon the written consent of the Controlling Holders provided to the Trustee, such Event of Default shall be deemed waived and such declaration and its consequences rescinded and annulled, and the Trustee shall promptly give written notice of such waiver, rescission or annulment to the Issuer and shall give notice thereof by Mail to all Holders of Bonds; but no such waiver, rescission and annulment shall extend to or affect any subsequent Event of Default or impair any right or remedy consequent thereon.

(c)     Upon the occurrence and continuance of any Event of Default, then and in every such case the Trustee, in its discretion may, and upon the written direction of the Controlling Holders and receipt of indemnity to its satisfaction shall, in its own name and as the Trustee of an express trust, perform any or all of the following:

(i)     by mandamus, or other suit, action or proceeding at law or in equity, enforce all rights of the Holders under this Indenture or the applicable Bonds, including without limitation requiring the Issuer or the Borrower to carry out any agreements with or for the benefit of the Holders and to perform its or their duties under the Act, the Loan Agreement, the Mortgage, the Regulatory Agreement and this Indenture, and exercise any rights under the Collateral Assignment of Management Agreement, provided that any such remedy may be taken only to the extent permitted under the applicable provisions of the Loan Agreement, the Mortgage, the Regulatory Agreement, the Collateral Assignment of Management Agreement or this Indenture, as the case may be;

(ii)     bring suit upon the Bonds;

(iii)     by action or suit in equity enjoin any acts or things which may be unlawful or in violation of the rights of the Holders of Bonds;

(iv)     foreclose or exercise any other remedy permitted under the Mortgage; or

(v)     file proofs of claim in any bankruptcy or insolvency proceedings related to the Issuer, the Borrower or the Project, necessary or appropriate to protect the interests of the Trustee or the Holders of the Bonds.

(d)     Notwithstanding anything herein to the contrary, neither the Holders of the Bonds nor the Trustee acting on behalf of the Holders of the Bonds shall have any right, and hereby waive any right, to institute a proceeding under the Bankruptcy Code seeking to adjudge the Issuer insolvent or a bankrupt or seeking a reorganization of the Issuer.

Upon instituting any such proceeding, the Trustee shall be entitled, as a matter of right, to the appointment of a receiver of the Project and other assets pledged under this Indenture or the Mortgage, pending resolution of such proceeding.  The Trustee shall have the right to decline to follow any direction of any Bondholder that in the sole and absolute discretion of the Trustee would be unjustly prejudicial to the Trustee, that would expose the Trustee to unreasonable liability or financial exposure or that is not in accordance with law or the provisions of this Indenture.  The Trustee shall be entitled to rely without further investigation or inquiry upon any written direction given by the Controlling Holders, and shall not be responsible for the propriety of or be liable for the consequences of following any such direction.  Notwithstanding anything to the contrary contained herein, the Trustee shall not be required to foreclose the Mortgage or bid on behalf of the Holders at any foreclosure sale (a) if, in the Trustee's sole and absolute discretion, such action would subject the Trustee to personal liability for the cost of investigation, removal and/or remedial activity with respect to Hazardous Substances, (b) if the presence of any Hazardous Substances on the property subject to the Mortgage results in such property having no or nominal value or (c) if as a result of any such action, the Trustee would be considered to hold title to or to be a "mortgagee-in-possession," "owner" or "operator" of the Project within the meaning of the

Comprehensive Environmental Responsibility Cleanup and Liability Act of 1980, as amended, unless the Trustee has previously determined, based on a report prepared by an environmental audit consultant acceptable to the Trustee, that (i) the Project is in compliance with applicable Environment Laws and (ii) there are not circumstances present at the Project relating to the use, management or disposal of any Hazardous Substances for which investigation, testing, monitoring, containment, clean-up or remediation could be required under any federal, State or local law or regulation. It is acknowledged and agreed that the Trustee has no authority to manage, own or operate the Project, or any portion thereof, except as necessary to exercise remedies upon an Event of Default.

Section 8.03    Restoration to Former Position.  In the event that any proceeding taken by the Trustee to enforce any rights under this Indenture shall have been discontinued or abandoned for any reason, or shall have been determined adversely to the Trustee, then the Issuer, the Trustee and the Holders shall be restored to their former positions and rights hereunder, respectively, and all rights, remedies and powers of the Trustee shall continue as though no such proceeding had been taken.

Section 8.04    Cure by Holders.  Any Holder of Bonds may, but shall not be obligated to, cure an Event of Default under this Indenture, including the advancing of funds ("Advanced Funds") to the Trustee for payments required under this Indenture, or to indemnify the Trustee under Sections 9.04 and 9.06 hereof.  Any Advanced Funds are to be applied by the Trustee in accordance with the written instructions of the Holder providing the same; provided, however, that such Holder shall not have a right or interest in the Advanced Funds that is superior to any right or interest any other party has under this Indenture.

Section 8.05    Controlling Holders' Right to Direct Proceedings.  Anything in this Indenture to the contrary notwithstanding, the Controlling Holders shall have the right, by an instrument in writing executed and delivered to the Trustee, to direct the time, method and place of conducting all remedial proceedings available to the Trustee under this Indenture or exercising any trust or power conferred on the Trustee by this Indenture.

Section 8.06    Limitation on Holders' Right to Institute Proceedings.  Unless otherwise provided for in this Indenture, no Holder shall have any right to institute any suit, action or proceeding in equity or at law for the execution of any trust or power hereunder, or any other remedy hereunder or on said Bonds, unless such Holder previously shall have given to the Trustee written notice of an Event of Default as hereinabove provided and unless also the Controlling Holders shall have made written request of the Trustee to do so after the right to institute said suit, action or proceeding under Section 8.02 hereof shall have accrued, and shall have afforded the Trustee a reasonable opportunity to proceed to institute the same in either its or their name, and the Trustee shall not have complied with such request within a reasonable time. No one or more of the Holders of the Bonds shall have any right in any manner whatever by its or their action to affect, disturb or prejudice the security of this Indenture, or to enforce any right hereunder or under the Bonds, except in the manner herein provided, and all suits, actions and proceedings at law or in equity shall be instituted, had and maintained in the manner herein provided and for the equal benefit of all Holders of Bonds.  Notwithstanding anything to the contrary, the furnishing of indemnity to the Trustee as provided in Section 9.06 hereof is hereby declared in every such case,

at the option of the Trustee, to be a condition precedent to the institution of said suit, action or proceeding by the Trustee.

Section 8.07   No Impairment of Right to Enforce Payment.   Notwithstanding any other provision in this Indenture, the right of any Holder of a Bond to receive payment of the principal of and interest on such Bond, on or after the respective due dates expressed therein, or to institute suit for the enforcement of any such payment on or after such respective date, shall not be impaired or affected without the consent of such Holder.

Section 8.08   Proceedings by Trustee Without Possession of Bonds.   All rights of action under this Indenture or under any of the Bonds secured hereby which are enforceable by the Trustee may be enforced by it without the possession of any of the Bonds, or the production thereof at the trial or other proceedings relative thereto, and any such suit, action or proceeding instituted by the Trustee shall be brought in its name for the equal and ratable benefit of the Holders of Bonds, subject to the provisions of this Indenture.

Section 8.09   No Remedy Exclusive.   No remedy herein conferred upon or reserved to the Trustee or to Holders is intended to be exclusive of any other remedy or remedies, and each and every such remedy shall be cumulative, and shall be in addition to every other remedy given hereunder, or now or hereafter existing at law or in equity or by statute; provided, however, that any conditions set forth herein to the taking of any remedy to enforce the provisions of this Indenture or the Bonds shall also be conditions to seeking any remedies under any of the foregoing pursuant to this Section.

Section 8.10   No Waiver of Remedies.   No delay or omission of the Trustee or of any Holder to exercise any right or power accruing upon any default shall impair any such right or power or shall be construed to be a waiver of any such default, or an acquiescence therein; and every power and remedy given by this Article to the Trustee and to the Holders, respectively, may be exercised from time to time and as often as may be deemed expedient.

Section 8.11   Application of Money.

(a)   If an Event of Default occurs with respect to the Bonds, any money held in any Fund or Account hereunder (excluding the Rebate Fund) or received by any receiver or by the Trustee, or by any Holder pursuant to any right given or action taken under the provisions of this Article or the Mortgage, after payment of (i) the fees, expenses, liabilities or advances payable to or incurred or made by the Trustee or any Holder, (ii) the costs and expenses of the proceedings resulting in the collection of such money, and (iii) Operating Expenses of the Project as determined to be appropriate by the Trustee (and the Trustee may, in its discretion, rely on the Budget to make such determination), shall be deposited in the Revenue Fund; and all money so deposited in the Revenue Fund during the continuance of an Event of Default (other than money for the payment of Bonds which have matured or otherwise become payable prior to such Event of Default or for the payment of interest due prior to such Event of Default) shall be applied (except as otherwise provided in Section 5.05 hereof with respect to money deposited in a Bond Fund Account or a Debt Service Reserve Account for the benefit of the Holders of a particular Series) as follows:

(i)     Unless the principal of all the Bonds shall have been declared due and payable, all such money shall be applied (A) first, together with all amounts on deposit in the Debt Service Reserve Accounts relating to the Senior Bonds, to the payment to the persons entitled thereto of all installments of interest then due on such Series of Bonds, with interest on overdue installments, if lawful, at the Default Rate, in the order of maturity of the installments of such interest and, if the amount available shall not be sufficient to pay in full any particular installment of interest, then to the payment ratably, according to the amounts due on such installment of interest on such Senior Bonds on a parity and pro rata basis and (B) second, together with any amounts on deposit in the Debt Service Reserve Accounts relating to the Senior Bonds, to the payment to the persons entitled thereto of the unpaid principal of any of the Senior Bonds that shall have become due (other than Senior Bonds called for redemption for the payment of which money is held pursuant to the provisions of this Indenture) with interest on such Senior Bonds at the Default Rate from the respective dates upon which they became due and, if the amount available shall not be sufficient to pay in full Senior Bonds due on any particular date, together with such interest, then to the payment ratably, according to the amount of principal and interest due on such date, in each case to the persons entitled thereto, without any discrimination or privilege.

(ii)    If the principal of all the Bonds shall have been declared due and payable, all such money shall be applied to the payment of the principal and interest then due and unpaid upon the Bonds, with interest on overdue interest and principal, as aforesaid at the Default Rate, if lawful, first to the payment of the Senior Bonds, without preference or priority of principal over interest or interest over principal, or of any installment of interest over any other installment of interest, or of any Senior Bond over any other Senior Bond, ratably, according to the amounts due respectively for principal and interest, to the persons entitled thereto without any discrimination or privilege, next in the same manner to the payment of the Series 2018C Bonds and finally in the same manner to the payment of the Series 2018D Bonds.

(iii)   If the principal of all the Bonds shall have been declared due and payable, and if such declaration shall thereafter have been rescinded and annulled under the provisions of this Article, then, subject to the provisions of clause (ii) of this Section 8.11(a) which shall be applicable in the event that the principal of all the Bonds shall later become due and payable, the money shall be applied in accordance with the provisions of clause (i) of this Section 8.11(a).

(b)     Whenever money is to be applied pursuant to the provisions of this Section, such money shall be applied at such times, and from time to time, as the Trustee shall determine, having due regard to the amount of such money available for application and the likelihood of additional money becoming available for such application in the future.  Whenever the Trustee shall apply such funds, it shall fix the date (which shall be an Interest Payment Date unless it shall deem another date more suitable) upon which such application is to be made and upon such date interest on the amounts of principal and interest to be paid on such date shall cease to accrue.  The Trustee shall give notice of the deposit with it of any such money and of the fixing of any such date by Mail to all Holders of the Bonds and shall not be required to make payment to any Holder of a

Bond until such Bond shall be presented to the Trustee for appropriate endorsement or for cancellation if fully paid.

Section 8.12    Severability of Remedies.  It is the purpose and intention of this Article to provide rights and remedies to the Trustee and the Holders which may be lawfully granted under the provisions of the Act, but should any right or remedy herein granted be held to be unlawful, the Trustee and the Holders shall be entitled, as above set forth, to every other right and remedy provided in this Indenture and by law.

Section 8.13    Notice of Event of Default.  If an Event of Default occurs and continues for five (5) Business Days after the Trustee has received written notice of the same as provided in Section 9.05 hereof, then the Trustee shall give notice thereof by Mail to the Holders, the Borrower and the Issuer, but if the Bonds are in book-entry, the Trustee shall give notice to the Clearing Agency.

## ARTICLE IX

## TRUSTEE

Section 9.01    Acceptance of Trusts.  The Trustee hereby accepts the trusts imposed upon it by this Indenture and its duties under this Indenture, the Loan Agreement and the Mortgage, and agrees to perform such trusts and duties, but only upon and subject to the following express terms and conditions set forth in this Article IX:

(a)    The Trustee, before the occurrence of an Event of Default and after the curing of all Events of Default which may have occurred, undertakes to perform such duties and only such duties as are specifically set forth in this Indenture.  In case an Event of Default (of which the Trustee has knowledge) has occurred (which has not been cured or waived), the Trustee shall exercise such of the rights and powers vested in it by this Indenture, and use the same degree of care and skill in their exercise, as a prudent person would exercise or use under the circumstances in the conduct of his or her own affairs.

(b)    The Trustee shall not be accountable for the use of any Bonds authenticated or delivered hereunder.  The Trustee may buy, sell, own and deal in any of the Bonds secured hereby with the same rights which it would have were it not the Trustee.

(c)    The Trustee shall not withhold unreasonably its consent, approval or action to any reasonable written request of the Issuer, provided that any such consent, approval or action is permitted by this Indenture.  Any action taken by the Trustee pursuant to this Indenture upon the request or authority or consent of any person who at the time of making such request or giving such authority or consent is the owner of any Bond shall be conclusive and binding upon all future Holders of the same Bond and upon Bonds issued in exchange therefor or in place thereof.

