LOAN AGREEMENT

Dated as of December 1, 2018

between

NEW HOPE CULTURAL EDUCATION FACILITIES FINANCE CORPORATION
as Issuer

and

BSPV-PLANO, LLC
as Borrower

Relating to

$66,795,000
New Hope Cultural Education Facilities Finance Corporation
Senior Living Revenue Bonds
(Bridgemoor Plano Project)

Consisting of:

$50,530,000 Senior Series 2018A
$6,765,000 Taxable Senior Series 2018B
$5,000,000 Subordinate Series 2018C
$4,500,000 Junior Subordinate Series 2018D

The interest of the New Hope Cultural Education Facilities Finance Corporation in this Loan Agreement (except for Reserved Rights of the Issuer) has been assigned to The Huntington National Bank (the "Trustee") under the Trust Indenture of even date herewith, and is subject to the security interest of the Trustee.

EXHIBIT B

# TABLE OF CONTENTS

Page

## ARTICLE I
## DEFINITIONS AND INTERPRETATION

Section 1.1    Definitions ........................................................................................ 2

Section 1.2    Rules of Construction ....................................................................... 2

## ARTICLE II
## REPRESENTATIONS

Section 2.1    Representations and Covenants of the Issuer ..................................... 2

Section 2.2    Representations and Covenants of the Borrower ................................ 3

Section 2.3    Special Purpose Entity Covenants ...................................................... 6

Section 2.4    [Reserved] ......................................................................................... 7

Section 2.5    Special Arbitrage Certifications ......................................................... 7

Section 2.6    Tax Exempt Status of Tax-Exempt Bonds ........................................... 7

Section 2.7    Regulatory Agreement ........................................................................ 7

Section 2.8    Tax Representations, Covenants and Warranties of Borrower .............. 7

## ARTICLE III
## ISSUANCE OF BONDS; LOAN TO BORROWER; RELATED OBLIGATIONS

Section 3.1    Issuance of Series 2018 Bonds; Deposit of Proceeds .......................... 11

Section 3.2    The Loan; Loan Payments; and Additional Payments ......................... 11

Section 3.3    Obligations Unconditional; Limited Recourse .................................... 13

Section 3.4    Assignment of Issuer's Rights ............................................................ 15

Section 3.5    Amounts Remaining in Funds ............................................................. 15

Section 3.6    Borrower Required to Complete Project and Pay if Project Fund Insufficient ...................................................................................... 15

Section 3.7    Security for Payments Under the Series 2018 Bonds ........................... 15

Section 3.8    Warranty of Title ............................................................................... 16

Section 3.9    Title Insurance .................................................................................. 16

Section 3.10   Borrower's Covenants Regarding Title ............................................... 16

Section 3.11   Priority ............................................................................................. 16

## ARTICLE IV
## THE PROJECT

Section 4.1    Acquisition of the Project .................................................................. 17

Section 4.2    Disbursement of Project Fund ............................................................. 17

Section 4.3    Operating Expenses ........................................................................... 18

Section 4.4    Rate Covenant; Coverage .................................................................. 18

Section 4.5    Failure to Meet Rate Covenant; Retention of Management Consultant ............. 19

Section 4.6    Maintenance and Modification of Project; Removal of Equipment ................... 20

Section 4.7    Management of the Project ................................................................. 22

Section 4.8    Forbearance and Deferral of Fees ...................................................... 22

Section 4.9    Taxes and Impositions ...................................................................... 23

Section 4.10    Utilities.......................................................................................... 24

Section 4.11    Hazardous Waste Covenant ............................................................. 24

Section 4.12    Needs Assessment Analysis............................................................. 25

Section 4.13    Trade Payables Covenant................................................................. 26

ARTICLE V
INSURANCE; DAMAGE, DESTRUCTION AND CONDEMNATION; USE OF NET
PROCEEDS

Section 5.1    Required Insurance ........................................................................... 26

Section 5.2    Delivery of Insurance Policies; Payment of Premiums ....................................... 28

Section 5.3    Insurance Proceeds........................................................................... 29

Section 5.4    Disbursement of Insurance Proceeds and Condemnation Awards ..................... 30

Section 5.5    Report of Insurance Consultant; Insurance Commercially Unavailable.............. 32

Section 5.6    Obligation to Continue Payments ........................................................ 32

Section 5.7    Insufficiency of Net Proceeds............................................................. 33

Section 5.8    Cooperation of Issuer ....................................................................... 33

ARTICLE VI
OTHER AGREEMENTS

Section 6.1    Successor to Issuer............................................................................ 33

Section 6.2    Servicing the Loan; Servicing Agreement............................................. 33

Section 6.3    Assignment, Selling and Leasing......................................................... 33

Section 6.4    Continued Existence ......................................................................... 35

Section 6.5    Indemnification ................................................................................ 35

Section 6.6    Recording and Filing......................................................................... 39

Section 6.7    Nonrecourse to Representatives of Issuer............................................. 39

Section 6.8    Amendment of Borrower Documents.................................................... 40

Section 6.9    Financial Statements and Reports ........................................................ 40

Section 6.10   Budget ........................................................................................ 42

Section 6.11   Notices of Certain Events ............................................................... 42

Section 6.12   Inspection of Project Books; Right of Access ................................... 43

Section 6.13   Other Indebtedness ....................................................................... 43

Section 6.14   [Reserved] ................................................................................... 44

Section 6.15   Continuing Disclosure ................................................................... 44

Section 6.16   Related Party Transactions ............................................................ 44

Section 6.17   Purchase of Tax-Exempt Bonds ..................................................... 44

Section 6.18   Release of Certain Land and Subordination; Granting of Easements.................. 44

Section 6.19   Liquidity Covenant ....................................................................... 46

Section 6.20   Occupancy Covenant ..................................................................... 46

Section 6.21   Additional Remedy for Breach of Certain Covenants ........................ 46

Section 6.22   Selection of Consultant ................................................................. 46

Section 6.23   Cumulative Cash Operating Loss Covenant ..................................... 46

Section 6.24   [Reserved] ................................................................................... 47

## ARTICLE VII
## DEFAULTS AND REMEDIES

Section 7.1    Defaults ...................................................................................... 48

Section 7.2    Notice of Default; Opportunity to Cure ........................................... 49

Section 7.3    Remedies ..................................................................................... 49

Section 7.4    No Remedy Exclusive .................................................................... 51

Section 7.5    Attorney's Fees and Expenses ........................................................ 51

Section 7.6    No Additional Waiver Implied by One Waiver .................................. 51

## ARTICLE VIII
## OPTIONS TO TERMINATE AGREEMENT

Section 8.1    Grant of Option to Terminate ......................................................... 51

Section 8.2    Exercise of Option to Terminate ..................................................... 52

## ARTICLE IX
## MISCELLANEOUS

Section 9.1    Confidential Information ................................................................ 52

Section 9.2    Entire Agreement ......................................................................... 53

Section 9.3    Notices ....................................................................................... 53

Section 9.4    Assignments .................................................................................. 53

Section 9.5    Severability ................................................................................... 53

Section 9.6    Execution of Counterparts ........................................................... 53

Section 9.7    Rights of Trustee .......................................................................... 53

Section 9.8    Amendments, Changes and Modifications ................................... 53

Section 9.9    Governing Law .............................................................................. 53

Section 9.10   Term of Agreement ....................................................................... 53

Section 9.11   No Liability of Issuer's Officers ................................................... 54

Section 9.12   Receipt of and Compliance With Indenture .................................. 54

Section 9.13   Usury; Total Interest ..................................................................... 54

Section 9.14   Survival .......................................................................................... 55

Section 9.15   Borrower's Tax Letter of Representation Controls ........................ 55

## ARTICLE X
## LIMITATIONS ON LIABILITY

Section 10.1   Limitation on Liability of the Issuer; Issuer May Rely ................... 55

Section 10.2   Delivery of Reports, Etc ................................................................ 57

EXHIBIT A     Description of the Project and Property Descriptions A-1
EXHIBIT B          Form of Requisition ................................................................. B-1
EXHIBIT C          Form of Compliance Certificate ............................................. C-1
EXHIBIT D          Form of Senior Series 2018A Note .......................................... D-1
EXHIBIT D-1        Form of Taxable Senior Series 2018B Note ........................... D-1-1
EXHIBIT D-2        Form of Subordinate Series 2018C Note ................................ D-2-1
EXHIBIT D-3        Form of Junior Subordinate Series 2018D Note ..................... D-3-1

## LOAN AGREEMENT

THIS LOAN AGREEMENT, dated as of December 1, 2018 (this "Loan Agreement"), is by and between the NEW HOPE CULTURAL EDUCATION FACILITIES FINANCE CORPORATION, a nonprofit cultural education facilities finance corporation duly organized and validly existing under the laws of the State of Texas (together with its successors, the "Issuer"), and BSPV-PLANO, LLC, a limited liability company, created and existing under the laws of the State of Texas (the "Borrower").

### RECITALS:

WHEREAS, the Borrower has requested the assistance of the Issuer to finance the acquisition, construction and equipping of a senior living facility to be known as Bridgemoor Plano Project (as more particularly described herein, the "Project"), located in the City of Plano, Collin County, Texas; and

WHEREAS, the Issuer is authorized by the provisions of Chapter 337, Texas Local Government Code, as amended (the "Act"), to issue one or more series of its revenue bonds and to loan the proceeds thereof to finance the acquisition, construction, and equipping of a senior living facility for use as rental housing; and

WHEREAS, in order to provide such assistance, the Issuer has provided for the issuance, pursuant to a Trust Indenture, dated the date hereof (the "Indenture"), between the Issuer and The Huntington National Bank, as Trustee (the "Trustee"), of the Bonds, including the Series 2018A Bonds, the Series 2018B Bonds, the Series 2018C Bonds and the Series 2018D Bonds, as identified in the Indenture; and

WHEREAS, under this Loan Agreement, the Issuer shall lend the proceeds of the Series 2018 Bonds to the Borrower, and the Borrower is obligated to make loan payments sufficient in time and amount to pay the principal of and premium, if any, and interest on the Series 2018 Bonds; and

WHEREAS, in order to evidence the obligation to make such loan payments, the Borrower has agreed to execute and deliver to the Issuer its promissory notes, one for each series of Series 2018 Bonds, in an original principal amount equal in total to the aggregate principal amount of the Series 2018 Bonds, in substantially the forms attached hereto as Exhibits D, D-1, D-2 and D-3 (the "Series 2018 Notes"); and

WHEREAS, the Bonds issued under the Indenture will be secured by an assignment and pledge of all right, title and interest of the Issuer in and to this Loan Agreement (except for Reserved Rights of the Issuer), the Series 2018 Notes, and, as applicable, a Deed of Trust, Assignment of Rents and Leases, and Security Agreement dated as of December 1, 2018 (the "Mortgage") by the Borrower to the trustee named therein, for the benefit of Issuer and as assigned to the Trustee (the "Mortgage").

NOW, THEREFORE, for and in consideration of the mutual agreements hereinafter contained, and for other consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto agree as follows:

## ARTICLE I

## DEFINITIONS AND INTERPRETATION

Section 1.1    <u>Definitions</u>.  All capitalized terms used herein and defined in the Indenture or in the Regulatory Agreement and Declaration of Restrictive Covenants of even date herewith (as amended and supplemented, the "Regulatory Agreement"), among the Issuer, the Borrower and the Trustee, shall have the meanings ascribed to them in the Indenture or in the Regulatory Agreement, as applicable.

Section 1.2    <u>Rules of Construction</u>.    In this Loan Agreement, unless the context otherwise requires:

(a)    The singular form of any word used herein, including the terms defined in Section 1.01 of the Indenture or in the Regulatory Agreement, shall include the plural, and vice versa.  The use herein of a word of any gender shall include correlative words of all other genders.

(b)    Unless otherwise specified, references to Articles, Sections and other subdivisions of this Loan Agreement are to the designated Articles, Sections and other subdivisions of this Loan Agreement as originally executed.  The words "hereof," "herein," "hereunder" and words of similar import refer to this Loan Agreement as a whole.

(c)    The headings or titles of the several articles and sections, and the table of contents appended to copies hereof, shall be solely for convenience of reference and shall not affect the meaning, construction or effect of the provisions hereof.

(d)    The parties acknowledge that each party to this Loan Agreement and their respective counsel have participated in the drafting and revision of this Loan Agreement and the other Bond Documents.  Accordingly, the parties agree that any rule of construction to the effect that ambiguities are to be resolved against the drafting party shall not apply in the interpretation of this Loan Agreement, any of the other Bond Documents or any amendment or supplement or exhibit hereto or thereto.

## ARTICLE II

## REPRESENTATIONS

Section 2.1    <u>Representations and Covenants of the Issuer</u>.  The Issuer represents and covenants that:

(a)    The Issuer is a nonprofit, cultural education facilities finance corporation duly organized and validly existing under the laws of the State of Texas.  Pursuant to a resolution adopted by the Governing Body of the Issuer, the Issuer has authorized the execution and delivery of the Series 2018 Bonds, the Indenture and the other Bond Documents to which it is a party, and the performance by the Issuer of all of its obligations hereunder and under the Bonds and the other Bond Documents to which it is a party.  The Bond Documents to which it is a party constitute valid, legal, binding, and enforceable obligations of the Issuer (subject to bankruptcy, insolvency or creditor rights laws generally, and principles of equity generally).

(b)       The Issuer finds and determines that the issuance of the Bonds under the Indenture and the acquisition, construction and equipping of the Project by the Borrower will further the purposes of the Act.

(c)       The Issuer finds and determines that the Project is necessary and convenient to construct and furnish an independent senior living community and in so doing provide a community benefit.

(d)       The Issuer has full power and authority to consummate all transactions described in the Bonds and the Bond Documents, and to perform all of its obligations hereunder and thereunder.

(e)       The Issuer has not pledged and covenants that it will not pledge the amounts derived from this Loan Agreement other than to secure the Bonds (except for payment of any amounts owing to the Issuer by virtue of its Reserved Rights, which the Issuer retains).

Section 2.2       Representations and Covenants of the Borrower.  The Borrower hereby represents and covenants as follows:

(a)       The Borrower is a limited liability company, whose managing member is an organization described in Section 501(c)(3) of the Code, created and existing under the laws of the State of Texas, is in good standing and is duly qualified to transact business in the State, is not in violation of any provision of its Organizational Documents, has power to enter into and perform its obligations under the Borrower Documents and has duly authorized the execution and delivery of the Borrower Documents.  The Bond Documents to which it is a party constitute valid, legal, binding, and enforceable obligations of the Borrower (subject to bankruptcy, insolvency or creditor rights laws generally, and principles of equity generally).

(b)       Neither the execution and delivery of the Borrower Documents, the consummation of the transactions described herein and therein, nor the fulfillment of or compliance with the terms and conditions thereof conflict with or result in a breach of the terms, conditions, or provisions of the Borrower's Organizational Documents or any restriction or any agreement or instrument to which the Borrower is now a party or by which the Borrower is bound, or constitutes a default under any of the foregoing, or results in the creation or imposition of any lien, charge or encumbrance whatsoever upon any of the property or assets of the Borrower under the terms of any instrument or agreement, except as provided in the Borrower Documents.

(c)       There is no action, suit, proceeding, inquiry or investigation, at law or in equity, before or by any court, public board or body, pending or, to the best knowledge of the Borrower, threatened against or affecting the Borrower, nor to the best of the knowledge of the Borrower is there any basis therefor, wherein an unfavorable decision, ruling, or finding would materially and adversely affect the transactions described in the Bond Documents or which would adversely affect, in any way, the validity or enforceability of the Bonds or the Bond Documents or any material agreement or instrument to which the Borrower is a party used or contemplated for use in the consummation of the transactions, contemplated hereby.

(d)       The Project is of the type authorized and permitted by the Act.

(e)     The Borrower will not take or permit to be taken any action which would have the effect, directly or indirectly, of causing interest on any of the Tax-Exempt Bonds to be includable in gross income for purposes of federal income taxation.

(f)     The Borrower will use due diligence to cause the Project to be acquired, constructed, equipped, and operated in accordance with the laws, rulings, regulations and ordinances of the State and the departments, agencies and political subdivisions thereof. The Borrower has obtained or will cause to be obtained all requisite consents, licenses, Required Permits (defined herein) and all other authorizations or approvals required from the State or other federal, state, regional and/or local governmental bodies for the acquisition, construction, equipping, occupancy, use and operation of the Project (collectively, "Governmental Approvals"). The Borrower has acquired good title to the Project. As used in this Loan Agreement "Required Permits" shall mean each building permit, environmental permit, certificate of occupancy, utility permit, land use permit, wetland permit, and any other permits, approvals or licenses issuable by any governmental authority required in connection with the construction, equipping, occupancy, use and operation of the Project.

(g)     The Borrower agrees to fully and faithfully perform all the duties and obligations that the Issuer has covenanted and agreed in the Indenture to cause the Borrower to perform and any duties and obligations that the Borrower or the Issuer is required by the Indenture to perform. The foregoing shall not apply to any duty or undertaking of the Issuer, which by its nature, cannot be or has not been delegated or assigned.

(h)     The Borrower agrees to provide to the Issuer all information necessary to enable the Issuer to complete and file all forms and reports required by the laws of the State and the Code in connection with the Project and the Bonds.

(i)     The Borrower acknowledges, represents, and warrants that it understands the nature and structure of the transactions relating to the financing of the Project; that it is familiar with the provisions of all of the documents and instruments relating to such financing to which it or the Issuer is a party or of which it is a beneficiary; that it understands the risks inherent in such transactions, including without limitation the risk of loss of the Project; and that it has not relied on the Issuer for any guidance or expertise in analyzing the financial or other consequences of such financing transactions or otherwise relied on the Issuer in any manner except to issue the Bonds in order to provide funds to lend to the Borrower.

(j)     The Permitted Encumbrances do not and will not materially and adversely affect (1) the ability of the Borrower to pay in full the principal of and interest on the Series 2018 Notes in a timely manner or (2) the current use being made or to be made of the Project, the current or anticipated operation of the Project or the current or future value of the Project.

(k)     The Borrower (1) has no knowledge of any material liability that has been incurred or is expected to be incurred by the Borrower that is or remains unsatisfied for any taxes or penalties with respect to any employee benefit plan, within the meaning of Section 3(3) of ERISA, or any "plan," within the meaning of Section 4975(e)(1) of the Internal Revenue Code or any other benefit plan (other than a multiemployer plan) maintained, contributed to, or required to be contributed to by the Borrower or by any entity that is under common control with the Borrower

within the meaning of ERISA Section 4001(a)(14) (a "Plan") or any plan that would be a Plan but for the fact that it is a multiemployer plan within the meaning of ERISA Section 3 (37); and (2) has made and shall continue to make when due all required contributions to all such Plans, if any. Each such Plan has been and will be administered in compliance with its terms and the applicable action shall be taken or fail to be taken that would result in the disqualification of loss of tax-exempt status of any such Plan intended to be qualified and/or tax-exempt.

(l)     The Borrower has no known material contingent liabilities.

(m)     The Borrower has no material financial obligation under any indenture, mortgage, deed of trust, loan agreement, or other agreement or instrument to which the Borrower is a party or by which the Borrower or the Project is otherwise bound, other than obligations incurred in the ordinary course of the operation of the Project and other than obligations under the Mortgage and the other Bond Documents.

(n)     The Borrower has not borrowed or received other debt financing that has not been heretofore repaid in full.

(o)     The Borrower (1) has not entered into the Loan or any Borrower Document with the actual intent to hinder, delay, or defraud any creditor and (2) received reasonably equivalent value in exchange for its obligations under the Borrower Documents.  Giving effect to the transactions described in the Borrower Documents, the fair saleable value of the Borrower's assets exceeds and will, immediately following the execution and delivery of the Borrower Documents, exceed the Borrower's contingent liabilities.  The fair saleable value of the Borrower's assets is and will, immediately following the execution and delivery of the Borrower Documents, be greater than the Borrower's probable liabilities, including the maximum amount of its contingent liabilities, or its debts as such debts become absolute and matured.  The Borrower's assets do not and, immediately following the execution and delivery of the Borrower Documents, will not constitute unreasonably small capital to carry out its business as conducted or proposed to be conducted.  The Borrower does not intend to, and does not believe that it will, incur debts and liabilities (including, without limitation, contingent liabilities and other commitments) beyond its ability to pay such debts as they mature (taking into account the timing and amounts to be payable on or in respect of obligations of the Borrower).

(p)     The Borrower is not (1) an "investment company" or a company "controlled" by an "investment company," within the meaning of the Investment Company Act of 1940, as amended; or (2) subject to any other federal or state law or regulation that purports to restrict or regulate its ability to borrow money.

(q)     The Project is not located in a flood hazard area as defined by the Federal Insurance Administration.

(r)     There is no proceeding threatened or pending for the total or partial condemnation, appropriation, or recapture of any material portion of the Project that would materially affect the Borrower's performance under the Borrower Documents, or the use, value, or operation of the Project.

(s)     All security deposits collected in connection with the Project are being held (i) in accordance with all applicable laws and (ii) in a segregated eligible account.

(t)     The Project is (1) free and clear of any damage that would materially and adversely affect the use or value of the Project as security for the Loan, (2) in good repair and condition so as not to materially and adversely affect the use or value of the Project as security for the Loan, and (3) all building systems contained therein are in good working order so as not to materially and adversely affect the use or value of the Project as security for the Loan.

(u)     The Project constitutes one or more separate tax parcels.

(v)     The Borrower, or Bond Counsel at the direction of the Borrower, will ensure that Internal Revenue Form 8038 is duly filed, which shall contain the information required to be filed pursuant to Section 149(e) of the Code.

Section 2.3     Special Purpose Entity Covenants.  The Borrower agrees as follows:

(a)     To maintain books and records separate from any other person or entity;

(b)     To maintain its accounts separate from any other person or entity;

(c)     Not to commingle its assets with those of any other person or entity;

(d)     To conduct its own business in its own name;

(e)     To maintain separate financial statements;

(f)     To pay its own liabilities out of its own funds;

(g)     To observe all applicable business organization formalities;

(h)     To pay the salaries of its own employees and maintain a sufficient number of employees in light of its contemplated business operations;

(i)     Not to guarantee or become obligated for the debts of any other entity or hold out its credit as being available to satisfy the obligations of others;

(j)     Not to acquire obligations of its partners, members or shareholders;

(k)     To allocate fairly and reasonably any overhead for shared office space;

(l)     To use separate stationery, invoices and checks;

(m)     Not to pledge its assets for the benefit of any other entity or make any loans or advances to any entity;

(n)     To hold itself out as a separate entity;

(o)     To correct any known misunderstanding regarding its separate identity; and

(p)      To maintain adequate capital in light of its contemplated business operations.

Section 2.4      [Reserved].

Section 2.5      <u>Special Arbitrage Certifications</u>.  In Section 4.09(b) of the Indenture, and subject to the provisions of Section 5.07(g) of the Indenture, the Issuer has covenanted not to cause or direct any money in any Fund or Account under the Indenture to be used in a manner which would cause the Tax-Exempt Bonds to be classified as "arbitrage bonds," within the meaning of Section 148 of the Code.  The Borrower certifies and covenants to and for the benefit of the Issuer and the Holders that, so long as there are any Tax-Exempt Bonds Outstanding, money on deposit in any Fund or Account under the Indenture in connection with the Tax-Exempt Bonds, whether such money was derived from the proceeds of the sale of the Tax-Exempt Bonds or from any other source, will not be used in a manner which will cause the Tax-Exempt Bonds to be classified as "arbitrage bonds," within the meaning of Section 148 of the Code. In furtherance of this covenant, the Issuer covenants to comply with the terms set forth in the Issuer's Certificate as to Tax Exemption.

Section 2.6      <u>Tax Exempt Status of Tax-Exempt Bonds</u>.  The Borrower shall not take any action or omit to take any action which, if taken or omitted, respectively, would adversely affect the excludability of interest on the Tax-Exempt Bonds from the gross income, as defined in section 61 of the Code, of the owners thereof for federal income tax purposes.  The Borrower and the Issuer shall execute such amendments hereof and supplements hereto (and shall comply with the provisions thereof) as may, in the opinion of Bond Counsel, addressed to the Issuer, the Borrower and the Trustee, be necessary to preserve or perfect such exclusion.  The Borrower shall comply with each specific covenant in this Section at all times prior to the last maturity of the Tax-Exempt Bonds, unless and until there shall have been delivered to the Trustee and the Issuer a Favorable Opinion of Bond Counsel and thereafter such covenant shall no longer be binding upon Borrower. All representations, warranties, and certifications made by the Borrower in connection with the delivery of the Bonds on the Closing Date, including, but not limited to, those representations, warranties, and certifications contained in the Borrower's Tax Letter of Representation are and shall be true, correct, and complete in all respects.

