

EOD

04/21/2022

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE EASTERN DISTRICT OF TEXAS
SHERMAN DIVISION**

|  |  |  |
|---|---|---|
| In re: | § § § | Chapter 11 |
| BSPV-PLANO, LLC,[1] | § § | Case No. 22-40276 (BTR) |
| Debtor. | § § § § | |

**FINAL ORDER (1) AUTHORIZING THE DEBTOR TO USE THE CASH
COLLATERAL OF THE HUNTINGTON NATIONAL BANK, AS BOND TRUSTEE; (2)
PROVIDING THE HUNTINGTON NATIONAL BANK, AS BOND TRUSTEE,
<u>ADEQUATE PROTECTION; AND (3) MODIFYING THE AUTOMATIC STAY</u>**

This Final Order (1) Authorizing the Debtor to Use the Cash Collateral of The Huntington

National Bank, as Bond Trustee; (2) Providing The Huntington National Bank, as Bond Trustee,

Adequate Protection; and (3) Modifying the Automatic Stay (this "<u>Final Order</u>") is entered upon

the motion (the "<u>Motion</u>") of the above-captioned debtor (the "<u>Debtor</u>" or "<u>Borrower</u>") for entry

of an order authorizing the Debtor to use certain cash in which The Huntington National Bank, in

its capacity as trustee for certain pre-petition bonds and as secured lender to the Debtor (the "<u>Bond</u>

<u>Trustee</u>"), asserts a security interest (and which the Bond Trustee also asserts is held in trust for

the benefit of the beneficial holders of the Bonds (the "<u>Bondholders</u>") and upon the terms agreed

to by the Debtor and the Bond Trustee.

Upon the terms of the Motion, the stipulations, acknowledgements, statements and

arguments of the Debtor and the Bond Trustee, including by their respective counsel at the interim

and final hearings on the Motion, and based further on the record of these proceedings, the Court

makes the following findings of fact and rulings of law:

---

[1]  The last four (4) digits of the Debtor's federal tax identification number is (3228). The Debtor's address for
notices is: 4851 Keller Springs Road 209, Addison, Texas 75001.

**The Debtor's Chapter 11 Case; Procedural Background; Jurisdiction; Notice**

A.  On March 1, 2022 (the "Petition Date"), the Debtor filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code and thereby commenced a case thereunder (the "Chapter 11 Case"). The Debtor is operating its business and managing its property as a debtor in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code. No request has been made for the appointment of a trustee or examiner. As of the date of this Final Order, no committee of unsecured creditors has been appointed.

B.  This Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1334. This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2). Venue is proper before this Court under 28 U.S.C. §§ 1408 and 1409.

C.  This Court held a hearing to consider granting the relief requested in the Motion on an interim basis on March 8, 2022 (the "Initial Hearing"), following which, this Court entered an order [Docket No. 53] (the "Initial Interim Order") based on its consideration of the Motion, the arguments of counsel, the evidence adduced at the Initial Hearing, and the record before it, and found that, among other things, the Debtor was permitted to use $877,000 from the "Project Fund" (the "Project Fund") held by the Bond Trustee under the Indenture (as defined below), during the period from the Petition Date through March 18, 2022, solely in the amounts set forth and for the purposes specified in the budget attached to the Initial Interim Order as Exhibit "A" (the "Original Interim Budget").

D.  The Court scheduled a final hearing on the Debtor's proposed use of cash collateral in the Motion for March 18, 2022 at 2:00 p.m. (prevailing Central Time) (the "Second Hearing"). As announced at the Second Hearing, the Debtor and the Bond Trustee conferred and agreed to the terms of an extended period for the Debtor to use cash collateral for the period through and including April 1, 2022 as set forth in the Second Order Authorizing Interim Use of Cash Collateral

(the "Second Interim Order") dated March 22, 2022 [Docket No. 68] and accompanying budget (the "Second Interim Budget").

E.   The Debtor and the Bond Trustee agreed to a further extension of the use of cash collateral on the terms set forth in a Third Order Authorizing Interim Use of Cash Collateral (the "Third Interim Order"; and together with the Initial Interim Order, and the Second Interim Order, the "Interim Orders") and accompanying budget attached thereto (the "Third Interim Budget"), to allow the parties time to discuss a consensual final cash collateral order.

F.   This Court held a hearing to consider the Motion on a final basis on April 19, 2022 (the "Final Hearing").

G.   The Debtor has properly served notice of the Motion and the interim hearings and the Final Hearing thereon pursuant to sections 102, 361, 362 and 363 of the Bankruptcy Code, Federal Rules of Bankruptcy Procedure 2002 and 4001, and the Local Bankruptcy Rules of this Court (the "Local Rules"), as applicable, as described more fully in paragraph 3 hereof.

**The Secured Bond Obligations**

H.   The Debtor is obligated to the Bond Trustee on account of the Bonds (as defined below) authorized and issued by the New Hope Cultural Education Facility Finance Corporation (the "Issuer") for the benefit of the Debtor.

I.   Pursuant to that certain Trust Indenture dated as of December 1, 2018 between the Issuer and the Bond Trustee (the "Indenture"), the Issuer issued its $66,795,000 aggregate principal amount of Revenue Bonds comprised of:

    i.   $50,530,000 Senior Living Revenue Bonds (Bridgemoor Plano Project), Senior Series 2018A;

    ii.   $6,765,000 Senior Living Revenue Bonds (Bridgemoor Plano Project), Taxable Senior Series 2018B;

     iii.    $5,000,000 Senior Living Revenue Bonds (Bridgemoor Plano Project), Subordinate Series 2018C; and

     iv.    $4,500,000 Senior Living Revenue Bonds (Bridgemoor Plano Project), Junior Subordinate Series 2018D

(collectively, the "Bonds").

    J.   The Issuer loaned the proceeds of the Bonds to the Debtor pursuant to that certain Loan Agreement dated December 1, 2018 (the "Loan Agreement") between the Issuer and the Debtor. The Debtor used the proceeds of the Bonds to: (i) finance the acquisition of the site on which the Community (defined below) would be built, (ii) finance a portion of the cost of constructing, developing, furnishing and equipping the Community, (iii) fund interest on the Bonds, during the construction phase and for the anticipated lease-up of the Community, (iv) fund separate debt service reserve accounts for the Bonds, and (v) pay the costs of issuance of the Bonds.

    K.   The rights of the Issuer under the Loan Agreement and the other documents evidencing and/or securing the Bonds (collectively, the "Bond Documents") were assigned to the Bond Trustee under the terms of the Indenture and/or that certain Assignment of Notes, Liens, Security Interests and Other Documents, dated January 8, 2019. As a result, the Bond Trustee may enforce all rights of the Issuer.

    L.   The Bond Trustee has a security interest, lien and mortgage on substantially all of the Debtor's assets. Specifically, pursuant to a Deed of Trust, Assignment of Rents and Leases, and Security Agreement dated as of December 1, 2018 from the Debtor to the mortgage trustee for the benefit of the Issuer and assigned to the Bond Trustee (the "Deed of Trust"), the Bond Trustee has a first lien on and security interest in all of the Debtor's assets, including the Debtor's independent living senior community known as Bridgemoor Plano (the "Community"), all real estate, personal property, and fixtures associated with or located at the Community, and all Project Revenues (as defined in the Deed of Trust) and other personal property described in the Deed of Trust, subject

-4-

only to certain Permitted Encumbrances, as defined in and described in the Deed of Trust. In addition, the Bond Trustee holds certain moneys and securities, which were originally funded by the Bondholders, which moneys and securities have been pledged and assigned to the Bond Trustee as security for the payment amounts owed on account of the Bonds. These funds and securities are held by the Bond Trustee under the Indenture in the following funds, each as defined in the Bond Documents:

| Fund or Account | Approximate Balance as of Petition Date |
|---|---|
| Project Fund | $6,191,540.97 |
| Operations and Maintenance Reserve Funds (the "O&M Fund") | $2,155,305.31 |
| Series 2018A Debt Service Reserve Fund | $2,481,383.02 |
| Series 2018B Debt Service Reserve Fund | $288,052.26 |

(collectively, the "Trustee-Held Funds"). All of the collateral described in this paragraph L is referred to as the "Prepetition Collateral." The Bond Trustee's liens on the Prepetition Collateral are referred to herein as the "Prepetition Liens."

M. The Indenture, the Loan Agreement, the Deed of Trust, and the other documents executed in connection with such documents or the Bonds are referred to herein as the "Bond Documents."

N. The Debtor has acknowledged and agrees, and the Court finds, that the funds held in the Debt Service Reserve Funds and the O&M Fund are held in trust for the Bondholders. The Bond Trustee agrees that the funds in the Project Fund and $1,034,000 in the O&M Fund (the "Compromise Funds") are available to the Debtor to finish construction of the Community and for other purposes as set forth in this Final Order in accordance with the Cash Collateral Budget

(defined below). The Debtor reaffirms its acknowledgement that the Bond Trustee holds a validly perfected possessory security interest in the Trustee-Held Funds and is entitled to access the Trustee-Held Funds (other than the Compromise Funds) in accordance with the terms of the Bond Documents, subject to the automatic stay, the Interim Orders, and this Final Order. To the extent that the automatic stay pursuant to section 362(a) of the Bankruptcy Code applies to the Trustee Held Funds, as partial adequate protection for the use of the Trustee's Cash Collateral (as defined below), the Debtor stipulates to relief from the stay with respect to the Trustee Held Funds (other than the Compromise Funds) for the purpose of allowing the Bond Trustee to administer and apply the Trustee Held Funds (other than the Compromise Funds) in accordance with the Bond Documents; *provided, however,* that the Court shall retain jurisdiction over the proper application of such funds, or any potential reapplication of such funds, and both parties reserve all rights regarding such application.  The Trustee Held Funds (other than the Compromise Funds) shall be administered and applied as set forth in the Bond Documents and for the express purposes set forth therein, and shall not be used or made available to the Debtor as Cash Collateral or otherwise pursuant to this Final Order or any other order entered in this Chapter 11 Case.

O.  At the Initial Hearing, the Debtor asserted that the Community, in its current state, was worth not less than $80,000,000. The Bond Trustee has indicated to the Debtor that it has reviewed the value of the Community in its current state and believes that the Community is not worth less than $74,000,000.00 in its current state.

**The Bond Claim**

P.  The Debtor stipulates that as of the Petition Date, the amounts due and owing under the Bonds and Bond Documents are not less than:

(i)      unpaid principal in the amount of $66,795,000;

(ii)     accrued but unpaid interest on the Bonds in the amount of $3,036,693.75 (the aggregate of (i) and (ii) are referred to herein as the "Bond Claim"), which interest continues to accrue on the Bonds at a per diem default rate of $18,279.24; and

(iii)    unliquidated, accrued and unpaid fees and expenses of the Bond Trustee and its professionals (the "Expense Claim"). Such amounts when liquidated shall be added to the Bond Claim.

The Bond Trustee reserves any and all rights to amend the Bond Claim, including but not limited to asserting that additional fees, costs and charges are owed, including payments related to the defeasance of the Bonds, if applicable. Nothing herein shall be deemed to be a waiver of such rights. In the event the Bond Trustee amends the Bond Claim to increase the amount set forth in (i) and (ii) above, the Debtor may challenge any amounts in excess of (i) and (ii) above. Notwithstanding the foregoing or anything contained herein to the contrary, the Debtor reserves all rights, if any, to contest and object to the allowance and payment of the Bond Trustee's claim for postpetition interest at the default rate.

**Use of Cash Collateral and Need for Adequate Protection**

Q.  The Debtor has requested of the Bond Trustee the use of Cash Collateral (as defined below) in connection with the Chapter 11 Case to preserve the value of its business and to complete construction of the Community. Pursuant to the Bankruptcy Code, the Debtor is required to provide adequate protection to the Bond Trustee for the use of such Cash Collateral. The Bond Trustee has informed the Debtor and the Court that the Bond Trustee does not consent to the use of Cash Collateral except upon the terms and conditions of this Final Order.