(d)    As to the existence or nonexistence of any fact or as to the sufficiency or validity of any instrument, paper or proceeding, the Trustee shall be entitled to conclusively rely upon a certificate signed by an Issuer Representative or a Borrower Representative as sufficient evidence of the facts therein contained, and before the occurrence of a default of which the Trustee has notice as provided in Section 9.05 hereof, shall also be at liberty to accept a similar certificate to

the effect that any particular dealing, transaction or action is necessary or expedient, but may, at its discretion, secure such further evidence as Trustee deems necessary or advisable, but shall not be bound to secure the same. The Trustee may accept a certificate signed on behalf of the Issuer or Borrower to the effect that a resolution in the form therein set forth has been adopted by the Issuer as conclusive evidence that such resolution has been duly adopted, and is in full force and effect.

(e)        The permissive right of the Trustee to do things enumerated in this Indenture shall not be construed as a duty, and the Trustee shall not be answerable for other than its gross negligence or willful misconduct.

(f)        At any and all reasonable times the Trustee, and its duly authorized agents, attorneys, experts, engineers, accountants and representatives, shall have the right fully to inspect any and all of the property herein conveyed, including all books, papers and records of the Issuer or the Borrower pertaining to the revenues and receipts relating to the Project or the Bonds, and to take such memoranda from and in regard thereto as may be desired.

(g)        The Trustee shall not be required to give any bond or surety in respect of the execution of the trusts and powers hereunder or otherwise in respect of the premises.

(h)        The Trustee shall not be under any duty or obligation to perform any act that would cause it to incur any expense or liability or to institute or defend any suit in respect of this Indenture or to advance any of its own money, unless it is provided with indemnification satisfactory to it for the reimbursement of all expenses (including without limitation, attorneys' fees, expenses and court costs) to which it may be put and to protect it against all liability, except all liability which is adjudicated to have resulted from its gross negligence or willful misconduct by reason of any action so taken.

(i)        The Trustee shall not be required to enter, take possession of or take any other action with respect to the Project or the Mortgaged Property thereof unless it shall have first received assurances and indemnity satisfactory to it that the Trustee will not be subject to liability for, among other things, the existence of, or contamination by environmentally hazardous substances or other discharges, emissions or releases with respect to the Project or the Mortgaged Property.

(j)        The Trustee shall have no responsibility, opinion or liability with respect to any information, statements or recitals in any offering memorandum or other disclosure material prepared or distributed with respect to the issuance of the Bonds.

(k)        The Trustee's rights to immunities and protection from liability hereunder including, without limitation, its right to be indemnified, and its rights to payment of its fees and expenses shall survive its resignation or removal and final payment or defeasance of the Bonds and shall be enforceable by the Trustee in each of its capacities hereunder.

(l)        The Trustee shall not be under any obligation to effect or maintain insurance or to renew any policies of insurance or to inquire as to the sufficiency of any policies of insurance carried by the Borrower, or to report, or make or file claims or proof of loss for, any loss or damage insured against or which may occur.  The Trustee may rely on any report provided by the Borrower

pursuant to Section 5.5 of the Loan Agreement with respect to satisfaction of the insurance requirements of the Loan Agreement and the Mortgage, and shall have no responsibility for assuring compliance with such insurance requirements, but shall notify the Issuer and the Borrower if it has not received the report required by Section 5.5 of the Loan Agreement.

(m)     All money received by the Trustee need not be segregated except to the extent required by law or this Indenture.

(n)     [Reserved]

(o)     [Reserved]

(p)     The Trustee shall provide to the Issuer copies of written notices it has received or produced with respect to any Event of Default, the occurrence of any casualty or material damage or loss or any condemnation proceedings concerning the Project, the resignation or removal of the Trustee and the appointment of a successor trustee, or any amendments or supplements to this Indenture or the Loan Agreement.

(q)     The Trustee shall not be liable for any action taken or omitted by the Trustee in good faith at the direction of the Controlling Holders as to the time, method and place of conducting any proceedings for any remedy available to the Trustee or the exercising of any power conferred by this Indenture.

(r)     Whether or not therein expressly so provided, every provision of this Indenture relating to the conduct of, or affecting the liability of, or affording protection to the Trustee shall be subject to the provisions of this Section 9.01.

(s)     The Trustee agrees to accept and act upon instructions or directions pursuant to this Indenture sent by a Borrower Representative or an Issuer Representative by unsecured e-mail, facsimile transmission or other similar unsecured electronic methods.  If the Issuer and the Borrower elect to give the Trustee e-mail or facsimile instructions (or instructions by a similar electronic method) and the Trustee in its discretion elects to act upon such instructions, the Trustee's understanding of such instructions shall be deemed controlling.  The Trustee shall not be liable for any losses, costs or expenses arising directly or indirectly from the Trustee's reliance upon and compliance with such instructions notwithstanding such instructions conflict or are inconsistent with a subsequent written instruction.  The Issuer and the Borrower agree to assume all risks arising out of the use of such electronic methods to submit instructions and directions to the Trustee, including without limitation the risk of the Trustee acting on unauthorized instructions, and the risk or interception and misuse by third parties.

(t)     In no event shall the Trustee be responsible or liable for special, indirect, punitive or consequential loss or damage of any kind whatsoever (including, but not limited to, loss of profit) irrespective of whether the Trustee has been advised of the likelihood of such loss or damage and regardless of the form of action.

(u)     The Trustee shall not be responsible for and makes no representation as to existence, genuineness, value or protection of the Project or any other collateral securing the Bonds, or for the creation, perfection, priority, sufficiency or protection of any liens securing the

Bonds.  The Trustee shall not be responsible for filing any financing or continuation statements or recording any documents or instruments in any public office at any time or times or otherwise perfecting or maintaining the perfection of any lien or security interest in the Project or any other collateral securing the Bonds.

Section 9.02    No Responsibility for Recitals.  The recitals, statements and representations contained in this Indenture or in the Bonds, save only the Trustee's authentication upon the Bonds, shall be taken and construed as made by and on the part of the Issuer, and not by the Trustee, and the Trustee does not assume, nor shall it have, any responsibility or obligation for the correctness of any thereof.

Section 9.03    Limitations on Liability and Indemnity.  The Trustee may execute any of the trusts or powers hereof and perform the duties required of it hereunder by or through attorneys, agents, receivers or employees selected by it, and shall be entitled to advice of counsel concerning all matters of trust and its duty hereunder and to obtain the opinion of Counsel acceptable to the Trustee prior to taking action hereunder, and may in all cases pay such reasonable compensation to all such attorneys, agents, receivers or employees as is deemed necessary in connection with the performance of the Trustee's duties under this Indenture, and the Trustee shall not be answerable for the default or misconduct of any such attorney, agent or employee selected by it with reasonable care. The Trustee may act upon the advice of any attorney approved by the Trustee in the exercise of reasonable care, and the Trustee shall not be responsible for any loss or damage resulting from any action or non-action in good faith reliance upon such opinion or advice.  Without limitation, the Trustee shall be entitled to the benefit of the foregoing sentence with respect to the delegation to the Trustee's duties hereunder with respect to payment of principal, premium, if any, or interest on, or redemption of, the Bonds, the authentication and delivery thereof, and exchange and transfer thereof.  The Trustee shall not be answerable for the exercise of any discretion or power under this Indenture or for anything whatsoever in connection with the trust created hereby, except only for its own gross negligence or willful misconduct.  No provision of this Indenture shall require the Trustee to expend or risk its own funds or otherwise incur any financial liability in the performance of any of its duties hereunder, or in the exercise of any of its rights or powers, if it shall have reasonable grounds for believing that repayment of such funds or adequate indemnity against such risk or liability is not reasonably assured to it.  By way of clarification and not limitation, the Trustee and each of its officers, governing members, directors, officials, employees, attorneys and agents are the beneficiaries of the Indemnity provided pursuant to Section 6.5 of the Loan Agreement.

Section 9.04    Compensation, Expenses and Advances.  The Trustee shall be entitled to reasonable compensation for its services rendered hereunder (not limited by any provision of law in regard to the compensation of the trustee of an express trust) and to reimbursement for its actual out-of-pocket expenses (including counsel fees and expenses and any fees, expenses, payments, indemnification reserves or other security which may be incurred in connection with the appointment or designation of a separate trustee for all or part of the Bonds) reasonably incurred in connection therewith, except as a result of its negligence or willful misconduct. The Issuer agrees that it will, but solely from the Trust Estate as provided herein, pay to the Trustee such compensation and reimbursement of expenses and advances.  The Trustee shall have, in addition to any other rights hereunder, a lien and claim, for the payment of its compensation and the reimbursement of its expenses and any advances made by it, as provided in this Section, upon the

money which is on deposit in the appropriate Funds and Accounts created herein, subject to the requirements hereof for other applications of such Funds and Accounts, and the Trustee may withdraw the same from such Funds and Accounts when the same become due and payable, to the extent available for such purpose.

Section 9.05    Notice of Events of Default.  The Trustee shall not be required to take notice, or be deemed to have notice, of any default or Event of Default under this Indenture, other than an Event of Default under clause (a) of Section 8.01 hereof, unless a Responsible Officer of the Trustee shall have received actual knowledge or shall have been specifically notified in writing of such default or Event of Default by the Issuer, the Borrower or by the Holders of at least 25% of the Bond Obligation.  The Trustee may, however, at any time, in its discretion, and shall, upon the request of at least 25% of the Bond Obligation, require of the Borrower full information and advice as to the performance of any of the covenants, conditions and agreements contained herein.

Section 9.06    Action by Trustee.  The Trustee shall be under no obligation to take any action in respect of any default or Event of Default hereunder or toward the execution or enforcement of any of the trusts hereby created, or to institute, appear in or defend any suit or other proceeding in connection therewith, and if in its opinion such action may tend to involve it in expense or liability, unless furnished, from time to time as often as it may require, with security and indemnity satisfactory to it; but the foregoing provisions are intended only for the protection of the Trustee, and, shall not affect any discretion or power given by any provisions of this Indenture to the Holders or to the Trustee to take action in respect of any default or Event of Default without such notice or request from the Holders, or without such security or indemnity.

Section 9.07    Good Faith Reliance.  The Trustee shall be protected and shall incur no liability in acting or proceeding in good faith, reasonably exercised, upon any resolution, notice, electronic or facsimile transmission, request, consent, waiver, certificate, statement, affidavit, voucher, bond, requisition or other paper or document which it shall in good faith believe to be genuine and to have been passed or signed by the proper board, body or person or to have been prepared and furnished pursuant to any of the provisions of this Indenture or the other Bond Documents, or upon the written opinion of any attorney, engineer, accountant or other expert reasonably believed by the Trustee to be qualified in relation to the subject matter, and the Trustee shall be under no duty to make any investigation or inquiry as to the qualification of such person or any statements contained or matters referred to in any such instrument, but may accept and rely upon the same as conclusive evidence of the truth and accuracy of such statements.

Section 9.08    Dealings in Bonds or with the Issuer or the Borrower.  The Trustee may in good faith, reasonably exercised, buy, sell, own, hold and deal in any of the Bonds issued hereunder, and may join in any action which any Holder may be entitled to take with like effect as if it did not act in any capacity hereunder.  The Trustee, in its individual capacity, either as principal or agent, may also engage in or be interested in any financial or other transaction with the Issuer or the Borrower, and may act as depositary, trustee or agent for any committee or body of Holders secured hereby or other obligations of the Issuer or the Borrower as freely as if it did not act in any capacity hereunder.

Section 9.09    Resignation of Trustee.  The Trustee may resign and be discharged of the trusts created by this Indenture by executing an instrument in writing resigning such trust and

specifying the date when such resignation shall take effect, and filing the same with the Issuer and the Borrower, and by giving notice of such resignation by Mail, not less than 15 days prior to such resignation date, to all Holders or to the Clearing Agency if the Bonds are in book-entry.  Such resignation shall only take effect on the day a successor Trustee shall have been appointed as hereinafter provided.

Section 9.10    Removal of Trustee.  The Trustee may be removed at any time by the Borrower or by the Controlling Holders with the consent of the Borrower (not to be unreasonably withheld), by filing with the Trustee so removed and with the Issuer an instrument or instruments in writing appointing a successor, executed by a Borrower Representative if the Trustee has been removed by the Borrower (and notice thereof given by Mail to the Holders and the Issuer), or executed by said Holders of Bonds if the Trustee was removed by said Holders; provided that the Borrower may not remove the Trustee, and the consent of the Borrower shall not be required (in the case of removal by the Holders) if an Event of Default has occurred and is continuing hereunder or a Default has occurred and is continuing under the Loan Agreement.

Section 9.11    Appointment of Successor Trustee.  If at any time the Trustee shall resign, be removed, or be dissolved, or if its property or affairs shall be taken under the control of any State or federal court or administrative body because of insolvency or bankruptcy, or for any other reason become incapable of acting, then a vacancy shall forthwith and ipso facto exist in the office of Trustee and the Borrower, with written notice to the Issuer, shall promptly appoint a successor Trustee.  Any such appointment shall be made by a written instrument executed by a Borrower Representative.  Copies of such instrument shall be promptly delivered by the Borrower to the predecessor Trustee and to the Trustee so appointed.  The successor Trustee shall give notice of such appointment by Mail, at least once within 30 days of such appointment, to all Holders or to the Clearing Agency if the Bonds are in book-entry.

Any new Trustee so appointed as provided in this Section 9.11 shall immediately and without further act become the successor Trustee appointed in the manner above provided.

Section 9.12    Qualifications of Trustee.  The Trustee and every successor Trustee, if any, (a) shall be a bank or trust company duly organized under the laws of the United States or any state thereof authorized by law to perform all the duties imposed upon it by this Indenture, the Loan Agreement and the Mortgage, (b) shall at the time of appointment have (or in the case of a corporation or trust company included in a bank holding company system, the related bank holding company shall have) trust assets under management of at least $50,000,000, (c) shall be permitted under the Act to perform the duties of Trustee and (d) shall be acceptable to the Issuer.