Section 2.7      <u>Regulatory Agreement</u>.  In order to maintain the exclusion of interest on the Tax-Exempt Bonds from gross income for purposes of federal income taxation and certain additional requirements of the Issuer, the Borrower hereby agrees that it shall, concurrently with or before the execution and delivery of the Series 2018 Bonds, execute and deliver and cause to be recorded the Regulatory Agreement with respect to the Project.  The Borrower shall comply with every term of the Regulatory Agreement.  The Borrower agrees to cause any amendments to the Regulatory Agreement to be recorded in the appropriate official public records.

Section 2.8      <u>Tax Representations, Covenants and Warranties of Borrower</u>.

(a)      It is the intention of the parties hereto that interest on the Tax-Exempt Bonds shall be and remain excludable from gross income for federal income tax purposes, and, to that end, the covenants and agreements of the Issuer and the Borrower in this Section are for the benefit of the Trustee on behalf of and for each and every owner of the Tax-Exempt Bonds.

(b)      The Borrower covenants and agrees that it will not knowingly use or permit the use of any of the funds provided by the Issuer hereunder or knowingly use or invest or permit the use or investment of any other funds of the Borrower directly or indirectly, or direct the Trustee to invest any funds held by it hereunder or under the Indenture or otherwise, in such manner as would cause any Tax-Exempt Bond to be an "arbitrage bond" within the meaning of section 148 of the Code, a "hedge bond" within the meaning of section 149 of the Code, or "federally guaranteed" within the meaning of section 149(b) of the Code and applicable regulations promulgated from time to time thereunder. The Borrower covenants and agrees that neither it, nor any "related person" (as defined in section 147(a)(2) of the Code) will enter into any arrangement, formal or informal, for the purchase of Tax-Exempt Bonds.  The Borrower covenants and agrees that it will observe and not violate the requirements of section 148 of the Code and any such applicable regulations which, in the opinion of Bond Counsel, are applicable to the Borrower or to the Tax-Exempt Bonds.

(c)      In the event that at any time the Borrower is in receipt of an opinion of Bond Counsel to the effect that for purposes of this Section or the Indenture it is necessary to further restrict or limit the Yield on the investment of any money held by the Trustee under the Indenture beyond those situations and periods outlined in this Loan Agreement or the Issuer's Certificate as to Tax Exemption dated the Closing Date, the Borrower shall notify the Trustee in writing of the limitations which, in the opinion of Bond Counsel, apply to the investment of such funds and instruct the Trustee in writing as to the specific steps to be taken so as to comply with these limitations.

(d)      As additional consideration for the purchase of the Tax-Exempt Bonds by the purchaser thereof and the loan of the money represented thereby, and in order to induce such purchase by measures designed to insure the excludability from gross income of the interest thereon for federal income tax purposes, the Borrower shall deliver to the Trustee, within 25 days after each Computation Date,

(i)      a statement, signed by the Rebate Analyst stating the applicable portion of the Rebate Amount as of such Computation Date which must be paid over to the Treasury Department of the United States of America under section 148(f) of the Code taking into account all Gross Proceeds of the Tax-Exempt Bonds, and

(ii)      if required, an Internal Revenue Service Form 8038-T completed as of such Computation Date and such other Internal Revenue Service forms or other statements or forms required by the Code, Regulations, or other administrative rule, procedure, announcement, or guidelines.

(e)      If the Borrower shall discover or be notified as of any date that any payment made to the United States Treasury pursuant to Section 5.07 of the Indenture shall have failed to satisfy any requirement of the Regulations (whether or not such failure shall be due to any default by the Borrower, the Issuer, or the Trustee), the Borrower shall (i) deliver to the Trustee a brief written explanation of such failure and any basis for concluding that such failure was innocent and (ii) pay to the Trustee (for deposit to the Rebate Fund) and cause the Trustee to pay to the United States Treasury from the Rebate Fund, within 60 days after such discovery or notice, the "correction amount" specified in writing by the Borrower in respect thereof specified in Regulation Section

1.148-3(h) together with the explanation described in the immediately preceding clause (i) and the other documents required by Section 5.07 of the Indenture to accompany such payment from the Rebate Fund.

(f)     The Borrower shall retain as part of the official transcript all of its accounting records relating to the funds held under the Indenture and the Rebate Fund and all calculations made in preparing the statements described in this Section for at least six years after the final payment of the Tax-Exempt Bonds, whether by reason of maturity or prior redemption.

(g)     The Borrower shall not knowingly use or permit the use of any proceeds of Tax-Exempt Bonds or any funds of the Borrower, directly or indirectly, in any manner, and shall not knowingly take or permit to be taken any other action or actions which would conflict with the covenants contained herein or in the Regulatory Agreement.  The Borrower acknowledges that such covenants are designed for the purpose of ensuring that the Tax-Exempt Bonds are treated as an obligation described in section 103(a) of the Code.

(h)     Notwithstanding any provisions of this Section, if the Borrower shall provide to the Trustee and the Issuer an opinion of Bond Counsel that any specified action required under this Section or Sections 4.09 and 5.07 of the Indenture is no longer required or that some further or different action is required to maintain the exclusion from gross income for purposes of federal income taxation of interest on the Tax-Exempt Bonds, the Trustee, the Issuer and the Borrower may conclusively rely on such opinion in complying with the requirements of this Section and Sections 4.09 and 5.07 of the Indenture and be protected in so doing, and the covenants hereunder shall be deemed to be modified to that extent.

(i)     The Issuer covenants and agrees that it has not taken and will not take, or permit to be taken by parties within its control, and the Borrower covenants and agrees that it has not taken or permitted to be taken and will not take or permit to be taken, any action which will cause the interest on the Tax-Exempt Bonds to become includable in gross income for purposes of federal income taxation pursuant to the provisions of section 103(a) of the Code, provided that neither the Borrower nor the Issuer shall have violated these covenants if the interest on any of the  Tax-Exempt Bonds issued in accordance with section 103 of the Code becomes includable in gross income for purposes of federal income taxation to a person solely because such person is a "substantial user" of the Project or a "related person" within the meaning of section 147(a) of the Code.

(j)     The Borrower hereby covenants that the Project and each unit thereof constitute and will constitute a qualified residential rental project, as defined in section 142(d) of the Code and the regulations thereunder, and that each residential unit in the Project (other than a reasonable number of units for resident manager or other administrative use) will be rented or available for rental on a continual basis to members of the general public for the period required by said section. The Project consists of one or more proximate buildings or structures containing one or more similarly constructed accommodations containing separate and complete facilities for living, sleeping, eating, cooking and sanitation which are to be used on other than a transient basis and facilities which are functionally related and subordinate to such accommodations.  The Borrower and the Issuer each hereby elect to apply the requirements of section 142(d)(1)(B) to the Project. Commencing on the Closing Date and continuing throughout the remainder of the Qualified

Project Period, the Borrower represents, covenants and agrees that no less than 20% of the total number of units of the Project shall be, at all times, rented to and occupied by Low Income Tenants.

(k)     The Borrower further agrees that it shall not discriminate on the basis of race, creed, color, sex or national origin in the lease, use or occupancy of the Project or in connection with the employment or application for employment of persons for the construction, operation and management of the Project.

(l)     The Borrower further covenants that it has not executed and will not execute any other agreement, or any amendment or supplement to any other agreement, with provisions contradictory to, or in opposition to, the provisions hereof and of the Regulatory Agreement and that, in any event, the requirements of this Loan Agreement and the Regulatory Agreement are paramount and controlling as to the rights and obligations herein set forth and supersede any other requirements in conflict herewith and therewith.

(m)     The Borrower further covenants that it will not allow any proceeds of the Tax-Exempt Bonds to be used to provide any airplane, skybox or other private luxury box, health club facility, facility primarily used for gambling or facilities the primary purpose of which is the sale of alcoholic beverages for consumption off premises.

(n)     The Borrower covenants and agrees not to allow the amount of Gross Proceeds invested during any Tax-Exempt Bond year in Nonpurpose Investments with a Yield in excess of the Yield on the Tax-Exempt Bonds to exceed the amounts deposited in any other reserves required to be deposited or otherwise set aside by the Borrower to the extent that such amounts exceed 10% of the proceeds of the Tax-Exempt Bonds; and provided, further, that amounts invested in the Bond Fund or for an initial temporary period until needed for the governmental purpose of the Tax-Exempt Bonds shall at no time be considered subject to such restriction.

(o)     The Borrower covenants and agrees that with regard to the Bond Fund (i) such fund will be depleted at least once a year, except possibly for a carryover amount not to exceed the greater of the previous Tax-Exempt Bond year's earnings on the Bond Fund or one-twelfth of the previous Tax-Exempt Bond year's Debt Service Requirements on the Tax-Exempt Bonds; (ii) all amounts deposited to such fund will be spent within 13 months of deposit; and (iii) all amounts received from investment of such fund will be deposited therein and will be expended within twelve months of receipt.

(p)     As of the Closing Date, the Borrower is in compliance with all requirements pertaining to the Borrower set forth in the Issuer's Certificate as to Tax Exemption. The Borrower has complied and will comply with all the terms and conditions of the Borrower's Tax Letter of Representation executed by the Borrower, including the terms and conditions of the exhibits thereto, and the representations set forth in the Borrower's Tax Letter of Representation executed by the Borrower pertaining to the Borrower and the Project are true and accurate.

ARTICLE III

ISSUANCE OF BONDS; LOAN TO BORROWER;
RELATED OBLIGATIONS

Section 3.1    <u>Issuance of Series 2018 Bonds; Deposit of Proceeds</u>.  To provide funds to assist the Borrower in financing the acquisition, construction and equipping of the Project, the Issuer, concurrently with the execution and delivery of this Loan Agreement, and upon satisfaction of the conditions to the delivery of the Series 2018 Bonds set forth in Section 2.07 of the Indenture, will issue, sell and deliver the Series 2018 Bonds and will deposit the proceeds of the Series 2018 Bonds with the Trustee in accordance with Section 5.02 of the Indenture.

Section 3.2    <u>The Loan; Loan Payments; and Additional Payments</u>.

(a)    <u>The Loan</u>.  The Issuer agrees, upon the terms and conditions herein, to lend to the Borrower the proceeds received by the Issuer from the sale of the Series 2018 Bonds by causing such proceeds to be deposited with the Trustee for disposition as provided in the Indenture.  The obligation of the Issuer to make the Loan shall be deemed fully discharged upon the deposit of the proceeds of the Series 2018 Bonds with the Trustee.  The Loan shall be in a principal amount equal to the initial principal amount of the Series 2018 Bonds and evidenced by the Series 2018 Notes.

(b)    <u>Deposit of Project Revenues; Loan Payments; and Additional Payments</u>.  The Borrower shall pay (or cause the Manager to pay) all Project Revenues from the Project to the Trustee for deposit in the Revenue Fund and application in accordance with Article V of the Indenture.  The Project Revenues shall be used to pay the Loan Payments and the Additional Payments, as provided in this Section 3.2(b), in such lawful money of the United States of America as at the time of payment shall be legal tender for the payment of public and private debts.  The Borrower herby grants to the Trustee, for the benefit of the Persons secured by the lien of the Indenture, a security interest in the Project Revenues, and all money, securities, and obligations held for the credit of the Revenue Fund, as security for payment of the Loan Payments and the Additional Payments.

(i)    <u>Loan Payments</u>.  The Project Revenues shall be used to pay, as Loan Payments, the following amounts in accordance with Article V of the Indenture:

1.    on or before the 15th day of each month, commencing January, 2019 until such time as the principal of and the premium, if any, and interest on, the Bonds shall have been paid in full, or provisions made for such full payment in accordance with the provisions of the Indenture, to the Trustee for deposit in the order of priority set forth in the Indenture in the respective Interest Accounts in the Bond Fund provided for in the Indenture, a sum equal to the Interest Requirement on then Outstanding Bonds for such month; and

2.    on or before the 15th day of each month, commencing January, 2019 until such time as the principal of and the premium, if any, and interest on, the Bonds shall have been paid in full, or provisions made for such full payment in accordance with the provisions of the Indenture, to the Trustee for deposit in the order of priority set forth in the Indenture in the respective Principal Accounts in

the Bond Fund, a sum equal to the Principal Requirement on then Outstanding Bonds for such month.

The monthly installments of Loan Payments described in (1) and (2) above payable by the Borrower under this Loan Agreement shall in any event be equal in the aggregate to an amount that, with other funds in the respective Accounts in the Bond Fund then available for such payment, shall be sufficient to provide for the payment in full of the interest and premium, if any, on and principal of the Bonds as they become due and payable.

Except as otherwise provided in the Indenture, the Project Revenues shall also be used to pay, as Loan Payments, to the Trustee for deposit in the Bond Fund, such amounts as shall, together with any other money available therefor, be sufficient to pay all amounts, if any, required to redeem each Series of Bonds pursuant to the provisions of Article III of the Indenture as and when they become subject to redemption pursuant thereto, together with any related redemption premium associated therewith, all such payments to be made by the Borrower to the Trustee, for deposit into the related Bond Fund Accounts on or before the date such payments are required by said provisions of the Indenture.

(ii) <u>Additional Payments</u>. In addition to the Loan Payments, the Project Revenues shall be used to pay the following costs and expenses (to the extent such costs and expenses are not paid from the proceeds of the sale of the Bonds), in accordance with Article V of the Indenture, which costs and expenses are the Additional Payments:

1. any amounts required to be deposited in the respective Debt Service Reserve Accounts in order to satisfy the applicable Debt Service Reserve Requirement or to restore the balance on deposit in the applicable Debt Service Reserve Account to the related Debt Service Reserve Requirement;

2. amounts sufficient to maintain balances in the Insurance and Tax Escrow Fund (excluding the Property Tax Account), the Operating Fund, the Repair and Replacement Fund, the Administration Fund, and the Operations and Maintenance Reserve Fund, equal to the amounts required pursuant to the Indenture;

3. the Issuer's Fees and Expenses and all amounts advanced by the Issuer under authority of the Indenture or any of the Borrower Documents that the Borrower is obligated to repay;

4. the Ordinary Trustee's Fees and Expenses and the Extraordinary Trustee's Fees and Expenses, all amounts advanced by the Trustee under authority of the Indenture or any of the Borrower Documents that the Borrower is obligated to repay;

5. the Dissemination Agent Fee;

6. the Rebate Analyst Fee, and if a deposit is required to be made to the Rebate Fund as a result of any calculation made by such Rebate Analyst, the

amount of such deposit to the Rebate Fund in accordance with the terms of the Indenture;

       7.      the Management Fee; and

       8.      the fees and expenses of any Servicer engaged pursuant to Section 6.2 hereof.

       (iii)    <u>Miscellaneous</u>.  In the event the Borrower shall fail to pay, or fail to cause to be paid, any Loan Payments or Additional Payments as required by this Section 3.2(b) (except to the extent amounts due under Section 3.2(b) are paid from amounts on deposit in a Debt Service Reserve Account, the Repair and Replacement Fund or the Surplus Fund), the amount not paid shall continue as an obligation hereunder of the Borrower until the unpaid amount shall have been fully paid.  In addition, the Borrower shall pay, or cause to be paid, the amounts pursuant to Sections 3.2(b)(i) and 3.2(b)(ii)(3) and (4) with interest thereon at the Default Rate from the date of non-payment until the date so paid.  The requirement that interest be paid at the Default Rate shall be in addition to and not in lieu of any other remedy that may exist for the failure of the Borrower to make the payments required in this Section 3.2.

The Borrower shall pay, or cause to be paid, in accordance with the terms of this Section 3.2, the Loan Payments and Additional Payments without any further notice thereof.

The Borrower shall be permitted to distribute, free and clear of any and all liens or encumbrances on, or right to recovery of, such funds hereunder, to any Person any funds properly disbursed to the Borrower from the Surplus Fund subject to the terms and provisions of the Indenture.

       Section 3.3    <u>Obligations Unconditional; Limited Recourse</u>.  The Borrower agrees that all Loan Payments required to be made under this Loan Agreement will be paid directly to the Trustee for the account of the Issuer.  Such obligation and the other obligations of the Borrower to make the payments required in Section 3.2 and other Sections hereof and to perform and observe the other agreements contained herein shall be absolute and unconditional and shall not be subject to any defense or any right of setoff, counterclaim or recoupment arising out of any breach by the Issuer or the Trustee of any obligation to the Borrower whether hereunder or otherwise, or out of any Indebtedness or liability at any time owing to the Borrower by the Issuer or the Trustee. Until such time as the principal of and premium, if any, and interest on the Bonds shall have been fully paid or provision for the payment thereof shall have been made in accordance with the Indenture, the Borrower (a) will not suspend or discontinue any payments provided for in Section 3.2 hereof, (b) will perform and observe all other agreements contained in this Loan Agreement, and (c) except as provided in Article VIII hereof, will not terminate this Loan Agreement for any cause, including, without limiting the generality of the foregoing, failure of the Borrower to complete the acquisition, construction and equipping of the Project, the occurrence of any acts or circumstances that may constitute failure of consideration, destruction of or damage to the Project, the taking by eminent domain of title to or temporary use of any or all of the Project, commercial frustration of purpose, any change in the tax or other laws of the United States of America or of the State or any political subdivision of either or any failure of the Issuer or the Trustee to perform and observe

any agreement, whether express or implied, or any duty, liability or obligation arising out of or connected with this Loan Agreement or otherwise. On account of the assignment of substantially all of the rights of the Issuer under this Loan Agreement to the Trustee by virtue of the Indenture, the Trustee will have all rights and remedies herein accorded to the Issuer (except for Reserved Rights), but shall not have assumed any obligation of the Issuer hereunder or under any of the Bond Documents, and any reference herein to the Issuer will be deemed, with the necessary changes in detail, to include the Trustee, and the Trustee and the Bondholders are deemed to be and are third party beneficiaries of the representations, covenants, and agreements of the Borrower (but not any obligation of the Issuer) herein contained. Pursuant to the Indenture, the lien on the real property included in the Project and the security interest in the personal property included in the Project granted to the Issuer pursuant to the Mortgage will be assigned to the Trustee as security for the payment of the Series 2018 Bonds.

Nothing contained in this Section shall be construed to release the Issuer from the performance of any of the agreements on its part herein contained, and in the event the Issuer or the Trustee fails to perform any such agreement on its part, the Borrower may institute such action against the Issuer or the Trustee as the Borrower may deem necessary to compel performance so long as such action does not abrogate the obligations of the Borrower contained in the first sentence of this Section. The Borrower may, at its own cost and expense and in its name or in the name of the Issuer and with proper notice to the Issuer, prosecute or defend any action or proceeding or take any other action involving third persons which the Borrower deems reasonably necessary in order to secure or protect the Borrower's right of possession, occupancy and use of the Project, and in such event the Issuer hereby agrees to cooperate fully with the Borrower, at the Borrower's sole cost and expense, and to take all action necessary to effect the substitution of the Borrower for the Issuer in any such action or proceeding if the Borrower shall so request.

Notwithstanding the foregoing or any other provision or obligation to the contrary contained in this Loan Agreement or any other Bond Document, with the exception of any and all indemnities provided in the Bond Documents, which such indemnities shall be a general obligation of the Borrower, (a) the liability of the Borrower under this Loan Agreement and the other Bond Documents to any person or entity, including, but not limited to, the Trustee or the Issuer and their successors and assigns, is limited to the Borrower's interest in the Project, the Project Revenues and the amounts held in the Funds and Accounts created under the Indenture or other Bond Documents or any rights of the Borrower under any guarantees relating to the Project, and such persons and entities shall look exclusively thereto, to such other security as may from time to time be given for the payment of obligations arising out of this Loan Agreement or any other agreement securing the obligations of the Borrower under this Loan Agreement; and (b) from and after the date of this Loan Agreement, no deficiency or other personal judgment, nor any order or decree of specific performance (other than pertaining to this Loan Agreement, any agreement pertaining to the Project or any other agreement securing the Borrower's obligations under this Loan Agreement), shall be rendered against the Borrower nor any member of the Borrower, the assets of the Borrower (other than the Borrower's interest in the Project, this Loan Agreement, amounts held in the Funds and Accounts created under the Indenture, any rights of the Borrower under the Bond Documents or any rights of the Borrower under any guarantees relating to the Project), its officers, directors or members or their heirs, personal representatives, successors, transferees assigns, as the case may be, in any action or proceeding arising out of this Loan Agreement and

the Indenture or any agreement securing the obligations of the Borrower under this Loan Agreement, or any judgment, order or decree rendered pursuant to any such action or proceeding.

Section 3.4    Assignment of Issuer's Rights.  As security for the payment of the Bonds, the Issuer in the Indenture assigns to the Trustee certain of the Issuer's rights under this Loan Agreement and the Mortgage, including the right to receive payments hereunder and thereunder (except for any deposits to the Rebate Fund and the Reserved Rights), and the Borrower hereby assents to such assignment and agrees to make payments directly to the Trustee, without defense or set off by reason of any dispute between the Borrower and the Issuer or the Trustee. By virtue of such assignment and certain obligations of the Borrower to the Trustee, the Trustee shall have the right to enforce the obligations of the Borrower hereunder and thereunder, subject to the limitations hereof and thereof, including the limitations in Section 3.3.

Section 3.5    Amounts Remaining in Funds.  It is agreed by the parties hereto that after (a) payment in full of the Bonds, or provision for such payment having been made as provided in the Indenture, (b) payment of all fees, charges and expenses of the Trustee in accordance with the terms of the Indenture, and (c) payment of all other amounts required to be paid under this Loan Agreement and the Indenture, any amounts remaining in the Funds and Accounts held by the Trustee under the Indenture, subject to the application of money in the Rebate Fund as provided herein, shall be applied by the Trustee as provided in Section 5.16 of the Indenture. The Issuer shall have no claim to such amounts.

Section 3.6    Borrower Required to Complete Project and Pay if Project Fund Insufficient.  The Borrower shall complete the Project and pay that portion of the Costs of completing the Project as may be in excess of the money available therefor in the Project Fund.  In the event the money in the Project Fund available for payment of the amounts described in Section 5.03 of the Indenture is insufficient to pay such amounts in full, the Borrower agrees to pay such insufficiency.  The Issuer does not make any warranty, either express or implied, that the money which will be paid into the Project Fund and which, under the provisions of this Loan Agreement, will be available for payment of the Costs of the Project, will be sufficient to pay all the costs which will be incurred in that connection.  The Borrower agrees that if, after exhaustion of the money in the Project Fund, the Borrower pays any portion of the such Costs of the Project pursuant to the provisions of this Section, it will not be entitled to any reimbursement therefor from the Issuer or from the Trustee or from the Holders of any of the Bonds, nor will it be entitled to any diminution of the loan payments payable under Section 3.2 hereof.  The obligation of the Borrower to complete the acquisition, construction and equipping of the Project will survive any termination of this Loan Agreement.

Section 3.7    Security for Payments Under the Series 2018 Bonds.  Contemporaneously with the issuance of the Series 2018 Bonds, as security for the payment of the Bonds, the Issuer will execute and deliver the Indenture, under the terms of which all of the right, title, interest, and remedies of the Issuer in this Loan Agreement (except the Reserved Rights), the Series 2018 Notes and the Mortgage, together with all revenues and amounts to be received and all property to be held by the Issuer thereunder, will be assigned and will be the subject of a grant of a security interest to the Trustee and will be pledged as security for, among other things, the payment of the Series 2018 Bonds. The Borrower hereby consents to such assignment and grant of a security interest.