R.  Without the use of Cash Collateral, the Debtor would suffer immediate and irreparable harm and would likely be required to cease construction of the Community, and other operations immediately or, at a minimum, the Debtor's inability to use Cash Collateral would disrupt the Debtor as a going concern and would otherwise not be in the best interests of the Debtor, its estate, or its creditors, including the Bondholders and the existing tenants of the Community. In lieu of

giving the Bond Trustee relief from the automatic stay or attempting to obtain this Court's approval for use of Cash Collateral on a non-consensual basis, the Debtor wishes to provide adequate protection of the liens and security interests of the Bond Trustee in Cash Collateral and other Prepetition Collateral on the terms set forth in this Final Order, reflecting the agreement of the Debtor and the Bond Trustee.

S.   The Bond Trustee is willing to consent to the use of its Cash Collateral by the Debtor on the terms set forth in this Final Order, including that Cash Collateral is used solely in the amounts and categories set forth in the Cash Collateral Budget (as defined below) and this Final Order.

T.   The terms of the proposed use of Cash Collateral and this Final Order are fair and commercially reasonable, reflect the Debtor's prudent exercise of business judgment consistent with its fiduciary duties and constitute reasonably equivalent value and fair consideration. Good cause has been shown for the entry of this Final Order.

U.   To the extent any portion of the foregoing constitute rulings of law, they shall constitute this Court's rulings with respect to the matters so stated.

**NOW, THEREFORE, THE COURT HEREBY ORDERS AS FOLLOWS:**

1.      <u>Disposition</u>. The Motion is granted on a final basis, on the terms set forth in this Final Order. The date of this Final Order shall be known as the "<u>Effective Date</u>." Any objections to the relief sought in the Motion that have not been previously resolved or withdrawn, and all reservations of rights contained therein, are overruled, without prejudice to any future motion to use the Cash Collateral.

2.      <u>Jurisdiction</u>. This Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157(b) and 1334, and this matter constitutes a core proceeding as defined in 28 U.S.C. § 157(b)(2). Venue is proper before this Court under 28 U.S.C. §§ 1408 and 1409. The Debtor has operated its business and managed its property as Debtor in possession pursuant to 11 U.S.C. §§ 1107 and 1108.

3.      <u>Notice</u>. The Debtor has properly served notice of the Motion and the Final Hearing thereon pursuant to Sections 102, 361, 362, and 363 of the Bankruptcy Code, Bankruptcy Rules 2002 and 4001, and the Local Rules, which notice was sent to, among others: (i) counsel to the Bond Trustee; (ii) each of the Debtor's twenty largest unsecured creditors as set forth in the list filed by the Debtor in the Chapter 11 Case pursuant to Bankruptcy Rule 1007(d); (iii) all lienholders of record; (iv) all applicable governmental agencies to the extent required by the Bankruptcy Rules or Local Rules; (v) all parties that have filed a notice of appearance in this Chapter 11 Case; (vi) the United States Trustee; and (vii) those who have formally appeared and requested service in these proceedings pursuant to Bankruptcy Rule 2002. This notice is appropriate in the particular circumstances and is sufficient for all purposes under the Bankruptcy Code and the applicable Bankruptcy Rules and Local Rules in respect to the relief requested.

4.      <u>Good Cause</u>.  Good cause has been shown for entry of this Final Order.

5.      <u>Authorization to Use Cash Collateral</u>. The Debtor is authorized to use, as cash collateral (as defined in Section 363 of the Bankruptcy Code), Project Revenues (as defined in the Deed of Trust), the remaining funds in the Project Fund, $1,034,000 of the funds in the O&M Fund, and other cash received by the Debtor in the ordinary course of operations of its business, including all amounts currently held in the Debtor's operating account (collectively, the "<u>Cash Collateral</u>"), until the earlier of (i) the Debtor's ability to use Cash Collateral terminates as the result of the occurrence of a Termination Event (as set forth below) or (ii) August 26, 2022.  Use of Cash Collateral is only permitted in accordance with the terms of this Final Order. Use of Cash Collateral shall be limited solely to the categories of expenses listed in the budget attached hereto as **<u>Exhibit A</u>** (the "<u>Cash Collateral Budget</u>"). Further, use of Cash Collateral shall be limited solely to pay expenses in the amounts and at the times listed in the Cash Collateral Budget; <u>provided</u>, <u>however</u>, that the Debtor shall have authority to use Cash Collateral in excess of, and at times different from, the amounts set forth in the Cash Collateral Budget to the extent such a variance does not constitute a Termination Event described in paragraph 19(i) of this Final Order. Notwithstanding the foregoing, the Bond Trustee shall not be obligated to provide any Trustee-Held Funds other than the funds in the Project Fund and $1,034,000 from the O&M Fund.

6.      <u>Exclusion from Cash Collateral</u>. No party, other than the Debtor, may use the Cash Collateral of the Bond Trustee. The Debtor is not authorized to use and shall not use any Project Revenues not derived in the ordinary course of the Debtor's operations. Nothing in the Interim Orders, this Final Order, or in any subsequent order concerning the extension of the use of Cash Collateral, or other order of this Court entitles the Debtor to use any Trustee-Held Funds other than as expressly set forth herein. The Trustee Held Funds (other than the Compromise Funds) are held in trust for the Bondholders.  The Bond Trustee holds a validly perfected possessory security

interest in the Trustee Held Funds. The Bond Trustee is granted relief from the automatic stay pursuant to Section 362 of the Bankruptcy Code for the purpose of allowing the Bond Trustee to administer and apply the Trustee Held Funds (other than the Compromise Funds) in accordance with the Bond Documents, but the Court shall retain jurisdiction over such application or any reapplication thereof, and each of the Bond Trustee and the Debtor reserve their respective rights on the issue of application of such Trustee Held under the Bond Documents as to whether such amounts are allocated to principal, interest or other fees, costs and charges.

7.    <u>Prohibited Use of Cash Collateral</u>. Except as expressly provided in this Final Order, no Cash Collateral or proceeds thereof shall be used for the purpose of: (i) objecting to, or contesting in any manner, or raising any defense to, the validity, amount, extent, perfection, priority, or enforceability of the Bonds, the Prepetition Collateral, the Bond Claim, or any liens or security interests with respect thereto, or any other rights or interests of the Bond Trustee therein or in the Trustee-Held Funds; (ii) asserting any claims or defenses or causes of action arising out of, based upon, or related to, in whole or in part, the Bonds or the Bond Documents, against the Bond Trustee, the Bondholders in their capacity as such, or their respective agents, affiliates, subsidiaries, directors, officers, representatives, attorneys or advisors including, without limitation, any actions under Chapter 5 of the Bankruptcy Code, including with respect to payments made pursuant to the Bond Documents; (iii) paying any material amounts on account of claims arising before the Petition Date, except to the extent provided for in the Cash Collateral Budget and approved by the Court (including any critical vendor orders); (iv) seeking to modify any of the rights granted to the Bond Trustee hereunder; (v) seeking to bifurcate any claims of the Bond Trustee; or (vi) pursuing confirmation of a plan of reorganization or liquidation other than a plan of reorganization or liquidation consented to by the Bond Trustee.

8.    <u>Amendment or Extension of Budget</u>. The Debtor may, at any time, propose to the Bond Trustee in writing (including by email) an amended Cash Collateral Budget, for the period covered by this Final Order; provided, however, no such request shall require any funding from the Trustee Held Funds (other than the Compromise Funds). Any such proposed amendment or modification of the terms and conditions, or any amendment, modification, roll-forward or replacement of the Cash Collateral Budget itself, shall be subject to the prior written consent of the Bond Trustee. At such time as the amended budget becomes the Cash Collateral Budget, the Debtor shall file a copy thereof with this Court and serve it upon all parties entitled to notice in accordance with Bankruptcy Rule 4001(b).

9.    <u>Replacement Lien</u>. Except as otherwise provided in this Section 9, as further adequate protection for any diminution in the value of Cash Collateral and other Prepetition Collateral resulting from the Debtor's use thereof after the Petition Date ("<u>Diminution</u>"), and solely to the extent of any Diminution, the Bond Trustee shall have a valid, perfected, and enforceable replacement lien and security interest (the "<u>Replacement Lien</u>") in (i) all assets of the Debtor existing on or after the Petition Date of the same type as the Prepetition Collateral, together with the proceeds, rents, products, and profits thereof, whether acquired or arising before or after the Petition Date, to the same extent, validity, perfection, enforceability, and priority of the liens and security interests of the Bond Trustee as of the Petition Date (the "<u>Postpetition Bond Collateral</u>"); and (ii) all other assets of the Debtor of any kind or nature whatsoever within the meaning of Section 541 of the Bankruptcy Code, whether acquired or arising prepetition or postpetition, together with all proceeds, rents, products, and profits thereof (the "<u>Supplemental Collateral</u>"; and, collectively with the Postpetition Bond Collateral, the "<u>Collateral</u>"); provided, however, Supplemental Collateral shall not include: (i) causes of action under Chapter 5 of the Bankruptcy Code and proceeds thereof with the exception of any causes of action pursuant to

-12-

Section 542 of the Bankruptcy Code; and (ii) the proceeds of any equity funding or debtor-in-possession loan. The Replacement Lien shall be subject and subordinate to only valid and perfected liens existing on the Petition Date that are senior to Liens of the Bond Trustee ("Prior Liens").

10.    No Further Action Required. The approval of this Final Order by the Court shall be sufficient and conclusive evidence of the validity, extent, enforceability, and perfection of the Replacement Lien granted to the Bond Trustee, whether or not the Bond Trustee elects to file or record financing statements or any other documents that may otherwise be required under federal or state law in any jurisdiction, or to take such other steps as may otherwise be required to obtain, evidence, or perfect such liens under applicable law; provided, however, that upon the request of the Bond Trustee, the Debtor shall execute such other documents as may be reasonably requested to evidence and perfect such liens; that the Bond Trustee may, in its sole discretion, but shall not be required to, file a certified copy of this Final Order in any filing or recording office in any jurisdiction in which the Debtor has real or personal property; that the Debtor is authorized and directed to execute, or cause to be executed, all such financing statements or other documents upon the Bond Trustee's reasonable request; and that such filing or recording shall be accepted and shall constitute further evidence of perfection of the Bond Trustee's liens and security interests. No obligation, payment, transfer, or grant of security under this Final Order shall be stayed (other than by court order in an appeal from this Final Order), restrained, voidable, avoidable, or recoverable under the Bankruptcy Code or under any otherwise applicable state law, or subject to any defense, reduction, setoff, recoupment, or counterclaim.

11.    Superpriority Claim. As additional adequate protection for any Diminution, the Bond Trustee shall have a superpriority administrative expense claim pursuant to Section 507(b) of the Bankruptcy Code with recourse to and payable from any and all assets of the Debtor's estate, including but not limited to rights of the Debtor, choses in action, or claims of any kind whatsoever,

choate or inchoate, present or residual that for any reason cannot be made the subject of the Replacement Lien (the "Superpriority Claim"). The Superpriority Claim shall be subject only to Prior Liens and shall have priority, pursuant to Section 507(b) of the Bankruptcy Code, over any and all administrative expenses, diminution claims, and all other claims against the Debtor, now existing or hereafter arising, of any kind whatsoever, including, without limitation, all other administrative expenses of the kind specified in Section 503(b) of the Bankruptcy Code, and over any and all administrative expenses or other claims arising under Sections 105, 326, 328, 330, 331, 503(b), 506(c), 507(a), 507(b), 546, 726, 1113, or 1114 of the Bankruptcy Code, and shall at all times be senior to the rights of the Debtor, any successor trustee, or any creditor in this Chapter 11 Case, whether or not such expenses or claims may become secured by a judgment lien or other non-consensual lien, levy, or attachment, except that the Superpriority Claim shall not extend to any carve-out for estate professionals and US Trustee fees approved in any debtor-in-possession financing order entered by the Court.

12.   <u>Allowance of Claim</u>. Subject to paragraph 27 below, the entry of this Final Order by the Court shall be a conclusive and binding determination on all parties (x) as to the amount and validity of the Bond Claim as stated in paragraph P(ii) of this Final Order, and (y) as to the scope, extent, perfection, validity, and enforceability, in all respects, of the Bond Trustee's security interests and liens in the Prepetition Collateral, including, without limitation, the Cash Collateral.