Section 9.13    Judicial Appointment of Successor Trustee.  If at any time the Trustee shall resign and no appointment of a successor Trustee shall be made pursuant to the foregoing provisions of this Article prior to the date specified in the notice of resignation as the date when such resignation is to take effect, the resigning Trustee may forthwith apply to a court of competent jurisdiction for the appointment of a successor Trustee.  If no appointment of a successor Trustee shall be made pursuant to the foregoing provisions of this Article within three (3) months after a vacancy shall have occurred in the office of Trustee, any Holder may apply to any court of competent jurisdiction to appoint a successor Trustee.  Such court may thereupon, after such notice, if any, as it may deem proper and prescribe, appoint a successor Trustee.

Section 9.14   Acceptance of Trusts by Successor Trustee.   Any successor Trustee appointed hereunder shall execute, acknowledge and deliver to the Issuer an instrument accepting such appointment hereunder, and thereupon such successor Trustee, without any further act, deed or conveyance, shall become duly vested with all the estates, property, rights, powers, trusts, duties and obligations of its predecessor in the trust hereunder, with like effect as if originally named Trustee herein.   Upon request of the Trustee and the payment of the predecessor Trustee's fees and expenses hereunder, such predecessor Trustee and the Issuer shall execute and deliver an instrument transferring to such successor Trustee all the estates, property, rights, powers and trusts hereunder of such predecessor Trustee and, subject to the provisions of Section 9.04 hereof, such predecessor Trustee shall pay over to the successor Trustee all money and other assets at the time held by it hereunder, and such predecessor Trustee shall assign its beneficial interest in the Mortgage to the successor Trustee and record said assignment in the same manner as the Mortgage was recorded.

Section 9.15   Successor by Merger or Consolidation.   Any entity into which any Trustee hereunder may be merged or converted or with which it may be consolidated, or any entity resulting from any merger, conversion or consolidation to which any Trustee hereunder shall be a party, or any entity succeeding to the business of the Trustee, or any company to which the Trustee may sell or transfer all or substantially all of its corporate trust business, provided such entity meets the qualifications contained in Sections 9.12 or 9.18 hereof, as appropriate, shall be a successor Trustee under this Indenture, without the execution or filing of any paper or any further act on the part of the parties hereto, anything in this Indenture to the contrary notwithstanding.

Section 9.16   Intervention in Litigation of the Issuer.   In any judicial proceeding to which the Issuer is a party and which in the opinion of the Trustee and its counsel has a substantial bearing on the interests of the Holders, the Trustee, if permitted by the court having jurisdiction in the premises, may intervene and shall intervene, upon receipt of indemnity satisfactory to it, at the written request of Holders of at least a majority of the Bond Obligation.

Section 9.17   Paying Agent.   The Issuer hereby appoints the Trustee as the Paying Agent for the Bonds.

Section 9.18   Qualifications of Paying Agent; Resignation; Removal.   Any Paying Agent (a) shall be a bank or trust company, duly organized under the laws of the United States of America or any state thereof authorized by law to perform all the duties imposed upon it by this Indenture, and (b) shall at the time of appointment have (or in the case of a corporation or trust company included in a bank holding company system, the related bank holding company shall have), trust assets under management of at least $50,000,000.   Any Paying Agent may at any time resign and be discharged of the duties and obligations created by this Indenture by giving at least 15 days' notice to the Issuer, the Borrower and the Trustee.   The Paying Agent may be removed at any time at the direction of the Borrower or the Controlling Holders with the consent of the Borrower (not to be unreasonably withheld), with written notice to the Issuer, by an instrument signed by the Borrower or such Holders, as applicable, and filed with the Paying Agent and the Trustee.   In the event of the resignation or removal of any Paying Agent, such Paying Agent shall pay over, assign and deliver any money held by it in such capacity to its successor or, if there be no successor, to the Trustee.   Successor Paying Agents shall be appointed in accordance with the provisions of Section 9.11 hereof.

Section 9.19    <u>Several Capacities; Duty to Cooperate</u>.  Anything in this Indenture to the contrary notwithstanding, the same entity must serve hereunder as the Trustee and the Paying Agent.

Section 9.20    <u>Additional Duties</u>.  Notwithstanding any provisions hereof to the contrary, the Trustee shall have the following duties:

(a)    The Trustee shall continue to perform its function hereunder without regard to the insufficiency of payment of its fees, provided that nothing herein shall negate the Trustee's right to compensation and indemnification hereunder and as provided in the Loan Agreement; and

(b)    The Trustee shall provide to the Underwriter promptly following its request a list of the names and addresses of the registered Holders of all Bonds then outstanding at the sole cost and expense of the Underwriter or, if the Bonds are held in book-entry form, the special position report (or similar list of Beneficial Owners) from the Clearing Agency.

Section 9.21    <u>Survival</u>.

(a)    The rights of the Trustee to payment under this Indenture shall survive the Trustee's resignation or removal, the discharge of this Indenture and defeasance of the Bonds.

(b)    Notwithstanding anything in this Indenture or any of the Bond Documents to the contrary, the rights, protections, indemnities and immunities afforded to the Trustee hereunder shall survive the resignation or removal of any such party and the payment in full or defeasance of the Bonds.

## ARTICLE X

## EXECUTION OF INSTRUMENTS BY HOLDERS AND PROOF OF OWNERSHIP OF BONDS

Section 10.01  <u>Execution and Proof of Ownership</u>.  Any request, direction, consent or other instrument in writing required or permitted by this Indenture to be signed or executed by Holders or on their behalf by an attorney-in-fact may be in any number of concurrent instruments of similar tenor and may be signed or executed by Holders in person or by an agent or attorney-in-fact appointed by an instrument in writing or as provided in the Bonds.  Proof of the execution of any such instrument and of the ownership of Bonds shall be sufficient for any purpose of this Indenture and shall be conclusive in favor of the Trustee with regard to any action taken by it under such instrument if made in the following manner:

(a)    The fact and date of the execution by any person of any such instrument may be proved by the certificate of any officer in any jurisdiction who, by the laws thereof, has power to take acknowledgments within such jurisdiction, to the effect that the person signing such instrument acknowledged before him the execution thereof, or by an affidavit of a witness to such execution.

(b)    The ownership of Bonds shall be proved by the registration books kept under the provisions of Section 2.09 hereof.

Nothing contained in this Article shall be construed as limiting the Trustee to such proof, it being intended that the Trustee may accept any other evidence of matters herein stated which it may deem necessary or sufficient.  Any request, consent of, or assignment by any Holder shall bind every future Holder of the same Bond or any Bond or Bonds issued in lieu thereof in respect of anything done by the Trustee or the Issuer in pursuance of such request or consent.

ARTICLE XI

MODIFICATION OF BOND DOCUMENTS

Section 11.01 <u>Limitations</u>.  Neither this Indenture nor any of the Borrower Documents shall be Amended in any respect subsequent to the Closing Date except as provided in and in accordance with and subject to the provisions of this Article.  Notwithstanding any provisions of this Article, the Borrower's Tax Letter of Representation and the Regulatory Agreement may be Amended pursuant to the provisions thereof, and the Borrower's Tax Letter of Representation and the Regulatory Agreement shall be Amended to the extent required by such documents.

Section 11.02 <u>Supplemental Indentures Without Holder Consent</u>.  The Issuer and the Trustee may, from time to time and at any time, without the consent of but with prompt notice to the Holders, enter into Supplemental Indentures as follows:

(a)     to cure any formal defect, omission, inconsistency or ambiguity in this Indenture;

(b)     to add to the covenants and agreements of the Issuer in this Indenture other covenants and agreements, or to surrender any right or power reserved or conferred upon the Issuer if such surrender shall not, as provided by an opinion of Counsel, materially adversely affect the interests of the Holders, the Trustee being authorized to rely on an opinion of Counsel with respect thereto;

(c)     to confirm, as further assurance, any pledge of or lien on the Loan Agreement or of any other money, securities or funds subject to the lien of this Indenture;

(d)     to comply with the requirements of the Trust Indenture Act of 1939, as from time to time amended;

(e)     to preserve the exclusion of interest on the Tax-Exempt Bonds from gross income for federal income tax purposes, as set forth in a Favorable Opinion of Bond Counsel;

(f)     [reserved];

(g)     to provide for any Amendment specifically authorized or required by any provision of this Indenture;

(h)     in connection with any Additional Bonds; or

(i)     with respect to any other Amendment that, in the judgment of the Trustee, does not have a material adverse effect on the Holders of the Bonds, the Trustee being authorized to rely on an opinion of Counsel with respect thereto.

Section 11.03  <u>Supplemental Indentures Requiring Holders' Consent</u>.

(a)  Except for any Supplemental Indenture entered into pursuant to Section 11.02, subject to the terms and provisions contained in this Section and not otherwise, the Controlling Holders shall have the right from time to time to consent to and approve the execution and delivery by the Issuer and the Trustee of any Supplemental Indenture deemed necessary or desirable by the Issuer for the purposes of modifying, altering, amending, supplementing or rescinding, in any particular, any of the terms or provisions contained in this Indenture; however, unless approved in writing by Holders of two-thirds (2/3) of the aggregate principal amount of the Bonds affected thereby, nothing herein contained shall permit, or be construed as permitting, (i) a change in the times, amounts or currency of payment of the principal of or interest on any Outstanding Bond or a reduction in the principal amount or redemption price of any Outstanding Bond or the rate of interest thereon, or (ii) the creation of a claim or lien upon, or a pledge of, the Trust Estate ranking prior to the claim, lien or pledge created by this Indenture, or (iii) a reduction in the aggregate Bond Obligation the consent of the Holders of which is required for any such Supplemental Indenture or which is required, under Section 11.05, for any modification, alteration, amendment or supplement to any Borrower Documents.

(b)  If, at any time, the Issuer and the Trustee propose to enter into any such Supplemental Indenture for any of the purposes specified in this Section, the Trustee shall, subject to Section 11.07 and upon being satisfactorily indemnified with respect to expenses by the Borrower, cause notice (which notice shall be provided by the Issuer) of the proposed execution of such Supplemental Indenture to be mailed, postage prepaid, to all Holders affected thereby. Such notice shall briefly set forth the nature of the proposed Supplemental Indenture and shall state that copies thereof are on file at the Designated Office of the Trustee for inspection by all Holders affected thereby.  If, within 60 days or such longer period as shall be prescribed by the Trustee following the mailing of such notice, the Holders of not less than a majority of the Bond Obligation related to the Senior Bonds affected thereby at the time of execution of any such Supplemental Indenture shall have consented to and approved the execution thereof as herein provided, no Holder of any Bond shall have any right to object to any of the terms and provisions contained therein, or the operation thereof, or in any manner to question the propriety of the execution thereof, or to enjoin or restrain the Trustee or the Issuer from executing the same or from taking any action pursuant to the provisions thereof. Upon the execution of any such Supplemental Indenture as in this Section is permitted and provided, this Indenture shall be deemed to be and shall be modified and amended in accordance therewith.  The Trustee and Issuer may rely upon an opinion of Bond Counsel as conclusive evidence that the execution and delivery of a Supplemental Indenture have been effected in compliance with the provisions of this Article.

(c)  Anything herein to the contrary notwithstanding, so long as no Event of Default under the Indenture or Default under the Loan Agreement with respect to the Borrower has occurred and is continuing, a Supplemental Indenture under this Article shall not become effective unless and until the Borrower shall have consented to the execution and delivery of such Supplemental Indenture.  In this regard, the Trustee shall cause notice (which notice shall be provided by the Issuer) of the proposed execution and delivery of any such Supplemental Indenture to be mailed by certified or registered mail to the Borrower at least 20 days prior to the proposed date of execution and delivery of any Supplemental Indenture.

Section 11.04  <u>Amendment of Borrower Documents Without Holder Consent</u>.  Without the consent of but with notice to the Holders, the Trustee may consent to the execution and delivery of any Amendment of any Borrower Document from time to time as follows:

(a)     to cure any formal defect, omission, inconsistency or ambiguity in such Borrower Document;

(b)     to add to the covenants and agreements of the Issuer or the Borrower in such document other covenants and agreements, or to surrender any right or power reserved or conferred upon the Issuer or the Borrower, if such surrender shall not, in the judgment of the Trustee, materially adversely affect the interests of the Holders, the Trustee being authorized to rely on an opinion of Counsel with respect thereto;

(c)     to confirm, as further assurance, any lien on or pledge of the Project or the revenues therefrom or of any other property, money, securities or funds subject to the Mortgage or any other security for the Loan Agreement;

(d)     to preserve the exclusion of interest on the Tax-Exempt Bonds from gross income for federal income tax purposes, as set forth in an opinion of Bond Counsel;

(e)     [reserved];

(f)     to provide for any Amendment specifically authorized or required by any provision of any Borrower Document;

(g)     in connection with any Additional Bonds; or

(h)     with respect to any other Amendment that does not, in the judgment of the Trustee, have a material adverse effect on the Holders of the Bonds, the Trustee being authorized to rely on an opinion of Counsel with respect thereto.

Section 11.05  <u>Amendment of Borrower Documents Requiring Holders' Consent</u>.  Except in the case of Amendments referred to in Section 11.04 hereof, the Issuer and the Trustee shall not enter into, and shall not consent to, any Amendment of the Borrower Documents to which they are a party without the written approval or consent of the Controlling Holders, given and procured in the same manner as provided in Section 11.03 hereof *mutatis mutandis*; provided that the foregoing will not permit or be construed as permitting any change to the Notes of the type referred to in Section 11.03(a)(i) (substituting for such purpose the word "Note" for the words "Outstanding Bond") without the consent of all affected Holders given and obtained in the manner set forth in Section 11.03 hereof. If at any time the Issuer requests the consent of the Trustee to any such proposed modification, alteration, amendment or supplement, the Trustee will cause notice (which notice shall be provided by the Issuer) thereof to be given in the same manner as provided by Section 11.06 hereof with respect to Supplemental Indentures.  Such notice will briefly set forth the nature of such proposed modification, alteration, amendment or supplement and will state that copies of the instrument embodying the same are on file at the Designated Office of the Trustee for inspection by all Holders.  The Issuer and the Trustee may enter into, or may consent to, any such proposed modification, alteration, amendment or supplement subject to the same conditions

and with the same effect as provided in Section 11.03 hereof with respect to Supplemental Indentures *mutatis mutandis*.