Section 3.8    Warranty of Title.  The Borrower warrants that (a) it has acquired, or simultaneously with the issuance of the Series 2018 Bonds will acquire, good and indefeasible fee simple title to the Mortgaged Property, (b)  the Borrower is or will be the legal owner of all real and personal property included in the Project, and (c) the Project is and will be free from all adverse claims, security interests, and encumbrances, other than Permitted Encumbrances.  The Borrower will not suffer any liens to exist upon the Project as a result of any claims brought against the Borrower pursuant to a right or interest not existing in connection with or as permitted by this Loan Agreement or the Mortgage.

Section 3.9    Title Insurance.  The Borrower, prior to or simultaneously with the issuance of the Series 2018 Bonds, will furnish to the Trustee a commitment in writing, acceptable to the Issuer, to issue the Title Policy.  The Borrower will furnish to the Trustee within the time limit specified in any binder an original of the Title Policy.  The Title Policy shall be acceptable to the Issuer and will insure that the Trustee has a valid lien on the real property described in Exhibit "A" to the Mortgage subject only to Permitted Encumbrances.  There will be deleted from the Title Policy (to the extent legally obtainable) the standard Texas Land Title Association exceptions for discrepancies, encroachments, overlaps, conflicts in boundary lines, servitudes, shortages in area, or other matters which would be disclosed by an accurate survey and inspection of the Mortgaged Property, for mechanics' and materialmen's liens, or for rights or claims of parties in possession and easements or claims of easements not shown by the public records.  Any Net Proceeds payable either to the Issuer or the Borrower under the Title Policy will be subject to the lien of the Indenture, will be paid to the Trustee, and held by the Trustee in the Project Fund, and, at the Borrower's written direction, will be either (a) used to acquire or construct replacement or substitute property within the area of operation of the Issuer for that to which title has been lost, or (b) used to redeem Series 2018 Bonds pursuant to Section 3.01 of the Indenture. Any proceeds of the Title Policy remaining after the Series 2018 Bonds are no longer Outstanding will be paid to the Borrower.

Section 3.10    Borrower's Covenants Regarding Title.  The Borrower agrees to protect, preserve, and defend its interest in the Project and its title thereto, to appear and defend such interest and title in any action or proceeding affecting or purporting to affect the Project, the liens of the Mortgage thereon, or any of the rights of the Trustee thereunder, and to pay on demand all costs and expenses reasonably incurred by the Trustee in or in connection with any such action or proceeding, including reasonable attorneys' fees and expenses, whether any such action or proceeding progresses to judgment and whether brought by or against the Trustee. The Trustee will be reimbursed for any such costs and expenses in accordance with the provisions of Section 6.14 hereof.  If the Borrower does not take the action contemplated herein, the Trustee or Issuer may, but will not be under any obligation to, appear or intervene in any such action or proceeding and retain counsel therein and defend the same or otherwise take such action therein as it may be advised and may settle or compromise the same.

Section 3.11    Priority.  The Series 2018 Bonds and the related Notes' payment shall be secured by a lien on the Project under the Mortgage and in the manner and in the priority described in the Indenture.

ARTICLE IV

THE PROJECT

Section 4.1    <u>Acquisition of the Project</u>.  The Borrower's interest in any land, buildings and equipment, to be acquired or constructed with the proceeds of the Series 2018 Bonds or amounts deposited in the Project Fund shall be a part of the Project, shall belong to and be the property of the Borrower, and shall be subject to this Loan Agreement.

The Borrower agrees that it has or will acquire the Project prior to or simultaneously with issuance of the Series 2018 Bonds, substantially in accordance with the description set forth in Exhibit A hereto, and the Borrower agrees to use its best efforts to cause the acquisition of the Project to be completed as of the Closing Date and construction and equipping of the Project to be completed as soon as practicable and with all reasonable dispatch following the Closing Date.

Section 4.2    <u>Disbursement of Project Fund</u>.  Amounts in the Project Fund shall be disbursed by the Trustee as provided in the Indenture, upon delivery by the Borrower to the Trustee of a requisition, substantially in the form attached hereto as Exhibit B, executed by a Borrower Representative and approved by the Construction Consultant setting forth the nature of the amounts to be paid and the name of the payee and certifying that the amounts being paid are Costs of the Project.  The execution of each requisition submitted for disbursements by the Borrower shall constitute the certification, warranty, and agreement of the Borrower as follows:

(a)    the Project is free and clear of all liens and encumbrances except Permitted Encumbrances;

(b)    all evidence, statements, and other writings required to be furnished under the terms of this Loan Agreement, the Mortgage and the Indenture are true and omit no material fact, the omission of which may make them misleading;

(c)    all money previously disbursed from the Project Fund has been used solely to pay for costs allowed by this Loan Agreement (or to reimburse the Borrower for such costs previously paid by the Borrower), and the Borrower has written evidence to support this item of warranty;

(d)    none of the items for which payment is requested has formed the basis for any payment previously made from the Project Fund;

(e)    all bills for labor, materials, and fixtures used, or on hand and to be used, in the construction or equipping of the Project have been paid or will be paid from the proceeds of such disbursement;

(f)    Borrower shall have provided the Trustee with copies of all Required Permits and all other Governmental Approvals then needed in connection with the Project; and

(g)    Payment of the cost for which payment is requested will not violate any representation, warranty, or covenant of the Borrower in this Loan Agreement, the Regulatory Agreement or the Borrower's Tax Letter of Representation.

Section 4.3    Operating Expenses.  The Borrower agrees to pay when due all Operating Expenses.  The Borrower agrees to review and approve invoices for Operating Expenses on a timely basis.  Except when an Event of Default under Section 8.01(a) of the Indenture or a Default under this Loan Agreement has occurred and is continuing, the Borrower (or Manager) shall be entitled to request the disbursement from the Operating Fund of the monthly Budgeted Operating Requirements by the Trustee to fund the cost of operating the Project as provided in Section 5.08 of the Indenture.

The Borrower shall establish and maintain an Operating Account in a federally insured financial institution.  Money transferred from the Operating Fund to the Operating Account pursuant to Section 5.08 of the Indenture shall be held in the Operating Account and solely used by the Borrower or the Manager to pay Operating Expenses.  Amounts on deposit in the Operating Account in excess of the amount needed to pay or be reserved to pay actual Operating Expenses shall be transferred by the Borrower to the Trustee for deposit in the Revenue Fund.  Any balance in the Operating Account at such time that transfers from the Operating Fund to the Operating Account are not permitted pursuant to Section 5.08 of the Indenture shall be promptly transferred by the Borrower to the Trustee for deposit in the Operating Fund.

If actual Operating Expenses in any month exceed the Budgeted Operating Requirement for that month, the Borrower may requisition from the Operations and Maintenance Reserve Fund or the Surplus Fund the amount of such excess in the manner provided in Section 5.09 and Section 5.13 of the Indenture (and simultaneously provide copies of any requisition or related writing to the Issuer, the Underwriter and the Dissemination Agent).  However, if there are two such requests by the Borrower in any fiscal quarter that are in excess of 10% of the Budgeted Operating Requirement in any month, then prior to making the second request (i) the Borrower must notify the Trustee, the Issuer, the Underwriter and the Dissemination Agent in writing; and (ii) the Borrower must prepare or cause the Manager to prepare a written report that describes the reasons for the additional expenses and the circumstances surrounding the additional expenses and provide such report to the Trustee, the Issuer, the Underwriter and the Dissemination Agent.  If the Borrower ascertains that the actual expenses with respect to the Project in any month will continue to exceed the Budgeted Operating Requirement for that month, then the Borrower will prepare or cause the Manager to prepare a revised written Budget for the upcoming 12-month period which reflects the actual Operating Expenses in connection with the Project and provide such written Budget to the Trustee, the Issuer and the Underwriter.

On or before the earlier of 18 months after the Closing Date or the date of receipt of the final certificate of occupancy for the Project from the City of Plano, Texas, the Borrower will deposit $2,000,000 with the Trustee which amount shall be deposited to the Operations and Maintenance Reserve Fund and used as provided in Section 5.09 of the Indenture.

Section 4.4    Rate Covenant; Coverage.  The Borrower covenants and agrees to operate the Project as a revenue producing senior living facility, to charge such fees and rates for its facilities and services, and to exercise such skill and diligence as will provide Revenue Available for Debt Service, together with other available funds, sufficient to pay promptly all Operating Expenses and expenses of maintenance and repair of the Project and to provide all payments required to be made by the Borrower under this Loan Agreement.

Such rates, fees, and charges in each Fiscal Year of the Borrower will be sufficient to produce a Debt Service Coverage Ratio for the Senior Bonds of not less than 1.20 for the Fiscal Year ending December 31, 2021 and for each Fiscal Year thereafter, provided that principal and interest payable on any Indebtedness will not be included in the computation of Debt Service for the Senior Bonds to the extent that such principal and interest is payable from the proceeds of any Indebtedness. If, based upon the annual financial statements of the Borrower required by Section 6.9 hereof, for any Fiscal Year such Debt Service Coverage Ratio for the Senior Bonds was not maintained, the Borrower agrees to employ promptly a Financial Consultant for purposes of obtaining a report of such firm containing recommendations as to changes in the operating policies of the Borrower designed to maintain such Debt Service Coverage Ratio for the Senior Bonds and to follow such recommendations. No default under this paragraph will occur if a Debt Service Coverage Ratio for the Senior Bonds of at least 1.00 is maintained and if such recommendations are followed notwithstanding that such Debt Service Coverage Ratio for the Senior Bonds is not subsequently re-attained, but the Borrower will continue to be obligated to employ a Financial Consultant for such purpose until the required Debt Service Coverage Ratio for the Senior Bonds is re-attained. After two (2) consecutive years of not meeting the Debt Service Coverage Ratio for the Senior Bonds following December 31, 2021, the Controlling Holders of the Senior Bonds may replace the Financial Consultant and/or Management Consultant.

The Borrower further covenants and agrees that from time to time as often as necessary and to the extent permitted by law, it will revise the rates, fees, and charges aforesaid in such manner as may be necessary so that its Revenue Available for Debt Service on the Senior Bonds will be sufficient to meet the requirements of this Loan Agreement, and further, that it will take all action within its power to obtain approvals of any regulatory or supervisory authority to implement any rates, fees, and charges required in order to comply with the provisions of this Loan Agreement.

Section 4.5    Failure to Meet Rate Covenant; Retention of Management Consultant. If the Coverage Test for any Fiscal Year beginning on or after January 1, 2021 is not satisfied, but the Debt Service Coverage Ratio for the Senior Bonds is equal to or greater than 1.00 on all Outstanding Senior Bonds, the Borrower shall retain a Management Consultant. Payment of the fees of the Management Consultant shall be deemed an Operating Expense. The Management Consultant shall prepare recommendations with respect to the operations of the Project and the sufficiency of the rates, fees and charges imposed by the Borrower.

The Management Consultant's report shall (a) include the projection of the Project Revenues, Operating Expenses and Net Income Available for Debt Service on the Senior Bonds on a quarterly basis for not less than the next two Fiscal Years, and (b) make such recommendations to the Borrower as the Management Consultant believes are appropriate to enable the Borrower to increase the Debt Service Coverage Ratio for the Senior Bonds to satisfy the Coverage Test for the current Fiscal Year. If, in the judgment of the Management Consultant, it is not possible for the Borrower to meet such requirements, the report of the Management Consultant shall so indicate and shall project the Debt Service Coverage Ratio for the Senior Bonds which could be achieved if the recommendations of the Management Consultant are followed. Continuous retention of a Management Consultant during the years that are the subject of the Management Consultant's report shall not be required, however, if a Borrower Representative delivers a certificate to the Trustee within 45 days after the end of each calendar quarter, setting

forth the actual results for such quarter (which may be based on unaudited financial statements) and stating that such results show that the Debt Service Coverage Ratio for the Senior Bonds as projected by the Management Consultant is being met. The Borrower shall, to the extent lawful, feasible and compliant with the Regulatory Agreement, follow the recommendations of the Management Consultant.

So long as the Debt Service Coverage Ratio for the Senior Bonds is equal to or greater than 1.00 on all Outstanding Senior Bonds for any Fiscal Year, failure of the Borrower to satisfy the Coverage Test covenant shall not constitute a Default under this Loan Agreement unless (a) the Borrower fails to engage the Management Consultant or, (b) the Borrower fails to implement its reasonable recommendations, to the extent possible and to the extent consistent with the charitable mission of the Borrower, as required by this Loan Agreement.

Section 4.6    <u>Maintenance and Modification of Project; Removal of Equipment</u>.  The Borrower agrees that during the term of this Loan Agreement it will at its own expense (i) keep the Project in a safe condition, (ii) keep the buildings and all other improvements forming a part of the Project in good repair and in good operating condition, making from time to time, subject to the provisions of this Section 4.6, all necessary and proper repairs thereto and renewals and replacements thereof, including external and structural repairs, renewals, and replacements, and (iii) use the Equipment in the regular course of its business only, within the normal capacity of the Equipment, without abuse, and in a manner described in the manufacturer's warranty thereof, and cause the Equipment to be maintained in accordance with the manufacturer's then currently published standard maintenance contract and recommendations. The Borrower may, also at its own expense, from time to time make any Modifications to the Project it may deem desirable for its business purposes that do not adversely affect the operation or value of the Project, and provided further, that such Modifications shall not cause the Debt Service Coverage Ratio for the Senior Bonds to fall below the required Coverage Test for any Series of Senior Bonds. Prior to making any such Modifications, the Borrower shall certify in writing to the Trustee, the Issuer and the Underwriter that such Modifications do not adversely affect the operations or value of the Project, and as to proposed Modifications which require changes to the engineering plans approved for the Project by the City of Plano, or alter the number or size or square footage of type of units, spaces, or Project amenities described in the initial offering document related to the Bonds. Borrower shall also include with such certification a written statement from an Independent Architect that the Modifications do not adversely affect the operations or value of the Project.

The Borrower will execute a conditional assignment directing the Architect who has prepared any plans and specifications for any Modifications to make available to the Trustee a complete set of the plans and specifications, which assignment will be effective only upon a Default hereunder by the Borrower. Each construction contract executed by the Borrower for construction of any Modifications must contain a provision that, or by separate agreement such contractors must agree that, upon a Default by the Borrower hereunder, such contracts with the contractors and/or sub-contractors will be deemed assigned to the Trustee should the Trustee, in its sole and absolute discretion, so direct and in which case the Trustee may (but shall not be obligated to) agree to be responsible for the carrying out of all the terms and conditions thereof in place of the Borrower in such contracts. The Borrower covenants to include such conditional assignments in all Modifications, contracts and subcontracts executed for work to be performed on the Mortgaged Property.

The Borrower further agrees that at all times during the construction of Modifications which cost in excess of $100,000, the construction contract for such Modifications must be on a "fixed" or "guaranteed maximum price" basis and the Borrower must maintain or cause to be maintained in full force and effect Builder's Risk-Completed Value Form insurance for the full insurable value of such Modifications.  The Borrower will not permit any mechanics' or materialmen's or other statutory liens to be perfected or remain against the Project for labor or materials furnished in connection with any Modifications so made by it, provided that it will not constitute a Default hereunder upon such lien being filed, if the Borrower notifies promptly the Trustee, in writing, of any such liens, and the Borrower in good faith and in accordance with applicable law contests promptly such liens in the same manner as is provided for the contest of Impositions in Section 4.9 hereof; and in such event the Borrower may permit the items so contested to remain undischarged and unsatisfied during the period of such contest and any appeal therefrom.

The Borrower will not do or permit others under its control to do any work in or about the Project or related to any repair, rebuilding, restoration, replacement, alteration of, or addition to the Project, or any part thereof, unless the Borrower has first procured and paid for all requisite municipal and other governmental permits and authorizations.  All such work must be done in a good and workmanlike manner and in compliance with all applicable building, zoning, and other laws, ordinances, governmental regulations, and requirements and in accordance with the requirements, rules, and regulations of all insurers under the policies required to be carried under the provisions of Article V hereof.

If no Default under this Loan Agreement has happened and is continuing, in any instance where the Borrower in its discretion determines that any items of Equipment or parts thereof have become inadequate, obsolete, worn out, unsuitable, undesirable, or unnecessary, the Borrower may remove such items of Equipment or parts thereof from the Mortgaged Property and sell, trade in, exchange, or otherwise dispose of them (as a whole or in part) without any responsibility or accountability to the Issuer therefor, provided that the Borrower will:

(a)     Substitute and install anywhere in the Project items of replacement Equipment or related property (if such replacement Equipment or related property is necessary for the operation of the Project) having equal or greater value or utility (but not necessarily having the same function) in the operation of the Project for the purpose for which it is intended, provided such removal and substitution will not impair the nature of the Project, all of which replacement Equipment or related property will be free of all liens, security interests, and encumbrances (other than Permitted Encumbrances), will become subject to the security interest of the Mortgage, and will be held by the Borrower on the same terms and conditions as the items originally constituting Equipment, or

(b)     In the case of (i) the sale of any such Equipment, (ii) the trade-in of such Equipment for other machinery, furnishings, equipment, or related property not to become part of the Equipment and subject to the security interest of the Mortgage, or (iii) any other disposition thereof, the Borrower will pay to the Trustee the proceeds of such sale or disposition  (after deducting the reasonable expenses of any such sale, trade-in or other disposition) or an amount equal to the credit received upon such trade-in for deposit into the applicable Special Redemption Account of the Bond Fund. In the case of the sale, trade-in, or other disposition of any such

Equipment to the Borrower, or an Affiliate, the Borrower will pay to the Trustee an amount equal to the greater of the amounts and credits received therefor or the fair market value thereof at the time of such sale, trade-in, or other disposition (as certified in writing by the Borrower, with written evidence of the basis therefor) for deposit into the applicable Special Redemption Account of the Bond Fund.

Except to the extent that amounts are deposited into the Bond Fund as provided in the preceding subsection (b), the removal from the Project of any portion of the Equipment pursuant to the provisions of this Section will not entitle the Borrower to any abatement or diminution of the Loan Payments or Additional Payments payable under Section 3.2 hereof.

If prior to such removal and disposition of items of Equipment from the buildings and the Mortgaged Property, the Borrower has acquired and installed machinery, furnishings, equipment, or related property with its own funds which become part of the Equipment and subject to the security interest of the Mortgage and which have equal or greater utility, but not necessarily the same functions, as the Equipment to be removed, the Borrower may take credit to the extent of the amount so spent by it against the requirement that it either substitute and install other machinery and equipment having equal or greater value or that it make payment to the Trustee for deposit into the applicable Special Redemption Account of the Bond Fund.

The Borrower will report promptly, in writing, to the Trustee of each such removal, substitution, sale, or other disposition referred to in subsection (b) of this Section and will pay to the Trustee such amounts as are required by the provisions of subsection (b) of this Section to be paid promptly into the Special Redemption Account of the Bond Fund after the sale, trade-in, or other disposition requiring such payment.  No such report and payment need be made, however, until the amount to be paid into the applicable Special Redemption Account of the Bond Fund on account of all such sales, trade-ins, or other dispositions not previously reported in the aggregate has a value of at least $50,000. All amounts deposited in the Special Redemption Account of the Bond Fund pursuant to this Section 4.6 will be used to redeem Series 2018 Bonds pursuant to Section 3.02 of the Indenture on the earliest date Series 2018 Bonds can be redeemed at par.  The Borrower will not remove, or permit the removal of, any of the Equipment from the buildings or Mortgaged Property except in accordance with the provisions of this Section 4.6.  The Trustee is not responsible for verifying or validating any amounts received pursuant to this Section 4.6.

Section 4.7    Management of the Project.  The Borrower hereby agrees that during the term of the Loan Agreement if Lifestyle Property Management, Inc., the initial manager of the Project, ceases to serve as manger, the Borrower will employ promptly and at all times thereafter employ an experienced manager of senior living facilities that manages, and has for the past five years managed, at least 1,000 senior living facility units.

Section 4.8    Forbearance and Deferral of Fees.  The Borrower hereby agrees that it, any member of the Borrower, and any Manager which is an Affiliate of the Borrower, shall forbear from taking any management, administration, development or other fees, or any portions thereof, in the event and to the extent that moneys in the Revenue Fund are insufficient in any month to make all current and deferred deposits (other than deposits to the Surplus Fund) provided in the Indenture, that such fees will be deferred upon the occurrence of the events set forth in the Indenture, and that the payment of such fees will be made in accordance with Sections 5.04 and

5.13 of the Indenture. The Borrower agrees that any Management Agreement entered into with respect to the Project during the term of this Loan Agreement shall be subject to this Section and shall contain provisions consistent herewith.

Section 4.9    Taxes and Impositions.

(a)    Subject to paragraph (c) of this Section 4.9, the Borrower agrees to pay, prior to delinquency, all real property taxes and assessments, general and special, and all other taxes and assessments of any kind or nature whatsoever, which are assessed or imposed upon the Project, or become due and payable, and which create, may create or appear to create a lien upon the Project, or any part thereof, or upon any personal property, Equipment or other facility used in the operation or maintenance thereof (all of which taxes, assessments and other governmental and non-governmental charges of like nature are hereinafter referred to as "Impositions"); provided, however, that if, by law, any such Imposition is payable, or may at the option of the taxpayer be paid, in installments, the Borrower may pay the same together with any accrued interest on the unpaid balance of such Imposition in installments as the same become due and before any fine, penalty, interest or cost may be added thereto for the nonpayment of any such installment and interest. Payments made by the Trustee on behalf of the Borrower from funds held under the Indenture in the Insurance and Tax Escrow Fund shall, to the extent of such payments, discharge the Borrower's obligations hereunder.

(b)    If at any time after the date hereof there shall be assessed or imposed (i) a tax or assessment on the Project in lieu of or in addition to the Impositions payable by the Project pursuant to subparagraph (a) hereof or (ii) a license fee, tax or assessment imposed on the Trustee and measured by or based, in whole or in part, upon the amount of the outstanding Notes, then all such taxes, assessments or fees shall be deemed to be included within the term "Impositions," as defined in subparagraph (a) hereof, and the Borrower shall pay and discharge the same as herein provided with respect to the payment of Impositions.

(c)    Subject to the applicable State law provisions, the Borrower shall have the right before any delinquency occurs to contest or object to the amount or validity of any Imposition by appropriate legal proceedings, but this right shall not be deemed or construed in any way as relieving, modifying, or extending the Borrower's covenant to pay any such Imposition at the time and in the manner provided in this Section 4.9, unless the Borrower (a) has given prior written notice to the Trustee of the Borrower's intent to so contest or object to an Imposition, and (b) at the Trustee's sole absolute option and discretion, (i) the Borrower shall demonstrate to the Trustee's satisfaction that the legal proceedings shall conclusively operate to prevent the sale of the Project, or any part thereof, to satisfy such Imposition prior to final determination of such proceedings; (ii) the Borrower shall furnish a good and sufficient bond or surety as requested by and satisfactory to the Trustee; or (iii) the Borrower shall have provided a good and sufficient undertaking as may be required or permitted by law and to the Trustee's satisfaction to accomplish a stay of such proceedings.

(d)    The Borrower shall deposit or cause to be deposited with the Trustee into the Insurance and Tax Escrow Fund amounts sufficient to pay the annual Impositions as set forth in the Budget to be next due on the Project, in accordance with the provisions of the Indenture.  The Borrower further agrees to cause all bills, statements or other documents relating to Impositions to

be sent or mailed directly to the Trustee.  The Trustee has no responsibility to review the validity of the bills, statements or other documents submitted for payment but may rely conclusively on such bills, statements or other documents as submitted.  Upon receipt of such bills, statements or other documents, and provided the Borrower has deposited or caused to be deposited sufficient funds pursuant to this Section 4.9(d), the Trustee shall, so long as no Default has occurred and be continuing hereunder, pay such amounts as may be due thereunder out of the Insurance and Tax Escrow Fund.  If any time and for any reason the Trustee has actual knowledge that the funds so deposited are or will be insufficient to pay such amounts as may then or subsequently be due, the Trustee shall promptly notify the Borrower, and the Borrower shall immediately deposit or cause to be deposited an amount equal to such deficiency with, or as directed by, the Trustee, which deposit may be from amounts available in the Surplus Fund.  If the Borrower fails to deposit or cause to be deposited sums sufficient to fully pay such Impositions at least 30 days before delinquency thereof, the Trustee shall transfer to the Insurance and Tax Escrow Fund from the Surplus Fund the amount of such deficiency, if available in the Surplus Fund.  In addition the Trustee may, at the Trustee's election, but without any obligation to do so, advance any amounts required to make up the deficiency, from other Funds held by the Trustee under the Indenture (excluding the Rebate Fund) which advances, if any, shall be secured by the Mortgage and shall be repayable to the Trustee as herein elsewhere provided.