13.   <u>Value of Community</u>. The Debtor asserted at the Initial Hearing that the value of the Community in its current state is not less than $80,000,000. The Bond Trustee has indicated that following its review after the Initial Hearing, it believes the value of the Community in its current state is not less than $74,000,000. As such, the Court finds that the value of the Bond Trustee's collateral securing the Bond Claim is greater than the amount of the Bond Claim, and that the Bond Trustee is over-secured and protected by an equity cushion.

14.   <u>DIP Loan Draws and Cash Injection from BSPV Equity Holders</u>. As further adequate protection for the use of Cash Collateral, the Debtor and the Debtor's equity holders have agreed to provide funding pursuant to a debtor-in-possession loan approved by the Court in the amount of $1,000,000 (the "<u>DIP Loan</u>") and an equity contribution in an amount not less than $1,200,000 (the "<u>Equity Contribution</u>"). The proceeds of the DIP Loan and the Equity Contribution are to be used at the times, in the amounts, and for the uses set forth in the Cash Collateral Budget. As a condition for the use of Cash Collateral in any particular week, the Debtor shall have obtained and disbursed all amounts set forth in the Cash Collateral Budget under the line-item "DIP Loan Draws" from the proceeds of the DIP Loan, and under the line-item "Cash Injection from BSPV Holders" from the Equity Contribution, for such week and all prior weeks.

15.   <u>Completion Guaranty</u>. As further adequate protection for the use of Cash Collateral, one of the Debtor's equity holders, Steffen Waltz, agrees to provide the Bond Trustee with a completion guaranty substantially in the form of guaranty attached hereto as **Exhibit B** (the "<u>Completion Guaranty</u>").

16.   <u>Access to Community; Financial Information</u>. As further additional adequate protection of the Bond Trustee's security interests in the Cash Collateral and the Prepetition Collateral, the Debtor shall allow the Bond Trustee and its professionals and designees (including the Bond Trustee's construction monitor and financial consultant) reasonable access, during normal business hours to the premises of the Debtor in order to conduct inspections, appraisals, analyses, and/or audits of the Prepetition Collateral and the Collateral and to monitor construction at the Community, and shall otherwise reasonably cooperate in providing any other financial, operating and construction information reasonably requested by the Bond Trustee for this purpose. The Debtor shall provide to the Bond Trustee bi-weekly on the same day of the week, a report (in the form of the Cash Collateral Budget) indicating all receipts received and disbursements made by the

Debtor in the two weeks ending the prior Friday compared to the Cash Collateral Budget and detailing any variances of more than 10% and at least $10,000 from the expenditures and receipts in the Cash Collateral Budget.   The bi-weekly report also will detail construction progress, including compliance with milestones and estimates of construction completion percentage. The Debtor and its professionals shall be available once each week (subject to reasonable scheduling conflicts) for a telephonic conference call with the Bond Trustee and its representatives and professionals to discuss the status of construction and any proposed refinancing of the Bonds, plan of reorganization, the results of operations, and other matters pertaining to the Community and the Chapter 11 Case, provided that nothing herein requires the disclosure of privileged information or communications. The Bond Trustee's financial advisor, RBC Capital Markets, LLC ("RBC") shall have independent access to any investment banker retained by the Debtor. The Debtor shall provide to the Bond Trustee such other reports and information as the Bond Trustee may reasonably request from time to time, again subject to all privileges.

17.    Milestones.  As further adequate protection against Diminution, the Debtor shall comply with the following construction milestones (the "Milestones"):

a.   The Debtor shall have obtained temporary certificates of occupancy for the Community for the following number of occupants by the following dates:

| Number of Units | Deadline Date |
| --- | --- |
| 96 | May 31, 2022 |
| 126 | June 30, 2022 |
| 156 | July 31, 2022 |
| 318 | August 26, 2022 |

b.   The Debtor shall have achieved the following number of units occupied at the Community by the following dates:

| Number of Units Occupied | Deadline Date |
| --- | --- |
| 12 | May 31, 2022 |
| 22 | June 30, 2022 |
| 34 | July 31, 2022 |

| 41 | August 26, 2022 |

c.   The Debtor shall have completed construction of the cottages by not later than May 15, 2022; and

d.   The Debtor shall have completed construction of the apartment building by not later than August 15, 2022.

18.   <u>Compliance With Bond Documents</u>. As further adequate protection against Diminution, the Debtor shall comply with those terms and provisions of the Bond Documents set forth on **<u>Schedule A</u>** attached hereto and incorporated herein. The requirements of this Final Order shall be in addition to, and not in substitution for, the terms and provisions of the Bond Documents set forth on **<u>Schedule A</u>**; <u>provided</u>, <u>however</u>, in the event of any inconsistency between the Bond Documents and this Final Order, the terms of this Final Order shall control.

19.   <u>Termination of Use of Cash Collateral With Notice</u>. A Termination Event shall be deemed to have occurred five (5) business days after written notice sent by the Bond Trustee to the Debtor, its counsel, and the United States Trustee of the occurrence of any of the following (a "<u>Termination Event</u>"):

(i)   the payment of any expense that would cause aggregate actual expenditures on a cumulative basis in the Cash Collateral Budget measured during any consecutive four-week period to exceed one hundred ten percent (110%) of the total budgeted expenses in the Cash Collateral Budget for such measuring period (notwithstanding such variance, the Bond Trustee shall not be obligated to fund any additional amounts other than the Compromise Funds). Any budgeted expenditures not paid in a particular budget period may be paid during a subsequent period and, for the purpose of calculating the variances set forth above, the Cash Collateral Budget will be revised to move such expenditures to the later period;

(ii)   the failure of the Debtor to pay, within ten (10) days of the applicable due date, all undisputed administrative expenses in full in accordance with their terms as provided for in the Cash Collateral Budget except for any expenses under sections 503(b)(9) or 546(c) of the Bankruptcy Code, or any professional fees in full as otherwise ordered to be paid on an interim basis;

(iii)   the failure of the Debtor to timely pay all fees due under 28 U.S.C. § 1930;

(iv)   the Debtor fails to procure the Equity Contribution;

-17-

(v)     the Debtor utilizes Cash Collateral in a particular week without having expended all amounts set forth in the Cash Collateral Budget under the line-item "DIP Loan Draws" from the proceeds of the DIP Loan, and under the line-item "Cash Injection from BSPV Holders" from the Equity Contribution for such week and all prior weeks;

(vi)    Steffen Waltz fails to provide the Completion Guaranty to the Bond Trustee by April 26, 2022;

(vii)   the Debtor fails to provide the Bond Trustee and its professionals and designees access to the Community;

(viii)  The debtor fails to achieve a Milestone on the date specified; *provided, however*, that, prior to declaring a Termination Event, the Bond Trustee shall take into reasonable, good faith account: (i) whether the Debtor employed its reasonable, best faith efforts to achieve such Milestone; and (ii) whether the failure to achieve such Milestone was caused by events outside of the Debtor's control (such as weather events and governmental approvals), and the Court shall retain jurisdiction over any dispute regarding the same, but in no event shall attorney's fees be awarded against either party over any such dispute, without prejudice to the Bond Trustee's overall attorney's fees and expenses claims; and

(ix)    the failure of the Debtor to comply with, keep, observe, or perform any of its agreements or undertakings under this Final Order (unless a different termination period is specified for such agreement or undertaking).

Unless the Debtor has cured the Termination Event(s) specified in the Bond Trustee's notice prior to the expiration of the five (5) business day period (the "Default Notice Period") described in this paragraph 19 or obtained an order of this Court, on notice to and with the opportunity to be heard by the Bond Trustee, that no such Termination Event has occurred, the Debtor's authority to use Cash Collateral hereunder shall terminate immediately at the expiration of the Default Notice Period, without prejudice to the Debtor seeking an order of this Court to use Cash Collateral on a non-consensual basis.  During the Default Notice Period, the Debtor may request (and the Bond Trustee agrees not to oppose) an emergency hearing before the Court, with proper notice to the Bond Trustee, to contest the alleged occurrence or continuation of a Termination Event.  The Bond Trustee shall have the power to waive any Termination Event set forth in this paragraph 19 in its sole discretion without further order of the Court.

20. <u>Termination of Use of Cash Collateral Without Prior Notice</u>. The Debtor's

authority to use Cash Collateral hereunder shall terminate without any further action by this Court,

and a Termination Event shall occur without prior notice, upon the occurrence of any of the

following (also a "<u>Termination Event</u>"):

> (i)    the Chapter 11 Case is dismissed or converted to a case under
> Chapter 7 of the Bankruptcy Code;
>
> (ii)    the earlier of (y) the date of the entry of an order of this Court
> appointing a Chapter 11 trustee or an examiner with enlarged powers
> (beyond those set forth in Sections 1104(c) and 1106(a)(3) and (4) of the
> Bankruptcy Code) for the Debtor; or (z) the date the Debtor files a motion,
> application, or other pleading consenting to or acquiescing in any such
> appointment;
>
> (iii)    an order is entered in the Chapter 11 Case over the objection of
> the Bond Trustee approving financing pursuant to Section 364 of the
> Bankruptcy Code that would grant an additional security interest or a lien
> on any Collateral, except the DIP Loan, or granting a superpriority
> administrative claim that is equal or superior to the superpriority
> administrative claim granted to the Bond Trustee under this Final Order;
> and
>
> (iv)    an adversary proceeding or contested matter is commenced or
> joined by the Debtor or any committee appointed in this Bankruptcy Case
> challenging the amount, validity, enforceability, priority, or extent of the
> Bond Trustee's liens, security interests, or claims, except solely for the
> Retained Claim (defined below).

Upon the occurrence of a Termination Event described in this paragraph 20, the Debtor's authority

to use Cash Collateral hereunder shall automatically terminate, without prejudice to the Debtor

seeking an order of this Court to use Cash Collateral on a non-consensual basis.  The Bond Trustee

shall have the power to waive any Termination Event set forth in this paragraph 20 in its sole

discretion without further order of the Court.

21. <u>Claims and Causes of Action</u>. Subject to paragraph 27 of this Final Order, on

behalf of itself and the estate, the Debtor hereby waives, releases, and discharges the Bond

Trustee, all Bondholders in their capacity as such, and their respective affiliates, agents, attorneys,

professionals, officers, directors, and employees (collectively, the "Released Parties"), from any and all claims and causes of action arising out of, based upon, or related to, in whole or in part, the Bonds and the Bond Documents; any aspect of the prepetition relationship between the Bond Trustee and/or the Bondholders, and the Debtor; and any other acts or omissions by the Bond Trustee and/or the Bondholders in connection with either the Bond Documents or the Bond Trustee's and/or Bondholders' prepetition relationship with the Debtor. Further, subject to paragraph 27 of this Final Order, the Debtor waives any and all rights to object to or contest the amount of the Bond Claim (other than to the extent that the Bond Trustee amends the Bond Claim to increase the amount set forth in P(i) or (ii) above and the Debtor's reservation of rights to challenge whether the Bond Trustee is entitled to postpetition interest at the default rate) or the Bond Trustee's security interest in the Prepetition Collateral and agrees not to challenge that all such claims and security interests have been duly perfected and are in all respects valid and enforceable first priority security interests and liens. Notwithstanding the foregoing or anything else contained in this Final Order, the Debtor and the estate retain solely the following claim and cause of action (the "Retained Claim"): that the Project Fund may have been underfunded by approximately $2 million under the terms of the Bond Documents; however, the Debtor agrees not to assert the Retained Claim unless and until a Termination Event has occurred and so long as the parties are in the process of negotiating a potential consensual plan.

22.     Failure of Adequate Protection. Nothing herein shall constitute a waiver, release or modification of the rights of the Bond Trustee to assert a claim under Sections 364(c) and 507(b) of the Bankruptcy Code.