Section 11.06 <u>Procedures for Amendments</u>. If at any time the Trustee shall be requested to enter into any Supplemental Indenture pursuant to Section 11.03 or to consent to any Amendment pursuant to Section 11.05, the Trustee shall cause notice (which notice shall be provided by the Issuer) of the proposed Supplemental Indenture or other Amendment to be given by Mail to all Holders. Such notice shall set forth with particularity the nature of the proposed Supplemental Indenture or other Amendment and shall state that a copy thereof is on file at the Designated Office of the Trustee for inspection by all Holders. Within two (2) years after the date of the first giving of such notice, the Issuer and the Trustee may enter into such Supplemental Indenture or the Trustee may consent to such Amendment in substantially the form described in such notice, but only if there shall have first been delivered to the Trustee (i) the required consents, in writing, of Holders and (ii) the opinion of Bond Counsel required by Section 11.07 hereof.

If Holders of not less than the amount of Bond Obligation required by Section 11.03 or 11.05, as applicable, shall have consented to and approved the execution and delivery thereof as herein provided, no Holder shall have any right to object to the execution and delivery of such Supplemental Indenture or other Amendment, or to object to any of the terms and provisions contained therein or the operation thereof, or in any manner to question the propriety of the execution and delivery thereof, or to enjoin or restrain the Issuer, the Trustee or the Borrower from executing and delivering or consenting to the same or from taking or permitting any action pursuant to the provisions thereof.

Section 11.07 <u>Opinions; Certificate</u>. The Trustee shall not enter into or consent to any Amendment of any provision of any Bond Document unless there shall have been delivered to the Issuer and the Trustee an opinion of Bond Counsel stating that such Amendment is authorized or permitted by the Act and the applicable Bond Documents, and such Amendment will not adversely affect the exclusion of interest on the Tax-Exempt Bonds from the gross income of the recipients thereof for federal income tax purposes. In addition, the Trustee (i) may obtain, and shall be protected in relying on, an opinion of Counsel to the effect that such Amendment is authorized or permitted by this Indenture and complies with the terms hereof; and (ii) may require, as a condition to entering into or consenting to any such Amendment, a Compliance Certificate from the Borrower.

Section 11.08 <u>Effect of Amendments; Other Consents</u>. Upon the execution and delivery of any Supplemental Indenture or any Amendment to a Borrower Document pursuant to the provisions of this Article, this Indenture or such Borrower Document shall be, and be deemed to be, modified and amended in accordance therewith, and the respective rights, duties and obligations under the Bond Documents of the Issuer, the Trustee, the Borrower and all Holders shall thereafter be determined, exercised and enforced under the Bond Documents subject in all respects to such modifications and amendments.

Notwithstanding anything herein to the contrary, (i) the Trustee shall not be required to enter into or consent to any Amendment of any Bond Document which, in the sole judgment of the Trustee, might adversely affect the rights, obligations, powers, privileges, indemnities, immunities or other security provided the Trustee herein or therein; and (ii) except as otherwise

required hereby, the Trustee shall not enter into or consent to any Amendment of any Bond Document which affects the rights or obligations of the Borrower or the Issuer unless the Borrower or the Issuer enters into or consents to such Amendment.

## ARTICLE XII

## MISCELLANEOUS

Section 12.01  Successors of the Issuer.  In the event of the dissolution or transfer of functions of the Issuer, all the covenants, stipulations, promises and agreements in this Indenture contained, by or on behalf of, or for the benefit of, the Issuer, shall bind or inure to the benefit of the successors of the Issuer from time to time and any entity, officer, board, commission, agency or instrumentality to whom or to which any power or duty of the Issuer shall be transferred.

Section 12.02  Parties in Interest.  Except as herein otherwise specifically provided, nothing in this Indenture expressed or implied is intended or shall be construed to confer upon any person, firm or corporation other than the Issuer, the Borrower, the Trustee and the Holders any right, remedy or claim under or by reason of this Indenture, this Indenture being intended to be for the sole and exclusive benefit of the Issuer, the Borrower, the Trustee and the Holders.

Section 12.03  Severability.  In case any one or more of the provisions of this Indenture or of any Borrower Document or of the Bonds shall, for any reason, be held to be illegal or invalid, such illegality or invalidity shall not affect any other provisions of this Indenture, such Borrower Document or such Bonds, and this Indenture, the Borrower Documents and the Bonds shall be construed and enforced as if such illegal or invalid provisions had not been contained herein or therein.

Section 12.04  No Personal Liability.  No covenant or agreement contained in the Bonds or in this Indenture shall be deemed to be the covenant or agreement of any official, director, officer, agent or employee of the Issuer or the Trustee in his or her individual capacity, and neither the members of the Issuer or the Trustee nor any official executing the Bonds shall be liable personally on the Bonds or be subject to any personal liability or accountability by reason of the issuance thereof.

Section 12.05  Counterparts.  This Indenture may be executed in any number of counterparts, each of which, when so executed and delivered, shall be an original; but such counterparts shall together constitute but one and the same Indenture.  The exchange of copies of this Indenture and of signature pages by facsimile or PDF transmission shall constitute effective execution and delivery of this Indenture as to the parties hereto and may be used in lieu of the original Indenture and signature pages for all purposes.

Section 12.06  Governing Law.  The laws of the State shall govern the construction and enforcement of this Indenture and of all the Bonds issued hereunder.

Section 12.07  Notices.  Except as otherwise provided in this Indenture, all notices, certificates, requests, requisitions or other communications by the Issuer or the Trustee pursuant to this Indenture shall be in writing and shall be sufficiently given and shall be deemed given when mailed by overnight delivery by a nationally recognized service provider (such as Federal Express

or United Parcel Service) by registered mail, postage prepaid, or by facsimile transmission which produces receipt of transmission, addressed as follows:

| | |
|---|---|
| To the Issuer: | New Hope Cultural Education Facilities Finance Corporation |
| | c/o The Law Offices of James W. Wilson |
| | 103 W. Main Street |
| | Allen, Texas 75013 |
| | |
| To the Trustee: | The Huntington National Bank |
| | 40 Pearl Street, NW |
| | Corporate Trust MI-231 |
| | Grand Rapids, MI 49503 |
| | Attn:  Patrick J. O'Donnell |
| | Telephone: (616) 771-6210 |
| | Facsimile: (877) 377-6318 |
| | |
| To the Borrower: | BSPV-Plano, LLC |
| | 4851 Keller Springs Road, Suite 209 |
| | Addison, Texas 75001 |
| | Attn:  Richard Shaw |
| | Telephone: (972) 733-0096 |
| | Facsimile:  (972) 733-1864 |
| | |
| To the Manager: | BSPV-Plano, LLC |
| | 4851 Keller Springs Road, Suite 209 |
| | Addison, Texas 75001 |
| | Attn:  Richard Shaw |
| | Telephone: (972) 733-0096 |
| | Facsimile:  (972) 733-1864 |
| | |
| To the Asset Manager: | Lifestyle Property Management, Inc. |
| | 4851 Keller Springs Road, Suite 209 |
| | Addison, Texas 75001 |
| | Attn:  Richard Shaw |
| | Telephone: (972) 733-0096 |
| | Facsimile:  (972) 733-1864 |
| | |
| To the Underwriter: | BB&T Capital Markets |
| | 200 South College Street, Suite 750 |
| | Charlotte, NC  28202 |
| | Attn: Steve Coma, Managing Director |
| | Telephone:  (704) 954-1595 |
| | Facsimile:   (704) 954-1084 |

A copy of any communication given by or to the Borrower shall also be sent, as provided above, to the Manager at the address listed above.  Any of the foregoing may, by notice given hereunder to each of the others, designate any further or different addresses to which subsequent

notices, certificates, requests or other communications shall be sent hereunder or under the Loan Agreement.

Section 12.08 <u>Holidays</u>.    If the date for making any payment or the last date for performance of any act or the exercising of any right, as provided in this Indenture shall not be a Business Day, such payment may, unless otherwise provided in this Indenture, be made or act performed or right exercised on the next succeeding Business Day with the same force and effect as if done on the nominal date provided in this Indenture, and no interest shall accrue for the period after such nominal date.

Section 12.09 <u>Force Majeure</u>.    In no event shall the Trustee be responsible or liable for any failure or delay in the performance of its obligations hereunder arising out of or caused by, directly or indirectly, forces beyond its control, including, without limitation, strikes, work stoppages, accidents, acts of war or terrorism, civil or military disturbances, nuclear or natural catastrophes or acts of God, and interruptions, loss or malfunctions of utilities, communications or computer (software and hardware) services; it being understood that the Trustee shall use reasonable efforts which are consistent with accepted practices in the banking industry to resume performance as soon as practicable under the circumstances.

Section 12.10 <u>U.S.A. Patriot Act</u>.    The parties hereto acknowledge that in accordance with Section 326 of the U.S.A. Patriot Act, the Trustee, like all financial institutions and in order to help fight the funding of terrorism and money laundering, is required to obtain, verify, and record information that identifies each person or legal entity that establishes a relationship or opens an account with the Trustee. The parties to this Indenture agree that they will provide the Trustee with such information as it may request in order for the Trustee to satisfy the requirements of the U.S.A. Patriot Act.

IN WITNESS WHEREOF, the Issuer has caused this Indenture to be executed by its duly authorized officer and the Trustee has caused this Indenture to be executed on its behalf by its duly authorized officer, all as of the day and year first above written.

ISSUER

NEW HOPE CULTURAL EDUCATION FACILITIES FINANCE CORPORATION

By _____
President

[Signature Page of Indenture]

TRUSTEE

THE HUNTINGTON NATIONAL BANK

By: _____

Name: __Patrick O'Donnell__

Title: __Vice President__

[Signature Page of Indenture]

# EXHIBIT A

## (FORM OF SERIES 2018A BOND)

(a) <u>Form of Bond.</u>

NOTICE: Unless this Bond is presented by an authorized representative of The Depository Trust Company to the Issuer or its agent for registration of transfer, exchange or payment, and any Bond issued in lieu hereof is registered in the name of Cede & Co. or such other name as requested by an authorized representative of The Depository Trust Company and any payment is made to Cede & Co., ANY TRANSFER, PLEDGE OR OTHER USE HEREOF FOR VALUE OR OTHERWISE BY OR TO ANY PERSON IS WRONGFUL because the registered owner hereof, Cede & Co., has an interest herein.

R-____[1]                                                                              $_____

## UNITED STATES OF AMERICA
## STATE OF TEXAS

## NEW HOPE CULTURAL EDUCATION FACILITIES FINANCE CORPORATION
## SENIOR LIVING REVENUE BONDS
## (BRIDGEMOOR PLANO PROJECT)
## SENIOR SERIES 2018A

**THIS BOND AND THE ISSUE OF WHICH IT FORMS A PART ARE NOT GENERAL OBLIGATIONS OF THE ISSUER BUT ARE LIMITED OBLIGATIONS PAYABLE SOLELY FROM THE MONEY AND PROPERTIES PLEDGED FOR PAYMENT HEREOF.**

| MATURITY DATE: | DATED DATE: | INTEREST RATE | CUSIP NO.: |
|---|---|---|---|
| December 1, 2053 | December 1, 2018 | 7.250% | |

REGISTERED OWNER:        CEDE & CO.

PRINCIPAL AMOUNT:        _____ DOLLARS

The NEW HOPE CULTURAL EDUCATION FACILITIES FINANCE CORPORATION (the "Issuer"), a non-profit cultural education facilities finance corporation duly organized and validly existing under the laws of the State of Texas (the "State"), for value received, promises to pay, subject to the provisions hereof and of the Indenture (hereinafter mentioned), to the Registered Owner named above on the Maturity Date specified above, or upon earlier redemption as described

---

[1] The Initial Bonds shall be numbered T-1.

herein, the Principal Amount shown above and to pay interest on the unpaid principal amount hereof at the Interest Rate specified above until payment of the principal or redemption price hereof has been made.  Interest on this New Hope Cultural Education Facilities Finance Corporation Senior Living Revenue Bond (Bridgemoor Plano Project) Senior Series 2018A (this "Bond") is payable on each June 1 and December 1, commencing June 1, 2019 (each such date being hereinafter referred to as an "Interest Payment Date") and on any other date on which payment of principal of this Bond is due.  Interest hereon will be computed on the basis of a 360-day year of twelve 30-day months.

Any term used herein as a defined term but not defined herein shall be as defined in the Indenture.

This Bond is payable in lawful money of the United States of America.  The principal of and premium, if any, on this Bond is payable at the Designated Office of the Trustee in Grand Rapids, Michigan, upon presentation and surrender of this Bond.