(e)     The Borrower covenants and agrees not to suffer, permit or initiate the joint assessment of the real and personal property or any other procedure whereby the lien of the real property taxes and the lien of the personal property taxes shall be assessed, levied or charged to the Project as a single lien.

Section 4.10   Utilities.  The Borrower shall pay, or cause to be paid, when due, all utility charges which are incurred for the benefit of the Project or which may become a charge or lien against the Project for gas, electricity, water or sewer services furnished to the Project and all other taxes, assessments or charges of a similar nature, whether public or private, affecting the Project or any portion thereof, whether or not such taxes, assessments or charges are liens thereon.

Section 4.11   Hazardous Waste Covenant.  In addition to and without limitation of all other representations, warranties and covenants made by the Borrower under this Loan Agreement, the Borrower further represents, warrants and covenants that the Borrower will not use Hazardous Substances on, from or affecting the Project in any manner which violates Environmental Laws, and that to the best of the Borrower's knowledge, no tenant, subtenant, prior tenant, prior subtenant, prior owner or prior manager have used Hazardous Substances on, from, or affecting the Project in any manner which violates any Environmental Law. Without limiting the foregoing, the Borrower shall not cause or permit the Project or any part thereof to be used to generate, manufacture, refine, transport, treat, store, handle, dispose of, transfer, produce or process Hazardous Substances, except in compliance with all Environmental Laws, nor shall the Borrower cause or knowingly permit, as a result of any intentional act or omission on the part of the Borrower, the Manager or any tenant or subtenant, a release of Hazardous Substances onto the Project. The Borrower shall comply with and require compliance by the Manager and all tenants and subtenants with all Environmental Laws and, shall obtain and comply with, and require that the Manager and all tenants and subtenants obtain and comply with, any and all approvals, registrations or permits required thereunder.  The Borrower shall conduct and complete all investigations, studies, sampling and testing, and all remedial, removal and other action required

by a governmental authority under any applicable Environmental Law to clean up and remove all Hazardous Substances on, from or affecting the Project in accordance with all applicable federal, State and local laws, ordinances, rules and regulations. The Borrower shall defend, indemnify and hold harmless the Issuer, the Underwriter, and the Trustee from and against any claims, demands, penalties, fines, liabilities, settlements, damages, costs or expenses of whatever kind or nature, known or unknown, contingent or otherwise, arising out of, or in any way related to, (a) the presence, disposal, release or threatened release of any Hazardous Substances which are on or from the Project which affect the soil, water, vegetation, buildings, personal property, persons, animals or otherwise, (b) any personal injury (including wrongful death) or property damage (real or personal) arising out of or related to such Hazardous Substances on or from the Project, and/or (c) any violation of laws, orders, regulations, requirements or demands of government authorities, or written requirements of the Issuer and the Trustee, which are based upon or in any way related to such Hazardous Substances or Environmental Laws, including, without limitation, reasonable attorney and consultant fees and expenses, investigation and laboratory fees, court costs and litigation expenses. In the event the Project is foreclosed upon, or a deed in lieu of foreclosure is tendered, the Borrower shall deliver the Project in a manner and condition that shall conform with all applicable federal, State and local laws, ordinances, rules or regulations affecting the Project, including but not limited to Environmental Laws. The provisions of this paragraph shall be in addition to any and all other obligations and liabilities the Borrower may have to the Issuer and the Trustee at common law or under the Bond Documents, and shall survive the termination of this Loan Agreement and defeasance of the Bonds.

The indemnifications and protections set forth in this Section shall be extended, with respect to the Issuer, to its Governing Body, officers, employees, agents and persons under the Issuer's control or supervision, with respect to the Trustee and the Underwriter, to any of their respective directors, officers, employees, agents and persons under their control or supervision.

Anything to the contrary in this Loan Agreement notwithstanding, the covenants of the Borrower contained in this Section shall remain in full force and effect after the termination of this Loan Agreement and the defeasance of the Bonds until the later of (a) the expiration of the period stated in the applicable statute of limitations during which a claim or cause of action may be brought and (b) payment in full or the satisfaction of such claim or cause of action and of all expenses and charges incurred by the Issuer or the Trustee relating to the enforcement of the provisions herein specified.

For the purposes of this Section, the Borrower shall not be deemed an employee, agent or servant of the Issuer, the Underwriter or the Trustee or a person under the Issuer's, the Underwriter's or the Trustee's control or supervision.

Section 4.12    Needs Assessment Analysis. The Borrower will contract for a Needs Assessment Analysis to be prepared with respect to the Project every 5 years from the date of this Loan Agreement and then will submit copies of the report to the Trustee. The Needs Assessment Analysis must be conducted and prepared by a reputable consulting engineer and that, in the objective and reasonable opinion of the Borrower, is experienced in conducting needs assessment analyses for multifamily projects. Such Needs Assessment Analysis shall identify the major maintenance requirements (including the replacement of machinery and appliances), for the next 5 years and the estimated costs thereof and include recommendations for (a) the monthly amount

to be deposited to the Repair and Replacement Fund and (b) the Replacement Reserve Requirement. The Borrower shall revise the Replacement Reserve Requirement (and advise the Trustee in writing of the revised Replacement Reserve Requirement) based on the recommendation of the consulting engineer and the Borrower shall promptly implement any recommendations contained in the Needs Assessment Analysis to the maximum extent practicable.

Section 4.13    Trade Payables Covenant. The Borrower covenants (the "Trade Payables Covenant") that, commencing with the first full fiscal quarter following the issuance of the Series 2018 Bonds, it shall maintain at least 80% of its trade accounts payable at less than 60 days, provided that any trade account payable that is the subject of a bona fide dispute, the resolution of which is being diligently pursued by the Borrower, shall be excluded from such computation. For the purposes of this Section "trade accounts" means those trade accounts payable with respect to the operation of the Project as determined by generally accepted accounting principles.

(a)    Testing Compliance. Compliance with the Trade Payables Covenant shall be tested by the Borrower: (i) at the end of each fiscal quarter based on the Borrower's unaudited financial statements required pursuant to Section 6.9(a)(i) hereof, and (ii) at the end of each Fiscal Year based on the Borrower's Audited Financial Statements required pursuant to Section 6.9(a)(ii) hereof.

(b)    Failure to Meet Trade Payables Covenant. If the Trade Payables Covenant is not met at the end of any fiscal quarter or Fiscal Year, the Borrower shall, within 60 days of receipt of the financial statement showing such deficiency, complete a report setting forth in detail the reasons for such deficiency and shall adopt a specific plan setting forth steps designed to meet the Trade Payables Covenant by the end of the second quarter following the date such report and plan are required to be completed and file the same with the Trustee. If at the end of such second quarter the Borrower is still not in compliance with the Trade Payables Covenant, the Borrower shall employ a Management Consultant within 45 days of the end of such second calendar quarter. The Management Consultant shall, within 90 days of its engagement by the Borrower, prepare recommendations with respect to the operations of the Project such that the Borrower will comply with the Trade Payables Covenant. No Default hereunder shall occur if the Borrower's plan and, if required, the Management Consultant's recommendations, are delivered and followed (to the extent possible and consistent with the charitable mission of the Borrower) pursuant to this Section.

ARTICLE V

INSURANCE; DAMAGE, DESTRUCTION AND CONDEMNATION;
USE OF NET PROCEEDS

Section 5.1    Required Insurance. The Borrower shall procure and maintain continuously in effect during the term of this Loan Agreement policies of insurance with respect to the Project insuring against such hazards and risks and in such amounts as are customary for a prudent owner of properties comparable to those comprising the Project and located in the same area as the Project is located. Without limiting the generality of the foregoing, and subject to the unavailability of coverage as provided in Section 5.5(b), the Borrower shall maintain the following insurance with

one or more reputable insurance companies meeting the requirements set forth in Section 5.2 hereof with respect to the Project:

(a)     insurance against loss or damage to the Project by fire and any of the risks covered by insurance of the type now known as "fire and extended coverage" in an amount not less than the greater of (i) the full replacement cost of the Project and or (ii) the outstanding principal amount of the Bonds, and with a reasonable deductible from the loss payable for any casualty; the policies of insurance carried in accordance with this paragraph (a) shall contain the "Replacement Cost Endorsement;"

(b)     business interruption or loss of rent insurance in an amount equal to the greater of: (A) an amount equal to the maximum scheduled principal and interest payments on the Notes during any twelve month period, or (B) the gross amount of annual income projected (or, if greater, actual) for the Project based upon the projected (or, if greater, actual) occupancy of the Project; provided that such coverage shall be adjusted annually on each anniversary date of the policy to comply with the provisions of this Section 5.1(b);

(c)     comprehensive general liability insurance (including coverage for elevators and escalators, if any, on the Project and, if any construction of new improvements occurs after execution of this Loan Agreement, completed operations coverage for two years after construction of any improvements has been completed) on an "occurrence basis" against claims for "personal injury," including, without limitation, bodily injury, death or property damage occurring on, in or about the Project and the adjoining streets, sidewalks and passageways, such insurance to afford immediate minimum protection to a limit in no event less than $1,000,000 with respect to personal injury or death to any one or more persons or damage to property;

(d)     workers' compensation insurance (including employer's liability insurance) for all employees of the Borrower engaged on or with respect to the Project in such amount as is required by law;

(e)     during the course of any construction or repair of the Project, builder's completed value risk insurance against "all risks of physical loss" during construction or repair, with deductibles as are common in similar policies obtained by prudent owners of property similar in use to the Project and located in the same area in which the Project is located, in non-reporting form, at the Borrower's option covering the total value of work performed and equipment, supplies and materials furnished; such policy of insurance shall contain the "permission to occupy upon completion of work or occupancy" endorsement;

(f)     boiler and machinery insurance covering pressure vessels, air tanks, boilers, machinery, pressure piping, heating, air conditioning and elevator equipment and escalator equipment, provided any improvements contain equipment of such nature, and insurance against loss of occupancy or use arising from any breakdown of the same, in such amounts as are commonly obtained by prudent owners of property similar in use to the Project and located in the same area in which the Project is located;

(g)     flood insurance if the Project is in an area identified as a special flood hazard area pursuant to the Flood Disaster Protection Act of 1973, as amended, or other applicable law, unless

the Project has been removed from the area by application, with such insurance to be at least the amount available under the National Flood Insurance Act of 1968;

(h)     fidelity bonds or employee dishonesty insurance in an amount not less than $500,000 covering all officers, agents, and employees of the Borrower responsible for causing the proceeds of Bonds to be disbursed and covering all officers, agents, and employees of the Manager responsible for handling Project Revenues; and

(i)     such other insurance, in such amounts and against such hazards and risks, as is commonly obtained by prudent owners of property similar in use to the Project and located in the same area in which the Project is located.

All policies of insurance required by the terms of this Loan Agreement shall contain an endorsement or agreement by the insurer that any loss shall be payable in accordance with the terms of such policy, notwithstanding any act or negligence of the Borrower which might otherwise result in forfeiture of said insurance and the further agreement of the insurer waiving all rights of setoff, counterclaim or deductions against the Borrower.

The Trustee shall not be responsible for the sufficiency or the maintenance of any insurance coverage required hereby.

Section 5.2     Delivery of Insurance Policies; Payment of Premiums.   All policies of insurance provided for in Section 5.1 shall be issued by companies licensed to do business in the State, and such insurance companies must have a rating from the Rating Agency of no less than "BBB" (or its equivalent) or from A.M. Best Company, Inc. of no less than "A-" (a "Qualified Insurer").  Such policies shall be at least in amounts as required by the provisions of this Loan Agreement.  All policies of insurance shall name the Trustee as a named or an additional insured and shall have (i) attached thereto a lender's loss payable endorsement for the benefit of the Trustee, which endorsement indicates that all insurance proceeds in excess of $25,000 are payable directly to the Trustee and (ii) a clause in favor of the Trustee stating that there can be no changes, including modifications, amendments or cancellations, to the respective policy without 30 days prior written notice to the Trustee. The Borrower shall furnish the Trustee with an original or certified copies of certificates of insurance for all required insurance.

The Borrower shall not obtain (i) any umbrella or blanket liability or casualty insurance policy unless, in each case, the Trustee's interest is included therein as provided in this Loan Agreement and such policy is issued by a Qualified Insurer, or (ii) separate insurance concurrent in form or contributing in the event of loss with that required in Section 5.1 to be furnished by, or which may be reasonably required to be furnished by, the Borrower.  In the event the Borrower obtains separate insurance or an umbrella or a blanket policy, the Borrower shall notify the Trustee in writing of the same and shall cause certified copies of each policy to be delivered as required in Section 5.1.  Any blanket policy shall specifically allocate to the Project the amount of coverage from time to time required hereunder and shall otherwise provide the same protection as would a separate policy insuring only the Project in compliance with the provisions of Section 5.1.

Prior to the expiration of each such policy, the Borrower shall furnish the Trustee, Issuer and the Underwriter with certified copies of certifications of insurance from the reissuance of the

existing policy required by this Loan Agreement or the issuance of a new policy continuing insurance in force as required by this Loan Agreement.  In all cases, the Borrower shall immediately give written notice to the Trustee, Issuer and the Underwriter of any notice received by the Borrower of any expiration, cancellation or modification of, or material reduction of coverage under, any such policy.  The Borrower shall not consent to any material amendment to or the cancellation of any such policy.

In the event the Borrower fails to provide, maintain, keep in force or deliver and furnish to the Trustee the certificates of insurance required by this Loan Agreement or make the deposits required under this Section 5.2, the Trustee may, but is not required to, procure such insurance as is provided for in Section 5.1, and the Borrower will immediately pay all premiums thereon promptly upon demand by the Trustee (to the extent such amounts are not paid from money in the Insurance and Tax Escrow Fund held under the Indenture), and, until such payment is made by the Borrower, the amount of all such premiums shall be secured by this Loan Agreement.

The Borrower shall deposit or cause to be deposited with the Trustee to the Insurance and Tax Escrow Fund, in accordance with Sections 5.04 and 5.10 of the Indenture, amounts sufficient to pay when due the estimated aggregate annual insurance premiums on all policies of insurance required by this Loan Agreement.  Such amounts shall be disbursed as provided in the Indenture.

Section 5.3    Insurance Proceeds.  After the occurrence of any casualty to the Project, or any part thereof, the Borrower shall give prompt written notice thereof to the Trustee and each insurer and promptly submit a claim to insurer for payment of insurance proceeds; the Borrower shall provide the Trustee with a copy of such claim.

(a)    All Insurance Proceeds with respect to the Project in excess of $100,000 shall be paid to the Trustee, and each insurer is hereby authorized and directed to make payment for any such loss directly to the Trustee instead of payment to the Borrower.  All Insurance Proceeds with respect to the Project of $100,000 or less shall be paid to the Borrower.  Any Insurance Proceeds paid to the Trustee shall be applied as provided in this Section 5.3 and Section 5.17 of the Indenture.  Damage to or destruction of the Project shall not affect the lien of the Mortgage or the obligations of the Borrower hereunder, and the Trustee is authorized, at the Trustee's sole and absolute option, upon written notice to the Borrower, to compromise and settle all loss claims on said policies if not adjusted promptly by the Borrower.

(b)    Notwithstanding the application of Insurance Proceeds to the payment of a portion of the Bonds pursuant to the Indenture, the Borrower shall not be excused from the Loan Payments relating to any unpaid portion of the Bonds.  If any act or occurrence of any kind or nature on which insurance was not obtained or obtainable shall result in damage to or loss or destruction of the Project, the Borrower shall give immediate written notice thereof to the Trustee and the Borrower shall promptly, at the Borrower's sole cost and expense, restore, repair, replace and rebuild the Project as nearly as possible to its value, condition and character immediately prior to such damage, loss or destruction, in accordance with plans and specifications, provided that such Restoration, repair, replacement and rebuilding is permitted by law.

(c)    Except as provided below, nothing contained in this Loan Agreement shall be deemed to excuse the Borrower from repairing or maintaining the Project, as provided herein.  The

application or release by the Trustee of any Insurance Proceeds shall not cure or waive any Default or notice of default under this Loan Agreement or invalidate any act done pursuant to such notice.

(d)       All net Insurance Proceeds shall be applied, at the option of the Borrower so long as no Default has occurred and is continuing, either (i) to the payment of the Bonds in accordance with the Indenture and clean-up the damage to the Issuer's satisfaction, or (ii) to the Restoration of the Project (if permitted by law, and to the extent not permitted by law, such Insurance Proceeds shall be applied to the payment of the Bonds), except that (A) the proceeds of any business interruption or loss of rent insurance shall be deposited in the Revenue Fund under the Indenture and applied as therein provided and (B) any surplus Insurance Proceeds shall be applied to the payment of the Bonds.

(e)       Unless the Borrower exercises its option to apply the Insurance Proceeds to the payment of the Bonds in accordance with the provisions of the Indenture, and so long as any Bonds shall be outstanding and unpaid, and whether or not Insurance Proceeds are sufficient or available therefor, the Borrower shall promptly commence and complete with all reasonable diligence the Restoration of the Project as nearly as possible to the same value and revenue producing capacity which existed immediately prior to such loss or damage in accordance with plans and specifications prepared by an Independent Architect ("Restoration Plans"), and in compliance with all legal requirements. Any Restoration shall be effected in accordance with procedures as provided in Section 5.4 hereof.  The Borrower shall pay all costs of such Restoration to the extent not paid from Net Proceeds of Insurance Proceeds available therefor pursuant to this Section 5.3. If such Restoration is not permitted by law, the Insurance Proceeds shall be applied to the payment of the Bonds.

(f)       To exercise the option provided in paragraph (d) above, within thirty (30) days following the deposit of Insurance Proceeds or awards in accordance with the provisions of the Indenture, the Borrower shall give written notice of the option it has selected to the Trustee.  If such notice is to exercise the option of prepaying the Bonds, the Trustee shall apply the Net Proceeds of such Insurance Proceeds in the manner provided in Section 5.17 of the Indenture.  If such notice is to exercise the option of Restoration or if no such notice is received, the provisions of paragraph (e) above shall control.

Section 5.4       Disbursement of Insurance Proceeds and Condemnation Awards.

(a)       All Net Proceeds of Insurance Proceeds and/or Condemnation Awards received by the Trustee as provided in Section 5.3 hereof shall be applied as provided in this Section.

(b)       If the Borrower elects to apply the Insurance Proceeds or Condemnation Awards to the payment of the Bonds in accordance with the Indenture and the priorities specified therein, such Insurance Proceeds or Condemnation Awards shall be deposited with the Trustee and applied in accordance with the Indenture and such priorities.  If no Default shall exist hereunder and if the Borrower has elected Restoration and such Restoration is permitted by law, all Net Proceeds shall be deposited in the Project Fund and disbursed in accordance with the provisions of Section 5.03 of the Indenture to pay or reimburse the Borrower for the payment of the costs, fees and expenses incurred for the Restoration of the Project as required under Section 5.3 hereof; provided that no

distribution of Net Proceeds for Restoration shall be made until the Trustee shall have received from Borrower:

(i)       a written certification that Restoration Plans and procedures for the Restoration of the Project as required by Section 5.3(e) hereof have been complied with,

(ii)      a written certification that the Project Revenues (including the proceeds of any business interruption or loss of rent insurance and other funds irrevocably committed to the payment of such amounts) to be received during, and after completion of, the Restoration of the Project in accordance with the approved Restoration Plans, will be sufficient and available to make all payments and deposits when due hereunder, including without limitation to pay all principal of and premium, if any, and interest on the Bonds when due, to make all required deposits into the Funds and Accounts required by Section 5.04 of the Indenture, to pay all other Operating Expenses of the Project, and to pay the debt service on any indebtedness (other than the Bonds) then outstanding or to be incurred in connection with such Restoration,

(iii)     construction schedules and budgets and independently verified estimates and other evidence (including stipulated sum or guaranteed maximum cost construction contracts) that the Borrower certifies have been used by the Borrower to establish the total amount of the costs, fees and expenses necessary to complete the Restoration of the Project in accordance with the approved Restoration Plans, and the time period required to complete such Restoration,

(iv)     a certificate from an Independent Architect or contractor appointed by the Borrower upon which the Trustee may conclusively rely that the Net Proceeds available therefor together with funds deposited with the Trustee, or irrevocably committed by or on behalf of the Borrower, shall be sufficient to fully pay all costs, fees and expenses necessary for the Restoration of the Project in accordance with the approved Restoration Plans and all legal requirements, free and clear of all mechanic's liens and other liens or claims for lien which are not Permitted Encumbrances, and

(v)      a written waiver upon which the Trustee may conclusively rely of any rights of subrogation from any insurer under any Insurance Policy which, at any time claims that no liability exists as to the Borrower or the owner or insured under such Insurance Policies, and

(c)       If, within 60 days after the receipt of such Net Proceeds, the Borrower shall fail to furnish sufficient funds and the other items required by paragraph (b) of this Section or if any other Default shall then exist or shall occur and be continuing hereunder at any time (whether before or after the commencement of such Restoration), the Trustee may, and shall at the written request of the Controlling Holders, declare the entire principal balance of the Bonds or any portion thereof to be immediately due and payable and to avail itself of any and all remedies afforded hereunder upon a Default, and whether or not the Bonds shall be so accelerated such Net Proceeds, or any portion thereof, then held by the Trustee or other depository hereunder may be applied as provided in the Indenture.

(d)     No payment made prior to the final completion of the Restoration of the Project in accordance with the approved Restoration Plans shall exceed 90% of the value of the work performed from time to time, as such value shall be evidenced by an Independent Architect's or contractor's certificate to that effect, delivered to the Trustee, upon which the Trustee may conclusively rely; and at all times the undisbursed balance of such proceeds remaining in the possession of the Trustee or such other depository, together with funds deposited or irrevocably committed to the satisfaction of the Trustee by or on behalf of the Borrower to pay the cost of such Restoration, shall be sufficient to pay the entire unpaid cost of the Restoration free and clear of all liens or claims for lien, other than any Permitted Encumbrances, as evidenced by an Independent Architect's or contractor's certificate to that effect, delivered to the Trustee, upon which the Trustee may conclusively rely.

(e)     Any surplus of Net Proceeds, after payment of all costs, fees and expenses (including fees and expenses of the Trustee and its counsel, agents, experts or other consultants retained in connection with such Restoration) of such Restoration shall be applied to the redemption of Bonds as provided in Section 3.01 of the Indenture.

(f)     The Borrower shall make written monthly progress reports to the Trustee as to the status of construction and compliance with the budget prepared in connection with the Restoration of the Project.

Section 5.5     Report of Insurance Consultant; Insurance Commercially Unavailable.

(a)     The insurance required to be maintained pursuant to this Article V shall be subject to the annual review of the Insurance Consultant, and the Borrower agrees that it will follow any recommendations of the Insurance Consultant.  In order to establish compliance with this Article V, the Borrower agrees that it will deliver to the Trustee at or prior to the Closing Date and then annually thereafter within five months after the end of each Fiscal Year, a report of the Insurance Consultant setting forth a description of the insurance maintained, or caused to be maintained pursuant to this Article V and then in effect (including any alternative plan as permitted by Section 5.5(b) hereof) and stating whether, in the opinion of the Insurance Consultant, such insurance, the manner of providing such insurance and any reductions or eliminations of the amount of any insurance coverage during the Fiscal Year covered by such report comply with the requirements of this Article V and adequately protect the Project and the Borrower's operations.

(b)     In the event that any insurance required by Section 5.1 hereof is commercially unavailable at a reasonable cost, the Borrower, upon written notice to the Trustee, may provide such substitute coverage, if any, as is recommended by the Insurance Consultant at a reasonable cost.  The Borrower shall make a continuing good faith effort to secure the insurance required by Section 5.1 hereof, and if the insurance becomes commercially available at a reasonable cost, the Borrower shall acquire such insurance upon expiration of the substitute insurance or as otherwise recommended by the Insurance Consultant.