23.     Deemed Request for Stay Relief. This Final Order shall be deemed to constitute a request as of the Petition Date by the Bond Trustee for relief from the automatic stay with respect

-20-

to the Prepetition Collateral for purposes of any request for adequate protection granted hereunder but not otherwise, and not for any purposes of enforcing any right against any Collateral.

24.    <u>Bankruptcy Code Sections 506(c) and 552(b)</u>.  To the extent provided in this Final Order, in light of the Bond Trustee's agreement to permit the use of its Cash Collateral as herein provided, the Bond Trustee is entitled to (a) a waiver of any "equities of the case" claims under section 552(b) of the Bankruptcy Code and (b) a waiver of the provisions of section 506(c) of the Bankruptcy Code and any other surcharge on the Collateral.

25.    <u>Modification of Stay</u>. The automatic stay imposed by Section 362 of the Bankruptcy Code is hereby vacated and modified insofar as necessary to permit the Bond Trustee to: (i) receive any payments or distributions made by the Debtor to the Bond Trustee for and on behalf of the Bondholders, (ii) apply, allocate, or make payments from any of the funds or accounts maintained by the Bond Trustee (including, without limitation, the Trustee Held Funds, other than the Compromise Funds) in accordance with the terms of the Bond Documents and otherwise subject to this Final Order, and (iii) take any action authorized by the Interim Orders or this Final Order.

26.    <u>Preservation of Rights</u>. If any or all of the provisions of this Final Order are, at any time, modified, vacated or stayed, such stay, modification, or vacation shall not affect the validity, extent, priority, and enforceability of any lien, priority, or other benefit conferred under the Interim Order, or this Final Order prior to such stay, modification, or vacation.

27.    <u>Binding Effect</u>. This Final Order shall be binding on all creditors and parties in interest in this Chapter 11 Case, including, but not limited to, the Debtor (including its affiliates, insiders and equity holders and their respective affiliates) and any successors thereto, any Chapter 11 or Chapter 7 trustee that is appointed or elected in this Chapter 11 Case <u>provided</u>, <u>however</u>, that this Final Order is without prejudice to the rights of individual creditors (other than affiliates,

insiders and equity holders of the Debtor and their respective affiliates) or an official committee of unsecured creditors (a "Committee"), if any, to, on behalf of the Debtor's estate, challenge the validity, amount, perfection, priority, extent or enforceability of the Bond Claim or the pre-petition security interests of the Bond Trustee (a "Challenge"), so long as any Challenge is made on or before June 1, 2022, after which time all Challenges shall be deemed finally and conclusively barred; provided further that if one or more Challenges are timely made under this paragraph 27 and properly filed, then except for such Challenges, all potential Challenges are hereby deemed forever waived and relinquished. In the event the Bond Trustee asserts it is owed amounts in excess of the Bond Claim, for among other reasons those set forth in paragraph P hereof, any party (including the Debtor) may object to the amounts in excess of the Bond Claim.

28.    No Competing Liens. Except as set forth herein, the Debtor shall not grant liens on, or security interests in, the Prepetition Collateral or the Collateral to any other party, pursuant to Section 364 of the Bankruptcy Code or otherwise, without the consent of the Bond Trustee, except subordinated liens authorized in connection with the DIP Loan.

29.    Reservation of Rights. Except as provided in this Final Order, neither the Debtor nor the Bond Trustee waives any of its rights under the Bankruptcy Code, any applicable law, or the Bond Documents, including, without limitation, the right of the Debtor or the Bond Trustee at any time to seek any relief (or to oppose any such relief) under the Bankruptcy Code, or the right of the Debtor or the Bond Trustee to exercise any of its rights and remedies under the Bankruptcy Code at any time.

30.    Further Relief. Nothing herein shall (i) preclude the Bond Trustee from seeking any other relief that it may deem appropriate, including relief from the automatic stay; or (ii) prevent the Bond Trustee from asserting at some later time that its liens and security interests in the Prepetition Collateral are not being adequately protected.

31.    <u>No Third Party Beneficiaries</u>. Except as expressly provided herein, no rights are created hereunder for the benefit of any third party, any creditor, or any direct, indirect or incidental beneficiary except for the Bondholders, as set forth herein.

32.    <u>Effectiveness</u>. The rights and obligations of the parties under this Final Order shall be effective and enforceable as of the date of the Petition Date, and, for the avoidance of doubt, Bankruptcy Rule 6004(h) shall not apply hereto. If any or all of the provisions of this Final Order are hereafter reversed, modified, vacated or stayed, such reversal, modification, vacatur, or stay shall not affect (i) the validity, extent, priority, or enforceability of any obligations incurred prior to the actual receipt of written notice by the Bond Trustee of the effective date of such reversal, modification, vacatur, or stay, or (ii) the validity, extent, or enforceability of the liens and claims granted hereunder.

**SO ORDERED.**

Signed on 4/21/2022

_Brenda T. Rhoades_     YM

HONORABLE BRENDA T. RHOADES,
CHIEF UNITED STATES BANKRUPTCY JUDGE

AGREED:

| MUNSCH HARDT KOPF & HARR, P.C. | GREENBERG TRAURIG, LLP |
|---|---|
| By: /s/ Davor Rukavina<br>Jay H. Ong, Esq.<br>Texas Bar No. 24028756<br>Davor Rukavina, Esq.<br>Texas Bar No. 24030781<br>Thomas D. Berghman, Esq.<br>Texas Bar No. 24082683<br>3800 Lincoln Plaza<br>500 N. Akard Street<br>Dallas, Texas 75201-6659<br>Telephone: (214) 855-7500<br>Facsimile: (214) 855-7584<br><br>**PROPOSED ATTORNEYS FOR THE DEBTOR-IN-POSSESSION** | By: /s/ Kevin J. Walsh (*w/ permission*)<br>Kevin J. Walsh<br>WalshKe@gtlaw.com<br>Colleen A. Murphy<br>MurphyC@gtlaw.com<br>Charles W. Azano<br>AzanoCh@gtlaw.com<br>One International Place, Suite 200<br>Boston, Massachusetts 02110<br>Telephone: (617) 310-6000<br>Facsimile: (617) 310-6001<br><br>**COUNSEL FOR THE HUNTINGTON NATIONAL BANK SOLELY IN ITS CAPACITY AS BOND TRUSTEE ON BEHALF OF HOLDERS OF CERTAIN BONDS** |

**EXHIBIT "A"**

**BSPV-Plano, LLC**
**26-Week Cash Flow Forecast – Weeks Ended 03/04/22 - 08/26/22 (in 000s)**

| CF Forecast Week Number / Week Ending | 26-Week Total |
|---|---|
| **Operating Cash Balance** | |
| Opening Cash Balance | 256 |
| **Operating Receipts:** | |
| Rent (Less Concessions) [1] | 228 |
| Other Income [1] | 28 |
| Other | |
| **Total Receipts** [1] | 256 |
| **Operating Disbursements:** | |
| *Operations* | |
| Management Fee | 14 |
| Marketing & Advertising | 25 |
| Payroll | 188 |
| Utilities | 47 |
| Repairs & Maintenance | 45 |
| Insurance [1] | 183 |
| Tenant Activities | 7 |
| G&A | 28 |
| Other Exp | 15 |
| **Total Operating Disbursements** [1] | 522 |
| **Operating Cash Flow** | (266) |
| **Soft Cost Draws** | 238 |
| **Construction-Related Receipts:** | |
| Access to Project Fund | 6,192 |
| Access to O&M Fund | 796 |
| E&O Draws | 1,000 |
| Cash Injection from BSPV Equity Holders | 1,200 |
| **Construction-Related Disbursements:** | |
| HVAC | 261 |
| HVAC Materials | 151 |
| HVAC Finals | 34 |
| Drywall | 302 |
| Insulation | 172 |
| Paint | 201 |
| Electrical | 82 |
| Electrical Trim | 41 |
| Fire Rough | 15 |
| Fire Finals | 116 |
| Flooring | 365 |
| Showers | 13 |
| Hardware | 14 |
| Trim | 61 |
| Plumbing | 550 |
| Plumbing Trim | 12 |
| Appliance Installation | 19 |
| Cabinets/Granite Installation | 104 |
| Framing/Siding | 28 |
| Roofing | 46 |
| Gutters | 8 |
| Elevators | 119 |
| Doors | 300 |
| Mirror Installation | 20 |
| Balconies | 106 |
| Courtyard Finishes | 55 |
| Landscaping | 55 |
| Lighting | 40 |

CONFIDENTIAL DRAFT

| | Total |
|---|---|
| Sidewalks | 25 |
| Striping/Bumper Stops | 40 |
| Garage Storage Units | 128 |
| Carpets | 50 |
| Pool/Pool Enclosure | 190 |
| Pool Deck/Concrete | 18 |
| Pool Furniture | 100 |
| Clubhouse Furniture | 95 |
| East Side Retaining Wall | 45 |
| Specialties | 175 |
| Utilities | 127 |
| GC Management | 46 |
| Additional GC Management – Regent Construction | 450 |
| Equipment Rental | 2 |
| Storage | 12 |
| Materials | 402 |
| Trash Cleanup | 92 |
| Punchlist/Final Clean | 129 |
| Drainage Under Railroad [1] | 200 |
| Hydrologist | 51 |
| Regulatory Consulting | 15 |
| Contingency | 378 |
| Retainage | 1,461 |
| **Total Construction-Related Disbursements** | **7,517** |
| **Construction-Related Cash Flow** | **1,671** |
| **Operating and Construction Net Cash Flow** | **1,645** |
| **Chapter 11 Related Disbursements** | |
| Critical vendor prepayment plans [7] | 552 |
| Debtor Professionals | 1,000 |
| Unsecured creditors committee | |
| US Trustee | |
| Utility security deposits | 72 |
| Other | 20 |
| **Total Chapter 11 Related Disbursements** | **1,644** |
| **Cash Flow Before Interest Payments** | **(0)** |
| **Interest Payments** | |
| A-Series Bonds | |
| B-Series Bonds | |
| C-Series Bonds | |
| D-Series Bonds | |
| **Total Interest Payments** | |
| **Net Cash Flow After Interest Payments** | **(0)** |
| **Ending Cash Balance [8]** | **(0)** |

Footnotes

1) Receipts are sourced from the 53-week Projection of Operating Results.
2) First move-in is scheduled for Mid-March. However, the concession that will be offered to first month's rent free – thus the people moving in March will not begin paying rent until April's rent, thus we will project this to be received for week of May to be conservative. The remaining projected cash received for rent will follow the 53-month projection.
   For simplicity sake, rent will be projected to be received on the first of the month, per the 53-week projection
3) Other Income includes parking, storage units, washer/dryer rental, door-to-door trash service, maid service, etc
4) Per recent discussions with insurance carriers
5) Disbursements are sourced from the 53-month Projection of Operating Results
6) Anticipated payments to services
7) Critical Vendor payment plan: Most critical vendors is scheduled at full pre-petition payment in week 2; remainder paid in weeks 3 and 4
8) Ending Cash Balance in Week 1 of $150k funded to bankruptcy counsel retainer

CONFIDENTIAL DRAFT

EXHIBIT "B"

## GUARANTY AGREEMENT

This Guaranty Agreement (this "*Guaranty*"), dated as of April 18, 2022, by STEFFEN WALTZ, an individual ("*Guarantor*"), in favor of THE HUNTINGTON NATIONAL BANK, as Trustee *(*together with its successors and assigns, the "*Trustee*") under the hereinafter defined Trust Indenture for the owners of the below-referenced Bonds (the "*Bondholders*"). The Trustee and the Bondholders are sometimes collectively referred to herein as the "*Guaranteed Parties*".

### PRELIMINARY STATEMENTS

A.      Effective as of December 1, 2018, New Hope Cultural Education Facilities Finance Corporation (the "*Issuer*"), issued Tax Exempt and Taxable Bonds (the "*Bonds*") to finance the acquisition, construction and equipment of a senior living facility in Plano, Collin County, Texas (the "*Project*") and advanced the proceeds of such the Bonds to BSPV-Plano, LLC, a Texas limited liability company (the "*Borrower*" and collectively with Guarantor, the "*Obligors*").