This Bond is one of a duly authorized issue of revenue bonds of the Issuer, aggregating $50,530,000 in principal amount, designated as "New Hope Cultural Education Facilities Finance Corporation Senior Living Revenue Bonds (Bridgemoor Plano Project) Senior Series 2018A (the "Series 2018A Bonds").  Simultaneously with the issuance of the Series 2018A Bonds, the Issuer is issuing $6,765,000 aggregate principal amount of its Senior Living Revenue Bonds (Bridgemoor Plano Project) Taxable Senior Series 2018B (the "Series 2018B Bonds"), $5,000,000 aggregate principal amount of its Senior Living Revenue Bonds (Bridgemoor Plano Project) Subordinate Series 2018C (the "Series 2018C Bonds") and $4,500,000 aggregate principal amount of its Senior Living Revenue Bonds (Bridgemoor Plano Project) Junior Subordinate Series 2018D (the "Series 2018D Bonds") all as more fully set forth in the Indenture (the Series 2018A Bonds, the Series 2018B Bonds, the Series 2018C Bonds and the Series 2018D Bonds are collectively referred to as the "Bonds," and each as a "Series").  The Bonds are issued under and pursuant to the laws of the State, particularly Chapter 337, Texas Local Government Code, as amended (the "Act"), and a Trust Indenture, dated as of December 1, 2018 (as amended and supplemented from time to time, the "Indenture"), between the Issuer and The Huntington National Bank (the "Trustee").

THIS BOND IS A SPECIAL, LIMITED OBLIGATION OF THE ISSUER.  THE BONDS AND THE INTEREST THEREON DO NOT CONSTITUTE NOR GIVE RISE TO A PECUNIARY LIABILITY, GENERAL OR MORAL OBLIGATION OR A PLEDGE OF THE FULL FAITH AND CREDIT OR TAXING POWER OF THE ISSUER, THE TOWN OF NEW HOPE, TEXAS (THE "TOWN"), THE STATE, OR ANY POLITICAL SUBDIVISION OF THE STATE WITHIN THE MEANING OF ANY CONSTITUTIONAL OR STATUTORY LIMITATIONS.  NEITHER THE STATE NOR ANY POLITICAL SUBDIVISION OF THE STATE NOR THE ISSUER NOR THE TOWN SHALL BE OBLIGATED TO PAY THE PRINCIPAL OF THE BONDS, THE INTEREST THEREON OR OTHER COSTS INCIDENT THERETO EXCEPT FROM REVENUES PLEDGED THEREFOR UNDER THE INDENTURE, ALL AS MORE FULLY SET FORTH IN THE INDENTURE.  NEITHER THE FULL FAITH AND CREDIT NOR THE TAXING POWER, IF ANY, OF THE ISSUER, THE TOWN, THE STATE, NOR ANY POLITICAL SUBDIVISION THEREOF, IS PLEDGED TO THE PAYMENT OF THE PRINCIPAL OF THE BONDS OR THE INTEREST THEREON OR OTHER COSTS INCIDENT THERETO.

NO RECOURSE SHALL BE HAD FOR THE PAYMENT OF THE PRINCIPAL OF OR PREMIUM, IF ANY, OR INTEREST ON THIS BOND AGAINST ANY PAST, PRESENT OR FUTURE OFFICER, DIRECTOR, MEMBER, EMPLOYEE OR AGENT OF THE ISSUER, OR OF ANY SUCCESSOR TO THE ISSUER, AS SUCH, EITHER DIRECTLY OR THROUGH THE ISSUER OR ANY SUCCESSOR TO THE ISSUER, UNDER ANY RULE OF LAW OR EQUITY, STATUTE OR CONSTITUTION OR BY THE ENFORCEMENT OF ANY ASSESSMENT OR PENALTY OR OTHERWISE, AND ALL SUCH LIABILITY OF ANY SUCH OFFICERS, DIRECTORS, MEMBERS, EMPLOYEES OR AGENTS, AS SUCH, IS HEREBY EXPRESSLY WAIVED AND RELEASED AS A CONDITION OF, AND CONSIDERATION FOR, THE EXECUTION AND ISSUANCE OF THIS BOND.

The Bonds are subject to mandatory redemption, optional redemption by the Issuer and mandatory sinking fund redemption as set forth in the Indenture.

In certain events, on the conditions, in the manner and with the effect set forth in the Indenture, the principal of all the Bonds then outstanding under the Indenture may become or may be declared due and payable before the stated maturities thereof, together with the interest accrued thereon. In such event, the Senior Bonds shall be entitled to payment in full prior to any payment being made on any other Bonds, and thereafter, the Series 2018C Bonds shall be entitled to payment in full prior to the payment of the Series 2018D Bonds, all as provided in the Indenture.

The Bonds are being issued for the purpose of providing financing for the acquisition, construction and equipping of a 318-unit senior living facility located in the City of Plano, Collin County, Texas (the "Project"), to make deposits to funds and accounts established with respect to the Bonds, and to pay costs in connection with the issuance of the Bonds. The proceeds of the Bonds are being used by the Issuer to finance a loan ("Loan") by the Issuer to BSPV-Plano, LLC (the "Borrower"), a limited liability company organized and existing under the laws of the State, pursuant to a Loan Agreement dated as of December 1, 2018 (as amended and supplemented from time to time, the "Loan Agreement") among the Issuer, the Trustee, and the Borrower. Pursuant to the Loan Agreement, the Borrower is obligated to make payments sufficient to pay principal of, premium, if any, and interest on the Bonds, which obligation is evidenced by promissory notes (the "Series 2018 Notes"). The liability of the Borrower under the Loan Agreement is limited as provided therein.

The Loan associated with the Senior Bonds is secured by a mortgage lien on and security interest in the Project (the "Mortgage"). The Series 2018A Bonds are secured by the assignment of payments made in respect of the applicable Series 2018 Note, which is further secured by the Mortgage. The Bond Fund Accounts for the Series 2018A Bonds and the Debt Service Reserve Account for the Series 2018A Bonds have been specifically pledged and set aside to secure or provide for the payment of principal of and interest on the Series 2018A Bonds.

Reference is hereby made to the Indenture, the Loan Agreement and the Mortgage, copies of which are on file with the Trustee, for the provisions, among others, with respect to the nature and extent of the security, the rights, duties and obligations of the Issuer, the Borrower, the Trustee and the Holders of the Bonds, the terms upon which this Bond is issued, and the terms and conditions upon which this Bond will be deemed to be paid, at or prior to maturity or prepayment of this Bond, upon the making of provision for the payment hereof in the manner set forth in the

Indenture, to all of the terms and conditions of which the Holder of this Bond hereby assents. The Holder of this Bond, by the acceptance hereof, is deemed to have agreed and consented to the terms and provisions of the Indenture, the Loan Agreement and the Mortgage.

It is hereby certified, recited and declared that all acts, conditions and things required by the Constitution and laws of the State to exist, to have happened and to have been performed, precedent to and in the execution and delivery of the Indenture and the issuance of this Bond, do exist, have happened and have been performed in regular and due form as required by law.

Neither the members of the Governing Body of the Issuer nor any person executing this Bond shall be personally liable on this Bond or be subject to any personal liability or accountability by reason of the issuance of this Bond.

This Bond shall not be valid or become obligatory for any purpose or be entitled to any benefit or security under the Indenture unless either (1) the Certificate of Authentication hereon has been executed by the Trustee by manual signature, or (2) the Comptroller's Registration Certificate hereon has been executed by an authorized representative of the Comptroller of Public Accounts of the State of Texas by manual signature.

IN WITNESS WHEREOF, the Issuer has caused this Bond to be executed in its name and on its behalf by the manual or facsimile signature of the President or any Vice President of the Issuer, and has caused its seal or a facsimile thereof to be reproduced hereon and attested by the manual or facsimile signature of the Secretary or any Assistant Secretary of the Issuer.

NEW HOPE CULTURAL EDUCATION
FACILITIES FINANCE CORPORATION

By: _____
     President

Attest:

By: _____
     Secretary

[SEAL]

(b)  Form of Certificate of Authentication[2]

CERTIFICATE OF AUTHENTICATION

This Bond is one of the Bonds described in the Indenture referred to herein.

Date of Authentication: _____

<div align="right">

THE HUNTINGTON NATIONAL BANK, as Trustee

</div>

By: _____
       Authorized Signatory

(c)  Form of Comptroller's Registration Certificate[3]

REGISTRATION CERTIFICATE OF
COMPTROLLER OF PUBLIC ACCOUNTS

| | | |
|---|---|---|
| OFFICE OF THE COMPTROLLER | § | |
| OF PUBLIC ACCOUNTS | § | |
| | § | REGISTER NO. _____ |
| THE STATE OF TEXAS | § | |

I HEREBY CERTIFY that this Bond has been examined, certified as to validity and approved by the Attorney General of the State of Texas, and duly registered by the Comptroller of Public Accounts of the State of Texas.

WITNESS my signature and seal of office this _____.

_____
Comptroller of Public Accounts
of the State of Texas

(SEAL)

---

[2] Do not include on Initial Bond. Include on definitive Bonds.
[3] Include on the Initial Bond. Do not include on definitive Bonds.

(d)   <u>Form of Assignment.</u>

<div align="center">ASSIGNMENT</div>

FOR VALUE RECEIVED the undersigned hereby sells, assigns and transfers unto

_____

<div align="center">(Please print or typewrite Name and Address,<br>including Zip Code, and Federal Taxpayer Identification or<br>Social Security Number of Assignee)</div>

the within Bond and all rights thereunder, and hereby irrevocably constitutes and appoints

_____

attorney to register the transfer of the within Bond on the books kept for registration thereof, with full power of substitution in the premises.

Dated: _____

Signature guaranteed by:

| | |
|---|---|
| NOTICE: Signature must be guaranteed by a member firm of the New York Stock Exchange or a commercial bank of trust company. | NOTICE: The signature to this Assignment must correspond with the name as it appears on the face of the within Bond in every particular, without alteration or enlargement or any change whatsoever. |

.

## EXHIBIT B

### (FORM OF SERIES 2018B BOND)

(a) <u>Form of Bond.</u>

NOTICE: Unless this Bond is presented by an authorized representative of The Depository Trust Company to the Issuer or its agent for registration of transfer, exchange or payment, and any Bonds issued in lieu hereof is registered in the name of Cede & Co. or such other name as requested by an authorized representative of The Depository Trust Company and any payment is made to Cede & Co., ANY TRANSFER, PLEDGE OR OTHER USE HEREOF FOR VALUE OR OTHERWISE BY OR TO ANY PERSON IS WRONGFUL because the registered owner hereof, Cede & Co., has an interest herein.

R-____[4]                                                              $_____

### UNITED STATES OF AMERICA
### STATE OF TEXAS

### NEW HOPE CULTURAL EDUCATION FACILITIES FINANCE CORPORATION
### SENIOR LIVING REVENUE BONDS
### (BRIDGEMOOR PLANO PROJECT)
### TAXABLE SENIOR SERIES 2018B

**THIS BOND AND THE ISSUE OF WHICH IT FORMS A PART ARE NOT GENERAL OBLIGATIONS OF THE ISSUER BUT ARE LIMITED OBLIGATIONS PAYABLE SOLELY FROM THE MONEY AND PROPERTIES PLEDGED FOR PAYMENT HEREOF.**

| <u>MATURITY DATE:</u> | <u>DATED DATE:</u> | <u>INTEREST RATE</u> | <u>CUSIP NO.:</u> |
|---|---|---|---|
| December 1, 2031 | December 1, 2018 | 8.000% | _____ |

REGISTERED OWNER:        CEDE & CO.

PRINCIPAL AMOUNT:        _____ DOLLARS

The NEW HOPE CULTURAL EDUCATION FACILITIES FINANCE CORPORATION (the "Issuer"), a non-profit cultural education facilities finance corporation duly organized and validly existing under the laws of the State of Texas (the "State"), for value received, promises to pay, subject to the provisions hereof and of the Indenture (hereinafter mentioned), to the Registered Owner named above on the Maturity Date specified above, or upon earlier redemption as described

---

[4] The Initial Bond shall be numbered T-1.

herein, the Principal Amount shown above and to pay interest on the unpaid principal amount hereof at the Interest Rate specified above until payment of the principal or redemption price hereof has been made.  Interest on this New Hope Cultural Education Facilities Finance Corporation Senior Living Revenue Bond (Bridgemoor Plano Project) Taxable Senior Series 2018B (this "Bond") is payable on each June 1 and December 1, commencing June 1, 2019 (each such date being hereinafter referred to as an "Interest Payment Date") and on any other date on which payment of principal of this Bond is due.  Interest hereon will be computed on the basis of a 360-day year of twelve 30-day months.

Any term used herein as a defined term but not defined herein shall be as defined in the Indenture.

This Bond is payable in lawful money of the United States of America.  The principal of and premium, if any, on this Bond is payable at the Designated Office of the Trustee in Grand Rapids, Michigan, upon presentation and surrender of this Bond.

This Bond is one of a duly authorized issue of revenue bonds of the Issuer, aggregating $6,765,000 in principal amount, designated as "New Hope Cultural Education Facilities Finance Corporation Senior Living Revenue Bonds (Bridgemoor Plano Project) Taxable Senior Series 2018B (the "Series 2018B Bonds").  Simultaneously with the issuance of the Series 2018B Bonds, the Issuer is issuing $50,530,000 aggregate principal amount of its Senior Living Revenue Bonds (Bridgemoor Plano Project) Senior Series 2018A (the "Series 2018A Bonds"), $5,000,000 aggregate principal amount of its Senior Living Revenue Bonds (Bridgemoor Plano Project) Subordinate Series 2018C (the "Series 2018C Bonds") and $4,500,000 aggregate principal amount of its Senior Living Revenue Bonds (Bridgemoor Plano Project) Junior Subordinate Series 2018D (the "Series 2018D Bonds") all as more fully set forth in the Indenture (the Series 2018A Bonds, the Series 2018B Bonds, the Series 2018C Bonds and the Series 2018D Bonds are collectively referred to as the "Bonds," and each as a "Series").  The Bonds are issued under and pursuant to the laws of the State, particularly Chapter 337, Texas Local Government Code, as amended (the "Act"), and a Trust Indenture, dated as of December 1, 2018 (as amended and supplemented from time to time, the "Indenture"), between the Issuer and The Huntington National Bank (the "Trustee").