Section 5.6     Obligation to Continue Payments.  If prior to full payment of the Bonds (or provision for payment thereof in accordance with the provisions of the Indenture) the Project or any portion thereof is destroyed (in whole or in part) or is damaged by fire or other casualty, or title to, or the temporary use of, the Project or any portion thereof shall be taken under the exercise

of the power of eminent domain by any governmental body or any person, firm or corporation acting under governmental authority, the Borrower shall nevertheless be obligated to continue to pay the amounts specified in Section 3.2 hereof.

Section 5.7    Insufficiency of Net Proceeds.  If, in accordance with this Loan Agreement, the Borrower elects to repair, restore or replace the Project and the Net Proceeds are insufficient to pay in full the cost of any Restoration, the Borrower will nonetheless complete the work and will pay any cost in excess of the amount of the Net Proceeds held by the Trustee.  The Borrower agrees that if by reason of any such insufficiency of the Net Proceeds, the Borrower shall make any payments pursuant to the provisions of this Section, the Borrower shall not be entitled to any reimbursement therefor from the Issuer, the Trustee, or the Holders, nor shall the Borrower be entitled to any diminution of the amounts payable under Section 3.2 hereof.

Section 5.8    Cooperation of Issuer.  The Issuer shall cooperate fully with the Borrower at the expense of the Borrower in filing any proof of loss with respect to any insurance policy covering the casualties described in Section 5.1 hereof and in the prosecution or defense of any prospective or pending condemnation proceeding with respect to the Project or any part thereof or any property of the Borrower in connection with which the Project is used and will, to the extent it may lawfully do so, permit the Borrower to litigate in any proceeding resulting therefrom in the name and on behalf of the Issuer. In no event will the Issuer voluntarily settle, or consent to the settlement of, any proceeding arising out of any insurance claim or any prospective or pending condemnation proceeding with respect to the Project or any part thereof without the written consent of the Borrower Representative.

## ARTICLE VI

## OTHER AGREEMENTS

Section 6.1    Successor to Issuer.  The Issuer will do all things in its power to maintain its existence or assure the assumption of its obligations hereunder and under the Indenture by any corporation or political subdivision succeeding to its powers under the Act.

Section 6.2    Servicing the Loan; Servicing Agreement.  The Controlling Holders may direct the Borrower to enter into a servicing agreement with a Servicer to perform such functions with respect to the servicing of the Loan as may be set forth in such servicing agreement.  Such functions may include, without limitation: assuring the maintenance of insurance as required by this Loan Agreement and the payment of premiums therefor; inspection of the Project; review of the Borrower's compliance with the Regulatory Agreement; monitoring the procedures for the collection of Project Revenues and their remittance to the Trustee; and review of the Borrower's obligations under the Borrower Documents to assure compliance with the terms thereof by the Borrower.

Section 6.3    Assignment, Selling and Leasing.  Except as otherwise provided in the Mortgage or permitted under the provisions of Section 10 of the Regulatory Agreement, after the completion of the acquisition, construction and equipping of the Project as described in Section 4.1 hereof, this Loan Agreement may be assigned and the Project sold or leased (other than by reason

of foreclosure or deed in lieu of foreclosure), as a whole, by the Borrower only as permitted by this Section 6.3, subject to each of the following conditions:

(a)    The assignee, purchaser or lessee shall assume the obligations of the Borrower hereunder and under the other Borrower Documents, in writing in form and substance reasonably satisfactory to the Trustee to the extent of the interest assigned or sold,

(b)    The assignee, purchaser or lessee shall deliver an opinion of Independent Counsel in form and substance reasonably satisfactory to the Issuer and the Trustee that the assumption described in paragraph (a) above is a valid and enforceable obligation of the assignee, purchaser or lessee,

(c)    The Borrower shall, within 10 days after the delivery thereof, furnish or cause to be furnished to the Issuer and the Trustee a true and complete copy of each assignment, assumption of obligation, or contract of sale, as the case may be,

(d)    The Borrower shall provide a Favorable Opinion of Bond Counsel addressed to the Issuer and the Trustee to the effect that such assignment, sale or lease does not adversely affect the exclusion from gross income of the recipients thereof of interest on the Tax-Exempt Bonds for federal income tax purposes,

(e)    No Default with respect to the Bonds Outstanding on account of such assignment, sale or lease shall have occurred and be continuing hereunder or under any other Borrower Document, unless such Default is cured or waived in connection with such assignment, sale or lease, and the Borrower shall deliver a Compliance Certificate to the Issuer and the Trustee to that effect,

(f)    The delivery to the Issuer and the Trustee of an opinion of Counsel to the effect that the successor to the Borrower hereunder is duly qualified to transact business in the State and obligated to maintain an agent in the State on whom service of process may be made in connection with any actions against the Borrower arising out of the Borrower Documents,

(g)    Compliance with the requirements of the Regulatory Agreement, including any consents required thereunder,

(h)    The Borrower shall have received the Issuer's written consent to such assignment, sale or lease, and

(i)    The assignee, purchaser or lessee must deliver an opinion or opinions of Independent Counsel to the Issuer and the Trustee the effect that, regardless of the assumption described above, a valid and enforceable first lien on and perfected security interest in the Project and other collateral securing the Bonds will remain and any such assignments and other documents executed for purposes of this Section 6.3 are valid delivered and enforceable obligations of such parties enforceable in accordance with their terms.

It is hereby expressly stipulated and agreed that any disposition of the Project by the Borrower in violation of this Section will be null, void and without effect, will cause a reversion of title to the transferor Borrower, and will be ineffective to relieve the Borrower of its obligations

under this Loan Agreement, the Regulatory Agreement and any other document, agreement or instrument evidencing or securing the Borrower's obligations hereunder and thereunder. The Borrower will include, verbatim or by incorporation by reference, all requirements and restrictions contained in this Loan Agreement and the Regulatory Agreement in any deed or other documents transferring any interest in the Project, if applicable, to any other person or entity to the end that such transferee has notice of and is bound by such restrictions, and will obtain the express written assumption of this Loan Agreement and the Regulatory Agreement by any such transferee.

Section 6.4    Continued Existence. The Borrower agrees that during the term of this Loan Agreement it will maintain its existence, will continue to be a limited liability company whose sole member is a nonprofit corporation in good standing in the State, will not dissolve or otherwise dispose of all or substantially all of its assets and will not consolidate with or merge into another legal entity or permit one or more other legal entities to consolidate with or merge into it; provided that the Borrower may, without violating this Loan Agreement contained in this Section, consolidate with or merge into another legal entity, or permit one or more legal entities or substantially all of its assets as an entirety and thereafter dissolve; provided (a) that a Favorable Opinion of Bond Counsel is provided to the Issuer and the Trustee regarding such acquisition, consolidation, merger or transfer; (b) that if the surviving, resulting or transferee legal entity, as the case may be, is not the Borrower, then such legal entity shall be a legal entity organized and existing under the laws of one of the states of the United States of America, shall be qualified to do business in the State, and shall assume in writing in form and substance satisfactory to the Issuer all of the obligations of the Borrower under this Loan Agreement, the Indenture and the other Borrower Documents; (c) that in the opinion of Independent Counsel addressed to the Issuer and the Trustee, this Loan Agreement shall be a valid and enforceable obligation of such surviving, resulting or transferee entity; (d) that no Default has occurred and is continuing hereunder; (e) that prior to such acquisition, consolidation, merger or transfer, the Borrower shall furnish a Compliance Certificate to the Issuer and the Trustee; and (f) that the Trustee shall have consented to such transfer pursuant to the Regulatory Agreement, unless such consent is not required pursuant thereto.

Section 6.5    Indemnification.

(i)    THE BORROWER COVENANTS AND AGREES TO PROTECT, INDEMNIFY AND SAVE THE ISSUER, THE TOWN OF NEW HOPE, TEXAS (THE "TOWN") AND THEIR RESPECTIVE OFFICIALS, DIRECTORS, OFFICERS, EMPLOYEES, AGENTS AND ATTORNEYS (EACH AN "ISSUER INDEMNIFIED PARTY") HARMLESS FROM AND AGAINST ALL LIABILITY, LOSSES, DAMAGES, COSTS, EXPENSES (INCLUDING REASONABLE ATTORNEYS' FEES), TAXES, CAUSES OF ACTION, SUITS, CLAIMS, DEMANDS AND JUDGMENTS OF ANY NATURE OR FORM (THE "ISSUER INDEMNITY LIABILITIES"), BY OR ON BEHALF OF ANY PERSON ARISING IN ANY MANNER FROM THE TRANSACTION OF WHICH THIS LOAN AGREEMENT IS A PART OR ARISING IN ANY MANNER IN CONNECTION WITH THE PROJECT OR THE FINANCING OF THE PROJECT INCLUDING WITHOUT LIMITING THE GENERALITY OF THE FOREGOING, ARISING FROM (I) THE WORK DONE ON THE PROJECT OR THE OPERATION OF THE PROJECT DURING THE TERM OF THIS LOAN AGREEMENT; (II) ANY BREACH OR DEFAULT ON THE PART OF

THE BORROWER IN THE PERFORMANCE OF ANY OF ITS OBLIGATIONS UNDER THIS LOAN AGREEMENT, THE REGULATORY AGREEMENT, THE MORTGAGE, THE INDENTURE OR ANY RELATED LOAN DOCUMENT (OTHER THAN A FAILURE TO PAY THE PRINCIPAL OF, AND ANY INTEREST AND PREMIUM ON, THE LOAN, THE NOTES OR THE BONDS); (III) ANY CLAIM OR CAUSE OF ACTION AGAINST THE ISSUER THAT SEEKS TO IMPOSE LIABILITY ON THE ISSUER WITH RESPECT TO THE BONDS, THIS LOAN AGREEMENT, THE REGULATORY AGREEMENT OR THE INDENTURE WHICH EXCEEDS THE LIABILITY OF THE ISSUER AS SET FORTH IN SECTION 10.1 HEREOF; (IV) THE PROJECT OR ANY PART THEREOF; (V) ANY VIOLATION OF ANY CONTRACT, AGREEMENT OR RESTRICTION RELATING TO THE PROJECT EXCLUDING THE PAYMENT OF THE PRINCIPAL OF AND PREMIUM, IF ANY, AND INTEREST ON THE BONDS, THE NOTES OR THE LOAN; OR (VI) ANY LIABILITY, VIOLATION OF LAW, ORDINANCE OR REGULATION AFFECTING THE PROJECT OR ANY PART THEREOF OR THE OWNERSHIP OR OCCUPANCY OR USE THEREOF. UPON NOTICE FROM ANY ISSUER INDEMNIFIED PARTY, THE BORROWER SHALL DEFEND THE ISSUER INDEMNIFIED PARTIES IN ANY ACTION OR PROCEEDING BROUGHT IN CONNECTION WITH ANY OF THE ABOVE, AND PROVIDE COMPETENT COUNSEL REASONABLY SATISFACTORY TO THE ISSUER; PROVIDED, HOWEVER, THAT THE ISSUER SHALL HAVE THE ABSOLUTE RIGHT TO EMPLOY SEPARATE COUNSEL IN ANY ACTION DESCRIBED IN THE PRECEDING SENTENCE AT THE EXPENSE OF THE BORROWER;

(ii)     IT IS THE INTENTION OF THE PARTIES HERETO THAT THE ISSUER INDEMNIFIED PARTIES SHALL NOT INCUR PECUNIARY LIABILITY BY REASON OF THE TERMS OF THIS LOAN AGREEMENT OR BY REASON OF THE UNDERTAKINGS REQUIRED OF THE ISSUER AND ITS DIRECTORS, OFFICERS, EMPLOYEES, AGENTS AND ATTORNEYS HEREUNDER IN CONNECTION WITH THE ISSUANCE OF THE BONDS, INCLUDING BUT NOT LIMITED TO THE EXECUTION AND DELIVERY OF THE INDENTURE, THIS LOAN AGREEMENT, THE REGULATORY AGREEMENT, AND ALL OTHER INSTRUMENTS AND DOCUMENTS REQUIRED TO CLOSE THE TRANSACTION; THE PERFORMANCE OF ANY ACT REQUIRED OF THE ISSUER INDEMNIFIED PARTIES, BY THIS LOAN AGREEMENT; OR THE PERFORMANCE OF ANY ACT REQUESTED OF THE ISSUER INDEMNIFIED PARTIES, BY THE BORROWER OR IN ANY WAY ARISING FROM THE TRANSACTION OF WHICH THIS LOAN AGREEMENT IS A PART OR ARISING IN ANY MANNER IN CONNECTION WITH THE PROJECT OR THE FINANCING OF THE PROJECT, INCLUDING BUT NOT LIMITED TO THE EXECUTION AND DELIVERY OF THE INDENTURE, THIS LOAN AGREEMENT, THE REGULATORY AGREEMENT AND ALL OTHER INSTRUMENTS AND DOCUMENTS REQUIRED TO CLOSE THE TRANSACTION. NEVERTHELESS, IF THE ISSUER INDEMNIFIED PARTIES SHOULD INCUR ANY SUCH PECUNIARY LIABILITY WITH RESPECT TO EVENTS OCCURRING AFTER THE DATE HEREOF, THEN IN SUCH EVENT THE BORROWER SHALL INDEMNIFY AND HOLD THE ISSUER INDEMNIFIED PARTIES HARMLESS AGAINST ALL CLAIMS BY OR ON BEHALF OF ANY PERSON, ARISING OUT OF THE SAME, AND ALL

COSTS AND EXPENSES (INCLUDING WITHOUT LIMITATION REASONABLE FEES AND EXPENSES OF COUNSEL) INCURRED IN CONNECTION WITH ANY SUCH CLAIM OR IN CONNECTION WITH ANY ACTION OR PROCEEDING BROUGHT THEREON, AND UPON TIMELY NOTICE FROM THE ISSUER THE BORROWER SHALL DEFEND THE ISSUER INDEMNIFIED PARTIES IN ANY SUCH ACTION OR PROCEEDING, AND PROVIDE COUNSEL SATISFACTORY TO THE ISSUER OR THE TOWN AND THE BORROWER SHALL PAY THE ISSUER'S OR THE TOWN'S EXPENSES INCLUDING PAYMENT OF THE REASONABLE FEES AND EXPENSES OF THE COUNSEL USED BY THE ISSUER OR THE TOWN; PROVIDED, HOWEVER, THAT THE ISSUER OR THE TOWN SHALL HAVE THE RIGHT TO EMPLOY SEPARATE COUNSEL IN ANY ACTION DESCRIBED IN THE PRECEDING SENTENCE AT THE EXPENSE OF THE BORROWER; AND

(iii)   NOTWITHSTANDING ANY PROVISION OF THIS SECTION 6.5 TO THE CONTRARY, THE ISSUER AND ITS DIRECTORS, OFFICERS, EMPLOYEES, AGENTS AND ATTORNEYS SHALL BE INDEMNIFIED BY THE BORROWER WITH RESPECT TO LIABILITIES ARISING FROM THE ISSUER'S OWN GROSS NEGLIGENCE, NEGLIGENCE OR BREACH OF CONTRACTUAL DUTY, BUT NOT FOR ANY LIABILITIES ARISING FROM THE ISSUER'S OWN BAD FAITH, FRAUD OR WILLFUL MISCONDUCT.

(a)   To the fullest extent permitted by law, the Borrower agrees to indemnify, hold harmless and defend the Trustee (including, without limitation, in its capacity a Dissemination Agent) and each of its officers, governing members, directors, officials, employees, attorneys and agents (each an "Indemnified Party"), against any and all losses, damages, claims, actions, liabilities, reasonable costs and expenses of any nature, kind or character (including, without limitation, reasonable attorneys' fees, expenses, litigation and court costs, amounts paid in settlement and amounts paid to discharge judgments and amounts paid to enforce this indemnity) (together with the Issuer Indemnity Liabilities, the "Liabilities") to which the Indemnified Parties, or any of them, may become subject under federal or state securities laws or any other statutory law or at common law or otherwise, to the extent arising out of or based upon or in any way relating to:

(i)   The Bond Documents or the execution or amendment thereof or in connection with transactions contemplated thereby, including the issuance, sale, transfer or resale of the Bonds;

(ii)   Any act or omission of the Borrower or any of its agents, contractors, servants, employees or licensees in connection with the Loan or the Project, the operation of the Project, or the condition, environmental or otherwise, occupancy, use, possession, conduct or management of work done in or about, or from the planning, design, acquisition, installation or construction of, the Project or any part thereof;

(iii)   Any lien (other than a Permitted Encumbrance) or charge upon payments by the Borrower to the Trustee hereunder, or any taxes (including, without limitation, all ad valorem taxes and sales taxes), assessments, impositions and other charges imposed on the Issuer or the Trustee in respect of any portion of the Project;

(iv)     Any violation of any Environmental Law, rule or regulation with respect to, or the release of any Hazardous Substance from, the Project or any part thereof during the period in which the Borrower is in possession or control of the Project;

(v)     The enforcement of, or any action taken or not taken by the Trustee related to remedies under, this Loan Agreement, the Indenture and the other Bond Documents;

(vi)     The defeasance and/or redemption, in whole or in part, of the Bonds;

(vii)     Any untrue statement or misleading statement or alleged untrue statement or alleged misleading statement of a material fact by the Borrower or the Issuer contained in any offering statement or document for the Bonds or any of the Bond Documents to which the Borrower or the Issuer is a party, or any omission or alleged omission from any offering statement or document for the Bonds of any material fact necessary to be stated therein in order to make the statements made therein by the Borrower or the Issuer, in the light of the circumstances under which they were made, not misleading;

(viii)     Any declaration of taxability of interest on the Tax-Exempt Bonds or allegations (or regulatory inquiry) that interest on the Tax-Exempt Bonds, is taxable for federal income tax purposes; and

(ix)     The Trustee's acceptance or administration of the trust of the Indenture, or the Trustee's exercise or performance of or failure to exercise or perform any of its powers or duties thereunder or under any of the Bond Documents to which it is a party.

(x)     In the case of the foregoing indemnification of the Trustee or any related Indemnified Party, the Borrower's obligation to indemnify shall not apply to the extent such damages are caused by the gross negligence or willful misconduct of such Indemnified Party.

(xi)     In the event that any action or proceeding is brought against any Indemnified Party with respect to which indemnity may be sought hereunder, the Borrower, upon written notice from the Indemnified Party (which notice shall be timely given so as not to materially impair the Borrower's right to defend), shall assume the investigation and defense thereof, including the employment of counsel reasonably approved by the Indemnified Party, and shall assume the payment of all fees and expenses related thereto, with full power to litigate, compromise or settle the same in its sole discretion; provided that the Indemnified Party shall have the right to review and approve or disapprove any such compromise or settlement, which approval shall not be unreasonably withheld.  Each Indemnified Party shall have the right to employ separate counsel in any such action or proceeding and to participate in the investigation and defense thereof.  The Borrower shall pay the reasonable fees and expenses of such separate counsel.

(xii)     Notwithstanding any transfer of the Project to another owner in accordance with the provisions of this Loan Agreement or the Regulatory Agreement, the Borrower shall remain obligated to indemnify each Issuer Indemnified Party and Indemnified Party pursuant to this Section 6.5 if such subsequent owner fails to indemnify any party entitled to be indemnified hereunder, unless the Issuer, the Trustee, and, if required, the Town, have

consented to such transfer and to the assignment of the rights and obligations of the Borrower hereunder.

(xiii)   The rights of any persons to indemnity hereunder and rights to payment of fees and reimbursement of expenses pursuant to Section 10.1 shall survive the final payment or defeasance of the Bonds and in the case of the Trustee any resignation or removal.   The provisions of this Section shall survive the termination of this Loan Agreement.   Nothing within this Section shall limit the rights of each Issuer Indemnified Party and Indemnified Party to indemnity under the Regulatory Agreement.

(xiv)   Nothing in this Section 6.5 shall in any way limit the Borrower's indemnification and other payment obligations set forth in the Regulatory Agreement.

Section 6.6    Recording and Filing.

(a)    At the time of the issuance of each Series of Bonds, the Borrower will cause the filing and recording of all financing statements and other instruments necessary to perfect or maintain the security interest and lien of the Trustee and the Issuer in the Borrower Documents.

(b)    The Borrower Representative will cause to be filed or recorded all necessary continuation statements within the time prescribed by the State Uniform Commercial Code - Secured Transactions or other applicable State law in order to continue the financing statements and instruments in connection with the security interests and liens identified in this Loan Agreement, the Mortgage or the Indenture filed and recorded on or before the Closing Date.   The Trustee shall have no duty to determine, at any time, whether the financing statements and instruments filed and recorded in connection with the security interests and liens identified in this Loan Agreement, the Mortgage or otherwise are or remain sufficient to perfect or establish such security interests and liens under applicable law.

(c)    Not earlier than 60 days nor later than 30 days before each fifth anniversary date after the Closing Date, the Borrower shall cause an opinion of Counsel to be delivered to the Trustee to the effect that all security agreements, financing statements, continuation statements, notices and other instruments required by applicable law have been recorded or filed or rerecorded or refiled in such manner and in such places as are required by law in order fully to preserve the rights of the Holders and the Trustee in the assignment to the Trustee of certain rights under this Loan Agreement pursuant to the Indenture and in the Project pursuant to the Mortgage.

(d)    The Borrower and the Issuer, at the request of the Borrower or the Trustee, shall execute and deliver all instruments and shall furnish all information and evidence deemed necessary or advisable by such Counsel in order to enable such Counsel to render the opinion referred to in subsection (c) of this Section.   The Borrower shall file and refile and record and rerecord or cause to be filed and refiled and recorded and rerecorded all instruments required to be filed and refiled and recorded and rerecorded pursuant to the law of the State and shall continue or cause to be continued the liens of such instruments for so long as the Bonds shall be outstanding, except as otherwise required in this Loan Agreement or the Mortgage.

Section 6.7    Nonrecourse to Representatives of Issuer.   No deficiency or other personal judgment, nor any order shall be rendered against the Issuer or any members of the Governing

Body, employees or officers of the Issuer, their heirs, personal representatives, successors, transferees or assigns, as the case may be, or against the Trustee or any of its employees or officers, their heirs, personal representatives, successors, transferees or assigns, as the case may be in any action or proceeding arising out of this Loan Agreement or the Indenture or any other Bond Document, or any judgment, order or decree rendered pursuant to any such action or proceeding. Any obligation of the Issuer hereunder is payable by the Issuer solely from the Trust Estate, and nothing in this Loan Agreement shall be considered as assigning or pledging any other funds of the Issuer other than the Trust Estate.

Section 6.8    <u>Amendment of Borrower Documents</u>.  Neither the Issuer nor the Borrower shall amend, supplement, alter, modify or terminate any Borrower Document, except as otherwise provided in such document, without the prior written consent of the Trustee, which may be given only as provided in Article XI of the Indenture.  Nothing in this Section shall prohibit any assignment or transfer otherwise permitted by Section 6.3 hereof.

Section 6.9    <u>Financial Statements and Reports</u>.  While this Loan Agreement is in effect, the Borrower will provide the Issuer, the Trustee, the Underwriter, and the Controlling Holders with the following:

(a)    Commencing January 31, 2019 for the month of December, 2018, and on the last day of each month thereafter for the immediately preceding month, a monthly statement of the Borrower as soon as practicable after the information is available but in no event later than the last day of the next succeeding month, (i) prior to the Completion Date, (A) a summary statement as to the status of construction including the report of any construction consultant retained by the Borrower in connection with the Project; (B) unaudited financial reports on the development costs of the Project incurred during that month and on an aggregate basis; and (C) statements of the balances for each fund and account required to be established hereunder or under the Indenture as of the end of each such month (obtained from the applicable trustee), all in reasonable detail and certified by an officer of the Borrower and (ii) after the Completion Date, (A) occupancy levels of the Project as of the end of each such month; and (B) an unaudited statement of revenues and expenses and statement of cash flows of the Borrower for each such month compared to the approved budget for that month and an unaudited balance sheet of the Borrower as of the end of each such month, all in reasonable detail and certified by a Borrower Representative. Prior to Stable Occupancy, a Borrower Representative shall organize and hold quarterly conference calls in the manner described in (g) below. The requirements of paragraph (a) will cease upon achieving Stable Occupancy.