B.      On March 1, 2022, the Borrower filed its voluntary petition for relief under Chapter 11 of Title 11 of the United States Code (the "*Bankruptcy Code*") commencing case no, 22-40276 (the "*Bankruptcy Case*") in the United States Bankruptcy Court for the Eastern District of Texas, Sherman Division (the "*Bankruptcy Court*")

C.      In connection with the agreement to use of the Trustee's cash collateral reached by the Borrower and the Trustee in the Bankruptcy Case and as approved by the Bankruptcy Court, the Guarantor has agreed to provide this Guaranty in favor of the Guaranteed Parties.

D.      The Guarantor, through his indirect interest in the Borrower, will materially benefit from the Borrower's ability to use cash collateral consensually as set for in a final order entered by the Bankruptcy Court concerning the use of cash collateral (the "*Cash Collateral Order*").

NOW, THEREFORE, for good and valuable consideration, receipt whereof is hereby acknowledged, the Guarantor hereby makes the following representations and warranties to, and hereby covenants and agrees with, the Guaranteed Parties as follows:

1.      All capitalized terms used herein without definition shall have the same meanings herein as such terms have in the Trust Indenture, dated as of December 1, 2018 by and between the Issuer and the Trustee (the "*Indenture*"), and the rules of construction set forth therein shall apply equally to this Guaranty *mutatis mutandis*.

2.      The Guarantor hereby guarantees to the Guaranteed Parties the Borrower's completion of construction of the Bridgemoor senior living apartment complex, Plano, Texas in accordance with (i) the plans and specifications therefor filed with the City of Plano, Texas, and (ii) the construction agreement (AIA Form A102-2017) dated July 10, 2018 between Borrower and the general contractor for the Project (which construction agreement is annexed hereto as Addendum A) ("*Guaranteed Obligation*"), <u>provided</u>, <u>however</u>, that the Guarantor will not be liable to pay the Guaranteed Obligation until after the cost of construction is funded as provided in the

Cash Collateral Budget (as defined in the Cash Collateral Order) pursuant to the following line items: the Project Fund, O&M Fund, and Cash Injection from BSPV Equity Holders.

3.     The Guarantor further agrees to pay to the Guaranteed Parties the Guaranty Collection Costs.  As used herein, the "*Guaranty Collection Costs*" shall mean all reasonable expenses, legal and/or otherwise (including court costs and reasonable attorneys' fees and expenses), paid or incurred by the Guaranteed Parties in endeavoring to collect the Guaranteed Obligation, or any part thereof, from the Guarantor, or in protecting, defending or enforcing this Guaranty in any litigation, bankruptcy or insolvency proceedings or otherwise, incurred subsequent to the date of this Guaranty.

4.     This Guaranty is a continuing, absolute, and unconditional guaranty, and shall remain in full force and effect until all of the Guaranteed Obligation shall be fully satisfied.  This Guaranty is a guaranty of payment and not of collection.

5.     The liability hereunder shall in no way be affected or impaired by (and the Guaranteed Parties are hereby each expressly authorized to make from time to time, without notice to Guarantor), any sale, pledge, surrender, compromise, settlement, release, renewal, extension, indulgence, alteration, substitution, exchange, change in, modification or other disposition of any of the Guaranteed Obligation, either express or implied, or of the Indenture, the Bonds or any Borrower Document or any other contract or contracts evidencing any thereof, or of any security or collateral therefor.  The liability hereunder shall in no way be affected or impaired by any acceptance by the Guaranteed Parties of any security for or other guarantors upon any of the Guaranteed Obligation, or by any failure, neglect or omission on the part of the Guaranteed Parties to realize upon or protect any of the Guaranteed Obligation, or any collateral or security therefor, or to exercise any lien upon or right of appropriation of any moneys, credits or property of any Obligor or other obligor or guarantor, possessed by any of the Guaranteed Parties, toward the performance of the Guaranteed Obligation, or by any application of payments or credits thereon. The Guaranteed Parties shall have the exclusive right to determine how, when and what application of payments and credits, if any, shall be made on said Guaranteed Obligation, or any part of same. In order to hold the Guarantor liable hereunder, there shall be no obligation on the part of the Guaranteed Parties, at any time, to resort for payment or performance to any Obligor or to any other obligor or guarantor, or to any other person, its property or estate, or resort to any collateral, security, property, liens or other rights or remedies whatsoever, and the Guaranteed Parties shall have the right to enforce this Guaranty against Guarantor irrespective of whether or not other proceedings or steps are pending seeking resort to or realization upon or from any of the foregoing.

6.     All diligence in collection or protection, and all presentment, demand, protest and/or notice, as to anyone and everyone, whether or not the Borrower, the Guarantor or others, of dishonor and of default and of non-payment and of the creation and existence of any and all of said Guaranteed Obligation, and of any security and collateral therefor, and of the acceptance of this Guaranty, and of any and all extensions of credit and indulgence hereunder, are expressly waived by Guarantor.  No act of commission or omission of any kind, or at any time, upon the part of the Guaranteed Parties in respect to any matter whatsoever, shall in any way affect or impair this Guaranty.

WALTZ GUARANTY

7.    Guarantor agrees that he will not exercise or enforce any right of exoneration, contribution, reimbursement, recourse or subrogation available to him against any person liable for payment of the Guaranteed Obligation, or as to any security therefor, unless and until the Guaranteed Obligation has been fully performed and satisfied and any commitments of the Guaranteed Parties to extend credit to the Borrower under the Borrower Documents shall have expired or terminated.  The payment by Guarantor of any amount or amounts to the Guaranteed Parties pursuant hereto shall not in any way entitle the Guarantor, either at law, in equity or otherwise, to enforce any right, title or interest (whether by way of subrogation or otherwise) in and to any collateral security for performance of the Guaranteed Obligation or any other rights or remedies in any way relating thereto or in and to any amounts theretofore, then or thereafter paid or applicable to the payment thereof howsoever such payment may be made and from whatsoever source such payment may be derived unless and until all of the Guaranteed Obligation and all Guaranty Collection Costs have been performed and paid and satisfied in full; and unless and until performance and such payment in full and termination, any payments made by Guarantor hereunder and any other payments from whatsoever source derived on account of or applicable to the Guaranteed Obligation or any part thereof shall be held and taken to be merely payments in gross to the Guaranteed Parties reducing pro tanto the Guaranteed Obligation.

8.    To the extent permitted by the Indenture, the Bonds or the other Borrower Documents, each Guaranteed Party may, without any notice whatsoever to Guarantor, sell, assign or transfer all of its rights under this Guaranty, thereto in conjunction with the sale, assignment or transfer of its ownership interest in the Bonds, and in that event it (or its designated authorized agent) shall have the right to enforce this Guaranty, by suit or otherwise, for the benefit of such assignee, transferee or holder as fully as if such assignee, transferee or holder were herein by name specifically given such rights, powers and benefits.

9.    Guarantor waives any and all defenses, claims, and discharges of the Borrower and of any other obligor pertaining to the Guaranteed Obligation, except the defense of discharge by payment and performance in full.  Subject to the foregoing sentence, Guarantor will not assert, plead or enforce against the Guaranteed Parties any defense of waiver, release, discharge in bankruptcy, statute of limitations, res judicata, statute of frauds, anti-deficiency statute, fraud, incapacity, minority, usury, illegality or unenforceability which may be available to the Borrower or any other person liable in respect of any of the Guaranteed Obligation, or any set-off available against the Guaranteed Parties to the Borrower or any such other person, whether or not on account of a related transaction.  Guarantor acknowledges and agrees that he is a guarantor, not a surety, under this Guaranty and shall not raise any suretyship law as a defense to his obligations hereunder and waives, to the maximum extent permitted by law, all rights and defenses of a surety under applicable law.

In addition to the above, to the fullest extent permitted by law, Guarantor unconditionally and irrevocably waives:  all suretyship rights and benefits under the Texas Rules of Civil Procedure and any similar statutes or rules of procedure.

10.    If any payment applied by the Guaranteed Parties to the Guaranteed Obligation is thereafter set aside, recovered, rescinded or required to be returned for any reason (including, without limitation, the bankruptcy, insolvency or reorganization of the Borrower or any other

obligor), the Guaranteed Obligation to which such payment was applied shall for the purposes of this Guaranty be deemed to have continued in existence, notwithstanding such application, and this Guaranty shall be enforceable as to such of the Guaranteed Obligation as fully as if such application had never been made.

11.    Guarantor hereby represents and warrants that:

(a) He is *sui juris* and has the full capacity, legal right, power and authority to enter into this Guaranty and to carry out and consummate all transactions contemplated by this Guaranty.

(b)    This Guaranty is a legal, valid and binding agreement of the Guarantor, enforceable against such Guarantor, in accordance with its terms, except to the extent that the enforceability of this Guaranty may be limited by general principles of equity which may permit the exercise of judicial discretion, and by bankruptcy, insolvency, moratorium, reorganization or similar laws relating to the enforcement of creditors' rights generally, now or hereafter in effect.

(c)    To the knowledge of the Guarantor, the execution and delivery of this Guaranty, the consummation of the transactions herein contemplated and the fulfillment of or compliance with the terms and conditions hereof, will not conflict with or constitute a violation or breach of or default (with due notice or the passage of time or both) under any indenture, mortgage, deed of trust, loan agreement, lease, contract or other material agreement or instrument to which the Guarantor is a party or by which he or his properties are otherwise subject or bound, or any applicable law or administrative rule or regulation, or any applicable court or administrative decree or order, or result in the creation or imposition of any prohibited lien, charge or encumbrance of any nature whatsoever upon any of the property or assets of the Guarantor, which conflict, violation, breach, default, lien, charge or encumbrance would materially and adversely affect the consummation of the transactions contemplated by this Guaranty or the financial condition, assets, properties, or operations of the Guarantor.

(d)    Except for the suit served on 3-31-2022 as per Exhibit "A", there is no action, suit, proceeding, inquiry or investigation, before or by any court or federal, state, municipal or other governmental authority, pending, or to the knowledge of the Guarantor, threatened against or affecting the Guarantor or the assets, properties or operations of the Guarantor which, if determined adversely to the Guarantor or its interests, would have a material adverse effect upon the consummation of the transactions contemplated by or the validity of this Guaranty or upon the financial condition, assets or properties of the Guarantor, and the Guarantor is not in default with respect to any order or decree of any court or any order, regulation or demand of any federal, state, municipal or other governmental authority, which default would have consequences that would materially and adversely affect the consummation of the transactions contemplated by, or the validity of, this Guaranty or the financial condition, assets or properties of the Borrower or the Guarantor. All tax returns except for the years 2020 and 2021 (federal, state and local) required to be filed by or on behalf of the Guarantor have been filed (or extensions have been filed in respect thereof), and all taxes shown thereon to be due, including interest and penalties, except such, if any, as are being actively contested by the Guarantor in good faith, have been paid or adequate reserves have been made for the payment thereof.

WALTZ GUARANTY

(e)    No information, exhibit or report furnished to the Trustee or the Bondholders by the Guarantor in connection with the negotiation of this Guaranty or the issuance of the Bonds contains any untrue statement of a material fact or omits to state a material fact required to be stated therein or necessary to make the statements therein, in the light of the circumstances under which they were made, not misleading.

(f)    The assumption by the Guarantor of the obligations hereunder will result in a direct financial benefit to the Guarantor; and the Guarantor has received a reasonably equivalent value therefor, and on the date hereof the Guarantor (i) is not insolvent; (ii) is not engaged or about to engage in a business or a transaction for which the remaining assets of the Guarantor are unreasonably small in relation to the business or transaction; and (iii) does not intend to incur, or believe or reasonably should believe that it will incur, debts beyond its ability to pay as such debts become due.