THIS BOND IS A SPECIAL, LIMITED OBLIGATION OF THE ISSUER.  THE BONDS AND THE INTEREST THEREON DO NOT CONSTITUTE NOR GIVE RISE TO A PECUNIARY LIABILITY, GENERAL OR MORAL OBLIGATION OR A PLEDGE OF THE FULL FAITH AND CREDIT OR TAXING POWER OF THE ISSUER, THE TOWN OF NEW HOPE, TEXAS (THE "TOWN"), THE STATE, OR ANY POLITICAL SUBDIVISION OF THE STATE WITHIN THE MEANING OF ANY CONSTITUTIONAL OR STATUTORY LIMITATIONS.  NEITHER THE STATE NOR ANY POLITICAL SUBDIVISION OF THE STATE NOR THE ISSUER NOR THE TOWN SHALL BE OBLIGATED TO PAY THE PRINCIPAL OF THE BONDS, THE INTEREST THEREON OR OTHER COSTS INCIDENT THERETO EXCEPT FROM REVENUES PLEDGED THEREFOR UNDER THE INDENTURE, ALL AS MORE FULLY SET FORTH IN THE INDENTURE.  NEITHER THE FULL FAITH AND CREDIT NOR THE TAXING POWER, IF ANY, OF THE ISSUER, THE TOWN, THE STATE, NOR ANY POLITICAL SUBDIVISION THEREOF, IS PLEDGED TO THE

PAYMENT OF THE PRINCIPAL OF THE BONDS OR THE INTEREST THEREON OR OTHER COSTS INCIDENT THERETO.

NO RECOURSE SHALL BE HAD FOR THE PAYMENT OF THE PRINCIPAL OF OR PREMIUM, IF ANY, OR INTEREST ON THIS BOND AGAINST ANY PAST, PRESENT OR FUTURE OFFICER, DIRECTOR, MEMBER, EMPLOYEE OR AGENT OF THE ISSUER, OR OF ANY SUCCESSOR TO THE ISSUER, AS SUCH, EITHER DIRECTLY OR THROUGH THE ISSUER OR ANY SUCCESSOR TO THE ISSUER, UNDER ANY RULE OF LAW OR EQUITY, STATUTE OR CONSTITUTION OR BY THE ENFORCEMENT OF ANY ASSESSMENT OR PENALTY OR OTHERWISE, AND ALL SUCH LIABILITY OF ANY SUCH OFFICERS, DIRECTORS, MEMBERS, EMPLOYEES OR AGENTS, AS SUCH, IS HEREBY EXPRESSLY WAIVED AND RELEASED AS A CONDITION OF, AND CONSIDERATION FOR, THE EXECUTION AND ISSUANCE OF THIS BOND.

The Bonds are subject to mandatory redemption, optional redemption by the Issuer and mandatory sinking fund redemption as set forth in the Indenture.

In certain events, on the conditions, in the manner and with the effect set forth in the Indenture, the principal of all the Bonds then outstanding under the Indenture may become or may be declared due and payable before the stated maturities thereof, together with the interest accrued thereon. In such event, the Senior Bonds shall be entitled to payment in full prior to any payment being made on any other Bonds, and thereafter, the Series 2018C Bonds shall be entitled to payment in full prior to the payment of the Series 2018D Bonds, all as provided in the Indenture.

The Bonds are being issued for the purpose of providing financing for the acquisition, construction and equipping of a 318-unit senior living facility located in the City of Plano, Collin County, Texas (the "Project"), to make deposits to funds and accounts established with respect to the Bonds, and to pay costs in connection with the issuance of the Bonds. The proceeds of the Bonds are being used by the Issuer to finance a loan ("Loan") by the Issuer to BSPV-Plano, LLC (the "Borrower"), a limited liability company organized and existing under the laws of the State, pursuant to a Loan Agreement dated as of December 1, 2018 (as amended and supplemented from time to time, the "Loan Agreement") among the Issuer, the Trustee, and the Borrower. Pursuant to the Loan Agreement, the Borrower is obligated to make payments sufficient to pay principal of, premium, if any, and interest on the Bonds, which obligation is evidenced by promissory notes (the "Series 2018 Notes"). The liability of the Borrower under the Loan Agreement is limited as provided therein.

The Loan associated with the Senior Bonds is secured by a mortgage lien on and security interest in the Project (the "Mortgage"). The Series 2018B Bonds are secured by the assignment of payments made in respect of the applicable Series 2018 Note, which is further secured by the Mortgage. The Bond Fund Accounts for the Series 2018B Bonds and the Debt Service Reserve Account for the Series 2018B Bonds have been specifically pledged and set aside to secure or provide for the payment of principal of and interest on the Series 2018B Bonds.

Reference is hereby made to the Indenture, the Loan Agreement and the Mortgage, copies of which are on file with the Trustee, for the provisions, among others, with respect to the nature and extent of the security, the rights, duties and obligations of the Issuer, the Borrower, the Trustee

and the Holders of the Bonds, the terms upon which this Bond is issued, and the terms and conditions upon which this Bond will be deemed to be paid, at or prior to maturity or prepayment of this Bond, upon the making of provision for the payment hereof in the manner set forth in the Indenture, to all of the terms and conditions of which the Holder of this Bond hereby assents. The Holder of this Bond, by the acceptance hereof, is deemed to have agreed and consented to the terms and provisions of the Indenture, the Loan Agreement and the Mortgage.

It is hereby certified, recited and declared that all acts, conditions and things required by the Constitution and laws of the State to exist, to have happened and to have been performed, precedent to and in the execution and delivery of the Indenture and the issuance of this Bond, do exist, have happened and have been performed in regular and due form as required by law.

Neither the members of the Governing Body of the Issuer nor any person executing this Bond shall be personally liable on this Bond or be subject to any personal liability or accountability by reason of the issuance of this Bond.

This Bond shall not be valid or become obligatory for any purpose or be entitled to any benefit or security under the Indenture unless either (l) the Certificate of Authentication hereon has been executed by the Trustee by manual signature, or (2) the Comptroller's Registration Certificate hereon has been executed by an authorized representative of the Comptroller of Public Accounts of the State of Texas by manual signature.

IN WITNESS WHEREOF, the Issuer has caused this Bond to be executed in its name and on its behalf by the manual or facsimile signature of the President or any Vice President of the Issuer, and has caused its seal or a facsimile thereof to be reproduced hereon and attested by the manual or facsimile signature of the Secretary or any Assistant Secretary of the Issuer.

NEW HOPE CULTURAL EDUCATION
FACILITIES FINANCE CORPORATION

By: _____
    President

Attest:

By: _____
    Secretary

[SEAL]

(b)  Form of Certificate of Authentication[5]

<div align="center">CERTIFICATE OF AUTHENTICATION</div>

This Bond is one of the Bonds described in the Indenture referred to herein.

Date of Authentication: _____

<div align="right">THE HUNTINGTON NATIONAL BANK, as Trustee</div>

By: _____
     Authorized Signatory

(c)  Form of Comptroller's Registration Certificate[6]

<div align="center">REGISTRATION CERTIFICATE OF<br>COMPTROLLER OF PUBLIC ACCOUNTS</div>

| OFFICE OF THE COMPTROLLER | § | |
| OF PUBLIC ACCOUNTS | § | |
| | § | REGISTER NO. _____ |
| THE STATE OF TEXAS | § | |

I HEREBY CERTIFY that this Bond has been examined, certified as to validity and approved by the Attorney General of the State of Texas, and duly registered by the Comptroller of Public Accounts of the State of Texas.

WITNESS my signature and seal of office this _____.

_____
Comptroller of Public Accounts
of the State of Texas

(SEAL)

---

[5] Do not include on Initial Bond.  Include on definitive Bonds.
[6] Include on the Initial Bond.  Do not include on definitive Bonds.

<div align="center">B-6</div>

(d)   <u>Form of Assignment.</u>

<div align="center">ASSIGNMENT</div>

FOR VALUE RECEIVED the undersigned hereby sells, assigns and transfers unto

_____

<div align="center">(Please print or typewrite Name and Address,<br>
including Zip Code, and Federal Taxpayer Identification or<br>
Social Security Number of Assignee)</div>

the within Bond and all rights thereunder, and hereby irrevocably constitutes and appoints

_____

attorney to register the transfer of the within Bond on the books kept for registration thereof, with full power of substitution in the premises.

Dated: _____

Signature guaranteed by:

_____     _____

| NOTICE: Signature must be guaranteed by a member firm of the New York Stock Exchange or a commercial bank of trust company. | NOTICE: The signature to this Assignment must correspond with the name as it appears on the face of the within Bond in every particular, without alteration or enlargement or any change whatsoever. |
|---|---|

# EXHIBIT C

## (FORM OF SERIES 2018C BOND)

(a) <u>Form of Bond.</u>

NOTICE: Unless this Bond is presented by an authorized representative of The Depository Trust Company to the Issuer or its agent for registration of transfer, exchange or payment, and any Bond issued in lieu hereof is registered in the name of Cede & Co. or such other name as requested by an authorized representative of The Depository Trust Company and any payment is made to Cede & Co., ANY TRANSFER, PLEDGE OR OTHER USE HEREOF FOR VALUE OR OTHERWISE BY OR TO ANY PERSON IS WRONGFUL because the registered owner hereof, Cede & Co., has an interest herein.

R-____[7]                                                                          $_____

## UNITED STATES OF AMERICA
## STATE OF TEXAS

## NEW HOPE CULTURAL EDUCATION FACILITIES FINANCE CORPORATION
## SENIOR LIVING REVENUE BONDS
## (BRIDGEMOOR PLANO PROJECT)
## SUBORDINATE SERIES 2018C

**THIS BOND AND THE ISSUE OF WHICH IT FORMS A PART ARE NOT GENERAL OBLIGATIONS OF THE ISSUER BUT ARE LIMITED OBLIGATIONS PAYABLE SOLELY FROM THE MONEY AND PROPERTIES PLEDGED FOR PAYMENT HEREOF.**

| MATURITY DATE: | DATED DATE: | INTEREST RATE | CUSIP NO.: |
|---|---|---|---|
| December 1, 2053 | December 1, 2018 | 10.00% | |

REGISTERED OWNER:     CEDE & CO.

PRINCIPAL AMOUNT:     _____ DOLLARS

The NEW HOPE CULTURAL EDUCATION FACILITIES FINANCE CORPORATION (the "Issuer"), a non-profit cultural education facilities finance corporation duly organized and validly existing under the laws of the State of Texas (the "State"), for value received, promises to pay, subject to the provisions hereof and of the Indenture (hereinafter mentioned), to the Registered Owner named above on the Maturity Date specified above, or upon earlier redemption as described

---

[7] The Initial Bonds shall be numbered T-1.

herein, the Principal Amount shown above and to pay interest on the unpaid principal amount hereof at the Interest Rate specified above until payment of the principal or redemption price hereof has been made. Interest on this New Hope Cultural Education Facilities Finance Corporation Senior Living Revenue Bond (Bridgemoor Plano Project) Series 2018A (this "Bond") is payable on each June 1 and December 1, commencing June 1, 2019 (each such date being hereinafter referred to as an "Interest Payment Date") and on any other date on which payment of principal of this Bond is due. Interest hereon will be computed on the basis of a 360-day year of twelve 30-day months.

Any term used herein as a defined term but not defined herein shall be as defined in the Indenture.

This Bond is payable in lawful money of the United States of America. The principal of and premium, if any, on this Bond is payable at the Designated Office of the Trustee in Grand Rapids, Michigan, upon presentation and surrender of this Bond.

This Bond is one of a duly authorized issue of revenue bonds of the Issuer, aggregating $5,000,000 in principal amount, designated as "New Hope Cultural Education Facilities Finance Corporation Senior Living Revenue Bonds (Bridgemoor Plano Project) Subordinate Series 2018C (the "Series 2018C Bonds"). Simultaneously with the issuance of the Series 2018C Bonds, the Issuer is issuing $50,530,000 aggregate principal amount of its Senior Living Revenue Bonds (Bridgemoor Plano Project) Series 2018A (the "Series 2018A Bonds"), $6,765,000 aggregate principal amount of its Senior Living Revenue Bonds (Bridgemoor Plano Project) Taxable Senior Series 2018B (the "Series 2018B Bonds"), and $4,500,000 aggregate principal amount of its Senior Living Revenue Bonds (Bridgemoor Plano Project) Junior Subordinate Series 2018D (the "Series 2018D Bonds") all as more fully set forth in the Indenture (the Series 2018A Bonds, the Series 2018B Bonds, the Series 2018C Bonds and the Series 2018D Bonds are collectively referred to as the "Bonds," and each as a "Series"). The Bonds are issued under and pursuant to the laws of the State, particularly Chapter 337, Texas Local Government Code, as amended (the "Act"), and a Trust Indenture, dated as of December 1, 2018 (as amended and supplemented from time to time, the "Indenture"), between the Issuer and The Huntington National Bank (the "Trustee").

THIS BOND IS A SPECIAL, LIMITED OBLIGATION OF THE ISSUER. THE BONDS AND THE INTEREST THEREON DO NOT CONSTITUTE NOR GIVE RISE TO A PECUNIARY LIABILITY, GENERAL OR MORAL OBLIGATION OR A PLEDGE OF THE FULL FAITH AND CREDIT OR TAXING POWER OF THE ISSUER, THE TOWN OF NEW HOPE, TEXAS (THE "TOWN"), THE STATE, OR ANY POLITICAL SUBDIVISION OF THE STATE WITHIN THE MEANING OF ANY CONSTITUTIONAL OR STATUTORY LIMITATIONS. NEITHER THE STATE NOR ANY POLITICAL SUBDIVISION OF THE STATE NOR THE ISSUER NOR THE TOWN SHALL BE OBLIGATED TO PAY THE PRINCIPAL OF THE BONDS, THE INTEREST THEREON OR OTHER COSTS INCIDENT THERETO EXCEPT FROM REVENUES PLEDGED THEREFOR UNDER THE INDENTURE, ALL AS MORE FULLY SET FORTH IN THE INDENTURE. NEITHER THE FULL FAITH AND CREDIT NOR THE TAXING POWER, IF ANY, OF THE ISSUER, THE TOWN, THE STATE, NOR ANY POLITICAL SUBDIVISION THEREOF, IS PLEDGED TO THE PAYMENT OF THE PRINCIPAL OF THE BONDS OR THE INTEREST THEREON OR OTHER COSTS INCIDENT THERETO.