(b)    Commencing as soon as they are available but not more than forty-five (45) days after the first full fiscal quarter after the Completion Date, and not later than forty-five (45) days after each fiscal quarter thereafter, quarterly unaudited financial statements of the Borrower, including a combined or combining statement of revenues and expenses and statement of cash flows of the Borrower during such period, a combined or combining balance sheet as of the end of each such fiscal quarter, and for each fiscal quarter ending December 31, 2020 and thereafter, a calculation of Days' Cash on Hand as of the end of each such fiscal quarter, Debt Service Coverage Ratio for the twelve (12) preceding consecutive months ending with such fiscal quarter and commencing with the first full quarter of operations and quarterly thereafter, occupancy levels at the Project (including the number of units and percentage of units occupied by residents whose

incomes do not exceed 50 percent of the area median income, as adjusted for family size) as of the end of each such fiscal quarter, all prepared in reasonable detail and certified, subject to year-end adjustment, by an officer of the Borrower Representative. Such financing statements and calculations will be accompanied by a comparison to the annual budget provided pursuant to subparagraph (d) below.

(c)     If at any time the Debt Service Coverage Ratio of the Borrower for the Fiscal Year ending December 31, 2021 and for each Fiscal Year thereafter is less than 1.20 and Days' Cash on Hand of the Borrower is less than the Days' Cash on Hand Requirement in each case on a Liquidity Testing Date, thereafter the Borrower will deliver the financial information and the calculations described in the preceding paragraphs on a monthly basis not later than forty-five (45) days after the end of each month until either the Debt Service Coverage Ratio of the Borrower is at least 1.20 or Days' Cash on Hand of the Borrower is at least equal to the applicable Days' Cash on Hand Requirement for two consecutive fiscal quarters.

(d)     Within one hundred fifty (150) days of the end of each Fiscal Year beginning the Fiscal Year ending December 31, 2018 an annual audited financial report of the Borrower prepared by a firm of certified public accountants, including a balance sheet as of the end of such Fiscal Year and a statement of cash flows for such Fiscal Year and a statement of revenues and expenses for such Fiscal Year, showing in each case in comparative form the financial figures for the preceding Fiscal Year, and commencing with the Fiscal Year ending December 31, 2021, together with a separate written statement of the accountants preparing such report (or another firm of certified public accountants) containing calculations of the Borrower's Debt Service Coverage Ratio and Days' Cash on Hand of the Borrower at the end of such Fiscal Year. The annual audited financial report shall be filed with the Dissemination Agent.

(e)     On or before the date of delivery of the financial reports referred to in paragraph (d) above, a Certificate of a Borrower Representative (i) stating that the Borrower is in compliance with all of the financial terms, provisions and conditions of this Loan Agreement, the Indenture, and the other Bond Documents or, if not, specifying all such financial defaults and the nature thereof, (ii) calculating and certifying the Debt Service Coverage Ratio and Days' Cash on Hand as of the end of such Fiscal Year, as appropriate, and (iii) attaching a summary of the Borrower's annual operating and capital budget for the coming Fiscal Year and information about the occupancy at the Project, sources of revenue for such units, turnover statistics and any changes in services offered at the Project.

(f)     On or before the date of delivery of the financial report referred to in paragraph (d) above, a management's discussion and analysis of results for the applicable Fiscal Year; provided, however, in the event a covenant violation exists for any fiscal quarter, a management's discussion and analysis of results for the applicable fiscal quarter will be delivered on or before the date of delivery of the financial report referred to in paragraph (c) above.

(g)     The Borrower Representative shall make available one or more representatives for a telephone conference call, which shall occur: (i) quarterly commencing April 1, 2019 until the Completion Date, (ii) in the event the Debt Service Coverage Ratio covenant or Days' Cash on Hand Requirement are met, at least once each Fiscal Year and (iii) in the event the Debt Service Coverage Ratio covenant or Days' Cash on Hand Requirement are not met, at least every other

fiscal quarter.  The Borrower Representative shall post notice of such calls to EMMA at least two (2) weeks prior to the scheduled date of each call.

(h)     Within thirty (30) days after the occurrence thereof, the Borrower will provide to the Issuer, the Underwriter, the Controlling Holders and the Trustee written notice of a Change of Control.  In addition, the Borrower shall provide such additional information as the Trustee, the Underwriter, or any Controlling Holders may reasonably request.

Section 6.10   Budget.  At least thirty (30) days prior to the first day of each Fiscal Year, the Borrower will prepare the Annual Budget on a monthly basis for the following Fiscal Year. Each Annual Budget shall include provision for payment by the Borrower of the costs, fees and expenses payable or incurred under this Loan Agreement and the Indenture including, without limitation, the costs of maintaining the insurance coverage required pursuant to Section 5.2 hereof and all applicable Operating Expenses payable by the Borrower, and all Administration Expenses. If the Borrower fails to prepare the Annual Budget for any Fiscal Year, the Annual Budget for the preceding Fiscal Year will continue in effect until the Annual Budget is prepared for the remainder of the applicable Fiscal Year. Promptly following preparation by the Borrower, a copy of each Annual Budget or amendment thereto will be furnished to the Issuer, the Trustee, and Requesting Bondholders. The Annual Budget must indicate whether the Rate Covenant is anticipated to be met for the Fiscal Year to which such Annual Budget relates.

If the Annual Budget indicates that the Rate Covenant will not be met, the Borrower shall promptly employ a Financial Consultant to review the Annual Budget of the Borrower and will certify to the Issuer and the Trustee that the Annual Budget of the Borrower, revised to reflect such recommendations or variations as may be presented in writing by the Financial Consultant, is reasonable, and whether the Rate Covenant for the Fiscal Year to which such revised Annual Budget relates will be met based on the rates, fees, and charges recommended and the Operating Expenses projected by the Financial Consultant.

If the Borrower complies with all recommendations of the Financial Consultant with respect to rates, fees, charges, and Operating Expenses reflected in the revised Annual Budget of the Borrower, the failure to meet the Debt Service Coverage Ratio requirements of Section 4.4 hereof for the Fiscal Year will not constitute an Event of Default under this Loan Agreement as long as such Debt Service Coverage Ratio is at least 1.00.

Notwithstanding the foregoing, the Borrower may make changes to the Annual Budget provided in all respects that any such change or changes shall not result in a default or breach of any covenants contained in this Loan Agreement or any of the other Bond Documents.

Section 6.11   Notices of Certain Events.  The Borrower hereby covenants to notify the Issuer and the Trustee in writing of the occurrence of any Default known to it hereunder or any event which, with the passage of time or service of notice, or both, would constitute a Default hereunder, specifying the nature and period of existence of such event and the actions being taken or proposed to be taken with respect thereto.  Such notice shall be given promptly, and in no event more than 10 Business Days after the Borrower receives notice or knowledge of the occurrence of any such event.  The Borrower further agrees that it will, and will require the Manager to, give prompt written notice to the Issuer, the Underwriter and the Trustee if Insurance Proceeds or

Condemnation Awards are received with respect to the Project and are not used to repair or replace the Project, which notice shall state the amount of such proceeds or awards.

Section 6.12   Inspection of Project Books; Right of Access.  At any time during normal business hours upon not less than two Business Days' notice, the Trustee, the Issuer or any Holder of more than $100,000 of the Bond Obligation may have access to the Project and all books and records of the Borrower pertaining to the Project and shall be permitted to inspect the same, discuss the affairs of the Borrower and the Project with appropriate representatives of the Borrower, the Manager and the Borrower's outside accountants and shall be permitted to make copies of any of such records.

Section 6.13   Other Indebtedness.  The Borrower shall not incur any Indebtedness, other than the Series 2018 Notes and the other debts permitted or anticipated herein as of the Closing Date relating to the Series 2018 Bonds, except that the Borrower is permitted to incur the following so long as no Default or Event of Default has occurred and is continuing:

       1.     such Short-Term Indebtedness as the Borrower, in its judgment, deems expedient; provided that the aggregate amount of Short-Term Indebtedness outstanding at any time does not exceed ten percent (10%) of the total Operating Expenses of the Borrower for the preceding Fiscal Year for which Audited Financial Statements are available;

       2.     such Long-Term Indebtedness as the Borrower, in its judgment, deems expedient, including Indebtedness incurred as a result of the issuance of Additional Bonds; provided that prior to incurring, assuming, or guaranteeing any such Long-Term Indebtedness the Borrower must furnish to the Issuer and the Trustee:

       (i)     a certificate signed by the Borrower Representative setting forth the terms of such Long-Term Indebtedness and the calculation of (A) the Debt Service Coverage Ratio for the Senior Bonds for the last Fiscal Year for which Audited Financial Statements are available, and (B) the Debt Service Coverage Ratio for the Senior Bonds for such last Fiscal Year assuming the proposed Long-Term Indebtedness was incurred on the first day of such Fiscal Year and that the Annual Debt Service on such proposed Long-Term Indebtedness for such Fiscal Year is equal to its Maximum Annual Debt Service and stating that each such Debt Service Coverage Ratio in clauses (A) and (B) was at least equal to the required Coverage Test for such Fiscal Year;

       3.     Indebtedness incurred in the ordinary course of business which does not give rise to a lien or encumbrance on the Project or security interest in Project Revenues except for Permitted Encumbrances; and

       4.     Any Indebtedness incurred or assumed pursuant to (2) above which is not Additional Bonds shall not be secured by a lien on or security interest in all or any portion of the Project or the Project Revenues, except to the extent such lien

or security interest is otherwise a Permitted Encumbrance, and such Indebtedness will not be secured by the money and investments held in any Fund established under the Indenture.

Section 6.14   [Reserved]

Section 6.15   <u>Continuing Disclosure</u>.   The Borrower and Dissemination Agent have entered into the Continuing Disclosure Agreement.   While this Loan Agreement is in effect, the Borrower shall at all times remain a party to the Continuing Disclosure Agreement, or if the Continuing Disclosure Agreement terminates, it shall enter into a similar agreement to provide for the dissemination of the financial statements and notices required by Rule 15c2-12 under the Securities Exchange Act of 1934, as amended.   The Borrower agrees that while the Bonds are Outstanding, it will perform its obligations under the Continuing Disclosure Agreement. Notwithstanding any other provision of this Loan Agreement, failure of the Borrower to comply with this Section and the Continuing Disclosure Agreement shall not be a Default, and the rights and remedies of the Issuer, the Trustee, and the Holders to enforce the provisions of this Section shall be limited solely to a right, by action in mandamus or for specific performance, to compel performance of the obligations of the Borrower under this Section.

Section 6.16   <u>Related Party Transactions</u>.   The Borrower shall not enter into any transaction, including, without limitation, the purchase, sale, lease, or exchange of property or the rendering of any service, with any Affiliate except in the ordinary course of business and pursuant to the reasonable requirements of the Borrower's business and upon terms found by the Governing Body of the Borrower to be fair and reasonable and no less favorable to the Borrower than would be obtained in a comparable arm's length transaction with a Person not an Affiliate.

Section 6.17   <u>Purchase of Tax-Exempt Bonds</u>.   Neither the Borrower nor any "related person" to the Borrower (within the meaning of Section 147(a)(2) of the Code) will purchase any of the Tax-Exempt Bonds, pursuant to any arrangement, formal or informal, unless the Borrower or such related person delivers a Favorable Opinion of Bond Counsel to the Trustee and the Issuer.

Section 6.18   <u>Release of Certain Land and Subordination; Granting of Easements</u>.   The parties hereto reserve the right at any time and from time to time to (a) effect the release and removal from the Mortgage of any part (or interest in such part) of the Mortgaged Property with respect to which the Borrower proposes to convey fee title to a public utility or public body in order that utility services or public services may be provided to the Project, or to effect the subordination of the lien of the Mortgage to rights granted to a public utility or public body in order that utility services or public services may be provided to the Project, (b) grant easements, licenses, rights of way (including the dedication of public highways), and other rights or privileges in the nature of easements with respect to any property included in the Project, free from the lien of the Mortgage, or (c) release existing easements, licenses, rights of way, and other rights or privileges with or without consideration; provided, that if at the time any such release, removal, or grant is made any of the Bonds are Outstanding and unpaid, the Borrower must deposit with the Issuer and the Trustee the following:

(a)       [Reserved],

(b)     a resolution or action of the Governing Body of the Borrower (i) containing a complete legal description of that portion of the Mortgaged Property to be released or subordinated, (ii) stating the purpose for which the Borrower desires the release or subordination, (iii) requesting such release or subordination, and (iv) approving what the Borrower believes is an appropriate amendment to the Mortgage,

(c)     a certificate of the Borrower to the effect that the Borrower is not in default under any of the provisions of this Loan Agreement and that neither any building nor any other improvement constituting part of the Project is located on a portion of the Mortgaged Property with respect to which the release or subordination is to be granted, accompanied by a plat of survey of the Mortgaged Property certified by a registered surveyor of the State depicting (i) the boundaries of the portion of the Mortgaged Property with respect to which the release or subordination is to be granted, (ii) all improvements located on the property surveyed and the relation of the improvements by distances to the boundaries of the portion of such property with respect to which the release or subordination is to be granted, and (iii) all easements and rights of way with recording data and instruments establishing the same,

(d)     a copy of the instrument conveying the title to or subordinating the lien of the Mortgage in favor of a public utility or public body or granting or releasing such easement, license, right of way, or other right or privilege, and

(e)     a certificate of an Architect, dated not more than 60 days prior to the date of the conveyance, release, subordination or grant and stating that, in the opinion of the person signing such certificate, (i) the portion of the Mortgaged Property so proposed to be released or with respect to which the subordination is proposed or with respect to which an easement, license or right of way is proposed to be granted is necessary or desirable in order to obtain utility services or public services to benefit the Project and (ii) the conveyance, release, subordination or grant so proposed to be made will not impair the usefulness of the Project as a senior living facility and will not destroy the means of ingress thereto and egress therefrom.

If such release or subordination relates to a part of the Mortgaged Property on which transportation or utility facilities are located, the Borrower will retain an easement to use such transportation or utility facilities to the extent necessary for the efficient operation of the Project as a senior living facility.  Any money consideration received in connection with the release of any portion of the Mortgaged Property or the subordination of the lien of the Mortgage pursuant to this Section 6.18 will be deposited in a Special Redemption Account of the Bond Fund and used to redeem Bonds pursuant to Section 3.01 of the Indenture on the earliest date Bonds can be redeemed at par.

If all of the conditions of this Section are met, the Trustee is, when directed in writing by the Issuer to do so, authorized to release any such property from the lien of the Mortgage or subordinate such lien or execute and deliver any instrument necessary or appropriate to confirm and grant or release any such easement, license, right of way, or other right or privilege.

No release or conveyance effected under the provisions of this Section will entitle the Borrower to any abatement or diminution of the Loan Payments or the Additional Payments payable under Section 3.2 hereof.

Section 6.19    Liquidity Covenant.    The Borrower covenants on each Liquidity Testing Date, it will maintain sufficient Days' Cash on Hand to meet the Days' Cash on Hand Requirement.

Compliance with the Liquidity Covenant shall be tested on each Liquidity Testing Date (i) semiannually based on the Borrower's quarterly unaudited financial statements for the six (6) months ended June 30, commencing June 30, 2019 and (ii) annually based on the Borrower's audited financial statements required pursuant to Section 6.9 hereof.  If, based upon the annual financial statements of the Borrower required by Section 6.9 hereof, for any Fiscal Year such Liquidity Covenant was not met, the Borrower agrees to employ promptly a Financial Consultant for purposes of obtaining a report of such firm containing recommendations as to changes in the operating policies of the Borrower designed to comply with the Liquidity Covenant and to follow such recommendations. No default under this paragraph will be deemed to occur if within five (5) Business Days following a Liquidity Testing Date, the Borrower contributes sufficient funds to the Operating Reserve Fund to cause compliance with the Days' Cash on Hand Requirement. No default under this paragraph will occur if a Debt Service Coverage Ratio of at least 1.10 is maintained and if such recommendations are followed, notwithstanding that compliance with the Liquidity Covenant is not subsequently attained, but the Borrower will continue to be obligated to employ a Financial Consultant for such purpose until compliance with the Liquidity Covenant is attained.  After four (4) consecutive Liquidity Testing Dates following December 31, 2020, reflecting non-compliance with the Days' Cash on Hand Requirement, the Controlling Holders of the Senior Bonds may replace the Financial Consultant.

Section 6.20    Occupancy Covenant.    The Borrower covenants that for each fiscal quarter starting with the fiscal quarter which ends not less than ninety (90) days following the Completion Date and ending (the "Ending Quarter") with the first full fiscal quarter following Stable Occupancy (each an "Occupancy Quarter") and within five (5) Business Days following the end of each Occupancy Quarter through the Ending Quarter, it shall provide the Issuer and the Trustee with the number of units occupied at the end of such Occupancy Quarter.

Section 6.21    Additional Remedy for Breach of Certain Covenants.    In addition to the remedies provided in Section 7.3 hereof, if the Borrower fails to meet the Rate Covenant, the Liquidity Covenant, or the Occupancy Covenant, upon (i) the recommendation of a Financial Consultant or (ii) at the written direction of the Controlling Holders, the Borrower shall hire, in accordance with Section 4.7 hereof, a new Manager approved by either the Financial Consultant or Controlling Holders.

Section 6.22    Selection of Consultant.    The Borrower is obligated to provide notice in writing to the Issuer, the Trustee and the Holders of any Bonds of the selection of any Consultant required to be employed hereunder by posting such information on EMMA. The Owners of such Series 2018 Bonds are deemed to approve the selection of the Consultant unless the Controlling Holders object in writing delivered to the Issuer and the Trustee within twenty (20) days of notice of the posting on EMMA of the selection of such Consultant, in which event the Borrower shall attempt to engage another Consultant in accordance with the above-described process. All Consultant reports delivered pursuant to this Loan Agreement must be posted to EMMA.

Section 6.23    Cumulative Cash Operating Loss Covenant.    The Borrower covenants that during the period (a) commencing with the fiscal quarter which ends not less than 90 days

following the receipt of a certificate of occupancy for the first building comprising any portion of the Project in which the average occupancy of the units in said building for three consecutive months is equal to or greater than eighty-five percent (85%), as stated in a certificate executed by the Borrower Representative and delivered to the Trustee and (b) ending with the fiscal quarter when Stable Occupancy has occurred, it will calculate its Cumulative Cash Operating Loss as of the last day of each such fiscal quarter (a "CCOL Testing Date"). The Borrower is required to conduct its business so that as of each CCOL Testing Date, the Cumulative Cash Operating Loss is not greater than $1,000,000. The Cumulative Cash Operating Loss is not required to be calculated for any period after the Project achieves Stable Occupancy.

If, as of any CCOL Testing Date, the Cumulative Cash Operating Loss of the Borrower is greater than the amounts set forth above, the Authorized Borrower Representative shall, within 30 days after making such calculation, deliver a certificate to the Trustee, the Issuer, the Underwriter, EMMA, and all Bondowners (each a "Required Information Recipient") setting forth in reasonable detail the reasons for such deficiency and adopting a specific plan setting forth steps to be taken designed to achieve compliance for future periods.

After any two consecutive CCOL Testing Dates showing the Cumulative Cash Operating Loss to be greater than the amounts set forth above, the Authorized Borrower Representative shall, within 30 days after such determination, employ a Financial Consultant to make recommendations with respect to the rates, fees and charges of the Borrower and the Borrower's methods of operation and other factors affecting its financial condition in order to decrease Cumulative Cash Operating Loss to the required level for future periods. A copy of the Financial Consultant's report and recommendations, if any, shall be filed with each Required Information Recipient within 60 days of engagement of any such Financial Consultant. The Borrower shall to the extent reasonable (in the Borrower's judgment) and as permitted by law follow each recommendation of the Financial Consultant. The Borrower shall provide written notice to the Financial Consultant and each Required Information Recipient of any recommendations the Borrower believes to be unreasonable or unlawful and the reasons for such determination. The Borrower shall not be required to obtain a Financial Consultant's report for exceeding the permitted Cumulative Cash Operating Loss if such failure occurs within three (3) fiscal quarters of the failure that triggered the delivery of a prior Consultant's report addressing the information described above.

If the Cumulative Cash Operating Loss is greater than the amounts set forth above for two consecutive quarters, then the Authorized Borrower Representative shall establish a meeting or conference call and invite the Financial Consultant, the Bondowners and the Underwriter. The initial meeting shall occur no later than 30 days following such event and shall be held on a quarterly basis thereafter, until such time as the Borrower has a Cumulative Cash Operating Loss no greater than the amount set forth above.

If the Cumulative Cash Operating Loss is greater than the amounts set forth above for three consecutive quarters, then the Trustee shall declare an Event of Default only if directed to do so in writing by the Controlling Holders.

Section 6.24   [Reserved].

## ARTICLE VII

## DEFAULTS AND REMEDIES

Section 7.1      Defaults.  Each of the following shall constitute a "Default" hereunder:

(a)      Failure by the Borrower to pay any Loan Payments; provided that failure to make a Loan Payment shall not constitute a Default to the extent that the amounts on deposit in any Fund or Account held under the Indenture are sufficient and available to pay principal, premium (if any) and interest due on the related Series of Bonds on the next Bond Payment Date.

(b)      Failure by the Borrower to make, or cause to be made, any (i) Additional Payment (except for the Additional Payments described in Section 3.2(b)(ii)(8), (9) and (10)) or (ii) amounts required to be paid under Sections 4.3, 4.9, 4.10 and 5.1 on or before the date due.

(c)      Failure by the Borrower to meet the Coverage Test covenant if the Borrower fails to engage a Management Consultant or the Borrower fails to implement any of the Management Consultant's reasonable recommendations to the extent possible, and to the extent consistent with the charitable mission of the Borrower, as provided in this Loan Agreement.

(d)      Failure by the Borrower to perform or observe any of its covenants or agreements contained in this Loan Agreement, the Borrower's Tax Letter of Representation, or the Regulatory Agreement other than as specified in paragraphs (a) through (c) of this Section 7.1, and such failure shall continue beyond the applicable grace period specified in Section 7.2 hereof.

(e)      The dissolution or liquidation of the Borrower or the filing by the Borrower of a voluntary petition in bankruptcy, or adjudication of the Borrower as a bankrupt, or assignment by the Borrower for the benefit of its creditors or the entry by the Borrower into an agreement of composition with its creditors, or the approval by a court of competent jurisdiction of a petition applicable to the Borrower in any proceeding instituted under the provisions of State law or the federal bankruptcy statute, as amended, or under any similar act which may hereafter be enacted. The term "dissolution or liquidation of the Borrower," as used in this Section 7.1(e), shall not be construed to include the cessation of the existence of the Borrower resulting either from a merger or consolidation of the Borrower into or with another entity or a dissolution or liquidation of the Borrower following a transfer of all or substantially all of its assets as an entirety, under the conditions permitting such actions contained in Section 6.3 hereof.

(f)      The occurrence or continuance of an "Event of Default" under the Mortgage, the Regulatory Agreement or the Indenture.

(g)      Failure by the Borrower to maintain a Debt Service Coverage Ratio equal to or greater than 1.00 to 1.00 on all Outstanding Bonds and other Long-Term Indebtedness for any Fiscal Year.

The Trustee shall not be deemed to have knowledge of any Default hereunder other than a Default under paragraph (a) hereof, unless a Responsible Officer of the Trustee shall have received actual knowledge or shall have been specifically notified in writing of such Default by the Issuer, the Borrower or by the Holders of at least 25% of the Bond Obligation.

Section 7.2    Notice of Default; Opportunity to Cure.  No default under Section 7.1(d) hereof shall constitute a Default hereunder until:

(a)    The Trustee or the Issuer, by Mail, shall give notice to the Borrower of such default specifying the same; and

(b)    The Borrower shall have had 30 days after receipt of such notice to correct the default and shall not have corrected it; provided, however, that:

(i)    if such default cannot be corrected within 30 days, it shall only be a Default hereunder if the Borrower fails to initiate and diligently pursue appropriate corrective action and such default is not remedied within 120 days after the date of occurrence thereof, or

(ii)    if by reason of Force Majeure the Borrower is unable in whole or in part to carry out any of its agreements contained herein (other than its obligations contained in Article III hereof), the Regulatory Agreement or the Tax Certificate, it shall only be a Default hereunder if the Borrower fails to remedy such default within 120 days after the date of occurrence thereof.