12.    Guarantor is fully aware of the financial condition of the Borrower, including without limitation that the Borrower is the debtor in the Bankruptcy Case, and the requirements of the Indenture and the other Borrower Documents, as well as the status of construction at the Project, and is executing and delivering this Guaranty based solely upon its independent investigation of all matters pertinent hereto and is not relying in any manner upon any representation or statement by any Guaranteed Party.  Guarantor hereby assumes full responsibility for obtaining any additional information concerning the financial condition and prospects of the Borrower and shall have no right to require any Guaranteed Party to obtain or disclose any information with respect to the Guaranteed Obligation, the financial condition or prospects of the Borrower, the ability of the Borrower to pay or perform the Guaranteed Obligation, the existence, perfection, priority or enforceability of any collateral security for any or all of the Guaranteed Obligation, the existence or enforceability of any other guarantees of all or any part of the Guaranteed Obligation, any action or non-action on the part of the Guaranteed Parties, the Borrower or any other Person, or any other event, occurrence, condition or circumstance whatsoever.

13.    Any invalidity or unenforceability of any provision or application of this Guaranty shall not affect other lawful provisions and applications hereof, and to this end the provisions of this Guaranty are declared to be severable.  The liability of Guarantor under this Guaranty is in addition to and shall be cumulative with all other liabilities of the Guarantor to the Guaranteed Parties, as guarantor of the Guaranteed Obligation, without any limitation as to amount, unless the instrument or agreement evidencing or creating such other liability specifically provides to the contrary.

14.    Any demand for payment on this Guaranty or any other notice required or desired to be given hereunder to the Guarantor shall be in writing (including, without limitation, notice by electronic mail ("*email*")) and shall be given to the Guarantor at his address or email address set forth on the signature page hereof, or to such other address or email address as either such party may hereafter specify by notice to the Guaranteed Parties given by courier, by United States certified or registered mail, postage prepaid, by telecopy or by other telecommunication device capable of creating a written record of such notice and its receipt.  Each such notice, request or other communication shall be effective (a) if given by email or telecopier, when such email or telecopy is transmitted to the email address or telecopier number specified in this Section and a

confirmation of such telecopy has been received by the sender, (b) if given by mail, five (5) days after such communication is deposited in the mail, postage prepaid, certified or registered with return receipt requested, addressed as aforesaid, or (c) if given by any other means, when delivered at the addresses specified in this Section.

15.    All payments to be made by Guarantor hereunder shall be made in immediately available and freely transferable funds at the place of payment specified by the applicable Guaranteed Party, all such payments to be paid without set-off, counterclaim or reduction and without deduction for, and free from, any and all present or future taxes, levies, imposts, duties, fees, charges, deductions, withholding or liabilities with respect thereto or any restrictions or conditions of any nature.  If a Guarantor is required by law to make any deduction or withholding on account of any tax or other withholding or deduction from any sum payable by such Guarantor hereunder, such Guarantor shall pay any such tax or other withholding or deduction and shall pay such additional amount necessary to ensure that, after making any payment, deduction or withholding, the Guaranteed Parties shall receive and retain (free of any liability in respect of any payment, deduction or withholding) a net sum equal to what they would have received and so retained hereunder had no such deduction, withholding or payment been required to have been made.

16.    Any one or more of the following shall constitute an event of default (a "*Guaranty Default*") under this Guaranty (whatever the reason for such event and whether it shall be voluntary or involuntary or be affected by operation of law or pursuant to any judgment, decree or order of any court or any order, rule or regulation of any administrative or governmental body) and the continuance of such default or breach for a period of 30 days after there has been given, by registered or certified mail, postage prepaid, to the Guarantor by the Trustee a written notice specifying such default or breach and requiring it to be remedied and stating that such notice is a "notice of default" hereunder:

(i) default in the performance, or breach, of any covenant or warranty of Guarantor in this Guaranty (other than a covenant or warranty, a default in the performance or breach of which is elsewhere in this Section specifically dealt with); or

(ii) failure by the Guarantor to pay any of any sums when due under this Guaranty or to cause the completion of the Project as guaranteed in Section 2; or

(iii) if Guarantor has become insolvent or makes a general assignment for the benefit of creditors, or any case, proceeding or other action under any existing or future Debtor Relief Law shall be filed or commenced by, against or in respect of Guarantor, or if Guarantor should at any time liquidate, dissolve, wind up his affairs or cease doing business, or contest, cancel or otherwise terminate his respective obligations under this Guaranty.

17.    If a Guaranty Default exists, any and all obligations of the Guarantor shall, at the option of the Trustee, forthwith become due without notice or other action of any kind by the Trustee, and the Trustee may proceed, to protect its rights and the rights of the Bondholders by suit in equity, action at law or other appropriate proceedings, whether for the specific performance of any covenant or agreement of the Guarantor herein contained or in aid of the exercise of any

power or remedy granted to the Trustee under the other Bond Documents, provided, that if any case, proceeding or other action under any existing or future Debtor Relief Law (hereinafter defined) shall be filed or commenced by, against or in respect of the Guarantor, the obligations of the Guarantor shall forthwith be due and performable, without notice or other action of any kind by the Trustee. The Trustee may proceed directly against Guarantor hereunder without resorting to any other remedies which it may have and without proceeding against any other security held by the Trustee. "*Debtor Relief Law*" means the Bankruptcy Code under Title 11 of the United States Code and all other liquidation, bankruptcy, assignment for the benefit of creditors, conservatorship, moratorium, receivership, insolvency, rearrangement, reorganization or similar debtor relief laws of the United States or other applicable jurisdictions in effect from time to time.

All payments received from the Borrower or Guarantor or on account of the Guaranteed Obligation from whatsoever source shall be taken and applied as payment in gross, and this Guaranty shall apply to and secure any ultimate balance that shall remain owing to the Guaranteed Parties.

18.   The ability of any Beneficial Owner of any Bond to institute any proceeding, judicial or otherwise, under or with respect to this Guaranty, shall be subject to the limitations on such Owner to institute any such proceeding upon an Event of Default under the Indenture as if such limitations applied to this Guaranty, *mutatis mutandis*, it being understood and intended, however, that no one or more Beneficial Owners of Bonds shall have any right in any manner whatever by virtue of, or by availing, any provision of this Guaranty to affect, disturb or prejudice the rights of any other Beneficial Owners of Outstanding Bonds, or to obtain or to seek to obtain priority or preference over any other Beneficial Owners or to enforce any right under this Guaranty.

19.   In the event Guarantor should default under any of the provisions of this Guaranty and the Trustee (in its own name or in the name and on behalf of the Bondholders) should employ attorneys or incur other expenses for the collection of any payments due hereunder or the enforcement of performance or observance of any agreement or covenant on the part of Guarantor herein contained, including, without limitation, in any bankruptcy, reorganization, receivership or other proceedings affecting creditors' rights and involving a claim under this Guaranty, such expenses shall constitute Guaranty Collection Costs and the Guarantor will on demand therefor pay to the Trustee the reasonable fees and expenses of such attorneys and such other expenses so incurred, in addition to all other amounts due hereunder.

20.   Before any judgment or decree for payment of money due hereunder has been obtained, the Trustee may by written notice delivered to the  Guarantor, waive any past default hereunder and its consequences.

Upon any such waiver, such default shall cease to exist, and any Guaranty Default arising therefrom shall be deemed to have been cured, for every purpose of this Guaranty and the Indenture; but no such waiver shall extend to any subsequent or other default or impair any right consequent thereon.

WALTZ GUARANTY

21.   If any agreement contained in this Guaranty should be breached by Guarantor and thereafter waived by the Trustee, such waiver shall be limited to the particular breach so waived and shall not be deemed to waive any other breach hereunder.

22.   All rights, remedies and powers provided by this Guaranty may be exercised only to the extent the exercise thereof does not violate any applicable provision of law in the premises, and all the provisions of this Guaranty are intended to be subject to all applicable mandatory provisions of law which may be controlling in the premises and to be limited to the extent necessary so that they will not render this Guaranty invalid or unenforceable.

23.   THE CONTRACTUAL AND OTHER GENERAL AGREEMENTS EVIDENCED BY THIS GUARANTY WILL BE GENERALLY GOVERNED AND CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE STATE OF TEXAS; *PROVIDED, HOWEVER*, TO THE EXTENT THAT ANY OF SUCH LAWS MAY NOW OR HEREAFTER BE PREEMPTED BY FEDERAL LAW, SUCH FEDERAL LAW SHALL SO GOVERN AND BE CONTROLLING. THE PARTIES AGREE THAT ANY DISPUTE ARISING UNDER THIS GUARANTY SHALL BE RESOLVED EXCLUSIVELY IN THE STATE AND FEDERAL COURTS IN THE STATE OF TEXAS. GUARANTOR HEREBY APPOINTS STEVEN A FLECKMAN, NORTHPOINT CENTRE I, 6836 AUSTIN CENTER BLVD., SUITE 270, AUSTIN, TEXAS 78731 AS AGENT FOR SERVICE OF PROCESS IN TEXAS. SUCH APPOINTMENT SHALL BE IRREVOCABLE UNTIL A SUCCESSOR SHALL HAVE BEEN APPOINTED AS GUARANTOR'S AGENT AND SUCH SUCCESSOR SHALL HAVE ACCEPTED THE APPOINTMENT. GUARANTOR AGREES THAT IT WILL AT ALL TIMES MAINTAIN AN AUTHORIZED AGENT TO RECEIVE SERVICE IN THE STATE OF TEXAS. THE FAILURE OF THE AUTHORIZED AGENT TO GIVE GUARANTOR NOTICE OF THE SERVICE OF ANY PROCESS SHALL NOT AFFECT THE VALIDITY OF ANY PROCEEDING BASED ON THAT PROCESS OR ANY JUDGMENT OBTAINED PURSUANT TO IT. NOTHING HEREIN SHALL AFFECT THE RIGHT OF THE GUARANTEED PARTIES TO BRING ANY ACTION OR PROCEEDING AGAINST A GUARANTOR OR WITH RESPECT TO ANY A GUARANTOR'S PROPERTY IN COMPETENT COURTS IN OTHER JURISDICTIONS. This Guaranty and every part thereof shall be effective upon delivery to the Guaranteed Parties, without further act, condition or acceptance by the Guaranteed Parties, shall be binding upon the Guarantor and upon his legal representatives, successors, and assigns, and shall inure to the benefit of the Guaranteed Parties, their successors, legal representatives, and assigns. The Guarantor waives notice of the Guaranteed Parties' acceptance hereof. This Guaranty may be executed in counterparts and by different parties hereto on separate counterpart signature pages, each of which shall be an original but all together to be one and the same instrument. The execution and transmittal of this Guaranty by facsimile transmission or e-mail shall be of the same binding effect as a handwritten execution original copy of this Guaranty.

24.   GUARANTOR HEREBY AGREES NOT TO ELECT A TRIAL BY JURY OF ANY ISSUE TRIABLE OF RIGHT BY JURY, AND WAIVES ANY RIGHT TO TRIAL BY JURY FULLY TO THE EXTENT THAT ANY SUCH RIGHT SHALL NOW OR HEREAFTER EXIST WITH REGARD TO THIS GUARANTY, OR ANY CLAIM, COUNTERCLAIM OR OTHER ACTION ARISING IN CONNECTION THEREWITH. THIS WAIVER OF RIGHT TO TRIAL BY JURY IS GIVEN KNOWINGLY AND VOLUNTARILY BY GUARANTOR, AND IS INTENDED TO ENCOMPASS DISCRETELY EACH INSTANCE AND EACH ISSUE AS TO WHICH THE RIGHT TO A TRIAL BY JURY WOULD OTHERWISE ACCRUE. THE GUARANTEED PARTIES ARE HEREBY AUTHORIZED TO FILE A COPY OF THIS PARAGRAPH IN ANY PROCEEDING AS CONCLUSIVE EVIDENCE OF THIS WAIVER BY THE GUARANTOR.

WALTZ GUARANTY

[SIGNATURE PAGE TO FOLLOW]

WALTZ GUARANTY

*ACTIVE 64039223v4*

IN WITNESS WHEREOF, the Guarantor has caused this Guaranty Agreement to be executed and delivered as of the date first above written.

"GUARANTOR"

STEFFEN WALTZ

_____

Address:
1301 West 25 Street, Suite 510
Austin, Texas 78705
512 600 8080
sewaltz@dominionadvisors.com

Accepted and agreed as of the date first above written.