NO RECOURSE SHALL BE HAD FOR THE PAYMENT OF THE PRINCIPAL OF OR PREMIUM, IF ANY, OR INTEREST ON THIS BOND AGAINST ANY PAST, PRESENT OR FUTURE OFFICER, DIRECTOR, MEMBER, EMPLOYEE OR AGENT OF THE ISSUER, OR OF ANY SUCCESSOR TO THE ISSUER, AS SUCH, EITHER DIRECTLY OR THROUGH THE ISSUER OR ANY SUCCESSOR TO THE ISSUER, UNDER ANY RULE OF LAW OR EQUITY, STATUTE OR CONSTITUTION OR BY THE ENFORCEMENT OF ANY ASSESSMENT OR PENALTY OR OTHERWISE, AND ALL SUCH LIABILITY OF ANY SUCH OFFICERS, DIRECTORS, MEMBERS, EMPLOYEES OR AGENTS, AS SUCH, IS HEREBY EXPRESSLY WAIVED AND RELEASED AS A CONDITION OF, AND CONSIDERATION FOR, THE EXECUTION AND ISSUANCE OF THIS BOND.

The Bonds are subject to mandatory redemption, optional redemption by the Issuer and mandatory sinking fund redemption and a tender option as set forth in the Indenture.

In certain events, on the conditions, in the manner and with the effect set forth in the Indenture, the principal of all the Bonds then outstanding under the Indenture may become or may be declared due and payable before the stated maturities thereof, together with the interest accrued thereon. In such event, the Senior Bonds shall be entitled to payment in full prior to any payment being made on any other Bonds, and thereafter, the Series 2018C Bonds shall be entitled to payment in full prior to the payment of the Series 2018D Bonds, all as provided in the Indenture.

The Bonds are being issued for the purpose of providing financing for the acquisition, construction and equipping of a 318-unit senior living facility located in the City of Plano, Collin County, Texas (the "Project"), to make deposits to funds and accounts established with respect to the Bonds, and to pay costs in connection with the issuance of the Bonds. The proceeds of the Bonds are being used by the Issuer to finance a loan ("Loan") by the Issuer to BSPV-Plano, LLC (the "Borrower"), a limited liability company organized and existing under the laws of the State, pursuant to a Loan Agreement dated as of December 1, 2018 (as amended and supplemented from time to time, the "Loan Agreement") among the Issuer, the Trustee, and the Borrower. Pursuant to the Loan Agreement, the Borrower is obligated to make payments sufficient to pay principal of, premium, if any, and interest on the Bonds, which obligation is evidenced by promissory notes (the "Series 2018 Notes"). The liability of the Borrower under the Loan Agreement is limited as provided therein.

The Loan associated with the Series 2018C Bonds is secured by a subordinate mortgage lien on and security interest in the Project (the "Mortgage"). The Series 2018C Bonds are secured by the assignment of payments made in respect of the applicable Series 2018 Note, which is further secured by the Mortgage on a subordinate basis to the Senior Bonds. The Bond Fund Account for the Series 2018C Bonds has been specifically pledged and set aside to secure or provide for the payment of principal of and interest on the Series 2018C Bonds.

Reference is hereby made to the Indenture, the Loan Agreement and the Mortgage, copies of which are on file with the Trustee, for the provisions, among others, with respect to the nature and extent of the security, the rights, duties and obligations of the Issuer, the Borrower, the Trustee and the Holders of the Bonds, the terms upon which this Bond is issued, and the terms and conditions upon which this Bond will be deemed to be paid, at or prior to maturity or prepayment of this Bond, upon the making of provision for the payment hereof in the manner set forth in the

Indenture, to all of the terms and conditions of which the Holder of this Bond hereby assents. The Holder of this Bond, by the acceptance hereof, is deemed to have agreed and consented to the terms and provisions of the Indenture, the Loan Agreement and the Mortgage.

It is hereby certified, recited and declared that all acts, conditions and things required by the Constitution and laws of the State to exist, to have happened and to have been performed, precedent to and in the execution and delivery of the Indenture and the issuance of this Bond, do exist, have happened and have been performed in regular and due form as required by law.

Neither the members of the Governing Body of the Issuer nor any person executing this Bond shall be personally liable on this Bond or be subject to any personal liability or accountability by reason of the issuance of this Bond.

This Bond shall not be valid or become obligatory for any purpose or be entitled to any benefit or security under the Indenture unless either (1) the Certificate of Authentication hereon has been executed by the Trustee by manual signature, or (2) the Comptroller's Registration Certificate hereon has been executed by an authorized representative of the Comptroller of Public Accounts of the State of Texas by manual signature.

     IN WITNESS WHEREOF, the Issuer has caused this Bond to be executed in its name and on its behalf by the manual or facsimile signature of the President or any Vice President of the Issuer, and has caused its seal or a facsimile thereof to be reproduced hereon and attested by the manual or facsimile signature of the Secretary or Assistant Secretary of the Issuer.

<div style="margin-left: 40%;">

NEW HOPE CULTURAL EDUCATION
FACILITIES FINANCE CORPORATION


By: _____
     President

</div>

Attest:


By: _____
     Secretary




[SEAL]

(b)  Form of Certificate of Authentication[8]

<div align="center">CERTIFICATE OF AUTHENTICATION</div>

This Bond is one of the Bonds described in the Indenture referred to herein.

Date of Authentication: _____

THE HUNTINGTON NATIONAL BANK, as Trustee

By: _____
        Authorized Signatory

(c)  Form of Comptroller's Registration Certificate[9]

<div align="center">REGISTRATION CERTIFICATE OF
COMPTROLLER OF PUBLIC ACCOUNTS</div>

OFFICE OF THE COMPTROLLER        §
OF PUBLIC ACCOUNTS               §
                                 §      REGISTER NO. _____
THE STATE OF TEXAS               §

I HEREBY CERTIFY that this Bond has been examined, certified as to validity and approved by the Attorney General of the State of Texas, and duly registered by the Comptroller of Public Accounts of the State of Texas.

WITNESS my signature and seal of office this _____.

_____
Comptroller of Public Accounts
of the State of Texas

(SEAL)

---

[8] Do not include on Initial Bond.  Include on definitive Bonds.
[9] Include on the Initial Bond.  Do not include on definitive Bonds.

(d)  <u>Form of Assignment.</u>

<div align="center">ASSIGNMENT</div>

FOR VALUE RECEIVED the undersigned hereby sells, assigns and transfers unto

_____

<div align="center">(Please print or typewrite Name and Address,
including Zip Code, and Federal Taxpayer Identification or
Social Security Number of Assignee)</div>

the within Bond and all rights thereunder, and hereby irrevocably constitutes and appoints

_____

attorney to register the transfer of the within Bond on the books kept for registration thereof, with full power of substitution in the premises.

Dated: _____

Signature guaranteed by:

_____        _____

NOTICE: Signature must be guaranteed by a member firm of the New York Stock Exchange or a commercial bank of trust company.

NOTICE: The signature to this Assignment must correspond with the name as it appears on the face of the within Bond in every particular, without alteration or enlargement or any change whatsoever.

## EXHIBIT D

### (FORM OF SERIES 2018D BOND)

(a) <u>Form of Bond.</u>

NOTICE: Unless this Bond is presented by an authorized representative of The Depository Trust Company to the Issuer or its agent for registration of transfer, exchange or payment, and any Bond issued in lieu hereof is registered in the name of Cede & Co. or such other name as requested by an authorized representative of The Depository Trust Company and any payment is made to Cede & Co., ANY TRANSFER, PLEDGE OR OTHER USE HEREOF FOR VALUE OR OTHERWISE BY OR TO ANY PERSON IS WRONGFUL because the registered owner hereof, Cede & Co., has an interest herein.

R-_____[10]                                                                                             $_____

### UNITED STATES OF AMERICA
### STATE OF TEXAS

### NEW HOPE CULTURAL EDUCATION FACILITIES FINANCE CORPORATION
### SENIOR LIVING REVENUE BONDS
### (BRIDGEMOOR PLANO PROJECT)
### JUNIOR SUBORDINATE SERIES 2018D

**THIS BOND AND THE ISSUE OF WHICH IT FORMS A PART ARE NOT GENERAL OBLIGATIONS OF THE ISSUER BUT ARE LIMITED OBLIGATIONS PAYABLE SOLELY FROM THE MONEY AND PROPERTIES PLEDGED FOR PAYMENT HEREOF.**

| MATURITY DATE: | DATED DATE: | INTEREST RATE | CUSIP NO.: |
|---|---|---|---|
| December 1, 2053 | December 1, 2018 | 12.00% | |

REGISTERED OWNER:        CEDE & CO.

PRINCIPAL AMOUNT:        _____DOLLARS

The NEW HOPE CULTURAL EDUCATION FACILITIES FINANCE CORPORATION (the "Issuer"), a non-profit cultural education facilities finance corporation duly organized and validly existing under the laws of the State of Texas (the "State"), for value received, promises to pay, subject to the provisions hereof and of the Indenture (hereinafter mentioned), to the Registered Owner named above on the Maturity Date specified above, or upon earlier redemption as described

---

[10] The Initial Bonds shall be numbered T-1.

herein, the Principal Amount shown above and to pay interest on the unpaid principal amount hereof at the Interest Rate specified above until payment of the principal or redemption price hereof has been made. Interest on this New Hope Cultural Education Facilities Finance Corporation Senior Living Revenue Bond (Bridgemoor Plano Project) Series 2018A (this "Bond") is payable on each June 1 and December 1, commencing June 1, 2019 (each such date being hereinafter referred to as an "Interest Payment Date") and on any other date on which payment of principal of this Bond is due. Interest hereon will be computed on the basis of a 360-day year of twelve 30-day months.

Any term used herein as a defined term but not defined herein shall be as defined in the Indenture.

This Bond is payable in lawful money of the United States of America. The principal of and premium, if any, on this Bond is payable at the Designated Office of the Trustee in Grand Rapids, Michigan, upon presentation and surrender of this Bond.

This Bond is one of a duly authorized issue of revenue bonds of the Issuer, aggregating $4,500,000 in principal amount, designated as "New Hope Cultural Education Facilities Finance Corporation Senior Living Revenue Bonds (Bridgemoor Plano Project) Junior Subordinate Series 2018D (the "Series 2018D Bonds"). Simultaneously with the issuance of the Series 2018D Bonds, the Issuer is issuing $50,530,000 aggregate principal amount of its Senior Living Revenue Bonds (Bridgemoor Plano Project) Senior Series 2018A (the "Series 2018A Bonds"), $6,765,000 aggregate principal amount of its Senior Living Revenue Bonds (Bridgemoor Plano Project) Taxable Senior Series 2018B (the "Series 2018B Bonds"), $5,000,000 aggregate principal amount of its Senior Living Revenue Bonds (Bridgemoor Plano Project) Subordinate Series 2018C (the "Series 2018C Bonds") all as more fully set forth in the Indenture (the Series 2018A Bonds, the Series 2018B Bonds, the Series 2018C Bonds and the Series 2018D Bonds are collectively referred to as the "Bonds," and each as a "Series"). The Bonds are issued under and pursuant to the laws of the State, particularly Chapter 337, Texas Local Government Code, as amended (the "Act"), and a Trust Indenture, dated as of December 1, 2018 (as amended and supplemented from time to time, the "Indenture"), between the Issuer and The Huntington National Bank (the "Trustee").

THIS BOND IS A SPECIAL, LIMITED OBLIGATION OF THE ISSUER. THE BONDS AND THE INTEREST THEREON DO NOT CONSTITUTE NOR GIVE RISE TO A PECUNIARY LIABILITY, GENERAL OR MORAL OBLIGATION OR A PLEDGE OF THE FULL FAITH AND CREDIT OR TAXING POWER OF THE ISSUER, THE TOWN OF NEW HOPE, TEXAS (THE "TOWN"), THE STATE, OR ANY POLITICAL SUBDIVISION OF THE STATE WITHIN THE MEANING OF ANY CONSTITUTIONAL OR STATUTORY LIMITATIONS. NEITHER THE STATE NOR ANY POLITICAL SUBDIVISION OF THE STATE NOR THE ISSUER NOR THE TOWN SHALL BE OBLIGATED TO PAY THE PRINCIPAL OF THE BONDS, THE INTEREST THEREON OR OTHER COSTS INCIDENT THERETO EXCEPT FROM REVENUES PLEDGED THEREFOR UNDER THE INDENTURE, ALL AS MORE FULLY SET FORTH IN THE INDENTURE. NEITHER THE FULL FAITH AND CREDIT NOR THE TAXING POWER, IF ANY, OF THE ISSUER, THE TOWN, THE STATE, NOR ANY POLITICAL SUBDIVISION THEREOF, IS PLEDGED TO THE PAYMENT OF THE PRINCIPAL OF THE BONDS OR THE INTEREST THEREON OR OTHER COSTS INCIDENT THERETO.

NO RECOURSE SHALL BE HAD FOR THE PAYMENT OF THE PRINCIPAL OF OR PREMIUM, IF ANY, OR INTEREST ON THIS BOND AGAINST ANY PAST, PRESENT OR FUTURE OFFICER, DIRECTOR, MEMBER, EMPLOYEE OR AGENT OF THE ISSUER, OR OF ANY SUCCESSOR TO THE ISSUER, AS SUCH, EITHER DIRECTLY OR THROUGH THE ISSUER OR ANY SUCCESSOR TO THE ISSUER, UNDER ANY RULE OF LAW OR EQUITY, STATUTE OR CONSTITUTION OR BY THE ENFORCEMENT OF ANY ASSESSMENT OR PENALTY OR OTHERWISE, AND ALL SUCH LIABILITY OF ANY SUCH OFFICERS, DIRECTORS, MEMBERS, EMPLOYEES OR AGENTS, AS SUCH, IS HEREBY EXPRESSLY WAIVED AND RELEASED AS A CONDITION OF, AND CONSIDERATION FOR, THE EXECUTION AND ISSUANCE OF THIS BOND.