Notwithstanding the foregoing clause (ii), the Borrower agrees to remedy with all reasonable dispatch the cause or causes preventing the Borrower from carrying out its agreements hereunder, provided that the settlement of strikes and other industrial disturbances shall be entirely within the discretion of the Borrower and the Borrower shall not be required to make settlement of strikes, lockouts and other industrial disturbances by acceding to the demands of the opposing party or parties when such course is in the judgment of the Borrower unfavorable to the Borrower.

Section 7.3    Remedies.  Whenever any Default under Section 7.1 hereof shall have happened and be continuing, any or all of the following remedial steps shall be available:

(a)    The Trustee may, and at the written request of the Controlling Holders of the Bonds shall, declare the outstanding principal balance and interest accrued on the Loan and all payments required to be made by the Borrower under Section 3.2 hereof with respect to the Bonds for the remainder of the term of this Loan Agreement to be immediately due and payable, whereupon the same shall become immediately due and payable.  Upon any such acceleration of the Loan, the Bonds shall be subject to mandatory redemption as provided in Section 3.01(d) of the Indenture.

(b)    The Trustee, for and on behalf of the Issuer, may (but shall not be obligated to), and with the written consent and direction of the Controlling Holders of the Bonds shall, take whatever action at law or in equity may appear necessary or desirable to collect the payments required to be made by the Borrower under Section 3.2 hereof then due and thereafter to become due, including, without limitation, pursuing remedies under the Mortgage and the remedies under Section 8.02 of the Indenture.

(c)    The Issuer or the Trustee may (but shall not be obligated to) take whatever action at law or in equity as may be necessary or desirable to enforce performance and observance of any obligation, agreement or covenant of the Borrower under this Loan Agreement.

The provisions of clause (a) of the preceding paragraph, however, are subject to the condition that if, at any time after the Loan shall have been so declared due and payable, and before any judgment or decree for the payment of the money due shall have been obtained or entered, there shall have been deposited with the Trustee a sum sufficient to pay all the principal of the Bonds matured prior to such declaration and all matured installments of interest (if any) upon all the Bonds, with interest on such overdue installments of principal as provided herein, and the reasonable fees and expenses of the Trustee, and any and all other Defaults known to the Trustee (other than in the payment of principal of and interest on the Loan due and payable solely by reason of such declaration) shall have been made good or cured to the satisfaction of the Controlling Holders or provision deemed by the Controlling Holders to be adequate shall have been made therefor, then, and in every such case, the Controlling Holders of the Bonds by written notice to the Issuer and to the Trustee, may, on behalf of the Holders of all the Bonds, rescind and annul such declaration and its consequences and waive such Default; provided that no such rescission and annulment shall extend to or shall affect any subsequent Default, or shall impair or exhaust any right or power consequent thereon.

In case the Trustee or the Issuer shall have proceeded to enforce its rights under this Loan Agreement and such proceedings shall have been discontinued or abandoned for any reason or shall have been determined adversely to the Trustee or the Issuer, then, and in every such case, the Borrower, the Trustee and the Issuer shall be restored respectively to their several former positions and rights hereunder, and all rights, remedies and powers of the Borrower, the Trustee and the Issuer shall continue as though no such action had been taken, subject to the results of any such proceedings or any settlement thereof.

The Borrower covenants that, in case a Default shall occur with respect to the payment of the Loan payable under Section 3.2(a) hereof, then, upon demand of the Trustee, the Borrower will pay to the Trustee the whole amount that then shall have become due and payable under said Section, with interest, to the extent permitted by law, on the amount then overdue at the Default Rate until such amount has been paid.

In case the Borrower shall fail forthwith to pay such amounts upon such demand, the Trustee shall be entitled and empowered (but not obligated) to institute any action or proceeding at law or in equity for the collection of the sums so due and unpaid, and may prosecute any such action or proceeding to judgment or final decree, and may enforce any such judgment or final decree against the Borrower and collect in the manner provided by law the money adjudged or decreed to be payable.

In case proceedings shall be pending for the bankruptcy or for the reorganization of the Borrower under the federal bankruptcy laws or any other applicable law, or in case a receiver or trustee shall have been appointed for the property of the Borrower or in the case of any other similar judicial proceedings relative to the Borrower, or the creditors or property of the Borrower, then the Trustee shall be entitled and empowered (but not obligated), by intervention in such proceedings or otherwise, to file and prove a claim or claims for the whole amount owing and unpaid pursuant to this Loan Agreement and, in case of any judicial proceedings, to file such proofs of claim and other papers or documents as may be necessary or advisable in order to have the claims of the Trustee allowed in such judicial proceedings relative to the Borrower, its creditors or its property, and to collect and receive any money or other property payable or deliverable on any

such claims, and to distribute such amounts as provided in the Indenture after the deduction of its charges and expenses. Any receiver, assignee or trustee in bankruptcy or reorganization is hereby authorized to make such payments to the Trustee, and to pay to the Trustee any amount due it for compensation and expenses, including expenses and fees of counsel incurred by it up to the date of such distribution.

Section 7.4    No Remedy Exclusive.  No remedy herein conferred upon or reserved to the Issuer is intended to be exclusive of any other available remedies, but each and every such remedy shall be cumulative and shall be in addition to every other remedy given under this Loan Agreement or now or hereafter existing at law or in equity.  No delay or omission to exercise any right or power accruing upon any Default shall impair any such right or power or shall be construed to be a waiver thereof, but any such right or power may be exercised from time to time and as often as may be deemed expedient.  In order to entitle the Issuer to exercise any remedy reserved to it in this Article, it shall not be necessary to give any notice, other than such notice as may be required in this Article.  Such rights and remedies as are given the Issuer hereunder shall also extend to the Trustee, and the Trustee and the Holders, subject to the provisions of the Indenture, shall be entitled to the benefit of all covenants and agreements herein contained.

Section 7.5    Attorney's Fees and Expenses.  If a Default hereunder occurs and if the Issuer or the Trustee, or the representative or agent of either, should employ attorneys or incur expenses for the enforcement of any obligation or agreement of the Borrower contained herein or in the other Borrower Documents, the Borrower on demand will pay to the Issuer or the Trustee, as the case may be, the reasonable fees and expenses of such attorneys and the reasonable expenses so incurred, including all costs of any and all investigations, proceedings and court appeals.

Section 7.6    No Additional Waiver Implied by One Waiver.  In the event any agreement contained in this Loan Agreement should be breached by any party and thereafter waived by the other parties, such waiver shall be limited to the particular breach so waived and shall not be deemed to waive any other breach hereunder.

<div style="text-align:center">

ARTICLE VIII

OPTIONS TO TERMINATE AGREEMENT

</div>

Section 8.1    Grant of Option to Terminate.

(a)    The Borrower shall have, and is hereby granted, the option to terminate this Loan Agreement as a whole at any time the Borrower declares it will cease to use the Project by reason of:

(i)    the damage or destruction of all or a significant portion of the Project (with property damage equal to at least $20,000,000) to such extent that, in the reasonable opinion of the Borrower, the Restoration thereof would not be economical;

(ii)    the condemnation of all or part of the Project or the taking by condemnation of such part, use or control of the Project (with the value of the property so taken or condemned equaling at least $20,000,000) as to render it unsatisfactory to the Borrower for its intended use, provided that any temporary taking by condemnation shall not give

rise to the option unless, in the Borrower's reasonable opinion, such temporary taking shall render the Project unsatisfactory to the Borrower for its intended use for a period of at least six months; or

(iii)     any changes in the Constitution of the State or the Constitution of the United States or of legislative or administrative action (whether State, federal, or local), by which this Loan Agreement shall become void or unenforceable or impossible of performance in accordance with the intent and purposes hereof;

provided, however, that (A) in the case of clause (i) or (ii) above, the Borrower shall comply with Article V hereof and apply the Insurance Proceeds resulting from such event to the payment of the Bonds in accordance with the Indenture, and (B) in the case of clause (iii) above, the Bonds shall have been fully paid or provision made for such payment pursuant to Article VII of the Indenture.

(b)     The Borrower shall also have and is hereby granted the option to prepay the Loan in whole and terminate this Loan Agreement if the Loan is prepaid in whole and in amounts necessary to redeem the Outstanding Bonds pursuant to Section 3.02 of the Indenture.

Section 8.2    <u>Exercise of Option to Terminate</u>.  To exercise any such option in Section 8.1 the Borrower shall give written notice to the Issuer and the Trustee, which notice shall specify therein the reason for and the date of termination, and the Borrower shall make arrangements satisfactory to the Issuer and the Trustee for the giving of any required notices of defeasance or redemption of all of the Bonds and any application of Insurance Proceeds in accordance with this Loan Agreement and the Indenture, and pay, or cause to be paid, on or prior to the applicable redemption date, to the Trustee, an amount equal to the sum of the following:

(a)     An amount of money which, when added to the amounts then on deposit under the Indenture and available for such purpose, will be sufficient to retire and redeem all the Outstanding Bonds on the earliest possible redemption date after notice as provided in the Indenture, including, without limitation, the principal amount thereof and all interest to accrue to said redemption date; plus

(b)     An amount of money equal to the Ordinary Trustee's Fees and Expenses and Extraordinary Trustee's Fees and Expenses under the Indenture accrued and to accrue until such final payment and redemption of the Bonds, including fees and expenses related to such redemption; plus

(c)     An amount of money equal to the Issuer's Fees and Expenses under this Loan Agreement accrued and to accrue until such final payment and redemption of the Bonds.

<div align="center">ARTICLE IX</div>

<div align="center">MISCELLANEOUS</div>

Section 9.1    <u>Confidential Information</u>.  The Borrower shall not be required to disclose, or to permit the Issuer, the Trustee or others to acquire access to, any trade secrets of the Borrower or any other processes, techniques or information reasonably deemed by the Borrower to be

proprietary or confidential, except as may be appropriate under State law for the prosecution or defense of any legal or equitable action arising hereunder or for the collection of a judgment or to ensure compliance with the Bond Documents.

Section 9.2    Entire Agreement.  The Bond Documents together constitute the entire agreement and supersede all prior agreements and understandings, both written and oral, between the Issuer and the Borrower with respect to the subject matter hereof.

Section 9.3    Notices.   All notices, certificates or other communications shall be sufficiently given and shall be deemed given on the second day following the date on which the same have been mailed by first class mail, postage prepaid, or by overnight mail service, addressed as provided in the Indenture.  A duplicate copy of each notice, certificate or other communication given hereunder by either the Issuer or the Borrower to the other shall also be given to the Trustee and the Manager.

Section 9.4    Assignments.  This Loan Agreement may not be assigned by any party without consent of the others, except that the Issuer shall assign to the Trustee its rights under this Loan Agreement (except its Reserved Rights) as provided by Section 3.4 hereof and the Borrower may assign its rights under this Loan Agreement as provided by Section 6.3 hereof.

Section 9.5    Severability.  If any provision of this Loan Agreement shall be held or deemed to be or shall, in fact, be illegal, inoperative or unenforceable, the same shall not affect any other provision or provisions herein contained or render the same invalid, inoperative, or unenforceable to any extent whatever.

Section 9.6    Execution of Counterparts.  This Loan Agreement may be simultaneously executed in several counterparts, each of which shall be an original and all of which shall constitute but one and the same instrument.  Delivery of an executed signature page of this Loan Agreement by facsimile or email transmission shall be effective as delivery of a manually signed counterpart hereof.

Section 9.7    Rights of Trustee.  The Trustee shall have and be protected by all of the rights, powers, indemnities, privileges, immunities and other protections provided to the Trustee under the Indenture which are hereby incorporated herein by reference.

Section 9.8    Amendments, Changes and Modifications.  Subsequent to the issuance of Bonds and prior to their payment in full (or provision for payment thereof having been made in accordance with the provisions of the Indenture), this Loan Agreement may not be effectively amended, supplemented, modified, altered or terminated except by an instrument in writing signed by the parties hereto, and only as permitted in Article XI of the Indenture and Section 6.8 hereof.

Section 9.9    Governing Law.  This Loan Agreement shall be governed exclusively by and construed in accordance with the laws of the State applicable to contracts made and performed in the State.

Section 9.10    Term of Agreement.  This Loan Agreement shall be in full force and effect from the date hereof until the later of (a) such time as all the Bonds shall have been fully paid or

provision made for such payment pursuant to Article VII of the Indenture, or (b) such time as the Borrower has paid, or caused to be paid, all amounts payable hereunder.

Section 9.11    No Liability of Issuer's Officers.    No recourse under or upon any obligation, covenant, or agreement contained in this Loan Agreement, or for any claim based thereon, or under any judgment obtained against the Issuer, or by the enforcement of any assessment or penalty or otherwise or by any legal or equitable proceeding by virtue of any constitution, rule of law or equity, or statute or otherwise or under any other circumstances, under or independent of the Indenture, shall be had against any member of the Governing Body or officer, as such, past present, or future of the Issuer, for the payment for or to the Issuer or any receiver thereof, of any sum that may be due and unpaid by the Issuer upon the Bonds. Any and all personal liability of every nature, whether at common law or in equity, or by statute or by constitution or otherwise, of any such member of the Governing Body or officer, as such, to respond by reason of any act or omission on his part or otherwise, for the payment for or to the Issuer or any receiver thereof, of any sum that may remain due and unpaid upon the Bonds, is hereby expressly waived and released as a condition of and in consideration for the execution of this Loan Agreement and the issuance of the Bonds.

Section 9.12    Receipt of and Compliance With Indenture.    The Borrower acknowledges that it has received an executed copy of the Indenture, and accepts and agrees to the provisions thereof, including, without limitation, the provisions of Section 9.04 of the Indenture with respect to compensation and indemnification of the Trustee, and agrees that it will take all such actions as are required or contemplated of it under the Indenture to preserve and protect the rights of the Trustee, the Issuer and of the Holders thereunder and that it will not take any action which would cause a default or Event of Default thereunder. It is agreed by the Borrower and the Issuer that all redemption of Bonds prior to maturity shall be effected as provided in the Indenture. The Borrower hereby agrees that its interest in the Mortgaged Property and its rights hereunder are subject to and subordinated to the interest and rights of the Trustee under the Indenture and acknowledges that the Trustee has entered into the Indenture in reliance upon the assignment to the Trustee of the Issuer's rights under this Loan Agreement and the Borrower's provision of indemnity. The Borrower covenants that it will perform all of the Issuer's obligations and covenants under the Indenture to the extent that they can be performed by the Borrower thereunder. The Borrower further covenants that it will perform all of the duties and obligations of the Borrower that are set forth in the Indenture. The Borrower further agrees that it will reimburse the Issuer for any expenses incurred in the administration of any of the foregoing agreements and this Loan Agreement and will hold the Issuer harmless from any liabilities thereunder in accordance with Section 6.5 hereof.

Section 9.13    Usury; Total Interest.    This Loan Agreement is subject to the express condition, and it is agreed, that at no time shall Loan Payments hereunder or under the other Bond Documents that are or are construed to be payments of interest on the Bond Obligation reflect the payment of interest at a rate in excess of the maximum rate permitted by applicable law. The Borrower shall not be obligated or required to pay, nor shall the Issuer be permitted to charge or collect, interest at a rate in excess of such maximum rate. If by the terms of this Loan Agreement, the Notes, or the other Bond Documents the Borrower is required to make such payments of interest borne at a rate in excess of such maximum rate, such payments shall be deemed to be reduced immediately and automatically to reflect such maximum rate and any such excess shall be applied to reduce the Bond Obligation. This Loan Agreement is also subject to the condition

that amounts paid hereunder representing late payment or penalty charges or the like, including the Default Rate, shall only be payable to the extent permitted by applicable law.

Section 9.14   <u>Survival</u>.

(a)   The rights of the Trustee to payments under this Loan Agreement, other than Loan Payments, shall survive the Trustee's resignation or removal, the discharge of this Loan Agreement and defeasance of the Bonds.

(b)   Notwithstanding anything in this Loan Agreement or any of the Bond Documents to the contrary, the rights, protections, indemnities and immunities afforded to the Trustee hereunder shall survive the resignation or removal of the Trustee and the payment in full or defeasance of the Bonds.

Section 9.15   <u>Borrower's Tax Letter of Representation Controls</u>.   In any matter relating to the exclusion of interest on the Tax-Exempt Bonds from gross income for federal income tax purposes, the terms and provisions of the Borrower's Tax Letter of Representation shall control in the event of any conflict between this Loan Agreement and the Borrower's Tax Letter of Representation.

<p align="center">ARTICLE X</p>

<p align="center">LIMITATIONS ON LIABILITY</p>

Section 10.1   <u>Limitation on Liability of the Issuer; Issuer May Rely</u>.

(a)   All obligations of the Issuer incurred under this Loan Agreement, the Regulatory Agreement and the Indenture shall be limited obligations of the Issuer, payable solely and only from Bond proceeds, and revenues and other amounts derived by the Issuer from the Trust Estate. THE BONDS SHALL BE PAYABLE SOLELY FROM THE REVENUES AND OTHER FUNDS AND PROPERTY PLEDGED UNDER THE INDENTURE AND THE MORTGAGE FOR THE PAYMENT OF THE BONDS, AND NO HOLDER OR HOLDERS OF ANY OF THE BONDS SHALL EVER HAVE THE RIGHT TO COMPEL ANY EXERCISE OF THE TAXING POWER OF THE STATE OR ANY POLITICAL SUBDIVISION OR OTHER PUBLIC BODY OF THE STATE, OR TO ENFORCE THE PAYMENT OF THE BONDS AGAINST ANY PROPERTY OF THE ISSUER, THE STATE OR ANY SUCH POLITICAL SUBDIVISION OR OTHER PUBLIC BODY, INCLUDING THE ISSUER, EXCEPT AS PROVIDED IN THE INDENTURE.   NO OFFICIAL, DIRECTOR, OFFICER, EMPLOYEE, AGENT OR ATTORNEY OF THE ISSUER OR THE TOWN, INCLUDING ANY PERSON EXECUTING THIS LOAN AGREEMENT ON BEHALF OF THE ISSUER, SHALL BE LIABLE PERSONALLY UNDER THIS LOAN AGREEMENT OR FOR ANY REASON RELATING TO THE ISSUANCE OF THE BONDS.   NO RECOURSE SHALL BE HAD FOR THE PAYMENT OF THE PRINCIPAL OF OR THE INTEREST ON THE BONDS, OR FOR ANY CLAIM BASED ON THE BONDS, OR OTHERWISE IN RESPECT OF THE BONDS, OR BASED ON OR IN RESPECT OF THIS LOAN AGREEMENT OR ANY AMENDMENT TO THIS LOAN AGREEMENT, AGAINST ANY OFFICIAL, DIRECTOR, OFFICER, EMPLOYEE, AGENT OR ATTORNEY OF THE ISSUER OR THE TOWN, AS SUCH, OR ANY SUCCESSOR

WHETHER BY VIRTUE OF ANY CONSTITUTION, STATUTE OR RULE OF LAW, OR BY THE ENFORCEMENT OF ANY ASSESSMENT OR PENALTY OR OTHERWISE, ALL SUCH LIABILITY BEING, BY THE ACCEPTANCE OF THIS LOAN AGREEMENT AND AS PART OF THE CONSIDERATION FOR THE ISSUANCE OF THE BONDS, EXPRESSLY WAIVED AND RELEASED.

(b)     It is expressly understood and agreed by the parties to this Loan Agreement that:

(i)     the Issuer may rely conclusively on the truth and accuracy of any certificate, opinion, notice or other instrument furnished to the Issuer by the Trustee, any Holder or the Borrower as to the existence of a fact or state of affairs required under this Loan Agreement to be noticed by the Issuer;

(ii)     the Issuer shall not be under any obligation to perform any record keeping or to provide any legal service, it being understood that such services shall be performed or caused to be performed by the Borrower; and

(iii)     none of the provisions of this Loan Agreement shall require the Issuer to expend or risk its own funds (apart from the proceeds of Bonds issued under the Indenture) or otherwise endure financial liability in the performance of any of its duties or in the exercise of any of its rights under this Loan Agreement unless it first shall have been adequately indemnified to its satisfaction against the costs, expenses and liabilities which may be incurred by taking any such action.

(c)     No provision, representation, covenant or agreement contained in this Loan Agreement or in the Indenture, the Bonds, or any obligation herein or therein imposed upon the Issuer, or the breach thereof, shall constitute or give rise to or impose upon the Issuer a pecuniary liability (except to the extent of any Loan repayments, revenues and receipts derived by the Issuer pursuant to this Loan Agreement and other moneys held pursuant to the Indenture, other than in the Rebate Fund). No provision hereof shall be construed to impose a charge against the general credit of the Issuer, the Town, the State or any other political subdivision of the State, the taxing powers of the foregoing, within the meaning of any Constitutional provision or statutory limitation, or any personal or pecuniary liability upon any official, director, officer, employee, agent or attorney of the Issuer or the Town.

(d)     All covenants, obligations and agreements of the Issuer contained in this Loan Agreement and the Indenture shall be effective to the extent authorized and permitted by applicable law. No such covenant, obligation or agreement shall be deemed to be a covenant, obligation or agreement of any present or future official, director, officer, employee, agent or attorney of the Issuer in other than his official capacity, and no official executing the Bonds shall be liable personally on the Bonds or be subject to any personal liability or accountability by reason of the issuance thereof or by reason of the covenants, obligations or agreements of the Issuer contained in this Loan Agreement or in the Indenture. No provision, covenant or agreement contained in this Loan Agreement, the Indenture or the Bonds, or any obligation herein or therein imposed upon the Issuer, or the breach thereof, shall constitute or give rise to or impose upon the Issuer a pecuniary liability or a charge. No recourse shall be had for the enforcement of any obligation, covenant, promise, or agreement of the Issuer contained in this Loan Agreement or in any Bond

or for any claim based hereon or otherwise in respect hereof or upon any obligation, covenant, promise, or agreement of the Issuer contained in any agreement, instrument, or certificate executed in connection with the Project or the issuance and sale of the Bonds, against any member of the governing board of the Issuer, its officers, counsel, financial advisor, employees or agents, as such, in his or her individual capacity, past, present, or future, or of any successor thereto, whether by virtue of any Constitutional provision, statute, or rule of law, or by the enforcement of any assessment or penalty or otherwise; it being expressly agreed and understood that no personal liability whatsoever shall attach to, or be incurred by, any member of the governing board, officers, counsel, financial advisors, employees or agents, as such, in his or her individual capacity, past, present, or future, of the Issuer or of any successor thereto, either directly or by reason of any of the obligations, covenants, promises, or agreements entered into between the Issuer and the Trustee or the Borrower to be implied therefrom as being supplemental hereto or thereto, and that all personal liability of that character against every such director, officer, counsel, financial advisor, employee or agent, is, by the execution of the Bonds, this Loan Agreement, and the Indenture, and as a condition of, and as part of the consideration for, the execution of the Bonds, this Loan Agreement, and the Indenture, expressly waived and released.

Section 10.2   <u>Delivery of Reports, Etc</u>.  The delivery of reports, information, policies, opinions, budgets, data, certificates  and documents to the Issuer and the Trustee as provided herein is for informational purposes only and the Issuer's and Trustee's receipt of such shall not constitute constructive knowledge of any information contained therein or determinable from information contained therein.  The Trustee and the Issuer shall have no duties or responsibilities hereunder except those that are specifically set forth herein, and no other duties or obligations shall be implied in this Loan Agreement against the Issuer or the Trustee.

[The remainder of this page intentionally left blank]

IN WITNESS WHEREOF, the parties hereto have executed this Loan Agreement under seal, all as of the day and year first above mentioned.

NEW HOPE CULTURAL EDUCATION
FACILITIES FINANCE CORPORATION

By: _____
    President

[Issuer Signature Page of Loan Agreement]

BSPV-PLANO, LLC
a Texas limited liability company

By: Spectrum Housing Corporation
its managing member

By: _____
Berri McBride, Vice President

[Borrower Signature Page of Loan Agreement]

EXHIBIT A

DESCRIPTION OF THE PROJECT

The Project will consist of the 318-unit senior living facility and related support facilities currently known as the Bridgemoor Plano Project and located approximately 500 feet south of 14th Street, bounded on the west by Rowlett Creek, on the south by the DART rail line and on the east along Park Vista Road, Plano, Collin County, Texas 75094.

EXHIBIT B

FORM OF PROJECT FUND REQUISITION

Requisition No. _____                     Date: _____

To:     The Huntington National Bank, as Trustee (the "Trustee") under the Trust Indenture dated as of December 1, 2018 (the "Indenture"), relating to New Hope Cultural Education Facilities Finance Corporation Senior Living Revenue Bonds (Bridgemoor Plano Project) Senior Series 2018A, Taxable Senior Series 2018B, Subordinate Series 2018C and Junior Subordinate Series 2018D.

Attention: Trust Department

       The undersigned Borrower Representative designated pursuant to the terms of the aforesaid Indenture and a Loan Agreement of even date therewith (the "Agreement") relating to the Bonds identified above between BSPV-Plano, LLC, a Texas limited liability company (the "Borrower") and the New Hope Cultural Education Facilities Finance Corporation hereby requests that there be paid from the Project Fund the sum set forth below, and in that connection with respect to the use of the proceeds of the Bonds, I HEREBY CERTIFY, as follow:

       An obligation in each of the amounts set forth below has been incurred in connection with the acquisition, construction and equipping of the Project, constitutes a Cost of the Project, and such obligation or amount represents a capital cost of the Project and not an Issuance Cost.

       Payee

| Name and Address; Wire Instructions | Purpose | Amount |
|---|---|---|
| | | |

     TOTAL:

      The Borrower hereby certifies that:

         1.     all representations, warranties and covenants contained in the Loan Agreement are true and correct as of the date hereof;

         2.     no Event of Default, as defined in the Indenture, or Default, as defined in the Loan Agreement, has occurred and is continuing;

         3.     the Project is free and clear of all liens and encumbrances except Permitted Encumbrances;

         4.     all evidence, statements, and other writings required to be furnished under the terms of this Loan Agreement and the Indenture are true and omit no material fact, the omission of which may make them misleading;

5.      all monies previously disbursed have been used solely to pay for costs allowed by this Loan Agreement (or to reimburse Borrower for such costs previously paid by Borrower), and the Borrower has written evidence to support this item of warranty;

6.      none of the items for which payment is requested has formed the basis for any payment previously made from the Project Fund;

7.      all bills for labor, materials, and fixtures used, or on hand and to be used, in the construction of the Project have been paid or will be paid from the proceeds of such disbursement; and

8.      payment of the cost referenced herein will not violate any representation, warranty, or covenant of the Borrower in the Loan Agreement, the Regulatory Agreement or the Borrower's Tax Letter of Representation.

Capitalized terms used but not defined herein shall have the meanings ascribed to such terms in the Indenture.

BSPV-PLANO, LLC
a Texas limited liability company

By: Spectrum Housing Corporation
      its managing member


By: _____
Name:
Title:

Approved:

AECC, INC.
Construction Consultant


By: _____

Name: _____

Title: _____

EXHIBIT C

FORM OF COMPLIANCE CERTIFICATE

FOR THE PERIOD ENDED DECEMBER 31, 20__

NEW HOPE CULTURAL EDUCATION FACILITIES FINANCE CORPORATION

$66,795,000
SENIOR LIVING REVENUE BONDS
(BRIDGEMOOR PLANO PROJECT)

CONSISTING OF:

$50,530,000 SENIOR SERIES 2018A
$6,765,000 TAXABLE SENIOR SERIES 2018B
$5,000,000 SUBORDINATE SERIES 2018C
$4,500,000 JUNIOR SUBORDINATE SERIES 2018D

I, _____, an authorized representative of BSPV-Plano, LLC, a Texas limited liability company, as "Borrower" for the above described Bonds (the "Bonds"), do hereby certify that (a) no Event of Default or Potential Default of which the Borrower has knowledge has occurred or is continuing, and (b) the Net Income Available for Debt Service and Debt Service Coverage Ratio calculations for Bridgemoor Plano Project for the twelve months ending as set forth below, are true and correct. Terms used herein as defined terms have the meanings provided in the Trust Indenture dated as of December 1, 2018, with regard to the Bonds.

Net Income Available for Debt Service:

Divided by: Annual Debt Service:

Bonds Debt Service Coverage Ratio: _____

Dated _____

BSPV-PLANO, LLC,
a Texas limited liability company

By: Spectrum Housing Corporation
    its managing member

By: _____
Name: _____
Title: _____

The undersigned _____, certifies that (a) it has reviewed the audited financial statements of the Borrower for the period ending December 31, 20__, (b) the foregoing

calculations of the Debt Service Coverage Ratio are correct, (c) the Net Income Available for Debt Service as of the last day of such Fiscal Year was $_____ and (d) the percentage of Project Revenues paid to the Manager as fees under the Management Agreement with regard to such Fiscal Year was _____%.

[INDEPENDENT CERTIFIED PUBLIC ACCOUNTANT]

Dated: _____          By: _____

EXHIBIT D

[FORM OF SERIES 2018A NOTE]

SENIOR LIVING PROMISSORY NOTE
SENIOR SERIES 2018A

$50,530,000                                                              January 8, 2019

FOR VALUE RECEIVED, the borrower executing this Senior Living Promissory Note Senior Series 2018A, and its successors and assigns (the "Borrower"), promises to pay to the New Hope Cultural Education Facilities Finance Corporation (the "Issuer") under that certain Trust Indenture, dated as of December 1, 2018 (the "Indenture"), between The Huntington National Bank, as Trustee (the "Trustee") and the Issuer, the principal sum of $50,530,000 payable on December 1, 2053, or such earlier dates as required in the Indenture or the Loan Agreement (as defined below), and interest accrued on the unpaid portion thereof, from the date hereof at the rate for each day of accrual equal to the rates of interest borne by the bonds of the Issuer designated as Senior Living Revenue Bonds (Bridgemoor Plano Project) Senior Series 2018A (the "Series 2018A Bonds") at the time Outstanding (as defined in the Indenture) payable on the dates and computed as described in the Indenture and the Loan Agreement, relating to principal and interest on the Series 2018A Bonds. Simultaneously with the issuance of the Series 2018A Bonds, the Issuer is issuing $16,265,000 aggregate principal amount of its Senior Living Revenue Bonds (Bridgemoor Plano Project) Taxable Senior Series 2018B (the "Series 2018B Bonds"), its Senior Living Revenue Bonds (Bridgemoor Plano Project), Subordinate Series 2018C (the "Series 2018C Bonds") and its Senior Living Revenue Bonds (Bridgemoor Plano Project) Junior Subordinate Series 2018D (the "Series 2018D Bonds"), as more fully set forth in the Indenture (the Series 2018A Bonds, the Series 2018B Bonds, the Series 2018C Bonds and the Series 2018D Bonds are collectively referred to as the "Bonds," and each as a "Series").

This Senior Living Promissory Note Senior Series 2018A and the payments required to be made hereunder (other than Reserved Rights) have been irrevocably assigned, without recourse, to the Trustee under the Indenture and such payments will be made directly to the Trustee for the account of the Issuer pursuant to such assignment.  All the terms, conditions and provisions of the Indenture, the Loan Agreement and the Series 2018A Bonds are hereby incorporated as a part of this Senior Living Promissory Note Senior Series 2018A.

The principal hereof (and premium, if any) and the interest hereon shall be payable at Grand Rapids, Michigan, the designated corporate trust office of the Trustee.  All such payments shall be in immediately available funds or in such coin or currency of the United States of America as at the time of payment is legal tender for payment of public and private debts.

If the specified date for any such payment shall be a day other than a Business Day (as defined in the Indenture), then such payment may be made on the next succeeding day which is a Business Day without additional interest and with the same force and effect as if made on the specified date for such payment.

All sums due hereon shall be payable at the opening of business of the designated corporate trust office of the Trustee on the date such payments become due.

This Senior Living Promissory Note Series 2018A is executed and delivered by the Borrower pursuant to the Loan Agreement, dated as of December 1, 2018 (the "Loan Agreement"), between the Issuer and the Borrower relating to the Series 2018A Bonds, to evidence a loan by the Issuer to the Borrower thereunder from proceeds of the Series 2018A Bonds. To the extent that any provision of this Senior Living Promissory Note Senior Series 2018A contradicts or is inconsistent with the provisions of the Loan Agreement, the provisions of the Loan Agreement shall control and supersede the contradictory or inconsistent provision herein.

The Borrower shall prepay the outstanding principal sum hereof, as a whole or in part, in the same amount and on the same dates, and with the same premiums, if any, as Series 2018A Bonds called for redemption prior to their maturity in accordance with the provisions of the Indenture. Presentation, demand, protest and notice of dishonor are hereby expressly waived by the Borrower.

This Senior Living Promissory Note Senior Series 2018A is also secured by the Mortgage (as defined in the Indenture).

If an Event of Default, as defined in the Indenture, or a Default as defined in the Loan Agreement, shall occur, the principal hereof and accrued interest hereon may, at the option of the holder hereof, be declared due and payable in the manner and with the effect provided in the Indenture or the Loan Agreement.

This Senior Living Promissory Note Senior Series 2018A is a contract made under and shall be construed in accordance with and governed by the laws of the State of Texas.

> BSPV-PLANO, LLC
> a Texas limited liability company
>
> By: Spectrum Housing Corporation
>   its managing member
>
>
> By: _____
> Name: _____
> Title: _____

Pay to the order of The Huntington National Bank, as Trustee for the owners of the Series 2018A Bonds hereinabove mentioned, without warranty and without recourse against the undersigned except warranty of good title, warranty that the Issuer has not assigned this Note to a Person or entity other than the Trustee, and that the original principal amount thereof remains unpaid hereunder.

NEW HOPE CULTURAL EDUCATION
FACILITIES FINANCE CORPORATION


By: _____
                            President

EXHIBIT D-1

[FORM OF TAXABLE SERIES 2018B NOTE]

SENIOR LIVING PROMISSORY NOTE
TAXABLE SENIOR SERIES 2018B

$6,765,000                                                                                    January 8, 2019

FOR VALUE RECEIVED, the borrower executing this Senior Living Promissory Note
Taxable Senior Series 2018B, and its successors and assigns (the "Borrower"), promises to pay to
the New Hope Cultural Education Facilities Finance Corporation (the "Issuer") under that certain
Trust Indenture, dated as of December 1, 2018 (the "Indenture"), between The Huntington
National Bank, or its successor, as trustee (the "Trustee") and the Issuer, the principal sum of
$6,765,000 payable on December 1, 2031, or such earlier dates as required in the Indenture or the
Loan Agreement (as defined below), and interest accrued on the unpaid portion thereof, from the
date hereof at the rate for each day of accrual equal to the rates of interest borne by the bonds of
the Issuer designated as Senior Living Revenue Bonds (Bridgemoor Plano Project) Taxable Senior
Series 2018B (the "Series 2018B Bonds") at the time Outstanding (as defined in the Indenture)
payable on the dates and computed as described in the Indenture and the Loan Agreement, relating
to principal and interest on the Series 2018B Bonds. Simultaneously with the issuance of the Series
2018B Bonds, the Issuer is issuing $60,030,000 aggregate principal amount of its Senior Living
Revenue Bonds (Bridgemoor Plano Project) Senior Series 2018A (the "Series 2018A Bonds"), its
Senior Living Revenue Bonds (Bridgemoor Plano Project), Subordinate Series 2018C (the "Series
2018C Bonds") and its Senior Living Revenue Bonds (Bridgemoor Plano Project) Junior
Subordinate Series 2018D (the "Series 2018D Bonds"), as more fully set forth in the Indenture
(the Series 2018A Bonds, the Series 2018B Bonds, the Series 2018C Bonds and the Series 2018D
Bonds are collectively referred to as the "Bonds," and each as a "Series").

This Senior Living Promissory Note Taxable Senior Series 2018B and the payments
required to be made hereunder (other than Reserved Rights) have been irrevocably assigned,
without recourse, to the Trustee under the Indenture and such payments will be made directly to
the Trustee for the account of the Issuer pursuant to such assignment.  All the terms, conditions
and provisions of the Indenture, the Loan Agreement and the Series 2018B Bonds are hereby
incorporated as a part of this Senior Living Promissory Note Taxable Senior Series 2018B.

The principal hereof (and premium, if any) and the interest hereon shall be payable at Grand
Rapids, Michigan, the designated corporate trust office of the Trustee.  All such payments shall be
in immediately available funds or in such coin or currency of the United States of America as at
the time of payment is legal tender for payment of public and private debts.

If the specified date for any such payment shall be a day other than a Business Day (as
defined in the Indenture), then such payment may be made on the next succeeding day which is a
Business Day without additional interest and with the same force and effect as if made on the
specified date for such payment.

All sums due hereon shall be payable at the opening of business of the designated corporate trust office of the Trustee on the date such payments become due.

This Senior Living Promissory Note Taxable Series 2018B is executed and delivered by the Borrower pursuant to the Loan Agreement, dated as of December 1, 2018 (the "Loan Agreement"), between the Issuer and the Borrower relating to the Series 2018B Bonds, to evidence a loan by the Issuer to the Borrower thereunder from proceeds of the Series 2018B Bonds.  To the extent that any provision of this Senior Living Promissory Note Taxable Senior Series 2018B contradicts or is inconsistent with the provisions of the Loan Agreement, the provisions of the Loan Agreement shall control and supersede the contradictory or inconsistent provision herein.

The Borrower shall prepay the outstanding principal sum hereof, as a whole or in part, in the same amount and on the same dates, and with the same premiums, if any, as Series 2018B Bonds called for redemption prior to their maturity in accordance with the provisions of the Indenture.  Presentation, demand, protest and notice of dishonor are hereby expressly waived by the Borrower.

This Senior Living Promissory Note Taxable Senior Series 2018B is also secured by the Mortgage (as defined in the Indenture).

If an Event of Default, as defined in the Indenture, or a Default as defined in the Loan Agreement, shall occur, the principal hereof and accrued interest hereon may, at the option of the holder hereof, be declared due and payable in the manner and with the effect provided in the Indenture or the Loan Agreement.

This Senior Living Promissory Note Taxable Senior Series 2018B is a contract made under and shall be construed in accordance with and governed by the laws of the State of Texas.

<div style="margin-left:3em">

BSPV-PLANO, LLC
a Texas limited liability company

By: Spectrum Housing Corporation
    its managing member


By: _____
Name: _____
Title: _____

</div>

D-1-2

Pay to the order of The Huntington National Bank, as Trustee for the owners of the Series 2018B Bonds hereinabove mentioned, without warranty and without recourse against the undersigned except warranty of good title, warranty that the Issuer has not assigned this Note to a Person or entity other than the Trustee, and that the original principal amount thereof remains unpaid hereunder.

NEW HOPE CULTURAL EDUCATION
FACILITIES FINANCE CORPORATION


By: _____
President

EXHIBIT D-2

[FORM OF SERIES 2018C NOTE]

SENIOR LIVING PROMISSORY NOTE
SUBORDINATE SERIES 2018C

$5,000,000                                                    January 8, 2019

FOR VALUE RECEIVED, the borrower executing this Senior Living Promissory Note Subordinate Series 2018C, and its successors and assigns (the "Borrower"), promises to pay to the New Hope Cultural Education Facilities Finance Corporation (the "Issuer") under that certain Trust Indenture, dated as of December 1, 2018 (the "Indenture"), between The Huntington National Bank, as Trustee (the "Trustee") and the Issuer, the principal sum of $5,000,000 payable on December 1, 2053, or such earlier dates as required in the Indenture or the Loan Agreement (as defined below), and interest accrued on the unpaid portion thereof, from the date hereof at the rate for each day of accrual equal to the rates of interest borne by the bonds of the Issuer designated as Senior Living Revenue Bonds (Bridgemoor Plano Project) Subordinate Series 2018C (the "Series 2018C Bonds") at the time Outstanding (as defined in the Indenture) payable on the dates and computed as described in the Indenture and the Loan Agreement, relating to principal and interest on the Series 2018C Bonds. Simultaneously with the issuance of the Series 2018C Bonds, the Issuer is issuing $61,795,000 aggregate principal amount of its Senior Living Revenue Bonds (Bridgemoor Plano Project) Senior Series 2018A (the "Series 2018A Bonds"), its Senior Living Revenue Bonds (Bridgemoor Plano Project) Taxable Senior Series 2018B (the "Series 2018B Bonds"), and its Senior Living Revenue Bonds (Bridgemoor Plano Project) Junior Subordinate Series 2018D Bonds (the "Series 2018D Bonds"), as more fully set forth in the Indenture (the Series 2018A Bonds, the Series 2018B Bonds, the Series 2018C Bonds and the Series 2018D Bonds are collectively referred to as the "Bonds," and each as a "Series").

This Senior Living Promissory Note Subordinate Series 2018C and the payments required to be made hereunder (other than Reserved Rights) have been irrevocably assigned, without recourse, to the Trustee under the Indenture and such payments will be made directly to the Trustee for the account of the Issuer pursuant to such assignment.  All the terms, conditions and provisions of the Indenture, the Loan Agreement and the Series 2018C Bonds are hereby incorporated as a part of this Senior Living Promissory Note Subordinate Series 2018C.

The principal hereof (and premium, if any) and the interest hereon shall be payable at Grand Rapids, Michigan, the designated corporate trust office of the Trustee.  All such payments shall be in immediately available funds or in such coin or currency of the United States of America as at the time of payment is legal tender for payment of public and private debts.

If the specified date for any such payment shall be a day other than a Business Day (as defined in the Indenture), then such payment may be made on the next succeeding day which is a Business Day without additional interest and with the same force and effect as if made on the specified date for such payment.

All sums due hereon shall be payable at the opening of business of the designated corporate trust office of the Trustee on the date such payments become due.

This Senior Living Promissory Note Subordinate Series 2018C is executed and delivered by the Borrower pursuant to the Loan Agreement, dated as of December 1, 2018 (the "Loan Agreement"), between the Issuer and the Borrower relating to the Series 2018C Bonds, to evidence a loan by the Issuer to the Borrower thereunder from proceeds of the Series 2018C Bonds.  To the extent that any provision of this Senior Living Promissory Note Subordinate Series 2018C contradicts or is inconsistent with the provisions of the Loan Agreement, the provisions of the Loan Agreement shall control and supersede the contradictory or inconsistent provision herein

The Borrower shall prepay the outstanding principal sum hereof, as a whole or in part, in the same amount and on the same dates, and with the same premiums, if any, as Series 2018C Bonds called for redemption prior to their maturity in accordance with the provisions of the Indenture.  Presentation, demand, protest and notice of dishonor are hereby expressly waived by the Borrower.

If an Event of Default, as defined in the Indenture, or a Default as defined in the Loan Agreement, shall occur, the principal hereof and accrued interest hereon may, at the option of the holder hereof, be declared due and payable in the manner and with the effect provided in the Indenture or the Loan Agreement.

This Senior Living Promissory Note Subordinate Series 2018C is a contract made under and shall be construed in accordance with and governed by the laws of the State of Texas.

> BSPV-PLANO, LLC
> a Texas limited liability company
>
> By: Spectrum Housing Corporation
>      its managing member
>
>
> By: _____
> Name: _____
> Title: _____

Pay to the order of The Huntington National Bank, as Trustee for the owners of the Series 2018C Bonds hereinabove mentioned, without warranty and without recourse against the undersigned except warranty of good title, warranty that the Issuer has not assigned this Note to a Person or entity other than the Trustee, and that the original principal amount thereof remains unpaid hereunder.

<div style="text-align:right;">

NEW HOPE CULTURAL EDUCATION
FACILITIES FINANCE CORPORATION


By: _____
                President

</div>

EXHIBIT D-3

[FORM OF SERIES 2018D NOTE]

SENIOR LIVING PROMISSORY NOTE
JUNIOR SUBORDINATE SERIES 2018D

$4,500,000                                                                                    January 8, 2019

FOR VALUE RECEIVED, the borrower executing this Senior Living Promissory Note Junior Subordinate Series 2018D, and its successors and assigns (the "Borrower"), promises to pay to the New Hope Cultural Education Facilities Finance Corporation (the "Issuer") under that certain Trust Indenture, dated as of December 1, 2018 (the "Indenture"), between The Huntington National Bank, as Trustee (the "Trustee") and the Issuer, the principal sum of $4,500,000 payable on December 1, 2053, or such earlier dates as required in the Indenture or the Loan Agreement (as defined below), and interest accrued on the unpaid portion thereof, from the date hereof at the rate for each day of accrual equal to the rates of interest borne by the bonds of the Issuer designated as Senior Living Revenue Bonds (Bridgemoor Plano Project) Junior Subordinate Series 2018D (the "Series 2018D Bonds") at the time Outstanding (as defined in the Indenture) payable on the dates and computed as described in the Indenture and the Loan Agreement, relating to principal and interest on the Series 2018D Bonds. Simultaneously with the issuance of the Series 2018D Bonds, the Issuer is issuing $62,295,000 aggregate principal amount of its Senior Living Revenue Bonds (Bridgemoor Plano Project) Senior Series 2018A (the "Series 2018A Bonds"), its Senior Living Revenue Bonds (Bridgemoor Plano Project) Taxable Senior Series 2018B (the "Series 2018B Bonds"), its Senior Living Revenue Bonds (Bridgemoor Plano Project) Subordinate Series 2018C (the "Series 2018C Bonds"), as more fully set forth in the Indenture (the Series 2018A Bonds, the Series 2018B Bonds, the Series 2018C Bonds and the Series 2018D Bonds are collectively referred to as the "Bonds," and each as a "Series").

This Senior Living Promissory Note Junior Subordinate Series 2018D and the payments required to be made hereunder (other than Reserved Rights) have been irrevocably assigned, without recourse, to the Trustee under the Indenture and such payments will be made directly to the Trustee for the account of the Issuer pursuant to such assignment.  All the terms, conditions and provisions of the Indenture, the Loan Agreement and the Series 2018D Bonds are hereby incorporated as a part of this Senior Living Promissory Note Junior Subordinate Series 2018D.

The principal hereof (and premium, if any) and the interest hereon shall be payable at Grand Rapids, Michigan, the designated corporate trust office of the Trustee.  All such payments shall be in immediately available funds or in such coin or currency of the United States of America as at the time of payment is legal tender for payment of public and private debts.

If the specified date for any such payment shall be a day other than a Business Day (as defined in the Indenture), then such payment may be made on the next succeeding day which is a Business Day without additional interest and with the same force and effect as if made on the specified date for such payment.

All sums due hereon shall be payable at the opening of business of the designated corporate trust office of the Trustee on the date such payments become due.

This Senior Living Promissory Note Junior Subordinate Series 2018D is executed and delivered by the Borrower pursuant to the Loan Agreement, dated as of December 1, 2018 (the "Loan Agreement"), between the Issuer and the Borrower relating to the Series 2018D Bonds, to evidence a loan by the Issuer to the Borrower thereunder from proceeds of the Series 2018D Bonds. To the extent that any provision of this Senior Living Promissory Note Junior Subordinate Series 2018D contradicts or is inconsistent with the provisions of the Loan Agreement, the provisions of the Loan Agreement shall control and supersede the contradictory or inconsistent provision herein

The Borrower shall prepay the outstanding principal sum hereof, as a whole or in part, in the same amount and on the same dates, and with the same premiums, if any, as Series 2018D Bonds called for redemption prior to their maturity in accordance with the provisions of the Indenture.  Presentation, demand, protest and notice of dishonor are hereby expressly waived by the Borrower.

If an Event of Default, as defined in the Indenture, or a Default as defined in the Loan Agreement, shall occur, the principal hereof and accrued interest hereon may, at the option of the holder hereof, be declared due and payable in the manner and with the effect provided in the Indenture or the Loan Agreement.

This Senior Living Promissory Note Junior Subordinate Series 2018D is a contract made under and shall be construed in accordance with and governed by the laws of the State of Texas.

<div style="margin-left:3em;">

BSPV-PLANO, LLC
a Texas limited liability company

By: Spectrum Housing Corporation
    its managing member


By: _____
Name: _____
Title: _____

</div>

Pay to the order of The Huntington National Bank, as Trustee for the owners of the Series 2018D Bonds hereinabove mentioned, without warranty and without recourse against the undersigned except warranty of good title, warranty that the Issuer has not assigned this Note to a Person or entity other than the Trustee, and that the original principal amount thereof remains unpaid hereunder.

NEW HOPE CULTURAL EDUCATION
FACILITIES FINANCE CORPORATION


By: _____
                   President