THE HUNTINGTON NATIONAL BANK, as Trustee

By _____
    Name _____
    Title _____

Address:

Corporate Trust MI-231
40 Pearl Street, NW
Grand Rapids, Michigan 49503
Attention: Patrick J. O'Donnell, Vice President
Facsimile Number: (877) 377-6318
Email: Patrick.j.odonell@huntington.com

COMPLETION GUARANTY IN BANKRUPTCY CASE

THE STATE OF TEXAS
CIVIL CITATION
CASE NO.471-00252-2022

*CAH 3/29/22 @
8:07AM*

TRTX Properties, LLC; and JMJ Development, LLC
vs. Richard Shaw, Roger Sefzik, Hoss Holdings,
LLC, Park Vista Seniors, LLC, FM 544 Park Vista
LTD, Pavist LLC, North/South Building, LLC,
BSPV-Plano, LLC, GW Equity Capital, LLC, Tower
98, LLC, BOS Trust, RP Shaw Investments, LLC

In the 471st District Court

Of Collin County, Texas

NOTICE TO DEFENDANT: "You have been sued. You may employ an attorney. If you or your attorney
do not file a written answer with the clerk who issued this citation by 10:00 a.m. on the Monday next
following the expiration of twenty days after you were served this citation and petition, a default judgment
may be taken against you. In addition to filing a written answer with the clerk, you may be required to make
initial disclosures to the other parties of this suit. These disclosures generally must be made no later than 30
days after you file your answer with the clerk. Find out more at TexasLawHelp.org."

TO:  GW Equity Capital, LLC, Registered Agent Steffen E Waltz, 1301 W 25th Street Suite 510, Austin TX
78705, Defendant

GREETINGS: You are commanded to appear by filing a written answer to **Plaintiff's Original Petition** at
or before ten o'clock A.M. on the Monday next after the expiration of twenty days after the date of service of
this citation before the Honorable 471st District Court of Collin County, Texas at the Courthouse of said
County in McKinney, Texas.

Said Plaintiff's Petition was filed in said court, by Wvance McMurry  McMurry Law PLLC  508 W Lookout
Suite 14-74  Richardson TX 75240 (Attorney for Plaintiff or Plaintiffs), on  January 18, 2022, in this case,
numbered 471-00252-2022 on the docket of said court.

The natures of Plaintiff's demand is fully shown by a true and correct copy of **Plaintiff's Original Petition**
accompanying this citation and made a part hereof.

Issued and given under my hand and seal of said Court at McKinney, Texas, on this the 23rd day of March,
2022.

ATTEST: Lynne Finley, District Clerk
Collin County, Texas
Collin County Courthouse
2100 Bloomdale Road
McKinney, Texas 75071
972-548-4320, Metro 972-424-1460 ext. 4320

By: _____, Deputy
Paula Bishop

**The law prohibits the Judge and the clerks from giving legal advice, so please do not seek legal advice.
Any questions you have should be directed to an attorney.**

Filed: 1/18/2022 12:00 AM
Lynne Finley
District Clerk
Collin County, Texas
By Suzanne Rogers Deputy
Envelope ID: 60870805

CAUSE NO. _471-00252-2022_

| | | |
|---|---|---|
| TRTX Properties, LLC; and | § | IN THE DISTRICT COURT |
| JMJ Development, LLC, | § | |
| | § | |
| Plaintiffs | § | |
| | § | |
| **vs.** | § | |
| | § | |
| Richard Shaw, Roger Sefzik | § | |
| Hoss Holdings, LLC, | § | ___ JUDICIAL DISTRICT |
| Park Vista Seniors, LLC, | § | |
| FM 544 Park Vista Ltd, Pavist LLC, | § | |
| North/South Building, LLC, | § | |
| BSPV-Plano, LLC, | § | |
| GW Equity Capital, LLC | § | |
| Tower 98, LLC, BOS Trust, | § | |
| RP Shaw Investments, LLC | § | |
| | § | |
| Defendants | § | COLLIN COUNTY, TEXAS |

## PLAINTIFFS' ORIGINAL PETITION

NOW COMES, TRTX Properties, LLC and JMJ Development, LLC (collectively, "**Plaintiffs**") and file this their Plaintiffs' Original Petition complaining of Richard Shaw, Roger Sefzi; Hoss Holdings, LLC; Park Vista Seniors, LLC; FM 544 Park Vista Ltd, Pavist LLC; North/South Building, LLC; BSPV-Plano, LLC; GW Equity Capital, LLC; Tower 98, LLC, BOS Trust; and RP Shaw Investments, LLC (collectively, "**Defendants**"), and in support would respectfully show the Court the following:

### I.    DISCOVERY PLAN

1.      Plaintiffs intend to conduct discovery in this action under Level 3 pursuant to Rule 190.4 of the Texas Rules of Civil Procedure. Pursuant to Rule 47 of the Texas Rules of Civil Procedure, Plaintiffs state that they seek monetary relief over $1,000,000.

### II.    PARTIES

2.      Defendant Richard Shaw ("Shaw") is an individual who is a resident of Texas, may

be served with process at his office at the following address: 4851 Keller Springs Rd #209 Addison TX 75001 or 172774 Preston Road, Dallas, Texas 75252.

3.     Defendant FM 544 Park Vista Ltd, ("FM544") is a Texas limited partnership whose general partner is Pavist, LLC that is located at 4851 Keller Springs Rd #209 Addison TX 75001 and may be served through its registered agent Richard Shaw at the same address.

4.     Defendant Park Vista Seniors, LLC, ("PV Seniors") is a Texas limited partnership that is located at 4851 Keller Springs Rd #209 Addison TX 75001 and may be served through its registered agent Richard Shaw at the same address.

5.     Defendant Pavist, LLC ("Pavist") is a Texas limited liability company that is located at 4851 Keller Springs Rd #209 Addison TX 75001 whose manager is Richard Shaw and may be served through its registered agent Richard Shaw at the same address.

6.     Defendant Roger Sefzik ("Sefzik") is an individual who is a resident of Washington and may be served with process at 7161 Valley View Rd., Ferndale, Washington 98248.

7.     Defendant BOS Trust ("BOS Trust") is a Texas Trust located at 4851 Keller Springs Road #209, Addison, Texas 75001.

8.     Defendant GW Equity Capital, LLC ("GW Equity") is Teas Limited Liability Company, located at 1301 W. 25th Street, Suite 510, Austin, Teas 78705 and may be served with process through its registered agent Steffen E. Waltz at the same address.

9.     Defendant Hoss Holdings, LLC ("Hoss Holdings") is a Texas limited liability company which maintains an address at 7161 Valley View Rd., Ferndale, Washington 98248 which may be served through its registered agent William Sefsik at 14 Edgemere Dr. Garland, Texas 75043.

10.     Defendant Tower 98, LLC ("Tower 98") is a New Mexico limited liability

company, that has an address at 7161 Valley View Rd., Ferndale, Washington, 98248 which may be served through its registered agent Bill Chappell Jr 7411 Jefferson Street NE. Suite A. Albuquerque, NM 87109.

11.     Defendant North/South Building, LLC ("North/South") is a Texas limited liability company that is located at 4851 Keller Springs Rd #209 Addison TX 75001 and may be served through its registered agent R. Shaw 7103 Preston Rd. Ste 250. Dallas, Texas 75248

12.     Defendant BSPV-Plano LLC ("BSPV") is a Texas limited liability company that is located at 4851 Keller Springs Rd #209 Addison TX 75001 and may be served through its registered agent AMPRO Investments, Inc. at 1301 West 25th Street Ste 510, Austin, Texas 78705.

13.     Defendant RP Shaw Investments, LLC ("RP Shaw") is a Texas limited liability company that is located at 4851 Keller Springs Rd #209 Addison TX 75001 and is the manager or managing member of RP Shaw and may be served through its registered agent Richard Shaw at 17774 Preston Road. Dallas, Texas 75252.

14.     TRTX Properties, LLC ("**TRTX**"), is a Texas limited liability company that maintains an office at 1755 Wittington Place, Suite 340, Dallas, Texas 75234.

15.     Plaintiff JMJ Development, LLC ("**JMJ**"), is a Texas limited liability company that maintains an office at 1755 Wittington Place, Suite 340, Dallas, Texas 75234.

### III.     JURISDICTION AND VENUE

16.     Venue is mandatory in Collin County, Texas as this suit is related to and for the recovery of real property located in Collin County, Texas and is further proper in Collin County, Texas because certain agreements made the basis of this lawsuit were performed, to be performed, and/or executed in Collin County, Texas, certain conduct complained of occurred in Collin County.

17.     The Court has jurisdiction over the parties and the subject matter of this controversy, the Defendants conduct business and/or maintain offices in Collin County, Texas, and the damages sought are within the jurisdictional limits of the Court.

### IV.     FACTUAL BACKGROUND

18.     Shaw is the manager and member in certain Defendant entities and/or controls such entities either directly or indirectly including not limited to FM544, Pavist, PV Seniors, BSPV, North/South, and RP Shaw ("Shaw Parties").

19.     This case stems from a prior conflict between David Ramolia ("**Ramolia**") and certain Shaw Parties and their related entities   (collectively "**Shaw Parties**") regarding Ramolia's claimed rights related to 31.5 acres of land located in Plano, Collin, County Texas ("**Property**") which was owned by FM544 upon which a 318 unit senior housing apartment complex was planned to be developed ("**Project**").  The Property included a 7.19 acre tract which Ramolia had conveyed to Shaw Parties as part of a supposed agreement between them in which Ramolia would be given an interest in the overall ownership entity that would develop a senior living facility on the Property and/or profit participation interests in the Project.

20.     Shortly thereafter, Shaw Parties negotiated and entered into certain agreements with Plaintiffs regarding the sale and development of the Project without disclosing the conflict between Shaw and Ramolia.

21.     This led to two lawsuits being filed against Shaw Parties in the state courts of Collin County, Texas, one by Plaintiff JMJ and the other by Ramolia.

22.     In response, a voluntary Chapter 11 bankruptcy petition ("BK Petition") was filed on behalf of FM 544 on November 7, 2017.   The BK Petition was filed under the putative authority of Shaw, in his alleged role as the Manager of Pavist which Shaw alleged was the General Partner

of the FM544. Pavist subsequently filed its own Chapter 11 bankruptcy petition, and the Court ordered the Debtor's case jointly administered with Pavist's case.

23.    During the course of the bankruptcy case, the parties therein including the Shaw Parties, Plaintiffs, and Ramolia entered into settlement agreement and multiple ancillary agreements as part of an overall global settlement attempting to resolve their disputes, including the lawsuits asserted by Defendant and Plaintiffs JMJ and its president Tim Barton ("Barton") against certain Shaw Parties (collectively, "**Settlement**").

24.    As part of the Settlement and ancillary agreements, Plaintiff TRTX would be made members in PV Seniors; and Plaintiffs would acquire the Property through PV Seniors (including any claimed interests of Ramolia related to the Property and Ramolia's claimed ownership interests in the FM544 which owned the Property), in order to develop the Project, and Plaintiffs would release their claims against the Shaw Parties.

25.    The ancillary agreements to the Settlement included (a) an Operating Agreement of PV Seniors (the "PV Seniors-Constituting Document"), pursuant to which Shaw agreed to make Barton President of the PV Seniors, empowered to manage the PV Senior's daily operations, with specified exceptions requiring either the approval of all the PV Senior's members or of Barton and Shaw's designees; (b) a Contract of Purchase and Sale (the "Sale Document"), through which the PV Seniors would purchase the Property; (c) an Agreement Between Owner and Consultant ("Construction Document") approved in the PV Seniors-Constituting Document, which appointed Lajolla Construction Management, LLC to "manage the design and construction" of the PV Senior's project on the Sole Asset after closing; and (d) a Development Fee Agreement (the "Development Fee Document") (collectively, "Ancillary Agreements" with the Settlement and Ancillary Agreements being collectively referred to below as the "Settlement"). The Ancillary

Agreements self-refer between themselves repeatedly, including: (a) the PV Seniors-Constituting Document, alone, authorizing Barton to sign the Sale Document, the Construction Document, and the Development Fee Document on behalf of the PV Seniors; (b) the PV Seniors-Constituting Document affirmatively approving both the Construction Document and the Development Fee Document, and denying Barton, the PV Seniors' President, the authority to alter either without the approval of all the PV Seniors' members; and (c) the Settlement Document affirmatively stating that the "Settling Parties have prepared [the Sale Document], through which [the PV Seniors was to] purchase the [Property], so consummating the Sale subject to the [FM544] Sale Motion. The Settling Parties shall execute this Agreement in connection with the Sale and other contemporaneously executed documents."

26.     Despite entering into the Settlement and his negotiation of both the Construction Document and the PV Seniors-Constituting Document that shielded it from alteration (as well as his fiduciary obligations to the PV Seniors), the Shaw Parties refused to turn over to Plaintiffs (a) any documentation of the construction plans for the Sole Asset; and (b) any documentation of the associated costs and contracts he had previously negotiated for development of the Property (through North/South). Instead of producing such documents, Shaw Parties simply "went dark" and refused to respond to communications from Barton and the PV Seniors for weeks, breached the Sale Document, and failed to close thereunder or perform any other obligations under the Settlement and the Ancillary Agreements.

27.     Shortly after Defendants' failure to close on the Sale Document the bankruptcy terminated Sale Document and the sale of the Property to Plaintiffs and the bankruptcy court after which Shaw sold the Property to Hoss Holdings, LLC

28.     Despite Shaw Parties' breaches and failure to perform under the Settlement and

Ancillary Agreements resulting in Plaintiffs' loss of the Property and including certain related rights, the bankruptcy court upheld the releases contained in the Settlement, including Plaintiffs' (JMJ and Barton) releases of Shaw, while acknowledging that certain legal claims could end up being asserted between the parties resulting from their conduct, including as related to the Settlement and the Ancillary Agreements.

29.     After the termination of the Sale Document, FM544 entered into a contract to sell the Property to "Hoss Holdings, LLC and or assigns" for $4.9 million which on information and belief Sefzik has ownership in or controls, either directly or indirectly.

30.     The Property was conveyed to Defendants BOS Trust, GW Equity Capital, LLC; Hoss Holdings, LLC; Tower 98, LLC; and Roger Sefzik who were apparently the assigns of Hoss Holdings, LLC as described in the Special Warranty Deed recorded in the real property records of Collin County, Texas on April 5, 2018 as document 20180405000421630.  ("Current Owners") Thereafter certain interests in the Property owned by BOS Trust were conveyed to BSPV (with BSPV being included in "Current Owners" as used below.)

31.     Plaintiffs have suffered actual and compensatory damages as a result, including as measured by the value and equity in the Property, certain rights and compensation to be received under the Ancillary Agreements, and the value and income from the developed Project.

32.     Certain claims of Tim Barton, Lajolla Construction Management, LLC, and their related entities related to the foregoing have been assigned to Plaintiff TRTX.

## V.      CAUSES OF ACTION

### A.  Breach of Contract

33.     Plaintiffs incorporate the foregoing paragraphs herein by reference and allege that based on the foregoing, the Shaw Parties breached the Sale Document, Settlement, certain

Ancillary Agreements entered into by the parties thereto and as a result, Plaintiffs were damaged.

**B.  Tortious Interference (Prospective and Existing Contracts)**

34.    Plaintiffs incorporate the foregoing paragraphs herein by reference and allege that based on the foregoing, Shaw, Shaw Parties, and the Current Owners willfully and intentionally tortiously interfered with the contract to convey the Property to Plaintiffs and the Ancillary Agreements and/or prospective agreements and as a result, the Sale Document was terminated including the Ancillary Agreements prospective agreements resulting in Plaintiffs being damaged.

**C.  Fraud, Fraud by Nondisclosure, and Fraudulent Inducement**

35.    Plaintiffs incorporate the foregoing paragraphs herein by reference and allege that Defendant Shaw and Shaw Parties committed fraud when they made certain material representations related to the foregoing which were false with the intent that Plaintiffs act upon such representations including Plaintiffs' releasing certain claims, including those against Shaw and other parties under the Settlement and entering into the Settlement, including the contract to obtain the Property and Ancillary Agreements, which resulted in Plaintiffs being damaged.

36.    Plaintiffs incorporate the foregoing paragraphs herein by reference and allege that based on the foregoing, including certain false representations and promises made by Shaw Parties, Plaintiffs were fraudulently induced by Shaw and Shaw Parties to release certain claims, including those against Shaw and Defendant, and to enter into the Settlement, including the contract to obtain the Property and other ancillary agreements, which resulted in Plaintiffs being damaged.

37.    Plaintiffs incorporate the foregoing paragraphs herein by reference and allege that based on the foregoing that Shaw Parties failed to disclose certain material facts to Plaintiffs related to the Property,  agreements and potential transactions involving the Current Owners as related to the  Property, the Settlement including the Ancillary Agreements, the claimed his relationship with

Ramolia and/or certain other parties involved in the bankruptcy case and Settlement, and/or his intent related to the foregoing and that Shaw Parties intended Plaintiffs, who relied on such nondisclosures to take certain action as a result, including entering into the Settlement and certain ancillary agreements, and as a result Plaintiffs were damaged.

### D.  Negligent Misrepresentation

38.    Plaintiffs incorporate the foregoing paragraphs herein by reference and allege in the alternative to the claims made in section C that Shaw Parties negligently made certain misrepresentations to Plaintiffs which were false which Plaintiffs relied on which resulted in Plaintiffs being damaged.

### E.  Statutory Fraud (Tex. Bus. & Com. Code §27.01)

39.    Plaintiffs incorporate the foregoing paragraphs herein by reference and allege that based on the foregoing and further assert that Defendants committed statutory fraud under Tex. Bus. & Com. Code §27.01 in a series of transactions involving real estate and involving interests in a company because he made certain false representations of a material fact in order to induce Plaintiffs into entering into the Settlement including certain ancillary agreements which involved both the transfer of the Property and his claimed interests in the ownership company of such Property to Plaintiffs in exchange for Plaintiffs entering into the Settlement and releasing certain claims related to such Property and related interests that were relied on by Plaintiffs and/or because Defendants made false promises to do certain acts and such promises were material, made with the intention of not fulfilling them, made to Plaintiffs for the purpose of inducing Plaintiffs into releasing certain claims and entering into the Settlement and certain Ancillary Agreements, and which were relied on by Plaintiffs.

40.    Furthermore, such fraud is a false, misleading, or deceptive act or practice under

---

Tex. Bus. & Com. Code §17.46(b) and as such, Plaintiffs seek to recover any additional remedies available thereunder.

### F.  Conspiracy

41.    Plaintiffs incorporate the foregoing paragraphs herein by reference and allege Defendants conspired among one another to commit fraud, fraud by nondisclosure, fraudulent inducement, statutory fraud, tortiously interfere with the agreements described above in order to deprive Plaintiffs of the Property and the development of the Project and benefit of the Settlement and Ancillary Agreements.

### G.  Piercing the Veil

42.    Plaintiffs incorporate the foregoing paragraphs herein by reference and allege and seek to pierce the veil of the Defendant entities.    Section 21.223 of the Texas Business Organizations Code states the following:

> § 21.223. Limitation of Liability for Obligations
> (a) A holder of shares, an owner of any beneficial interest in shares, or a subscriber for shares whose subscription has been accepted, or any affiliate of such a holder, owner, or subscriber of the corporation, may not be held liable to the corporation or its obligees with respect to:
> (1) the shares, other than the obligation to pay to the corporation the full amount of consideration, fixed in compliance with sections 21.157-21.162, for which the shares were or are to be issued;
> (2) any contractual obligation of the corporation or any matter relating to or arising from the obligation on the basis that the holder, beneficial owner, subscriber, or affiliate is or was the alter ego of the corporation or on the basis of actual or constructive fraud, a sham to perpetrate a fraud, or other similar theory [italics added]; or
> (3) any obligation of the corporation on the basis of the failure of the corporation to observe any corporate formality, including the failure to:
> (A) comply with this code or the articles of incorporation or bylaws of the corporation; or
> (B) observe any requirement prescribed by this code or the articles of incorporation or bylaws of the corporation for acts to be taken by the corporation or its directors or shareholders.
> (b) Subsection (a)(2) does not prevent or limit the liability of a holder, beneficial owner, subscriber, or affiliate if the obligee demonstrates that the holder, beneficial owner, subscriber, or affiliate caused the corporation to be used for the purpose of perpetrating and did perpetrate an actual fraud on the obligee primarily for the direct personal benefit of the holder, beneficial owner, subscriber, or affiliate.

43.      This section of the code may also be used to pierce veil of a limited liability company with respect to an entity's contractual liability where the entity is used by a member or manager to perpetrate a fraud for a defendant's personal benefit. *Shook v. Walden*, 368 S.W.3d 604, 607 (Tex.App.-Austin 2012, pet. denied). As such, the court should pierce the veil of the Defendant entities in order to assert personal liability onto its members and partners.

## VI.      REQUEST FOR DISCLOSURES

44.      Plaintiffs serve this Request for Disclosure to Defendant pursuant to Tex. R. Civ. P. §194 and requests such Defendants serve their responses within 50 days following service of this Original Petition.

## VII.      ATTORNEYS' FEES

45.      Plaintiffs seek the recovery of their attorneys' fees. In connection with pursuing the causes of action asserted herein, Plaintiffs have employed the undersigned counsel to represent them in this lawsuit and have agreed to pay a reasonable and necessary fee for those services. Plaintiffs are entitled to recover the reasonable attorneys' fees incurred as a result of pursuing the action herein through the trial of this cause and contingent awards in the event of appeals including as provided under section 38.001 of the Texas Civil Practice and Remedies Code.

## VIII.      SPECIFIC PERFORMANCE

46.      Plaintiffs seek to enforce specific performance under the Sale Document for the acquisition of the Property in addition to any other available remedies under the Sale Document and other causes of action asserted herein.

## IX.      PRAYER

47.      In light of the forgoing, Plaintiffs request that:

a)      Defendants be cited to appear and answer;

b)      Upon final hearing hereof, Plaintiffs be granted specific performance under the Sale Document and be awarded judgment for actual damages as well as certain exemplary and compensatory damages including as provided under Tex. Bus. & Com. Code §17.46(b);

c)      Plaintiffs recover reasonable attorneys' fees and contingent awards in the event of appeal; and

d)      for any such other and further relief, at law or in equity, to which Plaintiffs may show itself to be justly entitled.

DATED: December 31, 2021

Respectfully submitted,

By: /s/ Vance McMurry
W. Vance McMurry
State Bar No. 24047198
MCMURRY LAW, PLLC
508 W. Lookout, Suite 14-74
Richardson, Texas 75240
Telephone:  (972) 746-9656
Facsimile:   (888) 388-0561
vance@mcmurrylegal.com

**ATTORNEY FOR PLAINTIFFS**

## Schedule A

### Bond Covenants

### Loan Agreement Covenants

Section 2.2(b) (relating to compliance with Borrower's Organization Documents and Bond Documents)

Section 2.2(e) (relating to tax-exempt nature of the Bonds)

Section 2.2(f) (relating to construction of the Project in accordance with law and other regulations)

Section 2.2(h) (relating to providing information to the Issuer)

Section 2.3 (relating to SPE covenants)

Section 2.5 (relating to Special Arbitrage Certifications)

Section 2.6 (relating to Tax Exempt Status of the Bonds)

Section 2.7 (relating to Regulatory Agreement)

Section 2.8 (relating to Tax Exempt Status of the Bonds)

Section 3.10 (relating to Covenants Regarding Title)

Section 4.9 (relating to payment of Taxes and Impositions)

Section 4.10 (relating to payment of Utilities)

Section 4.11 (relating to Hazardous Waste Covenant)

Section 5.1 (relating to Insurance)

**Error! No document variable supplied.**" = "1" "" ""
*ACTIVE 63971349v8*

4854-6541-3660v.1 020783.00001