The Bonds are subject to mandatory redemption, optional redemption by the Issuer and mandatory sinking fund redemption as set forth in the Indenture.

In certain events, on the conditions, in the manner and with the effect set forth in the Indenture, the principal of all the Bonds then outstanding under the Indenture may become or may be declared due and payable before the stated maturities thereof, together with the interest accrued thereon. In such event, the Senior Bonds shall be entitled to payment in full prior to any payment being made on any other Bonds, and thereafter, the Series 2018C Bonds shall be entitled to payment in full prior to the payment of the Series 2018D Bonds, all as provided in the Indenture.

The Bonds are being issued for the purpose of providing financing for the acquisition, construction and equipping of a 318-unit senior living facility located in the City of Plano, Collin County, Texas (the "Project"), to make deposits to funds and accounts established with respect to the Bonds, and to pay costs in connection with the issuance of the Bonds. The proceeds of the Bonds are being used by the Issuer to finance a loan ("Loan") by the Issuer to BSPV-Plano, LLC (the "Borrower"), a limited liability company organized and existing under the laws of the State, pursuant to a Loan Agreement dated as of December 1, 2018 (as amended and supplemented from time to time, the "Loan Agreement") among the Issuer, the Trustee, and the Borrower. Pursuant to the Loan Agreement, the Borrower is obligated to make payments sufficient to pay principal of, premium, if any, and interest on the Bonds, which obligation is evidenced by promissory notes (the "Series 2018 Notes"). The liability of the Borrower under the Loan Agreement is limited as provided therein.

The Series 2018D Bonds are secured by the assignment of payments made in respect of the applicable Series 2018 Note on a subordinate basis to the Senior Bonds and the Series 2018C Bonds. The Bond Fund Account for the Series 2018D Bonds has been specifically pledged and set aside to secure or provide for the payment of principal of and interest on the Series 2018D Bonds.

Reference is hereby made to the Indenture, the Loan Agreement and the Mortgage, copies of which are on file with the Trustee, for the provisions, among others, with respect to the nature and extent of the security, the rights, duties and obligations of the Issuer, the Borrower, the Trustee and the Holders of the Bonds, the terms upon which this Bond is issued, and the terms and conditions upon which this Bond will be deemed to be paid, at or prior to maturity or prepayment of this Bond, upon the making of provision for the payment hereof in the manner set forth in the Indenture, to all of the terms and conditions of which the Holder of this Bond hereby assents. The

Holder of this Bond, by the acceptance hereof, is deemed to have agreed and consented to the terms and provisions of the Indenture, the Loan Agreement and the Mortgage.

It is hereby certified, recited and declared that all acts, conditions and things required by the Constitution and laws of the State to exist, to have happened and to have been performed, precedent to and in the execution and delivery of the Indenture and the issuance of this Bond, do exist, have happened and have been performed in regular and due form as required by law.

Neither the members of the Governing Body of the Issuer nor any person executing this Bond shall be personally liable on this Bond or be subject to any personal liability or accountability by reason of the issuance of this Bond.

This Bond shall not be valid or become obligatory for any purpose or be entitled to any benefit or security under the Indenture unless either (1) the Certificate of Authentication hereon has been executed by the Trustee by manual signature, or (2) the Comptroller's Registration Certificate hereon has been executed by an authorized representative of the Comptroller of Public Accounts of the State of Texas by manual signature.

IN WITNESS WHEREOF, the Issuer has caused this Bond to be executed in its name and on its behalf by the manual or facsimile signature of the President or any Vice President of the Issuer, and has caused its seal or a facsimile thereof to be reproduced hereon and attested by the manual or facsimile signature of the Secretary or Assistant Secretary of the Issuer.

<div style="text-align:right">

NEW HOPE CULTURAL EDUCATION
FACILITIES FINANCE CORPORATION

</div>

By: _____
      President

Attest:

By: _____
   Secretary

[SEAL]

(b)  <u>Form of Certificate of Authentication</u>[11]

<div align="center">CERTIFICATE OF AUTHENTICATION</div>

This Bond is one of the Bonds described in the Indenture referred to herein.

Date of Authentication: _____

<div align="right">THE HUNTINGTON NATIONAL BANK, as Trustee</div>

By: _____
      Authorized Signatory

(c)  <u>Form of Comptroller's Registration Certificate</u>[12]

<div align="center">REGISTRATION CERTIFICATE OF
COMPTROLLER OF PUBLIC ACCOUNTS</div>

| | | |
|---|---|---|
| OFFICE OF THE COMPTROLLER | § | |
| OF PUBLIC ACCOUNTS | § | |
| | § | REGISTER NO. _____ |
| THE STATE OF TEXAS | § | |

    I HEREBY CERTIFY that this Bond has been examined, certified as to validity and approved by the Attorney General of the State of Texas, and duly registered by the Comptroller of Public Accounts of the State of Texas.

    WITNESS my signature and seal of office this _____.

<div align="right">_____
Comptroller of Public Accounts
of the State of Texas</div>

(SEAL)

---

[11] Do not include on Initial Bond.  Include on definitive Bonds.
[12] Include on the Initial Bond.  Do not include on definitive Bonds.

(d)    Form of Assignment.

ASSIGNMENT

FOR VALUE RECEIVED the undersigned hereby sells, assigns and transfers unto

_____

(Please print or typewrite Name and Address,
including Zip Code, and Federal Taxpayer Identification or
Social Security Number of Assignee)

the within Bond and all rights thereunder, and hereby irrevocably constitutes and appoints

_____

attorney to register the transfer of the within Bond on the books kept for registration thereof, with full power of substitution in the premises.

Dated: _____

Signature guaranteed by:

_____    _____

| NOTICE: Signature must be guaranteed by a member firm of the New York Stock Exchange or a commercial bank of trust company. | NOTICE: The signature to this Assignment must correspond with the name as it appears on the face of the within Bond in every particular, without alteration or enlargement or any change whatsoever. |

.

**EXHIBIT E**

TENDER NOTICE

_____, 20__

BSPV- Plano, LLC
4851 Keller Springs Road, Suite 209
Addison, Texas 75001

The Huntington National Bank
40 Pearl Street, NW
Corporate Trust MI-231
Grand Rapids, Michigan 49503

New Hope Cultural Education Facilities Finance Corporation
c/o The Law Offices of James W. Wilson
103 W. Main Street
Allen, Texas 75030

New Hope Cultural Education Facilities Finance Corporation
Senior Living Revenue Bonds
(Bridgemoor Plano Project)
**[**Taxable Senior Series 2018B**][**Subordinate Series 2018C**]**

Ladies and Gentleman:

Pursuant to Section 3.11 of the Trust Indenture, dated as of December 1, 2018, related to the captioned Series 2018___ Bonds, you are hereby advised that _____, the beneficial owner of the above-referenced Series 2018__ Bonds, has elected to exercise its option to have $_____ of the above-referenced Bonds tendered for purchase on _____, 20__.

In the event of any questions, please do not hesitate to contact me at (___) ___-____.

Very truly yours,

_____

By:_____
Name:_____
Title:_____

**EXHIBIT F**

**COSTS OF ISSUANCE ACCOUNT REQUISITION**

The Huntington National Bank, as trustee

      Re:    Bridgemoor Plano Project

      You are requested to disburse funds from the Costs of Issuance Account in the Project Fund pursuant to Section 5.03 of the Trust Indenture, dated as of December 1, 2018 (the "Indenture"), by and between New Hope Cultural Education Facilities Finance Corporation and The Huntington National Bank, as trustee, in the amount(s), to the person(s) and for the purpose(s) set forth in this requisition (this "Requisition"). The terms used in this Requisition and not defined shall have the respective meanings given to those terms in the Indenture.

      REQUISITION NO.: _____
      PAYMENT DUE TO: _____
      AMOUNT(S) TO BE DISBURSED: $_____

      The undersigned, on behalf of BSPV-Plano, LLC, a limited liability company duly organized and existing under the laws of the State of Texas (the "Borrower"), certifies that:

(a) the expenditures for which money is requisitioned by this Requisition represent amount(s) that are properly payable under Section 5.03 of the Indenture and are proper charges against the above referenced fund or account, have not been included in any previous requisition and are set forth in the Schedule attached to this Requisition, with invoices or bills of sale attached for any sums for which payment is due and with evidence of prior payment by the Borrower for any sums for which reimbursement is requested; and

(b) the money requisitioned is not greater than is necessary to meet obligations due and payable or to reimburse the applicable party for funds actually advanced for such costs.

Date:_____

               BSPV-PLANO, LLC
               a Texas limited liability company

                    By:  Spectrum Housing Corporation
                           its managing member

                    By: _____
                        Name:
                        Title:

## EXHIBIT G

## INSURANCE AND TAX ESCROW FUND REQUISITION

The Huntington National Bank, as trustee

      Re:    Bridgemoor Plano Project

      You are requested to disburse funds from the Insurance and Tax Escrow Fund pursuant to Section 5.10 of the Trust Indenture, dated as of December 1, 2018 (the "Indenture"), by and between New Hope Cultural Education Facilities Finance Corporation and The Huntington National Bank, as trustee, in the amount(s), to the person(s) and for the purpose(s) set forth in this requisition (this "Requisition").  The terms used in this Requisition and not defined shall have the respective meanings given to those terms in the Indenture.

      REQUISITION NO.: _____
      PAYMENT DUE TO: _____
      AMOUNT(S) TO BE DISBURSED: $_____

      The undersigned, on behalf of BSPV-Plano, LLC, a limited liability company duly organized and existing under the laws of the State of Texas (the "Borrower"), certifies that:

(a)   the expenditures for which money is requisitioned by this Requisition represent amount(s) that are properly payable under Section 5.10 of the Indenture and are proper charges against the above referenced fund or account, have not been included in any previous requisition and are set forth in the Schedule attached to this Requisition, with invoices or bills of sale attached for any sums for which payment is due and with evidence of prior payment by the Borrower for any sums for which reimbursement is requested; and

(b)   the money requisitioned is not greater than is necessary to meet obligations due and payable or to reimburse the applicable party for funds actually advanced for such costs.

Date:_____

               BSPV-PLANO, LLC
               a Texas limited liability company

               By:  Spectrum Housing Corporation
               its managing member

               By:_____
                 Name:
                 Title:

## EXHIBIT H

## PROPERTY TAX ACCOUNT REQUISITION

The Huntington National Bank, as trustee

      Re:    Bridgemoor Plano Project

      You are requested to disburse funds from the Property Tax Account in the Insurance and Tax Escrow Fund pursuant to Section 5.10 of the Trust Indenture, dated as of December 1, 2018 (the "Indenture"), by and between New Hope Cultural Education Facilities Finance Corporation and The Huntington National Bank, as trustee, in the amount(s), to the person(s) and for the purpose(s) set forth in this requisition (this "Requisition"). The terms used in this Requisition and not defined shall have the respective meanings given to those terms in the Indenture.

      REQUISITION NO.: _____
      PAYMENT DUE TO: _____
      AMOUNT(S) TO BE DISBURSED: $_____

      The undersigned, on behalf of BSPV-Plano, LLC, a limited liability company duly organized and existing under the laws of the State of Texas (the "Borrower"), certifies that:

(a)    the expenditures for which money is requisitioned by this Requisition represent amount(s) that are properly payable under Section 5.10 of the Indenture and are proper charges against the above referenced fund or account, have not been included in any previous requisition and are set forth in the Schedule attached to this Requisition, with invoices or bills of sale attached for any sums for which payment is due and with evidence of prior payment by the Borrower for any sums for which reimbursement is requested; and

(b)    the money requisitioned is not greater than is necessary to meet obligations due and payable or to reimburse the applicable party for funds actually advanced for such costs.

Date:_____

           BSPV-PLANO, LLC
           a Texas limited liability company


           By:  Spectrum Housing Corporation
               its managing member


               By:_____
                 Name:
                 Title:

## EXHIBIT I

REPAIR AND REPLACEMENT FUND REQUISITION

The Huntington National Bank, as trustee

> Re:    Bridgemoor Plano Project

You are requested to disburse funds from the Repair and Replacement Fund pursuant to Section 5.11 of the Trust Indenture, dated as of December 1, 2018 (the "Indenture"), by and between New Hope Cultural Education Facilities Finance Corporation and The Huntington National Bank, as trustee, in the amount(s), to the person(s) and for the purpose(s) set forth in this requisition (this "Requisition").  The terms used in this Requisition and not defined shall have the respective meanings given to those terms in the Indenture.

> REQUISITION NO.:  _____
> PAYMENT DUE TO:  _____
> AMOUNT(S) TO BE DISBURSED: $_____

The undersigned, on behalf of BSPV-Plano, LLC, a limited liability company duly organized and existing under the laws of the State of Texas (the "Borrower"), certifies that:

(a) the expenditures for which money is requisitioned by this Requisition represent amount(s) that are properly payable under Section 5.11 of the Indenture and are proper charges against the above referenced fund or account, have not been included in any previous requisition and are set forth in the Schedule attached to this Requisition, with invoices or bills of sale attached for any sums for which payment is due and with evidence of prior payment by the Borrower for any sums for which reimbursement is requested; and

(b) the money requisitioned is not greater than is necessary to meet obligations due and payable or to reimburse the applicable party for funds actually advanced for such costs.

Date:_____

> BSPV-PLANO, LLC
> a Texas limited liability company
>
>
> By:  Spectrum Housing Corporation
> its managing member
>
>
> By:_____
>     Name:
>     Title: